clays, OL or OH. Correlations between the dilatancy, dry strength, toughness tests, and laboratory tests can be made to identify organic soils in certain deposits of similar materials of known geologic origin.

14.9 If the soil is estimated to have 15 to 25 % sand or gravel, or both, the words "with sand" or "with gravel" (whichever is more predominant) shall be added to the group name. For example: "lean clay with sand, CL" or "silt with gravel, ML" (see Fig. 1a and Fig. 1b). If the percentage of sand is equal to the percentage of gravel, use "with sand."

14.10 If the soil is estimated to have 30 % or more sand or gravel, or both, the words "sandy" or "gravelly" shall be added to the group name. Add the word "sandy" if there appears to be more sand than gravel. Add the word "gravelly" if there appears to be more gravel than sand. For example: "sandy lean clay, CL", "gravelly fat clay, CH", or "sandy silt, ML" (see Fig. 1a and Fig. 1b). If the percentage of sand is equal to the percent of gravel, use "sandy."

## 15. Procedure for Identifying Coarse-Grained Soils (Contains less than 50 % fines)

15.1 The soil is a *gravel* if the percentage of gravel is estimated to be more than the percentage of sand.

15.2 The soil is a *sand* if the percentage of gravel is estimated to be equal to or less than the percentage of sand.

15.3 The soil is a *clean gravel* or *clean sand* if the percentage of fines is estimated to be 5 % or less.

15.3.1 Identify the soil as a *well-graded gravel*, GW, or as a *well-graded sand*, SW, if it has a wide range of particle sizes and substantial amounts of the intermediate particle sizes.

15.3.2 Identify the soil as a *poorly graded gravel*, GP, or as a *poorly graded sand*, SP, if it consists predominantly of one size (uniformly graded), or it has a wide range of sizes with some intermediate sizes obviously missing (gap or skip graded).

15.4 The soil is either a *gravel with fines* or a *sand with fines* if the percentage of fines is estimated to be 15 % or more.

15.4.1 Identify the soil as a *clayey gravel*, GC, or a *clayey sand*, SC, if the fines are clayey as determined by the procedures in Section 14.

15.4.2 Identify the soil as a *silty gravel*, GM, or a *silty sand*, SM, if the fines are silty as determined by the procedures in Section 14.

15.5 If the soil is estimated to contain 10 % fines, give the soil a dual identification using two group symbols.

15.5.1 The first group symbol shall correspond to a clean gravel or sand (GW, GP, SW, SP) and the second symbol shall correspond to a gravel or sand with fines (GC, GM, SC, SM).

15.5.2 The group name shall correspond to the first group symbol plus the words "with clay" or "with silt" to indicate the plasticity characteristics of the fines. For example: "well-graded gravel with clay, GW-GC" or "poorly graded sand with silt, SP-SM" (see Fig. 2).

15.6 If the specimen is predominantly sand or gravel but contains an estimated 15 % or more of the other coarse-grained constituent, the words "with gravel" or "with sand" shall be added to the group name. For example: "poorly graded gravel with sand, GP" or "clayey sand with gravel, SC" (see Fig. 2).

15.7 If the field sample contains any cobbles or boulders, or both, the words "with cobbles" or "with cobbles and boulders" shall be added to the group name. For example: "silty gravel with cobbles, GM."

## 16. Report

16.1 The report shall include the information as to origin, and the items indicated in Table 13.

NOTE 13—*Example: Clayey Gravel with Sand and Cobbles, GC*—About 50 % fine to coarse, subrounded to subangular gravel; about 30 % fine to coarse, subrounded sand; about 20 % fines with medium plasticity, high dry strength, no dilatancy, medium toughness; weak reaction with HCl; original field sample had about 5 % (by volume) subrounded cobbles, maximum dimension, 150 mm.

In-Place Conditions—Firm, homogeneous, dry, brown

Geologic Interpretation—Alluvial fan

NOTE 14—Other examples of soil descriptions and identification are given in Appendix X1 and Appendix X2.

NOTE 15—If desired, the percentages of gravel, sand, and fines may be stated in terms indicating a range of percentages, as follows:

*Trace*—Particles are present but estimated to be less than 5 %
*Few*—5 to 10 %
*Little*—15 to 25 %
*Some*—30 to 45 %
*Mostly*—50 to 100 %

16.2 If, in the soil description, the soil is identified using a classification group symbol and name as described in Test Method D 2487, it must be distinctly and clearly stated in log forms, summary tables, reports, and the like, that the symbol and name are based on visual-manual procedures.

## 17. Precision and Bias

17.1 This practice provides qualitative information only, therefore, a precision and bias statement is not applicable.

## 18. Keywords

18.1 classification; clay; gravel; organic soils; sand; silt; soil classification; soil description; visual classification

**TABLE 13 Checklist for Description of Soils**

1. Group name
2. Group symbol
3. Percent of cobbles or boulders, or both (by volume)
4. Percent of gravel, sand, or fines, or all three (by dry weight)
5. Particle-size range:
   Gravel—fine, coarse
   Sand—fine, medium, coarse
6. Particle angularity: angular, subangular, subrounded, rounded
7. Particle shape: (if appropriate) flat, elongated, flat and elongated
8. Maximum particle size or dimension
9. Hardness of coarse sand and larger particles
10. Plasticity of fines: nonplastic, low, medium, high
11. Dry strength: none, low, medium, high, very high
12. Dilatancy: none, slow, rapid
13. Toughness: low, medium, high
14. Color (in moist condition)
15. Odor (mention only if organic or unusual)
16. Moisture: dry, moist, wet
17. Reaction with HCl: none, weak, strong

*For intact samples:*

18. Consistency (fine-grained soils only): very soft, soft, firm, hard, very hard
19. Structure: stratified, laminated, fissured, slickensided, lensed, homogeneous
20. Cementation: weak, moderate, strong
21. Local name
22. Geologic interpretation
23. Additional comments: presence of roots or root holes, presence of mica, gypsum, etc., surface coatings on coarse-grained particles, caving or sloughing of auger hole or trench sides, difficulty in augering or excavating, etc.

## APPENDIXES

(Nonmandatory Information)

### X1. EXAMPLES OF VISUAL SOIL DESCRIPTIONS

X1.1 The following examples show how the information required in 16.1 can be reported. The information that is included in descriptions should be based on individual circumstances and need.

X1.1.1 *Well-Graded Gravel with Sand (GW)*—About 75 % fine to coarse, hard, subangular gravel; about 25 % fine to coarse, hard, subangular sand; trace of fines; maximum size, 75 mm, brown, dry; no reaction with HCl.

X1.1.2 *Silty Sand with Gravel (SM)*—About 60 % predominantly fine sand; about 25 % silty fines with low plasticity, low dry strength, rapid dilatancy, and low toughness; about 15 % fine, hard, subrounded gravel, a few gravel-size particles fractured with hammer blow; maximum size, 25 mm; no reaction with HCl (Note—Field sample size smaller than recommended).

*In-Place Conditions*—Firm, stratified and contains lenses of silt 1 to 2 in. (25 to 50 mm) thick, moist, brown to gray; in-place density 106 lb/ft$^3$; in-place moisture 9 %.

X1.1.3 *Organic Soil (OL/OH)*—About 100 % fines with low plasticity, slow dilatancy, low dry strength, and low toughness; wet, dark brown, organic odor; weak reaction with HCl.

X1.1.4 *Silty Sand with Organic Fines (SM)*—About 75 % fine to coarse, hard, subangular reddish sand; about 25 % organic and silty dark brown nonplastic fines with no dry strength and slow dilatancy; wet; maximum size, coarse sand; weak reaction with HCl.

X1.1.5 *Poorly Graded Gravel with Silt, Sand, Cobbles and Boulders (GP-GM)*—About 75 % fine to coarse, hard, subrounded to subangular gravel; about 15 % fine, hard, subrounded to subangular sand; about 10 % silty nonplastic fines; moist, brown; no reaction with HCl; original field sample had about 5 % (by volume) hard, subrounded cobbles and a trace of hard, subrounded boulders, with a maximum dimension of 18 in. (450 mm).

### X2. USING THE IDENTIFICATION PROCEDURE AS A DESCRIPTIVE SYSTEM FOR SHALE, CLAYSTONE, SHELLS, SLAG, CRUSHED ROCK, AND THE LIKE

X2.1 The identification procedure may be used as a descriptive system applied to materials that exist in-situ as shale, claystone, sandstone, siltstone, mudstone, etc., but convert to soils after field or laboratory processing (crushing, slaking, and the like).

X2.2 Materials such as shells, crushed rock, slag, and the like, should be identified as such. However, the procedures used in this practice for describing the particle size and plasticity characteristics may be used in the description of the material. If desired, an identification using a group name and symbol according to this practice may be assigned to aid in describing the material.

X2.3 The group symbol(s) and group names should be placed in quotation marks or noted with some type of distinguishing symbol. See examples.

X2.4 Examples of how group names and symbols can be incororated into a descriptive system for materials that are not naturally occurring soils are as follows:

X2.4.1 *Shale Chunks*—Retrieved as 2 to 4-in. (50 to 100-mm) pieces of shale from power auger hole, dry, brown, no reaction with HCl. After slaking in water for 24 h, material identified as "Sandy Lean Clay (CL)"; about 60 % fines with medium plasticity, high dry strength, no dilatancy, and medium toughness; about 35 % fine to medium, hard sand; about 5 % gravel-size pieces of shale.

X2.4.2 *Crushed Sandstone*—Product of commercial crushing operation; "Poorly Graded Sand with Silt (SP-SM)"; about 90 % fine to medium sand; about 10 % nonplastic fines; dry, reddish-brown, strong reaction with HCl.

X2.4.3 *Broken Shells*—About 60 % gravel-size broken shells; about 30 % sand and sand-size shell pieces; about 10 % fines; "Poorly Graded Gravel with Sand (GP)."

X2.4.4 *Crushed Rock*—Processed from gravel and cobbles in Pit No. 7; "Poorly Graded Gravel (GP)"; about 90 % fine, hard, angular gravel-size particles; about 10 % coarse, hard, angular sand-size particles; dry, tan; no reaction with HCl.

## X3. SUGGESTED PROCEDURE FOR USING A BORDERLINE SYMBOL FOR SOILS WITH TWO POSSIBLE IDENTIFICATIONS.

X3.1 Since this practice is based on estimates of particle size distribution and plasticity characteristics, it may be difficult to clearly identify the soil as belonging to one category. To indicate that the soil may fall into one of two possible basic groups, a borderline symbol may be used with the two symbols separated by a slash. For example: SC/CL or CL/CH.

X3.1.1 A borderline symbol may be used when the percentage of fines is estimated to be between 45 and 55 %. One symbol should be for a coarse-grained soil with fines and the other for a fine-grained soil. For example: GM/ML or CL/SC.

X3.1.2 A borderline symbol may be used when the percentage of sand and the percentage of gravel are estimated to be about the same. For example: GP/SP, SC/GC, GM/SM. It is practically impossible to have a soil that would have a borderline symbol of GW/SW.

X3.1.3 A borderline symbol may be used when the soil could be either well graded or poorly graded. For example: GW/GP, SW/SP.

X3.1.4 A borderline symbol may be used when the soil could either be a silt or a clay. For example: CL/ML, CH/MH, SC/SM.

X3.1.5 A borderline symbol may be used when a fine-grained soil has properties that indicate that it is at the boundary between a soil of low compressibility and a soil of high compressibility. For example: CL/CH, MH/ML.

X3.2 The order of the borderline symbols should reflect similarity to surrounding or adjacent soils. For example: soils in a borrow area have been identified as CH. One sample is considered to have a borderline symbol of CL and CH. To show similarity, the borderline symbol should be CH/CL.

X3.3 The group name for a soil with a borderline symbol should be the group name for the first symbol, except for:

CL/CH lean to fat clay
ML/CL clayey silt
CL/ML silty clay

X3.4 The use of a borderline symbol should not be used indiscriminately. Every effort shall be made to first place the soil into a single group.

## X4. SUGGESTED PROCEDURES FOR ESTIMATING THE PERCENTAGES OF GRAVEL, SAND, AND FINES IN A SOIL SAMPLE

X4.1 *Jar Method*—The relative percentage of coarse- and fine-grained material may be estimated by thoroughly shaking a mixture of soil and water in a test tube or jar, and then allowing the mixture to settle. The coarse particles will fall to the bottom and successively finer particles will be deposited with increasing time; the sand sizes will fall out of suspension in 20 to 30 s. The relative proportions can be estimated from the relative volume of each size separate. This method should be correlated to particle-size laboratory determinations.

X4.2 *Visual Method*—Mentally visualize the gravel size particles placed in a sack (or other container) or sacks. Then, do the same with the sand size particles and the fines. Then, mentally compare the number of sacks to estimate the percentage of plus No. 4 sieve size and minus No. 4 sieve size present. The percentages of sand and fines in the minus sieve size No. 4 material can then be estimated from the wash test (X4.3).

X4.3 *Wash Test (for relative percentages of sand and fines)*—Select and moisten enough minus No. 4 sieve size material to form a 1-in (25-mm) cube of soil. Cut the cube in half, set one-half to the side, and place the other half in a small dish. Wash and decant the fines out of the material in the dish until the wash water is clear and then compare the two samples and estimate the percentage of sand and fines. Remember that the percentage is based on weight, not volume. However, the volume comparison will provide a reasonable indication of grain size percentages.

X4.3.1 While washing, it may be necessary to break down lumps of fines with the finger to get the correct percentages.

## X5. ABBREVIATED SOIL CLASSIFICATION SYMBOLS

X5.1 In some cases, because of lack of space, an abbreviated system may be useful to indicate the soil classification symbol and name. Examples of such cases would be graphical logs, databases, tables, etc.

X5.2 This abbreviated system is not a substitute for the full name and descriptive information but can be used in supplementary presentations when the complete description is referenced.

X5.3 The abbreviated system should consist of the soil classification symbol based on this standard with appropriate lower case letter prefixes and suffixes as:

| Prefix: | Suffix: |
|---|---|
| s = sandy | s = with sand |
| g = gravelly | g = with gravel |
| | c = with cobbles |
| | b = with boulders |

X5.4 The soil classification symbol is to be enclosed in

parenthesis. Some examples would be:

| Group Symbol and Full Name | Abbreviated |
|---|---|
| CL, Sandy lean clay | s(CL) |
| SP-SM, Poorly graded sand with silt and gravel | (SP-SM)g |
| GP, poorly graded gravel with sand, cobbles, and boulders | (GP)scb |
| ML, gravelly silt with sand and cobbles | g(ML)sc |

## X6. RATIONALE

Changes in this version from the previous version, D 2488 – 90, include the addition of X5 on Abbreviated Soil Classification Symbols.

*The American Society for Testing and Materials takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.*

*This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, 100 Barr Harbor Drive, West Conshohocken, PA 19428.*

*Peter M. Douglass, Inc.*

8427 NE 175th St. Kenmore, WA 98028
Telephone (425) 485-2349
Fax (425) 488-2979
e-mail pmdouglass@aol.com

**D-235 Report**
December 8, 2005

Schiffrin Olson Schlemlein & Hopkins, P.L.L.C.
Westlake Center Office Tower
1601 Fifth Avenue, Suite 2500
Seattle, WA 98101

Attn: Mr. James T. Hopkins

**Re:** DACW85-99-C-0003, Harbor Improvements, King Cove, AK

**Subject:** Geotechnical Expert Report on Differing Site Conditions

Dear Mr. Hopkins,

This report presents my findings and conclusions regarding the geotechnical issues surrounding the differing site conditions claim by Red Samm Construction, Inc (RSC) on the above referenced project. The purpose of my assignment on this project, as I understand it, is to provide my assessment of the differing site conditions and/or misrepresentation claim from the perspective of a geotechnical engineer who has been practicing as a consulting engineer in the northwest for over 35 years in conjunction with projects throughout the U. S. and abroad.

I am a registered engineering geologist in the state of Oregon and a registered civil engineer in the state of Washington, specializing in the field of geotechnical engineering. I have worked on a number of jobs in Alaska and opened the office of Hart/Crowser Assoc. in Anchorage, AK in the mid-eighties. I have also worked on a number of projects involving the identification and assessment of over-sized materials in conjunction with both surface and underground construction as such over-sized materials frequently have a significant impact on the work.

Over the past 15 years I have been self-employed as a consulting engineer (Peter M. Douglass, Inc.) specializing in underground construction but with considerable involvement on surface projects as well. A copy of my current resume is attached. I have prepared and reviewed several Geotechnical Baseline Reports (GBRs) that are frequently included within the Contract Documents (CDs) to define the geotechnical conditions that are established for bidding purposes. These GBR baselines are subsequently used as the basis for establishing a Differing Site Condition (DSC) and have done much to minimize, if not eliminate, the arguments over DSCs. I also provided final review of the 1997 ASCE publication on GBRs. Since 1990 I have served on over 15 Dispute Review Boards (DRBs) in the U.S. and abroad, have been an officer in the DRB

- Only one test pit (TP-5) was located within the dredge limits and it encountered "silty SAND" in the upper foot and then "Gravel with few Cobbles" (underlining added) to a depth of 8 feet";

- One other test pit (TP-1) was excavated near the dredge limits and was dug to a depth of 10 feet and encountered exactly the same soil deposits, similarly reporting "few Cobbles," with the addition of "and Boulders" in the Gravel unit below the finer "silty SAND" surface layer;

- The other 2 test pits (TP-2 and TP-4) were excavated closer to shore than TP-1 and TP-5 and encountered "Gravel with Cobbles and Boulders" to a depth of 9.5 feet (TP-2) and "Gravel and Cobbles" in the top foot and then "Gravel" to the full depth of 9.0 feet (TP-4);

- All test pits were excavated with a backhoe in a matter of hours within or upslope of the inter-tidal zone at a time near low tide;

- All test pits were included in the CDs but did not include a definition of the ambiguous qualitative term "few";

- Photos of the test pits, at least one mislabeled, were taken by Mr. Wilson, but not included in the CDs;

- Mr. Wilson's narrative report that accompanied the field test pit logs and photos, **and included some useful comments on the occurrence of oversized material**, was not included in the CDs.

The 1985 borings (all located outside the dredge limits beyond the NE corner of the project site) were included in the CDs. The results were as follows:

- All of the borings encountered very loose to medium dense SAND from the surface of the soil to a depth of at least 17 feet, with the exception of boring BH-4 where the sample attempts (no recovery) at 10 and 15 feet reported gravelly soils (based on drilling action) and that the sampler was probably driving or sitting on "small cobbles". The "casing advanced easily, however, indicating the gravel is in a soft matrix" (underlining added); and

- Boring BH-3 was advanced without sampling in the upper 30 feet but reported the material as "silty sand with occasional gravel" based on the "drill wash".

The CDs stated that the materials encountered in the borings, test pits, and geophysical investigation (report referenced but not included in the CDs) were **representative of the conditions to be encountered within the dredge limits**. No other pre-bid investigations of the subsurface conditions were accomplished.

Red Samm's primary contact during the bidding and subsequent construction phases was Mr. David Heeter, then Vice President of Red Samm, who testified in deposition that:

- He had visited the site prior to bidding, had reviewed the CDs (including the test pit logs and soils borings) and that he had prepared the bid for Red Samm;
- At the time of the initial bid he relied on a subcontractor quote for dredging and did not concern himself with the amount of cobbles, as this was quoted as a clamshell operation with offshore disposal;
- The subcontractor estimated that the dredging could be accomplished in one season.

B. Construction Phase

Red Samm was awarded the contract following bid opening on November 10, 1998, at which Red Samm was the apparent low bidder. Red Samm was given Notice to Proceed (NTP) on January 13, 1999 with completion required on November 8, 2000. As a practical matter RSC was allowed two construction seasons to accomplish the work, given the typically severe winter weather in the area.

During the first construction season (1999) Red Samm constructed the breakwater and entered into discussions with the City of King Cove over upland disposal of dredged materials, including identification of an upland disposal site. At this point, Red Samm was faced with selecting suitable means and methods for the dredging operation, recognizing that hydraulic dredging would provide the most economic means for upland disposal, provided that the material was suitable for hydraulic dredging.

Red Samm studied the information included in the CDs regarding the nature of the subsurface materials to be dredged, including the aforementioned borings (little or no oversized material within the dredge depths) and the test pit information (reporting "few" cobbles within the dredge limits).

In deposition, Mr. Heeter described how he arrived at a determination of "few" both by Webster's definition ("not many") and as a percentage (less than 1 percent based on an estimated number of "few" and a calculation of the volume of the test pit excavation). Although this supported Red Samm's conclusion that a hydraulic dredging operation was feasible, Mr. Heeter testified that he thought the best thing to do to determine what was meant by "few" was "do our own exploration to determine really what the value of few meant". Red Samm accomplished its own investigation of subsurface conditions by excavating 4 additional backhoe test pits from shore and by excavating 50 yards of material by clamshell and shipping all of the clamshell materials (and samples from the test pits) to their laboratory in Sand Point, AK to perform gradation analyses.

Mr. Heeter testified at deposition that the Red Samm explorations reported no cobbles (>3") in either the test pits or the clamshell sampling operation. Hence, these additional investigations, located within the dredge limits and between the borings and the test pits included in the CDs,

Comments added by Chuck Wilson to a draft of the COE's Findings Report for the July 25, 2001 stockpile sampling asserted that the results compared well with the description of the subsurface material contained in the July 1996 Trip Report prepared by Mr. Wilson who conducted the test pit explorations. However, Mr. Wilson's superior, Jerry Raychel, noted that the July 1996 Trip Report had not been provided to bidders and Mr. Wilson's comments should be revised in any final report. (Steven Henslee testimony. Dep. Ex. 22 and 25.) Ultimately, the COE elected to defer finalization of its report until the contractor had submitted a formal claim and then "tailor" the report appropriately. Henslee Dep. Ex. 25.

On September 10, 2001, the dredging operations were completed.

On October 30, 2001, Red Samm submitted its formal Request for Equitable Adjustment due to the differing site conditions.

A letter signed by Mr. Ron Flodin (signature dated January 23, 2002) presents the COE's Administrative Contracting Officer's denial of Red Samm's request stating:

- "The surface of the area that was dredged within the inter-tidal zone was primarily covered with gravel, cobbles and boulders". Photos that I have observed of the site within the dredging limits suggest a predominantly Sand deposit with only occasional cobbles and boulders.

- "...... ignores the data presented in the four remaining test pits and the observation of cobbles and boulders on the surface of the inter-tidal zone." This statement is contrary to the surface layer of "silty SAND" shown on the logs of both TP-5 and TP-1 (the only test pits located within or near the dredge limits) and suggests that the coarser materials on the shore, well outside the dredge limits, (TP-2, TP-3 and TP-4) are representative of conditions within the dredge limits.

- "No reference was made in the contract documents regarding the maximum or minimum percentages of cobbles or the limit on the cobble size." Although the COE later maintains that the logs were prepared in accordance with generally accepted standard ASTM D 2488 procedures, failure to note the estimated percentage of over-sized material and the maximum size of the cobbles and/or boulders on the logs is contrary to those recommended ASTM procedures.

- "Nevertheless, the results presented of cobble amounts ranging from 34.3% to 6.5% are within the realm of what a contractor should expect and plan for based on the information presented in the contract and visual inspection of the site." I certainly would take exception to this statement, especially that a percentage of cobbles on the order of 34.3% should have been expected.

- "The gradation tests of the samples (my note: this is referring to the sampling of the dredged spoils pile in July 2001) resulted in percentages of cobbles between 7.9% and 2.2%,...". This appears to be the first time that the COE shared these results with Red Samm and they were

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, INC., Plaintiff, | ) |
| vs. | ) No. 04-487C |
| THE UNITED STATES, Defendant. | ) |

**DEPOSITION OF PETER M. DOUGLASS**

January 12, 2006

Seattle, Washington

Byers & Anderson, Inc.
Court Reporters/Video/Videoconferencing

One Union Square
600 University St.
Suite 2300
Seattle, WA 98101
(206) 340-1316
(800) 649-2034

2208 North 30th Street, Suite 202
Tacoma, WA 98403
(253) 627-6401
(253) 383-4884 Fax
scheduling@byersanderson.com
www.byersanderson.com

Serving Washington's Legal Community Since 1980

cobbles," does that have any suggestion about the relative proportion of the two?
A Well, I think when you say "and," it suggests that there is more than -- that there is -- in other words, when you have a definition that says gravel and cobbles, I think what they're saying is, maybe as much as comparable percentages of gravels and cobbles.
Q Okay. Now let's go to the fifth bullet on Exhibit 1, your report. And where it says that "All test pits were included in the CDs but did not include a definition of the ambiguous qualitative term 'few.'"
Just to be clear, your suggestion of the word "few" is ambiguous?
A Yes.
Q And would it be ambiguous on its face? And by that, I mean, if you were to sort of see the term "few" on the report, would that leap out at you as being ambiguous, or would that not be something you would figure out until later on?
MR. HOPKINS: Objection. Vague and ambiguous, "on the report." I don't know what counsel is talking about, and he hasn't identified the report that he referred to in his question.
Q (By Mr. Prouty) I'm talking about on the test pit log, like we've got right here.