Golder Associates

Report To

The Department of the Army
U.S. Army Engineer District, Alaska

For

# GEOPHYSICAL SURVEY
# SOUTH HARBOR EXPANSION
# KING COVE, ALASKA

October 1997

Distribution: 3 copies - Corps of Engineers

D/F: RGD-97/5287x60917RPT.DOC

# 1. INTRODUCTION

The following report summarizes the results of the marine geophysical survey conducted by Golder Associates to assist in determining soil conditions for the proposed southern expansion of the small boat harbor at King Cove, Alaska. This project was conducted for the Alaska District Corps of Engineers under Contract No. DACA85-96-D-0002, Delivery Order No. 006. Navigation was provided by Terra Surveys of Palmer, Alaska. Field work began on July 31, 1997 and was completed on August 1, 1997. Bathymetry data were previously collected by Dowl Engineers in May, 1997 and provided to Golder Associates on an AutoCad base map (Sheet 1).

# 2. SURVEY OBJECTIVES

The Alaska District Corps of Engineers is conducting a study to determine the feasibility of expanding the small boat harbor south of the causeway that forms the southern border of the existing harbor. The study area is shown in Figure 1. Although the final scope of the expansion project is yet to be determined, a preliminary investigation using offshore marine geophysical techniques was requested to assist in evaluating site conditions.

A previous investigation, conducted by the Alaska District Corps of Engineers on June 29, 1996, consisted of five test pits excavated with a backhoe in the intertidal zone at the southwest end of the survey area (Sheets 1 through 4). No coordinates for these test pits were available, therefore, the locations were scaled off a sketch map of the site and can only be considered approximate. Logs for these test pits are provided in Appendix A. The test pit results indicate that shallow bedrock exists near the bedrock outcrop exposed along the southwest shoreline (Sheets 1 through 4), and deepens to greater than 10 ft to the northeast. Test Pit TP-3, the only test pit to encounter bedrock and the closest test pit to the outcrop, met refusal at 5 ft. The other four test pits encountered gravel with cobbles and boulders to depths of 8 to 10 ft.

The objectives of this geophysical survey were to;

- Perform a high-resolution seismic reflection survey to map the top of bedrock beneath the overlying unconsolidated sediments
- Perform a seismic refraction survey to assist in evaluating the excavatability of the bedrock across the site
- Develop an isopach map of the sediments overlying bedrock
- Provide a geologic interpretation of materials expected to be encountered during development of the site.

## 3. GEOLOGIC SETTING

### 3.1 Regional Geology

King Cove is located near the southern tip of the Alaska Peninsula at 55°03′ north latitude and 162°19′ west longitude. The terrain is mountainous with maximum elevations in the nearby area reaching about 2,000 ft.

The Alaska Peninsula is occupied by several active volcanoes and is paralleled to the south by the Aleutian Trench. Much of the region is underlain by volcanic and late Tertiary intrusive rocks. A quartz diorite pluton intrudes the volcanic and volcaniclastic sedimentary rocks of the Belkofski Formation at King Cove (Dubois et. al., 1989). Subduction of the Aleutian Trench is the major tectonic force affecting the geology of the region. The area is one of the most seismically active in the world.

The region was heavily glaciated during the Pleistocene Epoch which modified the land mass to its present configuration. Glaciers developed onshore and offshore. A glacier centered between Sanak and the Shumagin Islands advanced over the mainland in the King Cove area. The terrain is characterized by moderately steep, rounded, low mountains and

from the seismic refraction data. This correlation supports our interpretation that the smooth continuous reflector (R1) is a sedimentary layer and the top of bedrock interface is the more irregular reflector (R2) below it.

## 6. GEOLOGICAL INTERPRETATION AND EXPECTED MATERIAL TYPES

The unconsolidated sediment overlying R1 are characterized by numerous diffraction patterns and discontinuous, steeply dipping, reflectors with a predominant northeasterly dip (Figures 2 through 5). This signature is typical of coarse-grained sediments deposited in a high-energy environment. This interpretation is consistent with the test pit data from the southwest end of the site, which show mostly gravel with some cobbles and boulders in the upper 10 ft. The seismic signature for these upper sediments is uniform and was observed on the seismic records across the site, suggesting that coarse-grained sediments consisting of mostly of sand and gravel with some cobbles and boulders exist throughout the site.

The smooth nature of the R1 reflector and internal layering observed in some areas between the R1 reflector and the top of bedrock, suggest that this sedimentary layer was deposited in a low-energy environment, is likely fine-grained and consolidated, and does not require blasting to be excavated. No intrusive data is available to support or refute this interpretation.

The intrusive bedrock exposed at the southwest end of the site is fractured, but appears hard and competent. The relatively high seismic velocity of the bedrock (13,600 ft/second), calculated near the outcrop and across the southwest half of the site, suggests that the subsurface rock in these areas is also competent and will require blasting to excavate. This is consistent with Test Pit Log TP-3 which indicates refusal at 5 ft.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, a Connecticut Corporation** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 04-487C (Judge Block)** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**DECLARATION BY JEROME RAYCHEL**

I, Jerome Raychel, make the following declaration in accordance with 28 U.S.C. § 1746. I am aware that this declaration will be used in the United States Court of Federal Claims, and that this declaration is the legal equivalent to a statement under oath.

1. My name is Jerome Raychel and I am a registered professional civil engineer licensed in the state of Alaska and am currently employed by the U.S. Army Corps of Engineers, Alaska District ("District") and have been for approximately the past 31 years. In approximately December 1999, I became the Chief of the Geotechnical Branch of the Engineering Division. Through District internal reorganization in approximately July 2000, my title was renamed to Chief, Geotechnical Services, as part of Engineering Services of the District's Engineering Division. I currently supervise three sections within Geotechnical Services – Soils and Geology, Materials, and Survey. Prior to becoming Chief, Geotechnical Branch, I was employed as Chief, Soils and Geology Section and held that position since 1980. This is the

position I held at the time of the advertisement for bids for Contract No. DACW85-99-C-0003, Harbor Improvements, King Cove Harbor, Alaska ("contract") in 1998.

2. As Chief of the Soils and Geology Section, my responsibilities included supervision of section personnel and their planning and carrying out geotechnical investigations, and the preparation of input of geotechnical data into project solicitation and contract documents and project planning studies. The District's Soils and Geology Section is responsible for the geotechnical aspects of all District project designs. My responsibilities as chief of that section also included the custody and maintenance of geotechnical reports, studies and other data within the Soils and Geology section's files, including geophysical reports.

3. The District procured a seismic reflection survey and seismic refraction survey of the King Cove project area in order to obtain further subsurface information. This survey was conducted by Golder Associates, Inc. and resulted in an eleven page written report with attached figures, maps and appendix ("the Golder Report"). This information was kept by the District's Geotechnical Branch - Soils and Geology Section. The specifications for the contract, section 02222, Dredging, Excavation and Disposal, paragraph 1.2, Character of Materials, informed potential bidders that geophysical data for the area to be dredged could be obtained from the District's Geotechnical Branch, Soils and Geology Section. If a bidder for the project had requested to review geophysical data for the project area from the Corps, the Golder Report would have been provided for their review.

I have read the foregoing declaration and I certify under penalty of perjury that it is true and correct.

Jerome Raychel
Chief, Geotechnical Services
Alaska District

Executed this 15 day of March, 2006.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, INC.,

Plaintiff,

vs.

THE UNITED STATES,

Defendant.

No. 04-487C

**DEPOSITION OF DAVID HEETER**

September 27, 2005

Seattle, Washington

Byers & Anderson, Inc.
Court Reporters/Video/Videoconferencing

One Union Square
600 University St.
Suite 2300
Seattle, WA 98101
(206) 340-1316
(800) 649-2034

2208 North 30th Street, Suite 202
Tacoma, WA 98403
(253) 627-6401
(253) 383-4884 Fax
scheduling@byersanderson.com
www.byersanderson.com

25th Anniversary 1980-2005

A I started with them in '85, and kind of went up the ranks from project manager to vice president in charge of civil construction for them.
Q And what time did you become vice president?
A It was '91.
Q And what were the responsibilities of the vice president at that position at Red Samm?
A I pretty much had total control of all the civil work. I did all the estimating of the civil work, as well as overseeing all that work.
Q Now, how big is Red Samm?
A Currently, it's out of business.
Q Okay. How big was it at the time of the contract that's the subject of this lawsuit?
A We did about 10 to 15 million in civil work, and another 10 or 15 million in structures.
Q Is that per year?
A Yes.
Q And how many employees did Red Samm have at that point?
A As far as management goes, we had approximately 10 or 12.
Q You said Red Samm is no longer in business. What do you do now?
A I work for a company called Colaska.

A Yes. At least components -- some components of it. Some of the pieces that may have been purchased wouldn't have showed up beyond a one-line item down here at the bottom, on the back page.
Q Okay.
A But primarily yes.
Q And on this document, I don't see anything indicating to me a hydraulic dredger that was your property. Maybe I'm missing it. Is it there?
A No, it's not there.
Q And is that because at the time you did the bid -- or the estimate, I should say, you did not own a hydraulic dredger?
A That is correct.
Q We're done with that for now.
Is it my understanding that at the time that you did your estimation, that you intended to have a subcontractor do the dredging on the King Cove project?
A Yes.
Q And how did you go about determining which subcontractor you might use?
A We used the lowest quote.
Q Do you recall who that was?
A Yeah. That was American Construction.