Q And did you know what method they were going to use for the dredging?
A They were going to use clam dredging, clamshell dredging.
Q Now, did you discuss with them the method they were going to use; that is, clamshell versus any other kind of dredging?
A No.
Q Did you discuss with them the conditions of the material to be dredged?
A No.
Q Do you know how they made their estimate based upon the materials that they were expecting to encounter?
A No.
Q When you did the estimation yourself, did you look at the geotechnical data regarding the material to be dredged, or is that something you let the subcontractor look at?
A I looked at the material -- the subsurface information that was in the plans and specs.
Q Do you recall whether or not that changed your opinion about what the subcontractor would have to do in any way?
A No.
Q Was there anything in particular you might have been

something to that effect.
A Mm-hm.
Q Could you rephrase that, please?
A Well, most of this stuff that they're talking about -- incidental sunken logs, boulders, rocks, snags, debris, harbor debris and fishing operation debris -- those are all, in my mind, surface-oriented obstacles. They're not necessarily pertaining to the material that you're dredging.
Q Okay. How did you determine what the material was going to be like that you would be dredging?
A Primarily by the bore logs.
Q Now, if you sort of flip back to the Attachment A, the first couple pages are some test pits.
Now, when you said bore logs just a moment ago, did you include these test pits, or did you mean the drilling reports that follow this test pit information?
A I meant both of them.
Q Okay. Now, flip back to that second page, 1.2. The last full sentence in 1.2 says that, "Geophysical data for this area can be obtained from the Corps of Engineers, Geotechnical Branch - Soils and Geology Section, Alaska District."
Do you see that?

A Yes.
Q Did you seek to obtain any geophysical data from the Corps?
A No.
Q Why not?
A I felt that this was sufficient information that they provided.
Q Okay.
A And I -- yeah.
Q Is there anything else?
A No.
Q Okay. I think we're done with 86 for now.

(Exhibit No. 87 marked for identification.)

Q (By Mr. Prouty) I'm handing you Exhibit 87. And it's basically a print-up of some attachment to an e-mail.

Do you recognize that?
A Yes.
Q And Clayton Arterburn, is that an engineer who worked for you?
A Arterburn, yes.
Q Arterburn. I'm sorry.
A Yes. He was an engineer for me.

Q And though the pictures aren't of the highest possible quality, do they represent the King Cove project, or the area where the King Cove was being done?
A Yes.
Q And I see the very first one includes a barge and a crane, but besides that, did the area look pretty much the way it looked at the time of your site visit prior to bid, as it does in these pictures?
A Yes, it does.
Q Now, as I look at the pictures, I see sort of what appears to be a tidal flat; basically an area where it's perhaps low tide, so all the water has gone away and you can sort of see areas that are sometimes covered by the water. Is that right?
A That's correct.
Q And is that an area that was going to be dredged?
A I would say that at least part of this area (indicating) would have been dredged. The limits of that dredging went out into this tideflat a short distance.
Q Sure.
In the stuff in the very near foreground, which was dry land, that would not have been dredged; right?

A This material down here in the corner, and part of this little flat in here, I don't think was dredged.
Q Okay. And as I look in the tidal flat area -- and admittedly, these are not the highest resolution pictures -- I see some stones and things like that, or some sort of rocks sort of sticking out. Do you see those?
A Yes, I do.
Q And were those in fact stones or rocks or things of that nature?
A Yes, they were.
Q And were those things that would have to be removed during the dredging?
A Part of them, yes.
Q And these are visible to the naked eye?
A Yes, they are.
Q And they were visible when you made your site visit; correct?
A Yes.
Q Now, why did not -- did this warn you that you should have expected rocks of that nature when you did your dredging?
A It -- well, most of this material is coming off the hillside, and so we did additional test pits along the beach to verify if there was any of these rocks

in the actual dredging zone.
Q Okay. So was that later on that you did these additional pits?
A Yeah. This was -- this would have been in June/July, I believe, of '99, while we were placing the breakwater. We went in with an excavator and dug a series of test pits along the boundary of the -- inside the boundary, I should say, of the dredging limits.
Q Okay. And I'll get back to those in a little bit. I'm done with that document.
(Exhibit No. 88 marked for identification.)

Q (By Mr. Prouty) I'm giving you a document we've marked as Exhibit 88. And I'll tell you off the bat, it is a condensed version of a much thicker document. Essentially it's got a table of contents and a cover and then an appendix. But --
MR. HOPKINS: Well, just for the record, this document in its entirety has previously been entered in these proceedings as Deposition Exhibit 4.
MR. PROUTY: Right, a much thicker document. We'll just use this smaller document here.

MR. HOPKINS: Objection. Calls for speculation, lacks foundation.
A I wouldn't have had this information available to me at the time of the bid.
Q (By Mr. Prouty) Okay. Great. Thanks. We're done with that exhibit.
I'm going to ask you to go back to Exhibit 83, which is, I think, the second one you looked at earlier today. It's the sediment control plan document.
A Okay.
Q Now, I just want to ask you, the very last sentence on the first page, the no subsurface information --
A Yes.
Q Do you see it? Now, do you know what this refers to?
A Well, it's the sediment control plan for the project. And the sentence, the way I interpret it, is basically saying there was no subsurface information that would determine the amount of silt that's in the basin.
Q And would that be referring to the information provided by the Corps?
A That's correct.
Q Okay. We're done with that one.
MR. PROUTY: Next document.

MR. HOPKINS: Objection. Vague, ambiguous.

Q (By Mr. Prouty) Can you answer the question?

A It's just, like I said, whatever the definition of few is. I mean, I went to the extent of trying to determine what few was. And in essence, it's not very many.

Q Now, the word "few" was actually used by the person who dug the test pit; correct?

A I don't know that.

Q Okay.

A Just whatever is in the bore logs.

Q And wouldn't you agree the best way to find out what the person meant by "few" would be to ask the person?

A At the time of the bid?

Q At any time.

A I thought the best thing to do was what we did, which was do our own exploration to determine really what the value of few meant.

Q Right. You're talking about, of course, the later test pits you dug --

A Yes.

Q -- after you bid the project.

A Mm-hm.

Q Before you bid the project, when you were relying

upon the test pit logs provided by the Corps of Engineers, what did you do to determine what the Corps meant by few?
A Just what the information shows in the bore logs, the test pits.
Q Didn't you think it would make sense to ask what they meant by few?
A Not at the time of the bid, no.
Q Why not?
A At that point, it wasn't a concern.
Q The nature of the material that was going to be excavated was not a concern?
A Not at the time of the bid, when I had a -- when I used a sub quote. I mean --
Q And that would be because it was the subcontractor's concern, not yours?
A Primarily. But the bore logs and the test pits indicated pretty much it was sand and gravels.
Q It also described it as cobbles; right? If you want to look at it, it's Exhibit 86.
A I can't remember where test pit 5 was. Since most of these test pits were out of the dredge area, I didn't -- 85, 86. I can't remember exactly where test pit 5 was.
If this was the one that's inside the -- there

was only one -- that's right, it was test pit 1.
Okay. Repeat your question.
Q At the time of the bid -- actually, strike that.
You had essentially described it as sand, but isn't it true that it also described cobbles as being inside of these?
A An insignificant amount.
Q You said an insignificant amount?
A Mm-hm.
Q Does it say insignificant amount?
A No. It says a few.
Q Significant enough to be described or noted; correct?
MR. HOPKINS: Objection. Vague, ambiguous.
Q (By Mr. Prouty) Okay. Can you answer the question?
A Obviously they saw a few cobbles.
Q Are you familiar with a document called the ATSM?
A APSM?
Q A, T as in Tom, SM.
A ATSM? Yes.
Q And what is it?
A ASTM or ATSM?
Q I thought it was ATSM, but I could be wrong.
A No, it's ASTM.
Q ASTM?