Q So one test pit alone would not be sufficient to tell you what you're going to find in a large area?
A (Witness nods head.)
Q Is that "yes"?
A Yes.
Q Now, when you did the extra test pits yourself, how many were there?
A I want to say we dug four or five test pits.
Q And do you recall how deep they were?
A They were as deep as we could dig without a sloughing in. I would say eight to ten feet.
Q And who did the actual digging?
A Our worker.
Q Do you recall who?
A I can't recall the name of the operator that was there.
Q And who did the observation?
A The observations were done by -- I believe at that point, I'm sure Clayton was there. Don Luterbach. Those are the two names that were on-site at the time it was done.
Q Do you recall -- were they doing this at your instruction?
A Yes.
Q And did you ask them to look for anything in

Q Was that July of 1999?
A Yes, 1999. That's why we were doing the breakwater work.
And I don't know -- I can't remember if we approached the borough or the borough approached us, but they were interested in -- it was a mutually agreeable scenario if we could put this material up on shore. They were interested in part of it, and we were interested in part of the material.
So we talked about it, about the site, the upland disposal site, what site we could use if we did it. And then we did our investigation to verify the specifications -- or the bore logs and the test pit logs.
And over the course of the winter, through obtaining information on the equipment that's required and cost analysis of that, we decided that we would go ahead and suction dredge it and put it up on shore.
Q Let's break that up into smaller pieces.
You're talking about how -- was it the borough that you were talking to, or was it the city of --
A East Aleutian Borough, I believe, yeah, that was -- I think they were the one that was interested more than the City of King Cove, although there was two people

the ability to pump the material at the gradations that we sent them.

And they -- at the time we made arrangements to go to Holland, they had an operation going in Germany that had similar -- they were pumping similar material.

MR. PROUTY: Next document. Thanks.

(Exhibit No. 90 marked for identification.)

Q (By Mr. Prouty) Showing you Exhibit 90, which I just got last week from counsel, I'll ask you to take a quick look at that.

MR. HOPKINS: Just for the record, the first document of this is indicated as a one-page fax. The other documents I don't believe are necessarily part of the same document.

MR. PROUTY: Oh, is that right?

THE WITNESS: That's correct.

Q (By Mr. Prouty) Well, let's just look at the first page, then, for the time being. We'll look at the later pages.

Have you had a chance to look at that document?

A Yes.

Q Does it look familiar to you?
A Yes.
Q And what is it?
A This is a fax that we sent to DeGroot in January of 2000, prior to our visit. We sent them some specifications; obviously the quantities that we wanted, some of the King Cove physical conditions, and the material -- the dredge material, gradation of the dredge material.
Q Okay. Now, the gradation of the dredge material that's included in this document, the first page of the document, where did those figures come from?
A Those came out of materials -- the material was shipped to our Sand Point facility, where we had a lab there that ran gradations as we were processing material for the Corps on the breakwater job.
These are the test pits that we did in July, and also the dredging out near the breakwater that we did first of September.
Q So these are your own test pits, and these are statistics coming from them?
A That's correct.
Q And what you had done is, you had sent these off to be tested by somebody?
A We tested them ourselves. Our crusher foreman in

Sand Point, where we process the rock for the breakwater, we had our laboratory there run the gradations.

Q Okay. I'm confused, and that's probably my fault. So I just need to sort of back up.

A Okay.

Q Now, the rockery used for the breakwater, now, where did that come from?

A Sand Point.

Q And Sand Point is --

A A hundred miles to the east of King Cove.

Q So what happened -- so the information here essentially is, you shipped some things from your test pits or other dredging you had done, to Sand Point, and had them analyze it?

A That's correct.

Q So it's not an analysis of the Sand Point stuff; the analysis happened to be done at Sand Point?

A That's correct.

Q Okay. Now I'm no longer confused. Thank you.

MR. PROUTY: Tell you what. Because the other pages of this document are not part of it, this exhibit, why don't we just take the first page off of this exhibit, Exhibit 90.

Now, let's take the other pages and make this

Exhibit 91.

(Exhibit No. 91 marked for identification.)

Q (By Mr. Prouty) Do you recognize these pages?
A Yes.
Q And what are they?
A These are the gradations that we ran in Sand Point of the material that we sampled in King Cove.
Q So do the numbers reflected in these pages essentially wind up on Exhibit 90?
A Yeah. They're somewhat representative of those gradations total.
Q Now, were the source of these gradations or the source of materials, do I understand that you essentially used your crane when you were building the breakwater to essentially take some samples of the area that was going to be dredged, and then sent off to Sand Point?
A Yeah. It was a combination of the test pits, as well as material out in the center of the basin.
Q So is the material in the test pits also sort of mixed with this material taken from the crane and sent off?
A Yes. I think these -- actually, this material

here --
Q And by "here," you mean the stuff in Exhibit 91?
A In Exhibit 91, yeah.
-- came from the test pits.
Q Is there a way to tell?
A The date, primarily. 7/16/99. We did the test pits in July, and we did the dredging -- the clamshell on the barge, I believe, around the 1st of September.
Q Okay. Now, for Exhibit 90, after you faxed it to DeGroot, did they ever give you a response in writing?
A Boy. They gave us a few things in writing. I can't remember if they responded directly to the gradation.
Q What things do you recall getting from them in writing?
A Specifications of the pump, travel plans. Basically I would probably -- in writing, I don't know if it was, but obviously we made the trip over there. We wouldn't have done it if they would have told us that this material could not be utilized in their hydraulic dredge.
Q Were you communicating with them via telephone, via fax --
A Both.
Q -- via e-mail? Were there e-mails?

A No, I don't think so.

MR. PROUTY: Mr. Hopkins, the only thing I've seen in what you've produced to and from DeGroot is this one-page fax. You know, I was looking -- it's possible I've missed it. If there were any other documents from DeGroot or communications from DeGroot and Red Samm about the dredging information, I'd like to see it. I think it's requested in general enough terms in the document production request.

MR. HOPKINS: As far as I know, anything that we have has been produced. I do think there are a few other documents that definitely have been produced that reflect those communications.

MR. PROUTY: Okay.

MR. HOPKINS: If we have it, it's been produced.

MR. PROUTY: Very well. Thank you.

Q (By Mr. Prouty) Now, when you, in fact, went to Holland, did they express -- were there any concerns at all about cobbles or things of that nature discussed?

A No. The pump was rated to handle whatever could fit through the grizzly. At that point, there was no information that would lead us to believe that we

would run into more than a few cobbles.
Q Okay. What is a grizzly?
A It's the cage that goes around the inlet of the actual pump itself. It was -- it's a grid made out of three-quarter-inch-diameter steel bar. And it just prevents anything oversize from going through the pump.

MR. PROUTY: Next document.

(Exhibit No. 92 marked for identification.)

Q (By Mr. Prouty) This document, actually, I wish I'd shown you earlier. I'm not trying to confuse you. This goes back to things we found in the document production. It's obviously a page about test pit 5, but there's some writing in the bottom of it, as you see.
A Mm-hm.
Q And I'm wondering if you recognize that writing.
A That is my writing.
Q And could you tell me what it depicts?
A Well, it is -- it is the test pit depth as described in this -- I don't know if it's this exact test pit, but it was to determine the volume of a test pit relative to the few cobbles that they encountered.

to do with the King Cove project?
A No.
Q Okay. Done with that exhibit.
MR. PROUTY: Tell you what. Let's take five.
THE WITNESS: Okay.
(Recess 10:51-11:00 a.m.)

EXAMINATION (Continuing)

BY MR. PROUTY:
Q Let's go back to Exhibit 90, which was the one-page Red Samm fax to DeGroot.
I just want to make sure I understood something. This document was basically the information you sent to DeGroot to determine whether or not the conditions at King Cove would be good for using their dredge equipment; right?
A Yeah. It was primarily some information that they can make a determination whether their equipment would work or not, prior to us making the trip over there.
Q Right.
And the information included in there under the message area, all the sort of percentages and things