NO. 04-487
(J. Block)

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# PLAINTIFF'S RESPONSE TO GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

JAMES T. HOPKINS
Schiffrin Olson Schlemlein & Hopkins, PLLC
1601 Fifth Ave., Suite 2500
Seattle, WA 98101
Telephone: (206) 448-8100/Fax (206) 448-8514
Email: jth@soslaw.com
Attorneys for plaintiff Travelers Casualty and Surety Co. of America

May 5, 2006

# TABLES OF CONTENTS


I. Nature of the Case 2

II. Statement of Facts 3

III. Law and Argument 3

A. Summary Judgment Standards 7

B. Plaintiff Is Entitled to Recover on its Differing Site Condition Claim 7

1. The Contract Indicated Relatively Loose Soils Comprised of Sands and Gravels with Few Cobbles Which Were Suitable for Hydraulic Dredging 8

2. Red Samm Reasonably Interpreted the Contract Subsurface Data. Red Samm Had No Reason to Foresee the Actual Conditions Encountered 11

3. Red Samm Relied Upon the Contract Subsurface Data Pre-Bid and During Performance of the Work to Make Critical Decisions as to the Suitability of the Site for Hydraulic Dredging and Appropriate Hydraulic Dredging Equipment. Such Reliance Is Legally Sufficient 14

4. Red Samm Encountered Subsurface Conditions Materially Different from those Indicated in the Contract Documents 17

5. Due to the Differing Site Conditions and Misleading Information Contained in the Test Pit Logs, Red Samm Incurred Substantial Additional Costs 17

C. The Patent Ambiguity Rule Provides No Defense to the Government 18

1. The Term "Few" as Used in the Test Pit Logs Was Not a Patent Ambiguity 18

2. The Patent Ambiguity Doctrine Has No Application in this Case Because the Government Was Already on Notice 20

## TABLES OF CONTENTS
**-continued-**


3. The Patent Ambiguity Rule Has No Application Where the Government Has an Independent Duty of Disclosure 21

D. The Government Misrepresented the Results of Its Test Pits Explorations 21

E. Travelers Prevails on Its Nondisclosure Claim Due to the Government's Withholding of Its Superior Knowledge as to Its Observations of Cobbles in the Test Pits 24

F. The Government Must Pay Red Samm's Improperly Withheld Contract Balance of $218,460 25

IV. Conclusion 25

# TABLE OF AUTHORITIES

**CASES** **Page(s)**

All Power, Inc. v. United States,
60 Fed.Cl. 679 (2004)....9

Andersen Consulting v. United States,
959 F.2d 929(Fed.Cir. 1992)....8

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 106 S..Ct. 2505, 91 L.Ed.2d 202 (1986)....7

AT&T Communications, Inc. v. Perry,
296 F.3d 1307 (Fed.Cir. 2002)....24

Baltimore Contractors, Inc. v. United States,
12 Cl. Ct. 328 (1987)....9

California v. United States,
271 F.3d 1377 (Fed. Cir. 2001)....7

Christie v. United States,
237 U.S. 234, 35 S.Ct. 565, 59 L.Ed. 933 (1915)....22

Comtrol, Inc. v. United States,
294 F.3d 1357 (Fed. Cir. 2002)....8, 15

Fehlhaber Corp. v. United States,
138 Ct.Cl. 571, 151 F.Supp. 817 (1957)....9

Foster Const. C.A. & Williams Bros. Co. v. United States,
193 Ct.Cl. 587, 435 F.2d. 873 (Ct.Cl. 1970) ....8, 9, 11

Froeschle Sons, Inc. v. United States,
891 F.2d 270 (Fed.Cir. 1989)....14

Fruin-Colnon Corp. v. United States,
912 F.2d 1426 (Fed. Cir.)....15

GAF Corp. v. United States,
932 F.2d. 947, 949 (Fed.Cir. 1991)....24

Grumman Data Systems Corp. v. Dalton,
88 F.3d 990 (Fed. Ct. 1996)....18

Gould, Inc. v. United States,
935 F.2d. 1271 (Fed.Cir. 1991)....8

H. B. Mac, Inc. v. United States,
153 F.3d 1338 (Fed.Cir. 1998)....8

**TABLE OF AUTHORITIES**
**-continued-**


Hills Materials Co. v. Rice,
982 F.2d 514 (Fed. Cir. 1992) ... 8

Hol-Gar Mfg. Corp. v. United States,
169 Ct.Cl. 384, 351 F2d 972 (1965) ... 8

Hollerbach v. United States,
233 U.S. 165, 34 Sup.Ct. 553, 58 L.Ed. 898 (1914) ... 22

L. G. Everist, Inc. v. United States,
231 Ct.Cl. 1013 (1982) ... 25

L. Rosenman Corp. v. United States,
182 Ct.Cl. 586, 390 F.2d. 711, 713 (1968) ... 18

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d. 538 (1986) ... 7

McCormick Const. Co., Inc. v. United States,
18 Ct.Cl. 259, 263 (1989) ... 17

Metcalf Const. Co., Inc. v. United States,
53 Fed.Cl. 617 (2002) ... 18, 20

Overstreet Elec. Co., Inc. v. United States,
59 Fed.Cl. 99, 116 (2003) ... 19

Pacific Alaska Contractors, Inc. v. United States,
193 Cl.Ct. 850, 436 F.2d 461 (1971) ... 9

Potashnick v. United States,
123 Ct.Cl. 197, 105 F.Supp. 837 (1952) ... 22

Randa/Madison Joint Venture III v. Dahlberg,
239 F.3d 1264 (Fed.Cir. 2001) ... 9

Record Steel & Const., Inc. v. United States,
62 Fed.Cl. 508 (2004) ... 19, 20

Rice Lake Contracting, Inc. v. United States,
33 Fed.Cl. 144 (1995) ... 20

Sergent Mechanical System, Inc. v. United States,
34 Fed.Cl. 505 (1995) ... 15

Stock & Grove, Inc. v. United States,
204 Ct. Cl. 103, 493 F.2d. 629 (1974) ... 9

**TABLE OF AUTHORITIES**
**-continued-**

Stratos Mobile Networks USA, LLC v. United States,
213 F.3d 1375 (Fed.Cir. 2000)........................................7

T. Brown Constructors, Inc. v. Pena,
132 F.3d. 724 (Fed.Cir. 1998)........................................13, 22, 24

Triax Pacific, Inc. v. West,
130 F.3d. 1469 (Fed. Cir. 1997)........................................18

United Contractors v. United States,
177 Ct.Cl. 151, 368 F.2d. 585 (1966)........................................9, 13

U.S. v. Atlantic Dredging Co.,
253 U.S. 1, 40 S.Ct. 423, 64 L.Ed. 735 (1920)........................21, 23

U.S. v. Margolis,
138 F.2d 1002 (3rd Cir. 1943)........................................19

Weeks Dredging & Contracting, Inc. v. United States,
13 Cl.Ct. 193 (1987)........................................16

Woodcrest Const. Co. v. United States,
187 Ct.Cl. 249, 408 F.2d 406 (1969)........................................9

WPC Enterprises, Inc. v. United States,
163 Ct.Cl. 1, 323 F.2d 874 (1964)........................................16, 18

**BOARD OF CONTRACT APPEALS** **Page(s)**

Appeal of Power City Electric, Inc.,
74-1 BCA §10376, 1972 WL 1323 (I.B.C.A. 1973)........................21

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, a Connecticut corporation<br><br>v.<br><br>THE UNITED STATES | NO. 04-487<br>(J. Block) |

**PLAINTIFF'S RESPONSE TO GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Travelers Casualty and Surety Company of America ("Travelers"), opposes the government's motion for summary judgment on the grounds that both applicable law and disputed issues of material fact preclude finding summary judgment in favor of the government. Additionally, plaintiff respectfully cross moves for an order granting plaintiff summary judgment, pursuant to Rule 56(b) of the Rules of the Court of Federal Claims, because there is no genuine issue of material fact that would preclude a finding of summary judgment in favor of plaintiff and it is entitled to judgment as a matter of law. In support of its response and cross motion, plaintiff relies upon the pleadings and its brief, its response to the government's proposed findings of

uncontroverted fact, plaintiff's additional proposed findings of uncontroverted fact, and plaintiff's appendix accompanying this response and cross motion.

## I. NATURE OF THE CASE

Plaintiff seeks recovery for additional costs incurred by its assignor, Red Samm Construction, Inc. ("Red Samm"), in performance of its work on the King Cove Harbor Improvements Project ("project") for the United States Army Corps of Engineers ("Corps") at a remote site in King Cove, Alaska. Red Samm's work on the project was logically divided into two distinct components and two construction seasons - construction of a breakwater during the first season, followed by dredging the harbor within the breakwater in the second construction season.

At the request of the local municipality, Red Samm evaluated the feasibility of hydraulically dredging the harbor while building the breakwater. PPFUF 67[1]. Hydraulic dredging, if feasible, would have allowed upland disposal of the material and its reuse – a long standing desire of the both the local municipality and the Corps' local sponsor. Id. In making such determination, Red Samm relied upon test pit logs and soil boring logs furnished by the government ("contract subsurface data"), which indicated loose, easily dredgable materials, comprised of sand and gravels, with few, if any, cobbles. Id. Such an interpretation and expectation was shared by the Corps (PPFUF 41-43), who intended Red Samm to rely upon the contract subsurface data in both bidding and performing the work (PPFUF 58, 61) and who further understood the only purpose and reason for the contract subsurface data was to allow the contractor to determine the appropriate method and equipment to conduct the dredging work. PPFUF 35, 37, 38.

[1] "PPFUF" refers to a paragraph of Plaintiff's Additional Proposed Findings of Uncontroverted Facts, filed contemporaneously with this Response and Cross Motion.

Red Samm prudently conducted some limited sampling on its own to verify and confirm its interpretation of the contract subsurface data. PPFUF 70. Red Samm relied upon such interpretation and the contract subsurface data in determining the site was suitable for hydraulic dredging. PPFUF 71. Red Samm personnel traveled to Holland in January 2000 to meet with DeGroot Company engineers who considered the contract subsurface data, among other information, in making their recommendation to Red Samm regarding appropriate hydraulic dredging equipment. PPFUF 72.

Red Samm began work in the second construction season in 2000 with a DeGroot DOP dredge pump and system, hydraulic dredging equipment favorably reviewed by Corps researchers, who identified it as one of a limited number of innovative new dredging technologies. PPFUF 83, 91.

However, Red Samm's efforts were thwarted from the outset by excessive cobbles within the subsurface materials. PPFUF 83. While Red Samm demonstrated the productivity and capabilities of its dredging equipment on two days in relatively cobble free material, continuing and repeated encounters with areas of excessive cobbles left Red Samm no choice but to abandon its hydraulic dredging operation and shift to an alternative method, all at considerable delay and great additional expense. Id.

A third construction season was required in which Red Samm's subcontractor, Western Marine, dredged approximately 230,000 cubic yards, primarily with a clamshell dredge. PPFUF 86. A sub-subcontractor to Western Marine, Newhalem River Dredging, dredged approximately 55,000 cubic yards with a hydraulic dredging operation. Newhalem employed precisely the type of hydraulic dredging equipment, with appropriate expertise and experience, that the Corps deemed suitable and appropriate for

the subsurface conditions at the site. PPFUF 86, 88. However, Newhalem accomplished no better productivity than Red Samm had achieved with its hydraulic dredging operation and was only able to dredge a small portion of the total required quantities. PPFUF 90.

Observations by Corps' onsite personnel, Red Samm, gradations taken by both Red Samm and Corp personnel, and the analysis of plaintiff's experts all concur, and demonstrate substantial areas of the project contained cobble concentrations exceeding 10%. PPFUF 93.

Had the Corps, as required by applicable industry standards, disclosed the true observations of its geotechnical engineer of 5 to 10% cobbles in the Test Pits 1 and 5 excavations and over 5% cobbles in the Test Pit 2 excavations, Red Samm would have concluded the site was not feasible for hydraulic dredging and never have attempted it in the first place, thereby avoiding in excess of $2 million in additional costs. PPFUF 78.

However, Red Samm was mislead by the inaccurate information contained in the test pit logs, as was the Corps itself, which shared Red Samm's reasonable interpretation that the contract subsurface data indicated loose, easily dredgable material, with few, if any, cobbles and which was suitable for a hydraulic dredging operation. PPFUF 41-43, 78, 88.

The government is responsible for Red Samm's additional costs under all three of the legal theories asserted by Red Samm: differing site conditions, misrepresentation, or non-disclosure of superior knowledge. The government is also liable for $218,460 of Red Samm's contract balance improperly withheld as liquidated damages.

## II. STATEMENT OF FACTS

Plaintiff's additional proposed findings of uncontroverted facts appropriately supplement the limited and selective factual presentation provided by the government in its motion and presents a more complete record of the facts in this dispute. Accordingly, plaintiff respectfully refers the court to its responses to the government's proposed findings of uncontroverted facts and plaintiff's additional proposed findings of uncontroverted facts.

## III. LAW AND ARGUMENT

Travelers must recover because the Corps provided inaccurate and misleading test pit logs that did not properly convey the true observations of the Corps' geotechnical engineer regarding the extent of cobbles found in the test pits. Such information was essential to Red Samm's accurate interpretation and understanding of the test pit logs, was required by the applicable industry standard, and could only have been provided by the Corps' engineer who performed the test pit explorations.

Both Red Samm and the Corps were mislead by the inaccurate test pit logs. Both parties interpreted the contract subsurface data as indicating loose, easily dredgable soils, comprised primarily of sands and gavel, with few cobbles; conditions which were entirely suitable for a hydraulic dredging operation. Actual conditions were materially different, with far greater concentrations of cobbles, making the site unsuitable for hydraulic dredging, even with the specific equipment the Corps initially believed appropriate.

Red Samm reviewed the contract subsurface data prior to submitting its bid. The subcontractor's whose price quote Red Samm relied upon for its estimate, specifically

reviewed and relied upon the test pit logs and soil boring logs in providing its quote to Red Samm. Red Samm further relied on the test pit logs and soil boring logs during performance of its work to make critical decisions as to the suitability of the site for hydraulic dredging and the appropriate dredging equipment to employ. Such reliance was both intended and expected by the Corps and is legally sufficient to support plaintiff's claims.

The geophysical refraction methods employed by Golder did not identify cobbles. The Golder geophysical report contained only a generalized statement by a third party, uninvolved in the test pit explorations, that simply informed the contractor of the existence of cobbles in an indeterminate amount without any indication of the extent or quantity. This generalized statement would not have alerted Red Samm to conditions different than indicated in the test pit and soil boring logs; nor trump such more specific data.

The government's belated patent ambiguity argument also fails because the term "few" as used in the test pit logs had a reasonably understood, ordinary meaning and does not rise to the level of a patent ambiguity; as demonstrated by the fact, among other reasons, that neither Corps personnel nor any other bidder sought clarification of the term. Moreover, Red Samm could have provided no new information regarding the possible ambiguity, as the Corps was already on notice. The Corps' geotechnical engineer was aware of his actual observations of cobble concentrations, the requirements of ASTM 2488 in regard to the content of his report, and the inherent imprecision of the terms he actually choose to employ. The government attempts to escape responsibility for its errors by arguing the contractor was required to specifically request information

which the government had a duty and obligation to disclose in the first place, without prompting by the contractor.

### A. Summary Judgment Standards

In considering a summary judgment motion, the court should not weigh the evidence or make credibility determinations. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, all reasonable inferences and presumptions must be resolved in favor of the non-moving party. Anderson, 477 U.S. at 255. Similarly, the court should also resolve all doubt over factual issues in favor of the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d. 538 (1986).

Cross motions for summary judgment do not relieve the trial court of its duty to determine whether summary judgment is appropriate and the court must determine for itself whether summary judgment standards have been meet. Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1379 (Fed.Cir. 2000). When presented with such cross motions, the court is not compelled to grant one or the other. California v. United States, 271 F.3d 1377, 1380 (Fed. Cir. 2001). Each motion should be evaluated on its own merits. Id.

### B. Plaintiff Is Entitled to Recover on its Differing Site Condition Claim

To establish a Type 1 differing site condition claim, a contractor must prove the following:

> [T]he conditions indicated in the contract differed materially from those actually encountered during performance; the conditions actually encountered were reasonably unforeseeable based on all information available to the contractor at the time of bidding; the contractor reasonably relied upon its interpretation of the contract and the contract related documents; and the contractor

> was damaged as a result of the material variation between expected and encountered conditions.

Comtrol, Inc. v. United States, 294 F.3d 1357, 1362 (Fed. Cir. 2002) (citing H. B. Mac, Inc. v. United States, 153 F.3d 1338, 1345 (Fed.Cir. 1998).

The government seeks to avoid its obligations under the differing site condition clause through a series of arguments, each unsupported by the facts or law, which if accepted by the court would render both the purpose and content of the subsurface data contained in the contract documents meaningless. As demonstrated below, Travelers has met each element of its burden and is entitled to summary judgment on its differing site condition claim.

**1. The Contract Indicated Relatively Loose Soils, Comprised of Sands and Gravels with Few Cobbles, Which Were Suitable for Hydraulic Dredging.**

Determining contract "indications" in the context of a differing site condition claim is a matter of contract interpretation and thus a question of law. Foster Const. C.A. & Williams Bros. Co. v. United States, 435 F.2d. 873, 880 (Ct.Cl. 1970). It is axiomatic that contract interpretation starts with the plain language of the documents. Gould, Inc. v. United States, 935 F.2d. 1271, 1274 (Fed.Cir. 1991). "Wherever possible, words of the contract should be given their ordinary and common meaning." Hills Materials Company v. Rice, 982 F.2d. 514, 516 (Fed. Cir. 1992) (citing Hol-Gar Mfg. Corp. v. United States, 169 Ct.Cl. 384, 390, 351 F2d. 972 (1965). The ordinary meaning of language in the contract documents controls, not a party's subjective and unexpressed intent. Andersen Consulting v. United States, 959 F.2d. 929, 934 (Fed.Cir. 1992)

An appropriate technique of contract interpretation here is for the court to place itself in "the shoes of a reasonable and prudent contractor and decide[ing] how a such a

contractor would act in interpreting the contract documents." All Power, Inc. v. United States, 60 Fed.Cl. 679 (2004) (quoting Randa/Madison Joint Venture III v. Dahlberg, 239 F.3d 1264, 1274 (Fed.Cir. 2001)). Contract "indications" may be proven "by inferences and implications." Foster, 435 F.2d. at 881. Such indications "need not be explicit or specific, but only enough to impress or lull a reasonable bidder." Stock & Grove, Inc. v. United States, 493 F.2d. 629, 645, 204 Ct.Cl. 103 (1974). There need only be "reasonably plain or positive indications in the bid information or contract documents that such subsurface conditions would be otherwise than actually found in contract performance..." All Power, 60 Fed.Cl. at 684 (quoting Pacific Alaska Contractors, Inc. v. United States, 193 Ct.Cl. 850, 436 F.2d. 461,469 (1971)).

Drill hole data – test pit logs and soil boring logs - are recognized as the "most reliable" and the "most specific indicator" of subsurface conditions. Foster, 435 F.2d. at 888. Where such specific investigations are found to be inaccurate, this court has readily found a differing site condition to exist. Baltimore Contractors, Inc. v. United States, 12 Cl.Ct. 328 (1987) ("N" counts on soil boring logs inaccurate); Woodcrest Const. Co. v. United States, 187 Ct.Cl. 249, 408 F.2d 406 (1969) (differing site condition found where subsurface water encountered but boring logs showed none); United Contractors v. United States, 177 Ct.Cl. 151, 368 F.2d. 585 (1966) (differing site condition existed where high ground water not indicated in borings encountered).

Significantly, contract data showing that certain subsurface materials or conditions are not present is an "indication" such conditions will not be found. Woodcrest, supra; United Contractors, supra; Fehlhaber Corp. v. United States, 138

Ct.Cl. 571, 151 F.Supp. 817 (1957) (differing site condition found where subsurface rock encountered while soil boring showed none).

Here, the Corps conducted test pit explorations and included test pit logs and soil boring logs for the express purpose of providing the contractor sufficient information to determine both the method of dredging and the type of dredging equipment to employ. PPFUF 37, 38, 61. The Corps well understood the contract subsurface data would be used for that purpose and found it more than sufficient for the Corps to make its own judgments as to the nature of the subsurface materials, likely costs, and appropriate dredging methods and techniques. PPFUF 41-43. The contract documents described the information as "subsurface conditions" and "for the area to be dredged" and were reasonably understood as representing to Red Samm the nature of subsurface conditions. PPFUF 64, 65. Indeed, the Corps specifically asserted the contract subsurface data was "sufficiently representative to determine the consistency of the materials to be dredged." (emphasis added) PPFUF 63.

Specific indications of the contract subsurface data were: (a) subsurface soils were loose; (b) comprised primarily of sands and gravels; (c) contained no cobbles (Test Pit 4 and soil boring logs); or (d) at most a "few" cobbles (Test Pits 1 and 5). PPFUF 47-51, 54, 59-60.

The government tries to convert its failure to follow industry standards and provide accurate information as to the extent of cobbles observed in the test pits into a virtue, through its narrow argument that the contract documents did not state the percentage of cobbles. That argument fails, as does the government's other arguments in regard to the term "few." All four bore holes indicated a percentage of cobbles – 0%.

PPFUF 54-60. Test Pit 4 below the first foot indicated the same percentage – none. PPFUF 50. The description of "few" cobbles in the Test Pits 1 and 5 was plainly an indication of quantity or number.[2] PPFUF 67.

**2. Red Samm Reasonably Interpreted the Contract Subsurface Data and Had No Reason to Foresee the Actual Conditions Encountered.**

Red Samm's interpretation need not be the only possible interpretation, nor even the most accurate interpretation. "[A]ll that is required is that there be enough of an indication on the face of the contract documents for a bidder reasonably not to expect 'subsurface or latent physical conditions at the site differing materially from those indicated in the contract.'" Foster, 435 F.2d at 875. Red Samm's interpretation here is one supported by the plain meaning of the test pit logs, reason, and expert opinion. PPFUF 67, 68. It was also an interpretation shared by the Corps personnel involved in the project who reviewed the subsurface data compiled by the Corps. PPFUF 41-43.

Soil borings showed no cobbles within the dredge limits. PPFUF 59-60. The two test pits closest to, or within, the dredge area indicated only a "few." PPFUF 55. Test Pit 4 showed no cobbles below the first foot. PPFUF 50. Test Pits 2 and 3, while indicating cobbles, were in the upper tidal zone near a bedrock outcrop, and were considerably removed from the actual dredge area. PPFUF 49, 55. The Corps agrees Test Pit 3 was of no value in determining subsurface conditions for dredging purposes. PPFUF 49. A reasonable, geologic interpretation of the area would conclude that the lower tidal zone and actual dredge area had little or no concentrations of cobbles. PPFUF 55. Moreover,

---

[2] *See* www.http.//Merriam-Webster Unabridged Dictionary:
Main Entry: few
Function: *adjective*
1: consisting of or amounting to a small number: not many…

Red Samm took the extra step of obtaining samples on its own to verify and confirm its interpretation of the contract subsurface data. PPFUF 70.

Faced with the totality of this data and the recognition that Red Samm acted reasonably, the government resorts to diversion. It argues that the word "some" alone, found in a single paragraph of the Golder geophysical report, to describe Golder's offhand interpretation of the test pit logs, an exploration in which Golder itself was not involved, should have somehow alerted the contractor to the actual conditions encountered. Thus, the government argues the contractor should have ignored the test pit logs and soil boring logs, the "most reliable and most specific indicator[s]" of subsurface conditions, and instead base its understanding as to the subsurface conditions on the generalized and indeterminate comment of a third party, not involved in the test pit explorations.[3]

This argument fails both for its want of logic and the fact the geophysical refraction methods employed by Golder did not identify cobbles in the subsurface materials. PPFUF 69. Further, the information in the Golder geophysical report did not lead Corps project team members to interpret the contract subsurface data in a fashion any different than Red Samm. PPFUF 41-43. The statement in the Golder report simply informed the contractor of the existence of cobbles without any indication of quantity or extent. DPFUF 18.

---

[3] *See* www.http.//Merriam-Webster Unabridged Dictionary:
Main Entry: **some**
Function: *adjective*
1: being one unknown, undetermined, or unspecific unit or being or thing...
2: being one, a part, or an unspecified number of something (as a class, group, species, collection, or range of possibilites)...

Such a generalized and indeterminate statement does not override the more specific information found in the soil borings and test pit logs. This court has previously reached precisely such a conclusion in a case with analogous facts. United Contractors, 368 F.2d. 585 (1966). There, soil borings published with the contract documents did not indicate water within the limits of excavation. The contract documents did contain a general warning of "high ground water" within the project area. The court rejected the government's argument that such a general statement should have alerted the contractor to the actual conditions encountered – excessive groundwater within the excavation limits, which the court held to be differing site condition.

> The most reliable and most specific indicator – the borings – had shown that water would not interfere with excavation. We cannot agree that this precise information was negated by the undefined and unexplained generality of the "high ground water" clause.

368 F.2d. at 598.

The Federal Circuit has similarly emphasized that such "generalizations" regarding site conditions, "cannot overcome the particularized results" contained in specific soils test data. T. Brown Constructors, Inc. v. Pena, 132 F.3d. 724, 729 (Fed.Cir. 1998) ("the more specific test data trumps the more general test results").

Neither does plaintiff argue inconsistently here. In contrast, use of the term "some" by the government's geotechnical engineer in his written narrative report, coupled with his cautionary statements regarding appropriate dredging equipment were fundamentally different in context and value. Mr. Wilson's narrative report, not disclosed to bidders, was prepared by the very individual who conducted the test pit exploration and who had first hand knowledge of the extent of cobbles observed. PPFUF 39. His overall conclusion and intention to convey his observations of "significant"

concentrations of cobbles in the test pits was information not found in the test pit logs themselves. PPFUF 53.

**3. Red Samm Relied Upon the Contract Subsurface Data Pre-Bid and During Performance of the Work to Make Critical Decisions as to the Suitability of the Site for Hydraulic Dredging and Appropriate Hydraulic Dredging Equipment. Such Reliance Is Legally Sufficient.**

The government intended Red Samm to rely on the contract subsurface data both in bidding and performing the work. PPFUF 61. Red Samm did so. PPFUF 62, 63, 71. Red Samm read and reviewed the contract subsurface data while preparing its estimate prior to submitting its bid. PPFUF 62. For its estimate, Red Samm relied on the quote of American Construction, a subcontractor who specifically reviewed and relied upon the soil boring logs and test pit logs in estimating its productivity and developing its quote. Id. Such reliance is imputed to Red Samm and its sufficient in and of itself to meet the reliance requirement. Froeschle Sons, Inc. v. United States, 891 F.2d. 270 (Fed.Cir. 1989).

Further, Red Samm specifically relied on the contract subsurface data to make its initial determination that the site was suitable for hydraulic dredging. PPFUF 67, 71. The contract subsurface data was then among the information provided by Red Samm to DeGroot and considered by it in making recommendations to the contractor as to the appropriate type of dredging equipment. PPFUF 72.

The government asks the court to simply assume that because Red Samm conducted some supplemental investigations of its own, the contract subsurface data became a nullity without meaning, importance, or consideration by Red Samm. Neither logic nor the facts support such an argument. There is no evidence that shows the contract subsurface data became irrelevant or meaningless because Red Samm performed some

supplemental investigations on its own. Such investigations were intended to, and did, verify and confirm Red Samm's interpretation of the contract subsurface data. PPFUF 70; see also Pl. Response to DPFUF 23. While the only gradation analyses available to Red Samm were those it performed itself, which were then provided to DeGroot, the contract subsurface data was also provided and considered by DeGroot engineers. PPFUF 70. The government selectively relies upon testimony by Red Samm's Mr. Heeter regarding the gradation analyses to incorrectly infer that no other information was provided to DeGroot. Such testimony was not, in fact, given by Mr. Heeter.

The government is equally mistaken as to the law on reliance in a differing site condition claim. While reliance is an element, this court has previously rejected the argument that it must be manifested prebid. Sergent Mechanical System, Inc. v. United States, 34 Fed.Cl. 505, 522 n. 24 (1995). Sergent found unpersuasive an argument based upon Fruin-Colnon Corp. v. United States, 912 F.2d. 1426 (Fed. Cir. 1990), that a contractor's differing site condition claim must be dismissed due to a failure to demonstrate prebid reliance. In doing so, the Sergent court noted the distinction between a differing site condition claim and one based upon a latent ambiguity:

> [The] requirement of specific evidence concerning how a contractor reached its bid does not apply to the present case because in the instant dispute plaintiff is not alleging an ambiguous contract specification, but rather a differing site condition.

345 Fed.Cl. at 522, n.24.

The authority relied upon by the government does not truly support its characterization of the law and is entirely distinguishable from the present facts in any event. In Comtrol, Inc., the contractor never reviewed the soils report, nor was there any evidence indicating the contractor materially relied upon the report during performance

of its work. The government cites Weeks Dredging & Const., Inc. v. United States, 13 Ct.Cl. 193, 218 (1987) in support of its erroneous assertion that "reliance must be manifested prior to the contractor's bid." Def. Motion, p.7. Yet the cited portion of the decision contains no such statement. All that is found is the standard requirement that "the contractor must have *reasonably* relied on the indications of subsurface conditions in the contract." Weeks Dredging, 13 Ct.Cl. at 218 (emphasis in original).

While plaintiff's claim is not based upon a latent ambiguity per se, the government is also incorrect as to the required reliance for such a claim. Where the government does not make its interpretation of the ambiguous term known, reliance during performance is sufficient. WPC Enterprises, Inc. v. United States, 163 Ct.Cl. 1, 323 F.2d 874 (1964).

> [I]f some substantive provision of the Government-drawn agreement is fairly susceptible of a certain construction and the contractor actually and reasonably so construes it, in the course of bidding or performance, that is the interpretation that will be adopted – unless the parties' intention is otherwise affirmatively revealed.

Id. at 876 (emphasis added)

Here, the Corps never explained to Red Samm its own interpretation of the term "few" as used in the test pit logs until issuance of the Contracting Officer's Decision over two years after the work had been completed. PPFUF 85. Even with its present motion, the government provides the court no interpretation of its own. Since the Contracting Officer's interpretation was based upon an erroneous and improper application of ASTM 2488 (PPFUF 46, 94), the government's silence in this regard is perhaps not surprising.

**4. Red Samm Encountered Subsurface Conditions Materially Different from those Indicated in the Contract Documents.**

There is no bona fide basis for the government to argue otherwise. Its onsite observers noted concentrations of cobbles in excess of 10% in areas. PPFUF 93. Red Samm's observations and sampling of materials after it abandoned the hydraulic dredging operation and commenced claimshell dredging in the 2000 construction season revealed cobble concentrations on the average of 22%. Id. Limited and selected sampling of the stockpiled dredge materials in July 2001 by the Corps, found cobble concentrations as high as 8.9%. Id. Review of photographs of dredge material throughout the project demonstrates numerous areas of cobble concentrations in excess of 5%. Id.

A twelve inch pipeline cutterhead dredge, viewed as entirely appropriate for the site by the Corps, was unable to achieve better productivities than Red Samm's hydraulic dredge operation and could never have practically completed the project as required by the contract documents. PPFUF 88, 90. Clamshell dredging, rather than a hydraulic dredging operation originally deemed appropriate by both Red Samm and the Corps, was necessary to complete the work (PPFUF 83, 84, 86), a clear indicia of materially different conditions. McCormick Const. Co. v. United States, 18 Ct.Cl. 259, 263 (1989) ("Evidence as to a material difference most commonly illustrates....an alternative method of workmanship must be implemented in order to complete the contractual agreement.").

**5. Due to the Differing Site Conditions and Misleading Information Contained in the Test Pit Logs, Red Samm Incurred Substantial Additional Costs.**

These added costs were initially calculated by Red Samm in its Request for Equitable Adjustment. PPFUF 82. Plaintiff's expert, with an independent and different analysis, determined the amount of compensable additional cost as $2,459,228. Id. Red

Samm is also entitled to refund of $218,460 in liquidated damages wrongfully withheld by the government. See Pl.'s Response to DPFUF 32.

There is no issue in this case as to calculation of Red Samm's damages. The government has offered no competing analysis or contrary evidence. Indeed, the government declined to even question plaintiff's expert, Mr. Brown, on this subject during his deposition.

C. **The Patent Ambiguity Rule Provides No Defense to the Government.**

**1. The Term "Few" as Used in the Test Pit Logs Was Not a Patent Ambiguity.**

The government, as author of the contract documents, "has to shoulder the major task of seeing that within the zone of reasonableness the words of the agreement communicate the proper notions – as well as the main risk of a failure to carry that responsibility." WPC Enterprises, 323 F.2d. at 877. Therefore, the contractor is "not normally required....to seek clarification of any and all ambiguities, doubts or possible differences in interpretation." Id. Only where an ambiguity is "obvious," "gross," "glaring," or "substantial" does it rise to the level of a "patent ambiguity," imposing the duty to inquire on the contractor. Metcalf Const. Co., Inc. v. United States, 53 Fed.Cl. 617, 629 (2002) (quoting Grumman Data Systems Corp v. Dalton, 88 F.3d 990, 997 (Fed. Cir. 1996)).

The Federal Circuit has declined to give the patent ambiguity doctrine a broad application, since it has the effect "of relieving the government from the consequences of its own poorly drafted contracts." Triax Pacific, Inc. v. West, 130 F.3d. 1469, 1475 (Fed. Cir. 1997). The court's determination should be from the perspective of "what a reasonable man would find to be patent and glaring." L. Rosenman Corp. v. United

States, 182 Ct.Cl. 586, 390 F.2d. 711, 713 (1968). "An ambiguity that is not so glaring as to trigger the patent ambiguity exception is considered latent, and the *contra proferentem* rule applies." Record Steel and Cont., Inc. v. United States, 62 Fed. Cl. 508, 517 (2004). Not every dispute as to the meaning of a contract term rises to the level of a latent or patent ambiguity. Overstreet Elec. Co., Inc. v. United States, 59 Fed.Cl. 99, 116 (2003). The court is not required to accept a party's assertion that competing interpretations must constitute one or the other. Id.

While not free from ambiguity, the term "few" has a common and well understood dictionary meaning of "small number" or "not many."[4] PPFUF 67. The primary definition provided by Black's Law Dictionary, 5th Edition, 1979, only selectively quoted by the government in its motion, is "not many; or small number." See also, U.S. v. Margolis, 138 F.2d. 1002, 1003 (3rd Cir. 1943) ("the word 'few' used in the clause 'in the last few months' of the question means 'not many; of small number'"). It is not possible to accept the government's characterization of the term "few" as a patent ambiguity, without doing violence to its common and ordinarily understood meaning in the English language.

No bidder out of two rounds of bidding on the project viewed the term as so ambiguous as to require clarification. PPFUF 97. Neither did any member of the Corps' own project team ever request clarification from Mr. Wilson, the author of the test pit logs. The Corps never asserted the term was a patent ambiguity requiring clarification during the course of the work, nor did the Contracting Officer make such an assertion in her decision. PPFUF 85, 94.

---

[4] See p.11, n. 2, infra.

Even with its motion, the government does not offer any competing interpretation of its own. Rather, the government relies on the acknowledgment of plaintiff's witnesses that the term is ambiguous, and then asks the court to leap to the conclusion that it must be patently so, based solely on that testimony. The government's eleventh hour assertion of a patent ambiguity in the context of a dispositive motion before this court, where the issue was never raised by the government's personnel during the performance of the work, or in issuance of the Contracting Officer's Decision, is a significant factor suggesting the ambiguity was neither glaring, nor obvious as now asserted. Record Steel, 62 Fed.Cl. at 517. (government did not raise patent ambiguity argument until filing dispositive motion "Previously, its actions in implementing the contract left uncertain the Government's position on contractual interpretation.").

**2. The Patent Ambiguity Doctrine Has No Application in this Case Because the Government Was Already on Notice.**

An exception to a contractor's duty to inquire under the patent ambiguity doctrine exists where the government is already on notice of the ambiguity. Metcalf Const., 53 Fed.Cl. at 617. In this regard, it is assumed that government personnel who draft contract documents are "reasonably intelligent person[s] acquainted with the contemporary circumstances." Id. at 629. (quoting Rice Lake Contracting Inc. v. United States, 33 Fed.Cl. 144, 152 (1995)). Mr. Charles Wilson, who observed the test pit explorations and drafted the test pit logs, has a masters degree and must be presumed to understand the ordinary English language meaning of the term "few," as well as its lack of numerical precision. PPFUF 36. Mr. Wilson also was, or should have been, well aware of the requirements of ASTM 2488, although he chose not to follow them. PPFUF 46, 52. There is nothing further Red Samm could have brought to the government's attention

regarding any ambiguity in use of the term "few" in the test pit logs of which the government was not already quite aware.

**3. The Patent Ambiguity Rule Has No Application Where the Government Has an Independent Duty of Disclosure.**

ASTM 2488 required the government to state in the test pit logs, in numerical terms, its estimate of the percentage of cobbles observed in the test pit explorations. PPFUF 44. The uncontroverted facts are that the government failed to do so and instead employed the term "few." PPFUF 46, 52, 80. By attempting to invoke the patent ambiguity rule, the government asks the court to free it from the consequences of its error, because the contractor did not specifically request information the government had an independent duty to disclose without request or prompting by the contractor. There is no legal basis for the government's circular and self serving argument. Even if the court were to conclude that the term "few" was patently ambiguous, the government's failure to disclose accurate information in the test pit logs would supersede the contractor's duty to inquire under the patent ambiguity rule. Appeal of Power City Elec., Inc., 74-1 BCA §10376, 1972 WL 1323 (I.B.C.A. 1973) ("on balance the appellant's fault [failure to inquire] was less serious than the government's fault [failure to disclose]").

**D. The Government Misrepresented the Results of Its Test Pits Explorations.**

Above all else, the government must accurately convey to the contractor the results of its soil explorations. U.S. v. Atlantic Dredging Co., 253 U.S. 1, 40 S.Ct. 423, 64 L.Ed. 735 (1920). Longstanding federal jurisprudence has repeatedly found the government liable where its contract documents do not accurately describe the results of the government's soil borings or other soil explorations. Atlantic Dredging Co., supra;

Christie v. United States, 237 U.S. 234, 35 S.Ct. 565, 59 L.Ed. 933 (1915); Hollerbach v. United States, 233 U.S. 165, 34 S.Ct. 553, 58 L.Ed. 898 (1914).

Applying such authority, this court has found the government liable where "information obtained by defendant's engineers when making the core borings was not truthfully recorded...on the core-boring data drawing." Potashnick v. United States, 123 Ct.Cl. 197, 105 F.Supp. 837 (1952). The Federal Circuit has emphasized a similar finding is appropriate where the government's failure to follow standard soils testing techniques results in misleading information. T. Brown Constructors, 132 F.3d. 724 (exclusion of note from test report revealing samples were from weathered rock, contrary to standard test procedure, resulted in misleading information as to likely extent of clay)

Here, the government's geotechnical engineer observed in Test Pits 1 and 5 concentrations of cobbles between 5 and 10%, yet employed the term "few" to describe such observations in the test pit logs. PPFUF 47, 51. Such term failed to accurately convey the Corps' true observations of the extent of cobbles in the test pits. PPFUF 73-75. The Corps' geotechnical engineer was equally misleading in his description of the cobbles observed in Test Pit 2, which exceeded 5%, but were described solely by the term "with." PPFUF 76. The importance of reporting a specific numerical percentage of the estimated cobbles observed in the test pit explorations is made clear by ASTM 2488 – a procedure the government admits to be industry standard. PPFUF 44, DPFUF 10. The failure to properly follow this standard, coupled with the imprecise terminology used in the test pit logs, resulted in inaccurate and misleading information, which Red Samm relied upon to its detriment, in making key decisions as to the suitability of the site for hydraulic dredging and the appropriate type of equipment to employ. PPFUF 67, 78.

Both Atlantic Dredging and T. Brown Constructors are highly analogous to these facts. In the former, a "map" contained in the contract documents inaccurately described the results of soil borings and the character of the materials, misleading the contractor into selecting dredging "plant" and equipment which was only "efficient" or suitable for the conditions as indicated in the contract documents. Atlantic Dredging, 40 S.Ct. at 424. The Supreme Court held in favor of the contractor where the evidence revealed the soil borings had in fact found far more difficult material than had been reported in the contract documents.

Similarly, in T. Brown Constructors failure by the government to employ standard procedures in "washed sieve analysis" tests, coupled with its failure to disclose the irregularity in its test procedures, resulted in erroneous and misleading information as to the likely extent of clay to be found in the quarry from which the contractor would be required to produce aggregate. 132 F.3d at 728-729. As discussed in section III B.2 above, T. Brown Constructors is also noteworthy for its rejection of the government's defenses based upon more generalized statements as to the possible percentage of clay to be found in other portions of the contract documents:

> Generalizations about the composition of the quarry cannot overcome the particularized results found in the washed sieve analysis test."

Id. at 729.

T. Brown Constructors, citing United Constructors, supra, made clear that "the more specific test data trumps the more general test results." Id.

Again, this authority also demonstrates why the government's arguments based upon the Golder geophysical report are unavailing. That report simply implies of the "existence" of cobbles in an indeterminate amount, information that barely rises to the

"generalized" statements found insufficient to "trump" the specific test data in both T. Brown Constructors and United Constructors.

**E. Travelers Prevails on Its Nondisclosure Claim Due to the Government's Withholding of Its Superior Knowledge as to Its Observations of Cobbles in the Test Pits.**

To prevail on its claim of nondisclosure of superior knowledge, Travelers must prove that Red Samm:

(1) undertook to perform without vital knowledge of a fact that affects performance cost or direction,
(2) the government was aware that the contractor had no knowledge of and had no reason to obtain such information,
(3) any contract specification applied mislead the contractor, or did not put it on notice inquire, and
(4) the government failed to provide the relevant information.

AT&T Communications, Inc. v. Perry, 296 F.3d. 1307 (Fed.Cir. 2002) (quoting GAF Corp. v. United States, 932 F.2d. 947, 949 (Fed.Cir. 1991).

The actual percentage of cobbles observed by the Corps' geotechnical engineer was information vital to Red Samm's performance of the contract, a conclusion supported by logic, testimony of Corps personnel, and the fact that disclosure of such information is required by the industry standard which the government concedes applies. PPFUF 37, 44, 58, 77, 80. Short of telepathy, Red Samm had no means or ability to determine the actual percentage of cobbles observed in the test pits. As the government's geotechnical expert acknowledges, only the Corps' geotechnical engineer who performed the test pit explorations could provide such information. PPFUF 80. Instead of conveying the "significant" extent of cobbles he intended (PPFUF 53), the actual language employed by the Corps' geotechnical engineer communicated the precise opposite – "few," if any, cobbles in the subsurface conditions. Red Samm was mislead by the

government's failure to disclose the accurate data and because of such fact wrongly concluded the site was suitable for hydraulic dredging. PPFUF 67, 78.

L. G. Everist, Inc. v. United States, 231 Ct.Cl. 1013 (1982) provides no defense for the government. There the court's decision was based upon its determination that the contested information was "data equally available to both" parties. Here, only the Corps had access to the true observations of its geotechnical engineer in regard the to the extent of cobbles observed in the test pits.

**F. The Government Must Pay Red Samm's Improperly Withheld Contract Balance of $218,460.**

If the court finds for plaintiff on any of its three theories, Red Samm's delay in completion of the work was excusable. Liquidated damages in such circumstances would be improper and must be refunded to plaintiff.

## IV. CONCLUSION

The government provided inaccurate and misleading information in its test pit logs and failed to follow applicable industry standards. For this fundamental reason, plaintiff is entitled to recover on any of its theories and it respectfully requests the court so hold by denying the government's motion and granting plaintiff's cross motion for summary judgment.

DATED this 5th day of May, 2006.

*S/ James T. Hopkins*
James T. Hopkins, WSBA #11856
Schiffrin Olson Schlemlein & Hopkins, PLLC
1601 Fifth Ave., Suite 2500
Seattle, WA 98101
Telephone: (206) 448-8100/Fax (206) 448-8514
Email: jth@soslaw.com
Attorneys for plaintiff Travelers Casualty and Surety Co. of America