**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, a Connecticut corporation<br><br>v.<br><br>THE UNITED STATES | NO. 04-487<br>(J. Block) |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS AND PLAINTIFF'S ADDITIONAL PROPOSED FINDINGS OF UNCONTROVERTED FACTS**

Pursuant to Rule 56 (h)(2) of the Rules of the United States Court of Federal Claims, plaintiff submits these responses to defendant's proposed findings of uncontroverted facts and plaintiff's additional proposed findings of uncontroverted facts in support of plaintiff's cross-motion for summary judgment. To the extent that plaintiff agrees or does not disagree with any of defendant's proposed findings of fact, plaintiff does so solely for the purposes of these cross-motions for summary judgment and reserves the right to controvert any or all of defendant's proposed findings of fact should this matter proceed to trial.

I. Defendant's Proposed Findings of Fact and Plaintiff's Responses.

1. In 1998, the United States Army Corps of Engineers ("the Corps") solicited proposals for the King Cove Harbor Improvements Project In King Cove, Alaska ("the project"). AC 3.1. The project consisted of constructing a breakwater and subsequently dredging an entrance channel and mooring basin at the pre-existing harbor at King Cove, which is a remote site located in the Aleutian Island chain. Id.

Plaintiff does not disagree the with the above proposed finding of fact.

2. The solicitation for the project ("the solicitation") included the standard Federal Acquisition Regulation ("FAR") Site Investigations Clause, which provided, in relevant part, that:

> The Contractor acknowledges that it has taken steps reasonably necessary to ascertain the nature and location of the work, and that it has investigated and satisfied itself of the conditions which can affect the work or its cost, including but not limited to . . . (5) the character of equipment and facilities needed preliminary to and during work performance. The Contractor also acknowledges that it has satisfied itself as to the character, quality, and quantity of surface and subsurface materials to be encountered insofar as this information is reasonably ascertainable from an inspection of the site, including all exploratory work done by the Government. . .

App. 21.

Plaintiff does not disagree with the above proposed finding of fact.

3. The solicitation also included a description of the materials to be dredged. Section 02222, Dredging, Excavation, And Disposal provided:

> 1.2 Character of Materials.
>
> Exploration Logs for the area to be dredged and excavated are enclosed in Appendix A. Incidental sunken logs, boulders, rock, snags and other miscellaneous debris from harbor and fishing operations should be expected. Geophysical data for this area can be obtained from the Corps of Engineers, Geotechnical Branch -

Soils and Geology Section, Alaska District.

App. 2.

Plaintiff disagrees that Paragraph 1.2 of Section 02222 itself describes the materials to be dredged. Pl. App. 168-169.[1] Specific descriptions and indications of the subsurface conditions are instead found in Appendix A to Section 02222 in the form of five test pit logs and four soil boring logs, which paragraph 1.2 represents were "for the area to be dredged" and which Appendix A identified as "Subsurface Conditions." Pl. App. 215. The referenced geophysical data would not describe the materials to be dredged and only indicated the likely elevations of bedrock. Pl. App. 309-310, 330-331.

4. The exploration logs referenced in the solicitation are reproduced in their entirety at pages 5 - 20 of the appendix.

Plaintiff disagrees with the above proposed finding of fact because defendant's appendix omits sheets 3-5 of the BH 3 log and the BH 4 log in its entirety.

5. The exploration log for Test Pit 1, dug to ten feet deep with a backhoe, indicated "Silty Sand" for the first foot of excavation and "Gravel w/ few Cobbles & Boulders" for the remaining nine feet. App. 6.

Plaintiff disagrees with the above proposed finding of fact because the exploration log for Test Pit 1 also indicated "Easy digging" and "Sidewalls Caving - Refusal." Pl. App. 216. Therefore, plaintiff would restate the proposed finding of fact as follows:

The exploration log for Test Pit 1, dug to ten feet deep with a backhoe indicated "Silty Sand" for the first foot of excavation and "Gravel w/ few Cobbles & Boulders" for

[1] "Pl. App. __" refers to page(s) of Plaintiff's Appendix.

the remaining nine feet. The exploration log for Test Pit 1 also indicated "Easy digging" and "Sidewalls Caving - Refusal."

6. The exploration log for Test Pit 2, dug to nine and a half feet deep with a backhoe, indicated "Gravel w/ Cobbles & Boulders" throughout. App. 7.

Plaintiff disagrees with the above proposed finding of fact because the depth of the test pit was also indicated at ten feet and the exploration log for Test Pit 2 also indicated "Easy digging" and "Sidewalls Caving - Refusal." Pl. App. 217. Therefore, plaintiff would restate the proposed finding of fact as follows:

The exploration log for Test Pit 2, dug to nine and a half or ten feet deep with a backhoe, indicated "Gravel w/ Cobbles & Boulders" throughout. The exploration log for Test Pit 2 also indicated "Easy digging" and "Sidewalls Caving - Refusal."

7. The exploration log for Test Pit 3, dug to five feet deep with a backhoe, indicated "Gravel and Cobbles" for the first foot of excavation and "Weathered Bedrock" for the remaining four feet before it indicated "Difficult Digging - Refusal." App. 8.

Plaintiff does not disagree with the above proposed finding of fact.

8. The exploration log for Test Pit 4, dug to nine feet deep with a backhoe, indicated "Gravel & Cobbles" for the first foot of excavation and "Gravel" for the remaining eight feet. App. 9.

Plaintiff disagrees with the above proposed finding of fact because the exploration log for Test Pit 4 also indicated "Angular to Subangular," "Easy Digging" and "Sidewalls Caving - Refusal." Pl. App. 219. Therefore, plaintiff would restate the proposed finding of fact as follows:

The exploration log for Test Pit 4, dug to nine feet deep with a backhoe, indicated

"Gravel & Cobbles" for the first foot of excavation and "Gravel" for the remaining eight feet. The exploration log for Test Pit 4 also indicated "Angular to Subangular," "Easy Digging," and "Sidewalls Caving - Refusal."

9. The exploration log for Test Pit 5, dug to ten feet deep with a backhoe, indicated "Silty Sand" for the first foot of excavation and "Gravel w/ few Cobbles" for the remaining nine feet. App. 10.

Plaintiff disagrees with the above proposed finding of fact because the exploration log for Test Pit 5 indicated a depth of eight feet and also indicated "Easy Digging" and "Sidewalls Caving – Refusal." Pl. App. 220. Therefore, plaintiff would restate the above proposed finding of fact as follows:

The exploration log for Test Pit 5, dug to eight feet deep with a backhoe, indicated "Silty Sand" for the first foot of excavation and "Gravel w/few Cobbles" for the remaining seven feet. The exploration log for Test Pit 5 also indicated "Easy Digging" and "Sidewalls Caving – Refusal."

10. The American Society for Testing and Materials ("ASTM") promulgates standards for soil investigation and testing generally recognized as an industry standard. App. 27-28.

Plaintiff agrees with the above proposed finding of fact.

11. ASTM 2488 defines a "cobble" as a particle of rock that will pass a 12 inch square opening, but be retained by a three inch sieve. App. 34 (see Note 2).

Plaintiff disagrees with the above proposed finding of fact. The term "cobble" has a well understood meaning within the construction industry as a particle of rock from 3 to 12 inches in size. ASTM 2488 provides a "suggested" definition for the term

consistent with this understood meaning. Pl. App. 239 (Note 2). Other ASTM standards, such as ASTM 2487, titled "Classification of Soils for Engineering Purposes (Unified Soils Classification System)" provide the same "suggested" definition of the term "cobble." Pl. App. 292 (Note 4). Therefore, plaintiff would restate the above proposed finding of fact as follows:

ASTM 2488 and other ASTM standards provide a suggested definition of the term "cobble" as a particle of rock that will pass a 12 inch square opening, but be retained by a three inch sieve.

12. ASTM 2488 defines the term "boulder," as a particle of rock that will not pass a 12 inch square opening. Id.

Plaintiff disagrees with the above proposed finding of fact for the same reasons it disagrees with DPFUF No. 11. Therefore, plaintiff would restate the above proposed finding of fact as follows:

ASTM 2488 and other ASTM standards provide a suggested definition of the term "boulder," as a particle of rock that will not pass a 12 inch square opening.

13. ASTM 2488 directs that an investigator should "[e]stimate and note the percentages of cobbles and the percentages of boulders." App. 39 (see paragraph 12.2).

Plaintiff does not disagree with the above proposed finding of fact. However, plaintiff notes that the above proposed finding only partially states the requirements of Paragraph 12.2 of ASTM 2488, which also states "performed visually, these estimates will be on the basis of volume percentage." Pl. App. 244. Note 8 to Paragraph 12.2 further states "it is recommended that the report state that the percentage of cobbles and boulders are by volume." Id.

14. Note 15 to ASTM 2488 provides that:

> If desired, the percentages of gravel, sand, and fines may be stated in terms indicating a range of percentages as follows:
>
> - - -
>
> Few - - 5 to 10 %.
>
> - - -
>
> Some - - 30 to 45 %

App. 41. ASTM 2488 provides no other definition of "few" App. 34-44.

Plaintiff does not agree with the above proposed finding of fact because it fails to fully recite Note 15 to ASTM 2488. Pl. App. 246. Plaintiff also disagrees that ASTM 2488 provides any definition for the term "few." Rather, ASTM 2488 at Note 15 provides for an optional, specialized nomenclature which includes use of the term "few" to only describe the percentages of gravel, sands and fines contained in a sample. Id. ASTM 2488 provides no other use of the term "few." Pl. App. 239-249.

15. Mr. Roger Brown, plaintiff's expert, who "look[ed] at things as a contractor," (App. 26), described his recourse to the Webster's Dictionary to define "few:"

> . . . the term was used, "few," to describe the amount of cobbles in the soils exploration on this job. And that didn't tell me if it was one cobble or ten or two percent or 20 percent, which is what I would have needed to know.
>
> Q: Okay.
>
> A: And so it's a very ambiguous term.
>
> - - -
>
> A: And, therefore, I'm trying to think of what the author meant. It's an ambiguous term.

App. 29-30. See also App. 31 ("few" in the contract documents is "ambiguous").

Plaintiff disagrees with the above proposed finding of fact because it mischaracterizes and selectively quotes Mr. Brown's testimony. Def. App. 29-30. Mr. Brown testified that the term "few" as used in the test pit log was ambiguous because it did not provide a specific percentage of cobbles observed within the test pit. Id. Mr. Brown further testified that recourse to the dictionary definition lessened the ambiguity from the contractor's perspective. Id.

16. Mr. Peter Douglass, plaintiff's geotechnical expert, referred to "the ambiguous qualitative term 'few,'" when discussing the test pits in his expert report. App. 46. He later confirmed during his deposition that he believed the term, "few," to be ambiguous. App. 50.

Plaintiff does not disagree with the above proposed finding of fact.

17. As part of its site investigation, the Corps procured a seismic survey of the King Cove area in order to determine the depth and location of bedrock. App. 52-53. This survey was conducted by Golder and Associates and resulted in an 11-page report with appendices ("the Golder Report"), kept by the Geotechnical Branch - Soils and Technology Section, Alaska District of the Corps. App. 56. If a bidder upon the project had requested additional information from the Corps, the Golder Report would have been provided. Id.

Plaintiff does not disagree with the first two sentences of the above proposed finding of fact. Plaintiff disagrees with the last sentence of the above proposed finding of fact because Mr. Raychel's declaration states that if a bidder had requested "geophysical information" the Golder Report would have been provided. Def. App. 56. Therefore, the plaintiff would restate the last sentence of the above proposed finding of fact as follows:

If a bidder upon the project had requested geophysical information from the Corps, the Golder Report would have been provided.

18. The Golder Report states, in relevant part, that:

> This [seismic] signature is typical of coarse grained sediments deposited in a high energy environment. This interpretation is consistent with the test pit data from the southwest end of the site, which show mostly gravel with some cobbles and boulders in the upper 10 ft. The seismic signature for these upper sediments is uniform and was observed in the seismic records across the site, suggesting that coarse-grained sediments, consisting of mostly sand and gravel with some cobbles and boulders exist throughout the site.

App. 54.

Plaintiff does not disagree with the above proposed finding of fact.

19. Plaintiff's expert, Mr. Brown, states that the use of the word "some" by the Corps to describe the presence of boulders and cobbles at the project, "would have raised a flag, raised some concerns." App. 32-33.

Plaintiff disagrees with the above proposed finding of fact because it mischaracterizes Mr. Brown's testimony. Def. App. 32, l. 13-20. Mr. Brown's testimony in regard to the word "some" was as used by Mr. Wilson in the Geotechnical/July 1996 Trip Report prepared my Mr. Wilson, but not provided to bidders. Id., Pl. App. 309.

20. When asked, "If the information had stated, quote, mostly of sand and gravel, some cobbles and boulders throughout the site, would that have raised a flag?" Mr. Brown replied, "That would have raised a flag." App. 33.

Plaintiff disagrees with the above with the above proposed finding of fact for the same reasons stated in regard to DPFUF 19.

21. Red Samm Construction, Inc. ("Red Samm") made no inquiry, before or after its bid upon the project, for geophysical data from the Corps, referenced in the

solicitation. App. 62-63.

Plaintiff does not disagree with the above proposed finding of fact.

22. At no time did Red Samm inquire of the Corps what was meant by the term, "few," in the test pit logs. App. 68.

Plaintiff does not disagree with the above proposed finding of fact. However, plaintiff notes that Red Samm's letter of August 20, 2000 explained its interpretation of the term "few" as used in the test pit logs and implicitly invited the Corps to provide an alternative explanation if it had one. Pl. App. 250-251. The Corps did not respond to Red Samm's August 20, 2000 letter. Pl. App. 114, 303. The Corps did not provide Red Samm an explanation of the Corps' interpretation of the term "few" in the test pit logs until issuance of the Contracting Officer's Decision, dated November 26, 2003, more than two years after completion of the project. Pl. App. 303.

23. Mr. David Heeter, who performed the estimate for Red Samm upon the project (App. 59), stated that he did not seek clarification of the meaning of the word, "few," because, "at that point [prior to the bid] it wasn't a concern." App. 69. He further explained that it was primarily the subcontractor's concern. Id. Red Samm planned to have its subcontractor utilize "clamshell" dredging. App. 60-61. "Clamshell dredging" is the use of an excavator or crane with a "bucket" to mechanically gather material to be dredged from the dredge area and place it upon a barge for later disposal. App. 83. Sometime after Red Samm commenced work upon the breakwater, the City of King Cove offered Red Samm the opportunity to keep a portion of the dredge spoils for its own use. App. 72. At that point Red Samm first considered utilizing "hydraulic" or "suction" dredging. Id.

Plaintiff disagrees with the above proposed finding of fact because when Mr. Heeter was initially questioned regarding the appropriateness of seeking clarification of the term "few," Mr. Heeter made clear that Red Samm believed the "best thing to do" was to verify and confirm its interpretation of the term "few" and the contract subsurface data through some sampling of its own. Def. App. 68, Pl. App. 303.

24. At the time of bidding, cobbles and other large rocks were visibly present during low tide across the surface of the area to be dredged. App. 64-66.

Plaintiff disagrees with the above proposed finding of fact because it is not supported by the recited portion of the record which reflected testimony by Mr. David Heeter that a single photo shown to him in deposition identified "stones" or "rocks." Def. App. 65. The conclusion of plaintiff's geotechnical expert, Peter Douglass, based upon his review of photographs of the project site, was that there was "very little coarse material visible" during low tide across the surface of the area to be dredged. Pl. App. 181. Therefore, plaintiff would restate the proposed finding of fact as follows:

There was very little coarse material visible during low tide across the surface of the area to be dredged.

25. Red Samm's sediment control plan, drafted in April 1999, notes that "no subsurface information is given in the specifications to determine the amount of silt the basin contains." App. 67; 84.

Plaintiff does not disagree with the above proposed finding of fact.

26. Red Samm performed its own geotechnical survey in 1999, from which it determined the nature of the materials to be dredged. App. 65-66. Red Samm determined that "the best thing to do" to determine the value of cobble concentrations

was to "do our own exploration." App. 68. This investigation included the digging four additional on-shore test pits by Red Samm personnel; excavating 50 cubic yards of material in the off-shore area to be dredged by its own on-site clamshell excavator; and shipping the materials from the test puts and off-shore excavation to a subcontractor's laboratory for gradation analysis. App. 47; 71. In January 2000, Red Samm sent the information from its own testing of materials in the dredge area to the representatives of DeGroot company to determine the feasibility of using the DeGroot suction dredge for the project instead of clamshell dredging. App. 73-79. The data Red Samm chose to forward to DeGroot reflected zero cobbles. App. 80. The information sent to DeGroot did not include any data from the Corps. App. 74; 80-81.

Plaintiff disagrees with the above proposed finding of fact for the following reasons:

a. Red Samm did not perform a "geotechnical survey," but rather excavated some limited onshore test pits and took samples of material in the offshore area. Pl. App. 303.

b. The purpose of such effort by Red Samm was to verify its interpretation and understanding of the information contained in the test pit and soil boring logs; Def. App. 68 - 72; Pl. App. 303.

c. The gradation analysis of Red Samm's samples was performed at Red Samm's own facility in Sand Point, Alaska, not at a subcontractor's laboratory. Pl. App. 338.

d. The next to last sentence in the proposed finding implies that Red Samm was selective in the data forwarded to DeGroot, which is inaccurate; Pl. App. 306-307.

and

e. The information provided by Red Samm to DeGroot included the plans, test pit logs, and soil boring logs provided by the Corps in the contract documents. Id.

27. Based upon the information provided by Red Samm, DeGroot told Red Samm officials that its dredge would have no problem with the materials to be encountered at King Cove.

App. 78-79.

Plaintiff disagrees with the above proposed finding of fact because it is not supported by the cited testimony of Mr. Heeter, who testified "at that point, there was no information that would have lead us to believe that we would run into more than a few cobbles." Def. App. 78-79. Plaintiff would restate the above proposed finding of fact as follows:

Based upon the contract subsurface data, which indicated loose, easily dredgable soils, comprised of sand and gravels, with few cobbles and Red Samm's sampling, which confirmed such indications, DeGroot told Red Samm that its dredge would be suitable for the King Cove project.

28. The contract included a liquidated damages clause which provided that:

> If the Contractor fails to complete the work within the time specified in the contract, or any extension, the Contractor shall pay to the Government, as liquidated damages, the sum of $1,655 for each day of the delay.

App. 23.

Plaintiff agrees with the above proposed finding of fact.

29. The completion date specified in the contract was November 8, 2000.

App. 89.

Plaintiff agrees with the above proposed finding of fact.

30. The contract work was completed on September 10, 2001. App. 48.

Plaintiff agrees with the above proposed finding of fact.

31. As a result of Red Samm's failure to meet the completion date and the consequent liquidated damages, the contracting officer withheld payment upon the contract. App. 89.

Plaintiff disagrees with the above proposed finding of fact to the extent it implies Red Samm's failure to meet the original contractual completion date was inexcusable and that liquidated damages were properly withheld. Plaintiff notes that the Corps' designated change order negotiator for the project, Deborah Riedell, viewed the liquidated damages withheld as a "card" to be used in negotiations with Red Samm. Pl. App. 269.

32. The Corps withheld payment of $213,460.00 upon the contract. AC 9.2.

Plaintiff disagrees with the above proposed finding of fact. The amount stated by plaintiff in its amended complaint contained a typographical error. As acknowledged by the government in its response to plaintiff's interrogatory no. 2, the actual amount of liquidated damages withheld by the government was $218,460. Pl. App. 295. Therefore, plaintiff would restate the above proposed finding of fact as follows:

The Corps withheld payment of $218,460 for alleged liquidated damages.

33. The 306 day difference between November 8, 2000 and September 10, 2001, multiplied by the liquidated damages rate of $1,655 per day produces liquidated damages in the amount of $506,430.

Plaintiff agrees with the mathematical calculations as stated in the above proposed

finding of fact but disagrees to the extent that the proposed finding implies liquidated damages could be properly withheld.

II. Plaintiff's Additional Proposed Findings of Uncontroverted Fact.

34. An existing eleven acre small boat harbor had been constructed by the Corps in King Cove, Alaska in 1973 and 1974. Pl. App. 185. In 1986, the City of King Cove constructed a causeway immediately to the south of the existing boat harbor to serve as a ferry dock. Pl. App. 187, 191.

35. In 1995 and 1996, the Alaska District of the US Army Corps of Engineers ("Corps") conducted investigations and feasibility studies of three potential sites for a new boat harbor in King Cove, Alaska. Pl. App. 8,9, 17, 182-206. The site identified as "Alternative 2" was located to the south of the existing causeway. Pl. App. 187. In 1996, the Corps recognized the need to conduct subsurface explorations at the Alternative 2 site to gain an understanding of the nature of subsurface materials in order to determine the likely method of dredging. Pl. App. 8-11. The Alternative 2 site was ultimately selected for the project. Pl. App. 20, 86-87.

36. Charles Wilson acquired a Masters of Science and Geotechnical Engineering Degree in 1982 and began work with the Corps in 1986. Pl. App. 2-3. In 1996, Mr. Wilson was a geotechnical project engineer for the Corps and assigned to the King Cove project team. Pl. App. 4-6. Mr. Wilson was the primary source of information for Corps' project team members in regard to soils, geology or subsurface conditions at the project. Pl. App. 7.

37. The Corps recognized that any contractor performing the work on the project must make a fundamental decision as to whether the dredging work would be accomplished with a hydraulic or clamshell dredging operation. Pl. App. 21, 118-119, 134. The Corps further recognized that a key factor in making such a decision was the nature of the material to be dredged and that material which was too coarse or too large was not suitable for hydraulic dredging. Pl. App. 21-22, 118-119, 134-135, 137.

38 In the summer of 1996, Mr. Wilson conducted subsurface explorations at the project site which consisted of excavation of five test pits with a backhoe. The purpose of these test pit explorations was to explore for bedrock and evaluate subsurface conditions in regard to dredging. Pl. App. 27-28.

39. Mr. Wilson reported the results of the test pit explorations performed by him at the project site in 1996 with the following documents: Pl. App. 27-28, 193-206.

a. A two page narrative report titled "Trip Report for the Small Boat Harbor Improvement – South Expansion, King Cove, Alaska, July 1996"; Pl. App. 193-194, 273-274.

b. A test pit location map. Pl. App. 195, 281.

c. Five test pit logs Pl. App. 196-200, 276-280; and

d. A selection of photographs. Pl. App. 202-206, 282-283.

Of this information, only the test pit logs were included or referenced in the contract documents. Pl. App. 81-83, 211-237.

40. In April 1997, the Corps project team compiled a document titled "Navigation Improvements Detailed Project Report and Environmental Assessment – King Cove, Alaska. ("Detailed Project Report") Pl. App. 182. The Detailed Project Report represented the summary and written reporting of the investigation and analysis performed by Corps in regard to the project as of April 1997. Pl. App. 17. Included as Appendix C to the Detailed Project Report under the title "Geotechnical Report" were the test pit logs and other documentation prepared by Mr. Wilson as a result of the test pit explorations performed for him at the project site in 1996. Pl. App. 17-19.

41. The Detailed Project Report at page 27 reflected the Corps' interpretation of the test pit logs to "indicate easily dredgable material." Pl. App. 88-89, 189. A cost estimate for the Alternative 2 site contained in the Detailed Project Report described the material to be dredged as "sand." Pl. App. 188. The Detailed Project Report at page EA-6 reflected the expectation of the Corps that a hydraulic dredging operation "would most likely be used" in the form of a cutterhead dredge. Pl. App. 190.

42. A cost estimate prepared by Corps' cost estimator, Frank Antolin, dated May 5, 1997 for the Alternative 2 site reflected the Corps' interpretation of the test pit logs as indicating "that the dredging material is sand, gravel, and some boulders." Pl. App. 207-208. Mr. Antolin's estimate assumed the dredging would be performed by a hydraulic, cutterhead pipeline operation. Id.

43. Alan Jeffries, the Corps' hydraulic designer for the project, who was responsible for compiling the plans and specifications, interpreted the results of the Corps' geotechnical investigations at the project site to indicate "that the material to be dredged is sand and gravel ." Pl. App. 88-89, 92-93.

44. ASTM 2488 is titled "Standard Practice for Description and Identification of Soils (Visual-Manual Procedure)" (Pl. App. 239) and contains the following requirements among others:

a. Where ASTM 2488 procedures are used such fact "must be clearly stated" in the report. (Paragraph 1.2) Id.

b. If the maximum particle size found in a soil sample is a cobble or boulder "describe the maximum dimension of the largest particle." (Paragraph 10.11.3) Pl. App. 243.

c. "Estimate and note the percentage of cobbles and the percentage of boulders. Performed visually, these estimates will be on the basis of volume percentage." (Paragraph 12.2) Pl. App. 244.

d. "[I]t is recommended the report state the percentages of cobbles and boulders are by volume" (Note 8, p. 6) Id.

e. "If the field sample contains any cobbles or boulders, or both, the words 'with cobbles' or 'with cobbles and boulders' shall be added to the group name." (Paragraph 15.7) Pl. App. 246.

f. "The report shall include information as to origin, and the items indicated in Table 13." (Paragraph 16.1) Id. Table 13 on page 8 contains a check list of

information to be included in any report provided pursuant to ASTM 2488. Id.

45. ASTM 2488 provides for an optional, specialized nomenclature to describe the percentages of gravel, sand, and fines in any sample as follows: Id.

> Note 15 – If desired, the percentages of gravel, sand, and fines may be stated in terms indicating a range of percentages, as follows:
>
> *Trace* - Particles are present but estimated to be less than 5%
> *Few* - 5 to 10%
> *Little* – 15 to 25%
> *Some* – 30 to 45%
> *Mostly* – 50 to 100%

ASTM 2488 does not provide for any other use of the term "few." Pl. App. 71, 239-249.

46. Mr. Wilson admits ASTM 2488 does not provide for use of the term "few" to describe the percentage of cobbles observed in a test pit. Pl. App. 71.

47. In excavating Test Pit 1, Mr. Wilson observed that cobbles comprised 5 to 10% of the test pit excavation, but chose to use the term "few" to describe such observations in the test pit log. Pl. App. 37-41. Mr. Wilson made no measurement of the largest cobble or boulder found within the Test Pit 1 excavation. Id. The term "Refusal" as used in the test pit log meant that the excavation was caving in as fast as the hole could be dug. Pl. App. 38.

48. Mr. Wilson observed that cobbles comprised in excess of 5% of the Test Pit 2 excavation, but chose to use the term "with cobbles" to describe such observation in the Test Pit 2 log. Pl. App. 42-43. The notations "Easy digging" and "Sidewalls Caving

- Refusal" in the Test Pit 2 log meant very loose, unconsolidated material which kept caving in. Pl. App. 43-44.

49. Mr. Wilson observed that the upper one foot of Test Pit 3 was composed almost exclusively of gravel and cobbles and used the term "gravel and cobbles" to describe such fact in the Test Pit 3 log. Pl. App. 44-45. Mr. Wilson had no percentage of cobbles in mind as he made such observation. Id. Test Pit 3 was fairly far removed from the actual dredge area and of little value in determining the nature of the subsurface materials to be dredged. Pl. App. 45-46.

50. Mr. Wilson observed gravel and cobbles in the upper one foot of Test Pit 4 and gravels exclusively thereafter. Pl. App. 46-47. He observed no cobbles in Test Pit 4 below the one foot depth. Id.

51. Mr. Wilson observed that cobbles comprised 5 to 10% of the Test Pit 5 excavation below the first foot of depth, but chose to use the term "Gravel w/ few cobbles" to describe such observation in the Test Pit 5 log. Pl. App.48-49.

52. Mr. Wilson acknowledges that he did not "precisely" follow ASTM 2488 and that he "could have been more descriptive." Pl. App. 50-52 While Mr. Wilson used certain suggested definitions from ASTM 2488 he did not follow all its procedures. Id., Pl. App. 61-70. Mr. Wilson admits that:

a. Nothing in the test pit logs indicated ASTM 2488 was being employed. Pl. App. 52;

b. None of the test pit logs provided numerical estimates of the percentage of cobbles observed in the sample. Pl. App. 49-50.

c. None of the test pit logs contained a description or measurement of the largest cobble or boulder found in the sample. Id.

d. None of the items identified on the Table 13 check list under Paragraph 16 of ASTM 2488 were included in the test pit logs, with the exception of group symbols for Test Pits 1 and 5 and a description of particle angularity in Test Pit 4. Pl. App. 70.

53. Mr. Wilson's overall determination was that "there were significant cobbles and boulders present within the subsurface conditions." He intended his two page narrative report to convey such fact and expected it would be provided to the contractor. Pl. App. 56-58. However, Mr. Wilson's narrative report was neither included, nor referenced, in the contract documents. Pl. App. 83. Alan Jeffries consulted with Mr. Wilson regarding the information to include in the contract documents and would have included the report had he been requested to do so. Pl. App. 83-84, 150.

54. Notations in four of the five test pits of "Easy digging" and "Sidewalls Caving" were an indication of relatively loose soil according to Mr. Wilson, who agrees it would be reasonable for the contractor to so interpret such information. Pl. App. 16.

55. Test Pit 3 was located at an elevation of +8 and within 100 feet of a bedrock outcropping. Pl. App. 30-31, 209-210, 218. Test Pits 2 and 4 were at elevations of +1 and +4, respectively, and located within the tidal zone. Pl. App. 209-210, 217, 219. Test Pits 1 and 5 were located furthest to the east in the tide flats at elevations of -1. Pl. App. 32, 34-35, 209-210, 216, 220. Test Pit 5 was located within the actual dredge area. Pl. App. 34-35. Test Pit 1 was approximately 20 feet outside of the dredge limits. Id. A reasonable geological interpretation of the area and the test pits was that cobbles and boulders found on the surface in the upper portion of the tidal zone were the product of rocks from the bedrock outcropping, subjected to the tidal action overtime. Pl. App. 32-33, 180A-180B. Fewer cobbles would be expected in the lower tidal zone and actual dredge area, as demonstrated by the indications of "few" cobbles in Test Pits 1 and 5. Id.

56. Visual observations of cobbles on the surface of the tidal zone are not a reliable indicator of the extent of cobbles below the surface. Pl. App. 53-54, 345. Defendant's geotechnical expert, Charles Riddle, agrees. Pl. App. 154. Test Pit 4 illustrates this proposition, while cobbles were indicated in the first one foot of depth, none were found thereafter. Pl. App. 53-54, 219.

57. In the opinion of Red Samm's geotechnical expert, Peter Douglass, very little coarse material was visible on the surface of the dredge area. Pl. App. 181. The Corps' project manager, Lynden Belin, agrees that the visible surface was mostly sand. Pl. App. 123. Charles Riddle agrees the contractor should have relied on the more specific test pit data; rather than visual observations of the surface. Pl. App. 155.

58. The Corps agrees that : (1) knowledge of the subsurface conditions was not necessary for Red Samm to construct the breakwater; (2) the only reason for the inclusion of subsurface information within the contract documents was to provide Red Samm appropriate information to select the method and type of equipment to perform the dredging; and (3) the Corps expected Red Samm to rely upon the contract subsurface data in making a decision as to the type of dredge equipment to employ. Pl. App. 118-119, 144, 297.

59. During review of draft plans and specifications for the project, Mr. Wilson's superior, Jerry Raychel, requested that soil borings conducted in 1985 for the City of King Cove's construction of the causeway be included in the contract documents. Pl. App. 12-14. Mr. Raychel believed the soil borings provided useful information and it would be wise to include them within the contract documents. Id. By including such information the Corps intended the contractor to review it and rely on it. Pl. App. 14. The Corps believed the soil borings were useful information to determine the subsurface conditions at the project site. Id. Such information would not have been included in the contract documents if the Corps believed it to be of no value or use. Id., Pl. App. 109-110.

60. Four soil boring logs were also included in Appendix A to technical specification 02222 of the contract documents. Pl. App. 221-237. The soil borings were located in the northeastern portion of the project area and outside of the actual dredge

limits. Pl. App. 293. Dredging was required to an elevation of -17. The government's geotechnical expert, Charles Riddle, agrees with Red Samm that none of the soil borings indicated cobbles at or above such elevations. Pl. App. 156, 302.

61. The government intended Red Samm to rely upon the subsurface soils data found in Appendix A of technical specification 02222 in both bidding and performing the work on the project. Pl. App. 297.

62. Red Samm inspected the site prior to its bid. Pl. App. 165-167. Red Samm also reviewed the test pit logs and soil boring logs contained in Appendix A of technical specification 02222 of the contract documents prior to submitting its bid. Pl. App. 300. American Construction provided a quote to Red Samm to perform the dredging work prior to bid. Id., Pl. App.369-372. American reviewed and relied on the test pit logs and soil boring logs in preparing its quote. Pl. App. 369-370. Red Samm incorporated American's quote in its bid and estimate. Pl. App. 300.

63. The Corps' letter of December 20, 2000 reflected its intention and belief that the contract subsurface data was "sufficiently representative to determine the consistency of the material to be dredged." Pl. App. 120-121, 264.

64. The Corps' project manager, Lyden Belin, agrees that the technical specification 02222 was reasonably understood by Red Samm as representing that the

subsurface data contained in Appendix A to the specification indicated the nature of the material to be dredged at the project site. Pl. App. 121.

65. Technical specification section 02222 and the test pit logs and soil boring logs found in Appendix A of that specification section are reproduced in their entirety at pages 216 to 237 of Pl. App. Specification section 02222 represented the test pit logs and soil boring logs as "for the area to be dredged." Appendix A described such information as "Subsurface Conditions." Id.

66. During the feasibility and design stages of the project and thereafter, the Corps' local sponsor, state agencies, and the City of King Cove all expressed a strong desire for upland disposal of the dredge spoils so as to allow reuse of the material. Pl. App. 90, 101.

67. The City of King Cove approached Red Samm after award of the contract and requested Red Samm evaluate the possibility of upland disposal of the dredge material, provided the City of King Cove could arrange for a suitable upland disposal site. Pl. App. 301-304. During construction of the breakwater in 1999, Red Samm evaluated the feasibility of a hydraulic dredging operation to accomplish the dredging work. Id. In making that determination, David Heeter of Red Samm reviewed and relied upon the test pit and soil boring logs provided in the contract documents. Id. In interpreting the term "few" as used in the test pit logs, Mr. Heeter understood it to have an ordinary, dictionary meaning of "small, little, not many, small number." Pl. App. 170-

171, 302. Applying such definition to a reasonably assumed volume of the test pit, Red Samm reasonably concluded that the term "few," as used in the test pit logs, indicated less than 1% cobbles within the test pit sample. Id. Mr. Heeter also reviewed and relied upon the soil boring logs which indicated no cobbles within the required dredging depth, as well as the indications in four of the test pits of loose, unconsolidated soil. Pl. App. 302.

68. In the opinion of plaintiff's experts, Mr. Brown and Mr. Douglass, Red Samm's interpretation of the contract subsurface data was reasonable. Pl. App. 319-320, 351.

69. The Golder Geophysical Report did not identify cobbles. Pl. App. 309-310, 330-331. The only meaningful information provided by the Golder Report was location of bedrock. Pl. App. 331. The location of bedrock, as determined by Golder, was also provided through contour lines added to the plans included with the contract documents. Id. Sheet H-3, "Site Plan," of the plans included in the contract documents for the project depicted the contours of the bedrock in the southwest portion of the site and contained a note which stated in relevant part as follows:

> Geophysical exploration conducted by Golder Associates, October 1997. Top of bedrock contours were interpreted as shown in the southwest corner of the mooring basin..."

Pl. App. 293.

Red Samm acted reasonably in not reviewing the Golder Report. Pl. App. 331.

70. During the first construction season, Red Samm conducted supplementary test pit explorations and took samples of the material within the basin to confirm its interpretation of the contract subsurface data. Pl. App. 303.

71. By October 1999, Red Samm had concluded that the subsurface material at the project site was suitable for hydraulic dredging. Pl. App. 304. Red Samm relied on the test pit logs and soil boring logs published in contract documents to make that determination. Pl. App. 301-304.

72. Red Samm also provided the test pit logs and soil boring logs from the contract documents to DeGroot engineers who considered and reviewed such information in making their recommendation to Red Samm as to the appropriate dredging equipment. Pl. App. 306-307.

73. Use by the Corps of the term "few" in the Test Pit 1 log to describe its observation of cobbles comprising 5 to 10% of the test pit sample was inaccurate, misleading, and did not comply with the requirements of ASTM 2488. Pl. App. 239-249, 301-304, 320-321, 351.

74. Use by the Corps of the term "few" in the Test Pit 5 log to describe its observation of cobbles comprising 5 to 10% of the test pit sample was inaccurate, misleading and did not comply with the requirements of ASTM 2488. Id.

75. The analysis of plaintiff's expert, Mr. Douglass, demonstrates that cobbles comprising 5 to 10% of Test Pits 1 and 5 would have resulted in cobbles of such numbers that use of the term "few" to describe them was inaccurate and misleading. Pl. App. 349-351.

76. Use by the Corps of the term "with" in the Test Pit 2 log to describe its observation of cobbles comprising in excess of 5% of the test pit sample was inaccurate, misleading, and did not comply with the requirements of ASTM 2488. Pl. App. 239-249, 301-304, 320-321, 351.

77. The government intended the test pit logs to accurately describe the conditions observed at the test pit locations. Pl. App. 297.

78. Red Samm was mislead by the inaccurate information provided by the Corps in the test pit logs. Pl. App. 299-305. Had the actual percentages of cobbles observed by the Corps in the test pits been disclosed to Red Samm, the contractor would have concluded that hydraulic dredging was not feasible for the site and never attempted it. Id.

79. The percentages of cobbles observed by the Corps in the test pits was information vital to Red Samm's performance of the work. Pl. App. 239-249, 301-304, 320-321, 350-351.

80. The government's geotechnical expert, Charles Riddle, opines the Corps should have employed the procedures of ASTM 2488 in preparing the test pit logs. Pl. App. 159. Mr. Riddle agrees only the Corps could have provided Red Samm accurate information as to the percentage of cobbles observed by it in the test pits. Pl. App. 161. Mr. Riddle offers no opinion as to whether the Corps properly implemented the procedures of ASTM 2488 or whether the test pits logs, as prepared by the Corps, were misleading. Pl. App. 158.

81. The Government's failure to disclose the percentages of cobbles observed in the test pits mislead Red Samm. Pl. App. 239-249, 301-304, 320-321, 350-351.

82. Due to the differing site condition, inaccurate or misleading information provided by the government in the test pit logs, and the government's failure to disclose the true percentage of cobbles observed in the test pits, Red Samm incurred substantial additional costs. Pl. App. 304-305, 324-327. Red Samm's Serial Letter No. 109-060 dated October 30, 2001 submitted Red Samm's request for equitable adjustment in the amount of $2,729,242.09 and its request for time extension of 335 calendar days. Pl. App. 271. An independent analysis by plaintiff's expert, Mr. Brown, using a different methodology, has determined Red Samm incurred a total of $2,459,228 of additional cost due solely to the differing site conditions and/or the government's misrepresentations in the test pit logs. Pl. App. 324-327.

83. Red Samm commenced its hydraulic dredging operations on or about July 12, 2000 but soon encountered problems with excessive cobbles. Pl. App. 175-179, 304-305. Between July 13 and August 8, 2000, Red Samm explored various areas of the site attempting to locate material without excessive cobbles. Id., Pl. App. 328. While on two days Red Samm managed to find such material and achieved production of approximately 3,000 cubic yards each day (Pl. App. 115-116), continued problems with excessive cobbles plugging the intake to Red Samm's suction dredge lead Red Samm to conclude it could not achieve sufficient productivity to meet the required completion date. Pl. App. 305. Red Samm shut down the hydraulic dredging operation on August 8, 2000. Id. At such time, Red Samm had hydraulically dredged approximately 10,000 cubic yards of material which was pumped to an upland disposal site. Pl. App. 125.

84. The Corps agrees with Red Samm that it exhausted all avenues to achieve adequate production with its hydraulic dredging operation and its decision to abandon that operation was prudent under the circumstances. Pl. App. 126, 179.

85. Red Samm's Serial Letter No. 109-034 dated July 18, 2000 notified the Corps that Red Samm had encountered a differing site condition. Pl. App. 257. A draft response prepared by the Corps' project engineer, Lynden Belin, stated the term "few" as used in the test pit logs was "somewhat subjective." Pl. App. 258-259. While the Corps had considerable internal discussions on the subject (Pl. App. 102-114), the final version of the Corps' response, dated August 4, 2000, deleted such statement and did not provide any explanation of the Corps' interpretation of the term "few" as used in the test pit logs.

Pl. App. 112, 260-261. Red Samm responded to the Corps' August 4, 2000 correspondence with its Serial Letter No. 109-035 dated August 20, 2000, which explained Red Samm's interpretation of the contract subsurface data. Pl. App. 250-251, 303. The Corps did not respond to Red Samm's August 20, 2000 letter. Pl. App. 114, 303. In an April 2, 2003 letter, an attorney for the Aleutians East Borough, the Corps' local sponsor for the project, expressed concern that as of that date the Corps had not provided an explanation of its interpretation of the term "few" as used in the test pit logs. Pl. App. 266-268. The Corps did not provide any explanation to Red Samm of its interpretation of the term "few" as used in the test pit logs until issuance of the Contracting Officer's Decision dated November 26, 2003, which erroneously asserted that under ASTM 2488 the term "few" used in regard to cobbles meant 5-10%. Pl. App. 288, 303.

86. Red Samm resumed work on August 21, 2000 with a clamshell dredging operation. Pl. App. 305. On September 18, 2000 Red Samm began concurrent activities with a land based operation using an excavator and dump trucks. Id. Red Samm shut down operations in November 9, 2000 due to winter weather. Id. As of such time, Red Samm had dredged approximately one third of the total 360,000 cubic yards required under the contract. Id. As a result, a third season of work was required in 2001. Id. Red Samm employed Western Marine as a subcontractor, who commenced a clamshell dredging operation at the project site on May 9, 2001. Id. Western Marine employed Newhalem River Dredging as a sub-subcontractor to dredge a portion of the harbor. Newhalem implemented a hydraulic dredging operation employing a 12 inch pipeline

cutterhead dredge in an industry standard configuration. Pl. App. 140. Newhalem's logs indicate Newhalem dredged a total of 55,518 cubic yards over a 40 day period. Pl. App. 146, 328. Of this amount, 50,783 cubic yards were within the pay limits. Pl. App. 328. The balance of the dredging was accomplished by Western Marine with a clamshell dredge. Pl. App. 305.

87. Ms. Deborah K. Reidell was the Corps' change order negotiator for the project. Pl. App. 128. Ms. Reidell had a significant role in reviewing all communications relating to Red Samm's differing site condition claim and was part of the Corps' management team strategizing on how to deal with the claim. Pl. App. 129-130. The government has also offered the opinions of Ms. Reidell as an expert in regard to dredging methods and equipment. Pl. App. 289. Ms. Reidell agrees that: (1) any contractor performing work on the project would be required to choose between a hydraulic dredging operation or a mechanical clamshell dredging operation. Pl. App. 134.; (2) such decision depends to a large degree on the nature of subsurface conditions Id.; (3) hydraulic dredging is not suitable for all conditions Pl. App.134-135.; and (4) she would expect the contractor on the King Cove project to rely on the contract soils data in making a decision as to the type of dredging equipment to be employed. Pl. App. 144.

88. In October 1999, Ms. Reidell considered the King Cove site one which was suitable for hydraulic dredging. Pl. App. 136-137, 290. Ms. Reidell was not concerned at that time when she learned Red Samm intended to employ a hydraulic dredging operation at the project site. Id. Ms. Reidell considered a 12 inch pipeline

cutterhead dredge in an industry standard configuration as appropriate and suitable for the King Cove project. Pl. App. 138. Such a dredge is a relatively small cutterhead dredge within the overall family of that type of equipment Pl. App. 138-139. Newhalem River Dredging employed precisely the type of hydraulic dredging equipment Ms. Reidell considered suitable for the King Cove project. Pl. App. 140. In Ms. Reidell's view Newhalem was also a highly experience hydraulic dredging contractor who operated in the most efficient fashion possible on the King Cove project. Id.

89. At her January 12, 2006 deposition, Ms. Reidell testified to the following:

a. She had not researched or reviewed Corps technical reports which favorably evaluated the DeGroot DOP dredge pump employed by Red Samm. Pl. App. 141-142.;

b. She had not reviewed any DeGroot manufacturer's literature regarding the hydraulic dredging equipment employed by Red Samm, Pl. App. 133.;

c. Her calculations of Red Samm's hydraulic dredge productivity were erroneously based on the assumption of a total of 6,000 cubic hydraulically dredged by Red Samm rather than the more accurate figure of 10,000 cubic yards as acknowledged and recognized in the Contracting Officer's Decision. Pl. App. 148A.;

d. Ms. Reidell acknowledged inconsistencies and mathematical errors in her calculation of the daily average productivity achieved by Newhalem. Pl. App. 146-149.;

e. Ms. Reidell is not qualified to perform technical calculations comparable to plaintiff's expert, Jordan Isaiou, and has no reason to question Mr. Isaiou's analysis. Pl. App. 132-133.;

f. Ms. Reidell did no calculation of the average hourly or daily production achieved by Red Samm with its hydraulic dredging operation. Pl. App. 145.;

g. Ms. Reidell was unable to comment or offer any opinion on the analysis and comparison of hydraulic dredge productivities of Red Samm and Newhalem performed by plaintiff's expert, Roger Brown. Pl. App. 150.;

h. Ms. Reidell would be required to revise her opinion as to the adequacy and implementation of Red Samm's hydraulic dredging equipment, if Red Samm achieved substantially the same productivity as Newhalem. Id.; and

i. Ms. Reidell performed no analysis and did not consider whether the Red Samm's hydraulic dredging operation was impacted by a differing site condition. Pl. App. 151-152.

90. The analysis of plaintiff's expert, Roger Brown, demonstrates that Red Samm and Newhalem achieved substantially the same productivity in their hydraulic dredging operations at the project site. Pl. App. 309, 325, 328.

91. Technical experts for the Corps have favorably reviewed the DeGroot DOP dredge pump employed by Red Samm, selecting it as one of eleven out of ninety-one technologies considered which were identified as having "a high potential for increasing efficiency of productivity of the dredging operation." Pl. App. 358-368.

92. In the opinion of plaintiff's expert, Jordan Isaiou, Red Samm's hydraulic dredge equipment was suitable for the project site in conditions as anticipated by Red

Samm and would have achieved planned productivity but for excessive cobbles. Pl. App. 352-355.

93. Red Samm visually observed portions of the site with concentrations of cobbles between 10 and 20% during its dredging operations in 2000. Pl. App. 304. The Corps' onsite inspector, Earnie Mendenhall, agrees portions of the site contained cobble concentrations in excess of 10%. Pl. App. 117. Gradations of samples taken by Red Samm in ten locations after commencement of its clamshelling operation in the year 2000 found cobble percentages ranging from 6.5% to 34.3%, with an average of 22%. Pl. App. 304. An analysis by plaintiff's expert, Mr. Brown, of project photos, barge logs and daily reports determined that substantial portions of the project subsurface materials were materially different than indicated in the contract documents. Pl. App. 323-324. Limited and biased sampling by the Corps in July 2001 of the stockpile of dredged materials reflects percentages of cobbles ranging from 2.3 to 8.9% Pl. App. 348.

94. On November 26, 2003, Sandra J. Davidson, the Contracting Officer, issued Findings of Fact and the Contracting Officer's Decision ("COD"), which summarized her decision at page 2 as follows:

> The Government contends the dredge material encountered by the contractor was as indicated in the contract documents and is not a differing site condition. The Government maintains that the contractor's difficulties and inefficiencies were solely the result of the equipment the contractor chose to use.

Pl. App. 284-286.

The Contracting Officer's Decision did not assert that the term "few" as used in the test pit logs was a patent ambiguity which required clarification by Red Samm. Id. Rather, the Contracting Officer erroneously asserted that under ASTM 2488 such term meant 5-10% when used in regard to cobbles. Pl. App. 288.

95. The Contracting Officer's Decision also states in part as follows:

> Appendix A of TS 02222 contains exploration logs from five test pits excavated in June 1996 and drilling reports from four soil borings performed in November 1985 for a previous King Cove project. Per TS 022222-1.2, this information was representative of the area to be dredged and excavated under this contract.

Pl. App. 287A.

96. The contract documents for the project included a standard Federal Acquisition Regulation Differing Site Condition Clause. Def. App. 21.

97. A solicitation for the project was initially published on May 13, 1998. Pl. App. 272. Approximately four bidders submitted bids on the first round of bidding. Pl. App. 300. The project was re-advertised for bid and a second solicitation issued on October 7, 1998. Pl. App. 252-256. Six bidders submitted bids the second round of bidding. Id. The Corps never advised Red Samm that any bidder during either round of bidding of the project had sought clarification of the term "few" as used in the test pit logs or any other terminology employed in the soils data included in the solicitation. Pl. App. 300.

98. In the opinion of plaintiff's experts, Roger Brown and Peter Douglass, the term "few" as used in the test pit logs was not a patent ambiguity. Pl. App. 310-311, 330.

DATED 5th day of May, 2006.

*S/ James T. Hopkins*
James T. Hopkins, WSBA #11856
Schiffrin Olson Schlemlein & Hopkins, PLLC
1601 Fifth Ave., Suite 2500
Seattle, WA 98101
Telephone: (206) 448-8100/Fax (206) 448-8514
Email: jth@soslaw.com
Attorneys for plaintiff Travelers Casualty and Surety Co. of America