NO. 04-487
(J. Block)

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# APPENDIX TO PLAINTIFF'S RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS AND PLAINTIFF'S ADDITIONAL PROPOSED FINDINGS OF UNCONTROVERTED FACTS

JAMES T. HOPKINS
Schiffrin Olson Schlemlein & Hopkins, PLLC
1601 Fifth Ave., Suite 2500
Seattle, WA 98101
Telephone: (206) 448-8100/Fax (206) 448-8514
Email: jth@soslaw.com
Attorneys for plaintiff Travelers Casualty and Surety Co. of America

May 5, 2006

**PLAINTIFF'S APPENDIX**
**TABLE OF CONTENTS**


| | |
|---|---|
| Excerpts from Deposition of Charles Wilson | 1 |
| Excerpts from Deposition of Alan Jeffries | 78 |
| Excerpts from Deposition of Lynden Belin | 94 |
| Excerpts from Deposition of Earnie Mendenhall | 124 |
| Excerpts from Deposition of Deborah Reidell | 127 |
| Excerpts from Deposition of Charles Riddle | 153 |
| Excerpts from Deposition of David Heeter | 162 |
| Excerpts from Deposition of Peter Douglass | 180 |
| Navigation Improvements Detailed Project Report and Environmental Assessment, King Cove, AK (Deposition Exhibit 4[1]) | 182 |
| Current Working Estimate, Small Boat Harbor, King Cove, AK Alternate 2, South, New SBH, May 5, 1997 (Deposition Exhibit 6) | 207 |
| Site Plan (Deposition Exhibit 7) | 209 |
| Division 02 – Site Work, Section 02222 and Appendix A, Subsurface Conditions, Dredging, Excavation and Disposal (Deposition Exhibit 8) | 211 |
| ASTM D 2488 – 93 Standard Practice for Description and Identification of Soils (Visual-Manual Procedure) (Deposition Exhibit 12) | 239 |
| Red Samm Construction, Inc., Serial Letter 109-035, August 20, 2000 to Lynden Belin (Deposition Exhibit 13) | 250 |
| Abstract of Offers- Construction, Harbor Improvements, King Cove, AK, dated November 13, 1998 (Deposition Exhibit 28) | 252 |
| Red Samm Construction, Inc., Serial Letter 109-034, July 18, 2000 to Lynden Belin of the US Army Engineer District (Deposition Exhibit 36) | 257 |


[1] Exhibits for the depositions of fact witness were numbered sequentially and may be referenced in the testimony of several witnesses.

## TABLE OF CONTENTS
**-continued-**

Draft Letter from Thomas Johnson of Quality Assurance Branch in response to Red Samm Construction Serial Letter 109-34 (Deposition Exhibit 38) 258

August 4, 2000 Thomas Johnson letter to Red Samm Construction in response to Serial Letter 109-034 dated July 18, 1999 (Deposition Exhibit 41) 260

Inspector's Quality Assurance Report (QAR) Weekly Up Date of Construction dated August 7, 2000 (Deposition Exhibit 46) 262

Thomas Johnson dated December 29, 2000 to Red Samm Construction regarding Serial Letter 109-040 (Deposition Exhibit 55) 263

Joseph Levesque letter of April 2, 2003 to Greg Vanagel, Alaska District regarding Harbor Improvements Project. (Deposition Exhibit 61) 266

Email from Boguslaw Wierzbicki to Walter Wood dated September 14, 2001 Subject: King Cove Liquidated Damages (Deposition Exhibit 68) 269

Red Samm Construction Serial Letter 109-060 dated October 30, 2001 to Thomas Johnson (Deposition Exhibit 70) 271

Solicitation, Offer, and Award dated May, 13, 1998 Solicitation No. DAC85-8-0015 (Deposition Exhibit 76) 272

Trip Report for the Small Boat Harbor Improvement – South Expansion, King Cove, Alaska, July 1996 (Deposition Exhibit 78) 273

Excerpts from November 26, 2003 Finding of Fact and Contracting Officer's Decision 284

Excerpts from Report of Deborah K. Reidell dated December 12, 2005 289

Excerpts from ASTM D 2487-93 Classification of Soils for Engineering Purposes (Unified Soil Classification system) (Riddle Deposition Exhibit 10) 291

Plan Sheet H-3, Site Plan 293

## TABLE OF CONTENTS
**-continued-**


| | |
|---|---|
| Excerpts from Defendant's Responses to Plaintiff's First Set of Interrogatories, First Request for Production of Documents, and First Request for Admissions | 294 |
| Declaration of David Heeter | 299 |
| Declaration of Donald L. Luterbach | 306 |
| Declaration of Roger Brown and Exhibits thereto. | 308 |
| Declaration of Peter Douglass and Exhibits thereto. | 329 |
| Declaration of Jordan Isaiou and Exhibits thereto. | 352 |
| Declaration of Steven Brannon and Exhibits thereto. | 369 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, a Connecticut corporation | ) | NO. 04-487 |
| v. | ) | |
| THE UNITED STATES | ) | |

**DEPOSITION OF CHARLES R. WILSON**

APPEARANCES:

| | |
|---|---|
| **FOR TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA:** | **MR. JAMES T. HOPKINS**<br>Schiffrin Olson Schlemlein & Hopkins<br>Attorneys at Law<br>1601 Fifth Avenue, Suite 2500<br>Seattle, Washington 98101<br>(206) 448-8100 |
| **FOR THE UNITED STATES:** | **MR. REID PROUTY**<br>Trial Attorney<br>U.S. Department of Justice<br>Civil Division<br>1100 L Street, NW<br>Washington, D.C. 20530<br>(202) 305-7586 |
| ALSO PRESENT: | MS. CLAIRE BERRY |

* * * * * *

break we can do so at any time. The only thing I ask is if there's a question pending that you complete your answer to that question before we take a break, so if you feel like taking a break say so. With that in mind can you give me just a little thumbnail sketch of your educational background?

A Graduated in 1975 from Oklahoma State University with a degree in Forestry, Bachelor's degree. From there I worked in the Alaska Pipeline as a field engineer for a couple of years and after that was done.....

(Cell phone ring)

Q Excuse me. I apologize. I should have turned that off. All right. Proceed.

A When I completed my work with the Alaska Pipeline I went back to school at Oregon State University and I procured a degree in Masters of Engin- -- or Master's of Science and Geotechnical Engineering in 1982.

Q Have you had any other formal training since your Master's in 1982?

A No formal education.

Q Attend seminars or anything like that?

A I've attended seminars and short courses with the Corps of Engineers.

Q How about your employment history, let's say, starting with your period of time on the pipeline, can you just

give me a little sketch of your employment history?
A Yes. From graduation in 1975 from Oklahoma State I started work for Alaska Resource Sciences Corporation which was a subsidiary or family company, I think, with Williams Brothers Engineering. And I was a field engineer approximately two years. And as I said upon completion of that job went back to school at Oregon State University. On completion of that degree I came to Alaska worked for DOWL Engineers, a private engineering firm here in Anchorage for about four years, and then I got a Corps of Engineers and I've been with them since 1986.
Q And you're presently employed by the Corps of Engineers, correct?
A That's correct.
Q Can you give me a similar sort of history of what positions you've held with the Corps since you started?
A I've been primarily just the project geotechnical engineer until four or five years ago where I'm now chief of the soils and geology section.
Q Of the Alaska District of the Corps of Engineers?
A Yes, only Alaska District.
Q How many people are in the geology section?
A We have a soils and geology section. And currently there -- we have a drill crew which is the driller and

a drill helper. And I have five project engineers and at various times we have student hires and EITs that come through.

Q So the project engineers work under your supervision presently?

A Presently.

Q And I assume that your crew is to go perform subsurface explorations at various potential project sites?

A That's correct, in conjunction with we have other means and vehicles to contract other drilling companies here in town or throughout Alaska.

Q Is it fair to say then that's one of the -- historically that's been one of the primary functions of your -- of the geology section of the Alaska District is to conduct subsurface explorations for anticipated projects?

A I would say that's correct.

Q And obviously you do more than just that. You analyze existing data for potential projects as well, is that fair to say?

A Yes.

Q In 1996 what was your position?

A I was a project engineer.

Q Were you -- is there any sort of hierarchy in your section? Were you a senior project engineer or is

Q Can you kind of give me your best recollection in a general sense of the history of your involvement in the King Cove project? If you can kind of go back to the beginning and do it in a chronological order that may be most helpful?

A Well, I would have been assigned the project by my chief, Jerry Raychel. I would have worked with the project members. That'd be the designers, the hydraulics and the harbor -- H and H people which is hydraulics and hydrology which are generally the designers. I would furnish and try to aid them in the subsurface investigations for their project. And then after that was complete be available for construction

people if any needs arose or con- -- you know, construction people in the field.

Q So did that happen on the King Cove project, that typical scenario?

A Yes, I believe do -- believe so.

Q And we're certainly going to look at it in more detail, but you were involved in doing a subsurface exploration at the project site in 1996, correct?

A That's correct.

Q And as a general proposition after you performed that exploration or study did you stay involved in discussions with the team that was continuing to evaluate the project and ultimately prepare plans and specs?

A Yes, I did.

Q Once work started were you consulted when the contractor gave notice of a claim for a differing site condition?

A Yes.

Q And so if anyone within the Corps of Engineer team involved in the project wanted information regarding soils or geology, subsurface conditions you were the primary source of information, is that fair to say?
A Yes.
Q Now did you have anybody that worked with you or assisted you in a meaningful fashion? I don't mean a secretary that typed a letter, but I mean someone that helped you analyze data, review information, write reports?
A Jerry Raychel would have. I would have had conversations with him.
Q Jerry was in a supervisory capacity, correct?
A That's correct.
Q So would his -- would it be correct then his involvement would be for you to discuss parameters and

correct?
A Correct.
Q And alternative 2 was south of the causeway, correct?
A (No audible response)
Q Do you recall that as stated in page 2 of Exhibit 1 that there was a lack of information as to the subsurface conditions in the area of the second alternative?
A Yes.
Q That was a factor that was part of the planning and analysis for the project by the Corps, wasn't it?
A Yes.
Q I mean there was a recognized need to go out and conduct some subsurface explorations and gain an understanding of the nature of the subsurface materials in the area 2 project area?
A Yes.
Q And that was primarily your job on this project, correct?
A Yes.
Q Now do you agree with me that it was necessary for the Corps to acquire that information first to develop a proper design?
A Yes.
Q And by that information I mean adequate subsurface

information regarding the area south of the existing causeway?
A Yes.
Q They also needed adequate subsurface information to determine the likely methods of dredging, correct?
A Yes.
Q And the Corps needed that for cost estimating purposes, right?
A Would you repeat that?
A The Corps would need to understand the likely method of dredging for the project in order to accurately estimate the cost of the project?
A Yes.
Q And there would also likely be environmental considerations that would have to be addressed depending upon the nature of the dredging, true?
A Yes.

Q Section 2.2.1 of the project study plan here of Exhibit 2, reflects that a report will be prepared which refines the description of the geological history and characteristics of King Cove and adjacent area found in the reconnaissance report based on a thorough review of existing data and publications. You would have been the individual that did that, correct?
A Yes.
Q And looking under Section 2.2.2 also of the project study plan that's part of Exhibit 2, that section

addresses necessary exploration and testing and indicates that subsurface conditions must be determined for the alternative 2 and 3 areas, do you see that, down at the bottom?

A Yes, I see that.

Q And, again, the purpose of that was to determine the likely method of dredging, correct?

A Yes.

Q Okay. Were you involved in the decision to include in the contract documents the soil borings conducted in

1985 for the causeway project?
A Yes, my boss requested that they be in there.
Q And.....
A Jerry Raychel,.....
Q And when.....
A .....I recall that.
Q When did he make that request?
A That was during documents and specifications.....
Q This would have been.....
A .....preparation.
Q .....after your test pit exploration?
A Yes.
Q Was that request made after an initial review of the plans and specs -- draft plans and specs?
A I don't recall, but.....
Q It was approximately.....
A .....probably....
Q .....that time?
A Ap- -- in that time frame.
Q Was it probably the result of some sort of comments that had been generated regarding the draft plans and specs?
A As I recall Jerry -- it was -- he thought it might be useful information because it was existing information in the vicinity and he thought that it would be wise t

include it in the package.

Q And you had that discussion with you specifically?

A Yes.

Q And by putting it in the contract documents the Corps intended the contractor to review it and rely on it, correct?

A Yes.

Q And it felt it was useful information to determine the subsurface conditions at the site, correct?

A In supplemental with the geophysical exploration and the test pit exploration.

Q There wouldn't have been any reason to include the soil boring data from the 1985 project in the contract documents if it was of no value or use, would there?

A No.

Q So the information that you included in the July 1996 test pit logs is based on your visual observations?
A Yes.
Q As the test pits were being dug were you measuring the depth?
A I tried to within safety measures. I mean some of the test pits were caving. It wasn't -- and so I -- I believe I probably -- well, I know I did. I had a measurement of the -- how deep the hole was going into the ground.....
Q And you.....
A .....and I used that as a reference especially below water because the pits were filling with water, some of them were.
Q Did you tie a rock to a tape measure and throw it in the hole or what?
A No.
Q Just did the best you could to estimate the depths?

A I estimated it based upon how deep.....
Q The backhoe arm?
A Was reaching into -- yeah.
Q Was digging into the hole,.....
A Yes.
Q .....correct?
A Correct.
Q You mentioned the holes were caving, what'd you mean by that?
A The -- with the water seeping in through the sidewalls they were failing and the -- the walls were falling in into the.....
Q And that was something you noted on the test pit logs, correct?
A I think I did some of them.
Q And that's -- am I right that's an indication of what would be called loose unconsolidated soil?
A It is an indication of relatively loose soil, it can be.
Q And it would be reasonable to interpret it in that fashion, correct?
A Yes.
Q And I think -- am I correct it was easy digging with a backhoe except for the one pit that found bedrock?
A I think I noted that on the logs that it was easy di-

-- digging.

Q (By Mr. Hopkins) I've handed you a document that we've marked as Exhibit 4 which is titled Navigation Improvements Detailed Project Report and Environmental Assessment. It's Bates number EV 010084 through EV 010409. Have you ever seen this document before, Mr. Wilson?

A Probably.

Q Am I correct that this report, the detailed project report that's been marked as Exhibit 4, it's -- represents the summary and written reporting of all of the investigation and analysis that the Corps of Engineers had put into the project as of April 1997, would that be a fair characterization of what this document's about?

A I believe so.

Q (By Mr. Hopkins) Am I right that Appendix C to Exhibit 4, the detailed project report and environmental assessment contains a geotechnical report? Am I correct you prepared what's shown in Appendix C of Exhibit 4?
A I did.
Q And Appendix C contains a two page written report regarding the July 1996 test pit explorations.....
A Yes.
Q .....correct?
A That's correct.
Q It contains a test pit location map which is document EV 010324, correct?
A Yes.

Q It contains five test pit exploration logs, numbers TP 1 through TP 5?
A That's correct.
Q And then it contains four photographs?
A Yes. Five photographs.
Q Excuse me, five photographs, correct. Did you prepare the photos and label them?
A I don't know that I did for this specific document, but I did one.
Q You.....
A Somebody may have used different fonts or whatever, but yes, I did prepare these and that's - that's what I -- with the subtitles.
Q Okay. So the -- first of all, you took the photographs that are shown here in Appendix C of Exhibit 4, the detailed project report, correct?
A I did.
Q And you took those when you were out digging the test pits in July of 1996?
A I did.
Q And you also provided the label and description of the materials for those photos?
A I did.

Q Turning to the third page, page 22 of Exhibit 4, that's Bates number EV 010118, that's the cost estimate for alternative 2, correct?
A Yes.
Q And that's the alternative that ultimately became the actual project design, right?
A Yes.

Q Don't you agree that the Corps of Engineers both for its cost estimating purposes and a contractor performing work on this project had a fundamental decision to make as to whether the dredging work was going to be done with hydraulic dredging or a clamshell operation?
A I believe that's probably relatively accurate.
Q You're familiar based on your 20 plus years of experience with the Corps of Engineers in the general differences between hydraulic dredging equipment and a hydraulic dredging operation and a clamshell dredging operation, aren't you?
A Yes.
Q And don't you also agree with me that a key factor in making that decision which of those two basic types of

operation are going to be employed is an understanding of the nature of the material to be dredged, right?

A Yes.

Q Materials that is too coarse and too large is not suitable for a hydraulic dredging operation, true?

A If it's too coarse, no, it's not.

Q Mr. Wilson, I'm handing you a document we've marked as Exhibit 6, Bates number CE 008894 through 933, and it's titled Small Boat Harbor, King Cove, Alaska Alternate 2 South and it appears to be a detailed project estimate. Would I be correct in that regard?
A I believe it is.
Q And if I look at -- and by the way, this document has a preparation date of May 5, 1997, correct?
A Yes.
Q Turning to the second page it says basis of design, detailed project report dated April '97 Alternate 2, South SBH, Section 107, do you see that?
A Yes.
Q And would the reference to SBH mean Small Boat Harbor?
A Yes.
Q So would I be correct in interpreting this cost estimate as based upon alternate number 2 and the information provided in the detailed project report

dated April 1997 that we've previously viewed as Exhibit 4?
A Yes.
Q And, again, just for the record in case I didn't quite make that clear, Exhibit 4, the detailed project report, is a rather comprehensive document, isn't it?
A Yes.
Q And we're talking about two inches thick of 8 X 11 material?
A Yes.
Q Under the section labeled Construction Methodology on page 2 of Exhibit 6 it addresses the two fundamental aspects of the project, right, first constructing a breakwater and then dredging the harbor, correct?
A Yes.
Q I mean the King Cove project had a certain logical division, the first thing....
A Right.
Q .....you did was built a breakwater, correct?
A Correct.
Q And then you -- once the breakwater was built you'd come in and dredge out the basin, right?
A Right.
Q Those are fairly distinct and different construction activities?

A That's correct.
Q So they're sort of a logical division in the work on the project, correct?
A Yes.
Q And likewise a logical division in the design of the project?
A Yes.
Q So am I correct that the cost estimator working for the Corps of Engineers, Frank Antolin, has reflected on Exhibit 6 anticipated that the dredging would be done by quote, cutterhead pipeline equipment and the material will be discharged offshore and upland, isn't that what he indicates under construction methodology?
A Let me read it. That's what he states that his estimate it based on.
Q And then under the next section on page 2 of Exhibit 6, unusual conditions soil, quote, geotechnical field exploration report that the dredging material is sand, gravel and some boulders, do you see that statement?
A Yes, I do.

Q And this has -- Appendix C of Exhibit 4 is, I think we earlier touched on the geotechnical report that you

prepared as a result of your July 1996 trip to the site, right?
A It's a trip report, yes.
Q Do you have any earlier drafts of this report?
A Yes, there is one that's without the Appendix C, that this was prepared specifically for this document I think. And there is -- it's not a draft. It's just a final copy just like this except it's not -- it was stand alone document.
Q Okay. But is it word for word the same, just has a different heading?
A I believe so.
Q And I'm not going to make this an exhibit because I only have one copy of it, but showing you a document marked GEO 011078 through.....
A That's the one I'm.....
Q .....GEO 011089, is that -- that's the initial version of the trip report, correct?
A That's true.
Q And as far as you know the text in that document is identical to the one that's in Exhibit C?
A I believe it is.
Q I think it is, too. Well, you'd earlier touched on the purpose of the July 1996 test pit exploration, but looking now at the report which is part of Appendix C

to Exhibit 4 at page EV 010322, the second sentence under Scope says, quote, the scope of the visit was to explore for bedrock within the south expansion area and to evaluate subsurface conditions with regards to dredging, end quote, see that?

A Yes, I do.

Q Now you wrote that, right?

A Yes, I did.

Q So it's true that there were actually two purposes for your July 1996 test pit explorations, explore for bedrock and evaluate subsurface conditions for the anticipated dredging, correct?

A Yes. Would it be all right to take another break here at this point?

Q Sure.

(Off record)

**(Deposition Exhibit 7 marked)**

(On record)

COURT REPORTER: We marked Exhibit 7 while we were off record.

Q (By Mr. Hopkins) Mr. Wilson, can you identify Exhibit 7 as 8 X 11 copy of the site plan for this project and attached as the second page is a expanded view of the southwest corner of the site showing test pit locations?

A Yes.

Q Okay. So looking again at the site plan sheet H-3 test pit 3 was the fartherest up the slope so to speak,

correct?
A Yes.
Q There was a fairly steep slope that came down to the eastern perimeter of the project site, correct?
A That's correct.
Q And in fact, your report which is a part of Appendix C to the detailed project report shows a bed outrock -- bedrock outcrop, correct?
A Would you repeat that, please?
Q Your report which is part of Appendix C shows the little drawing that you made.....
A Oh.
Q .....to locate the test pits refers to a bedrock outcrop, correct?
A Yes.
Q And that was apparent to you visually or from what information?
A It's visually. It's a cliff.....
Q And.....
A .....or bluff.
Q And test pit 3 was sort of located right below it, correct?
A Out from the toe.
Q But of all the test pits it was fairly close to it?
A Within a 100 foot or so I suppose is.....

Q Uh-hum.
A Yes.
Q And I gather you observed cobbles in the tidal zone on the surface in the vicinity of test pits 2 and 4?
A I believe so, yes.
Q Test pits 1 and 5 were located further to the east more in the tide flats in a flatter, siltier surface, weren't they?
A Yes.
Q And would it be correct from a geological perspective or would it be reasonable from a geological perspective to understand the cobbles that are shown in the upper portion of the tidal zone on the surface as the product of the bedrock outcropping and landslides over time where the rocky material had been acted on by tidal action?
A I'm not sure of the -- where these came from.
Q Wouldn't that be a reasonable conclusion however?
A That's probably one source.
Q In other words, you've got rock outcropping and slopes and over time they weather and slide and those rocks fall into the tidal zone and are acted on by the tidal action, correct?
A Right. It's a once --.....
Q That's a fairly reasonable.....

A ....it's a reasonable sour- -- or source.
Q Reasonable geologic perspective on that area, correct?
A Yes.

Q Well, I'd like to get your help looking at the site plan and the contours that are on the site plan to see if we can understand the elevation of the original ground surface so -- and I understand that you have to do some interpretation of the site plan here, but can you try to determine for me at least based on what the site plan shows sheet H-3 of the plans for the project, the elevation of the original ground surface of test -- of each of the test pits is actually what I'd like to know.

A Okay. I think test pit 5 would be approximately minus one. Test pit 1 is approximately zero. Test pit 4 is approximately plus four. Test pit 2 is approximately plus one. And test pit 3 is approximately plus eight, I believe.

Q Now of the five test pits only test pit 5 was located

within the actual dredge area, correct?
A Yes.
Q Test pit 1 was the next closest and was based on the site plan sheet H-3 app- --.....
A Yes.
Q .....approximately how many -- can you -- can we have any idea how many feet from the top of the dredge slope?
A Twenty feet.
Q And test pit 1 and 5 were both in the flat, sandy, silty, low tide surface area, correct?
A Yes.

A Thanks.

COURT REPORTER: We've marked Exhibit 8.

**(Deposition Exhibit 8 marked)**

Q (By Mr. Hopkins) Okay. So just for the record, Mr. Wilson, we've now marked as Exhibit 8 this copy of Technical Specification 02222 that has the test pit logs and the soil boring logs that were provided to the contractors and were part of the contract documents, correct?

A Correct.

Q So let' -- just so we're dealing with the precisely correct document let's refer to Exhibit 8 and the logs on that one. So looking at test pit log number 1.....

A Okay.

Q .....we have an elevation of minus one and your prior analysis had been zero, so that's plus or minus a foot, correct?

A The size of the symbol on the drawing.

Q Right. So do you recall approximately how long it took to dig and observe the material in each test pit on a test pit per -- on a test pit basis?

A On the order of 30 minutes I suppose, from beginning to cut -- starting to dig, covering it up, moving to the new location.

Q And when you -- well, that was one of my questions. So

you'd dig a hole, you'd observe it and then the backhoe would fill the hole back up, you just didn't leave the empty holes, is that.....
A No.
Q .....the way it worked?
A That's correct.
Q Okay. So at test pit 1 the vertical shows -- the log for test pit 1, document EN 009667, shows half foot increments, right?
A Correct.
Q So you noted that the first foot was silty sand, correct, on the.....
A Foot and a half.
Q Foot and a half. Correct. And that's based on observation, right?
A That's correct.
Q And down....
A I may have measured that with -- with the tape because it wouldn't be dangerous at that -- to measure it at that time when you're down to that level of the hole.
Q So it's easy to measure a shallower depth than it is a deeper depth?
A And safer.
Q Safer. Then test pit -- then the log for test pit 1 shows from approximately 1 1/2 feet to 10 feet gravel

with few cobbles and boulders as the description of the soils, correct?
A That's correct.
Q And that based on your visual observations, right?
A That was correct.
Q And you also noted it's easy digging and the side walls are caving, right?
A At refusal, yes.
Q And refusal is actually where it's caving in or as deep as you can go or what?
A In this case it was caving in as fast as you could dig. The hole was expanding and it was becoming dangerous.
Q So it wasn't practical.....
A You can -- you couldn't keep up with -- the hole was caving.
Q Right. It wasn't practical to dig any deeper than 10 feet?
A Couldn't do it.....
Q Right..
A .....with that equipment.
Q Okay. In regard to the notation gravel with few cobble and boulders, did you have a specific quantity in mind when you wrote that term? I'm asking what was in your mind.
A Few to me means about 10 to -- or five to 10 percent

cobbles.....
Q And.....
A .....or -- or whatever you're using that to describe.
Q All right. So your testimony is when you took your -- and you probably -- you took field notes as you were observing this, correct?
A Yes, but they're essentially the same as this log.
Q I understand. We're going to hopefully look at your field notes, but your testimony here just so we're clear is that when you wrote the term few down which you were thinking was five to 10 percent?
A Yes.
Q And that would be based on seeing the number of cobbles and making a rough estimate as to the quantity of material, correct?
A Best estimate with regard to the spoil pile and what was coming out of the bucket and what you could see and what you could see covered up.
Q And is that an estimate based on volume or weight?
A It's typically weight.
Q So that would be your visual estimate of the percentage by weight?
A We try to calibrate ourselves to -- by weight if we can.....
Q Yeah. So I'm just.....

A .....but it's just a range. It's.....
Q I understand you're just looking there making an estimate. I understand that.
A Okay.
Q But I just want to make sure that I'm clear on this. And it's your testimony as you were standing there observing the excavation at test pit 1 it was your estimation that there were cobbles and boulders present that constituted five to 10 percent of the sample by weight?
A That would have been my -- my estimate.
Q That's what you meant when you wrote this word.....
A That's what I meant.
Q Okay. Now was that five to 10 percent a combination of cobbles and boulders together or was that five to 10 percent cobbles and five to 10 percent boulders?
A No, that would be together.
Q And a cobble, just so we're on the same page, is a particle greater than three inches, but less than 12 inches?
A That's correct.
Q And anything over 12 inches is a boulder?
A Yes.
Q Did you make any measurement of the size of the largest cobble or boulder within the sample?

A You mean physical measurement with a tape.....
Q Yeah.
A .....measure?
Q Take the measurement.
A I don't recall, but I probably didn't.
Q Okay. If you had made such an observation or notation it would be included in your field notes?
A Yes.
Q There's nothing here on the log, of course, to indicate the size of the largest cobble or boulder, correct?
A No.

Q Okay. All right. Let's turn to the log for test pit 2 and the next page in Exhibit 8, and that's document EN 009668. And I'm correct the log is in the same format as test pit 1, right?
A Yes.
Q I mean they're all in the same.....
A Yes.
Q .....format and the only thing different they have is the specific information regarding the elevation of the site, coordinates and what you found in the hole, correct?
A That's correct.
Q Okay. So for test pit 2 the description of the material is gravel with cobbles and boulders.....
A Yes.
Q .....correct?
A Yes.
Q What did you have in your mind as you observed the test pit 2 excavation as to the percentage of cobbles and boulders within the sample that was being dug?
A With to me generally means greater than five percent.
Q Okay. So in this case what was in your mind was

something more than five percent?
A Yes.
Q Was it less than 10 percent though?
A No upper limits.
Q No upper limits. So it had at least five percent and could have been more?
A Could have been more descriptive there.
Q Compared to test pit 1, again, I'm talking about what was going on in your mind as you were digging these test pits, did the percentage of cobbles observed in the test pit for test pit 2 in your mind, was it greater or less than the percentage of cobbles you observed in test pit 1?
A I don't recall actually.
Q Obviously there was a difference 'cause you used different notations, right?
A Yes. I noticed something different apparently.
Q And you can't as you sit here today tell me really what that difference was in your mind?
A I can't.
Q All you can tell me is that you thought when you used width you used greater than five percent?
A That's my typical convention.
Q Okay. Let's turn to test pit -- well, strike that. Staying on test pit 2 log just a minute, this also

notes easy digging and side walls caving, correct?
A Yes.
Q That was the same situation as test pit 1, right?
A Yes.
Q It was very loose, unconsolidated material that caved in, correct?
A With seepage, yes.
Q Test pit 3, let's turn to that log, which is document EN 009669, the first foot indicates gravel and cobbles, and below that weathered bedrock?
A Yes.
Q In terms of the description of the material in the first foot gravel and cobbles, did you have in mind at the time you were observing this some percentage of cobbles in that portion of the test pit?
A No, I think that that surface was composed almost exclusively of gravels and cobbles is what I would.....

Q Okay. And do you have any -- was there any range or percentage in mind when you -- as you observed test pit 3?

A No.

Q But it's more than five percent then for sure, right?

A Yes.

Q .....right? Now test pit 3 is vertically outside of any limits of the dredging, isn't it?

A Yes, it is.

Q And it's also fairly far removed horizontally and up the slope, isn't it?

A Yes.

Q Would you agree with me that test pit 3 is of very little value in making a judgment as to what the test

pits show in regard to the subsurface material to be dredged within the mooring basin?
A Yes, I believe it is. That wasn't the intent of that one though.
Q Okay. Turning to test pit 4 so the first foot is again described on test pit 4, and this is document EN 009670 as gravel and cobbles, correct?
A Yes.
Q So that would be a similar material on the surface as test pit 3, same description.....
A I would.....
Q .....then?
A .....believe similar based on the description.
Q And you had the same thing in mind, it's certainly considerably more than five percent.....
A Yes.
Q .....cobbles? Below the first foot on test pit 3 though materials described is gravel, correct?
A That's correct.
Q And that means you didn't observe any cobbles? You don't have any kind of notation here for cobbles, do you?
A I didn't observe any cobbles there.
A And here on test pit 4 you do make a description of the gravel size, angular to sub-angular, correct?

A Not size but shape.
Q Shape, excuse me, correct, shape. But you didn't do that on the other test pits. Why did you do that here on test pit 4?
A I'm not for certain, but I believe it was because I could see the standing wall of gravel, and I believe there's a picture in the report that shows that. And you could see the platey (ph) angularity in the wall and it didn't fall down as it readily -- as I noticed previously. It didn't collapse or cave. But I'm not certain. I mean that's just interpreting.....
Q Okay.
A .....what I think probably I saw.
Q And, again, the notation for the test pit 4 log is easy digging and you've got the side walls caving at about the same depth, eight feet?
A Yes.
Q Or rather nine feet, not eight?
A No -- nine, yes.
Q I'm reading that wrong. Turning to the log for test pit 5 and it's document EN 009671, I gather you observed sand on the first foot, silty sand?
A Yes.
Q And then throughout the rest of the test pit you describe it in the log as gravel with few cobbles,

correct?
A Correct.
Q And in your mind then was this the same type of material that you observed for test pit 1 except that you didn't see any boulders, was that it?
A It should have been similar.
Q And in regard to test pit 5 when you used the term few cobbles in the test pit log you were thinking five to 10 percent cobbles?
A Yes.
Q And that was based on looking at the material being excavated out of the hole?
A Yes. And -- and the spoil pile -- or the dredge pile there, yes.
Q Right. The backhoe digs.....
A That excavated material.....
Q .....a hole?
A Yes.
Q The backhoe digs a hole and dumps the stuff right besides the.....
A Yes.
Q .....hole?
A And tried to estimate the percentage.....
Q And, again, that was --.....
A .....in the pile.