Q .....that was an estimate -- a percentage estimate by weight like.....

A Yes.

Q .....the first one? And that -- did that involve in your mind just counting say, well, I see a cobble here, I see a cobble there, I see cobbles and this kind of my estimate, is that.....

A No, I see cobbles and it's kind of my estimate that I believe there's about five to 10 percent.

Q Okay. Now you mentioned -- so just in summary here, on none of the test pit logs for test pits 1 through 5 provide any estimate or stated amount in numerical terms of the percentage of cobbles or boulders in the sample, right?

A They do not.
Q They do not contain any description of -- or measurement of the largest cobble or boulder in the sample, do they?
A They do not.
Q And I think you earlier referenced or stated, you know, you were doing things kind of the way you do them meaning in your mind with means five percent, I think that was your comment in your earlier testimony? Just your sort of methodology that you developed.....
A Well, with regard to ASTM classifications, too, and the use of those terms.
Q Well, I guess that's where I'm going. Were you employing a particular system or a recognized system or methodology in preparing the logs for these test pits?
A I was trying to use the unified classification as -- you know, and what materials was there and I used those terms that's similar to the ones in ASTM.
Q You used some of the same terms but -- and by ASTM you're referring to ASTM 2488, right?
A Yes.
Q And I understand that you -- there's some similar terms, but I'm trying to get at, were you specifically -- as you prepared these logs and made your field notes were you trying to follow the procedures of ASTM 2488?

A Not precisely.

Q So you were following them -- some of them but not all of them?

A I guess that's kind of a co- -- yeah, correct characterization.

Q How many test pit logs have you prepared to prior to these that are part of Exhibit 8?

A I don't know exactly.

Q Quite a few?

A Quite a few.

Q I mean are we talking 100, 200?

A A hundred maybe.

Q And I would guess over that period of time you kind of just develop your own methodology of how you do things, right?

A You try to have a of- -- follow guidelines.

Q Okay. Was -- can you tell for me -- well, strike that. So I think your testimony is you were aware of the procedures of ASTM 2488 and you followed some of them but not all of them, and you used some of the same terms but not all of the same terms, correct, is that -- in preparing the test pit logs, is that correct?

A The terms I used represent the description -- or the -- they represent ASTM meaning of gravel, cobbles, few (ph) size determinations.

Q But you didn't follow the procedures of ASTM 2448 entirely in preparing these test pit logs, did you?
A I could have been more descriptive there.
Q So the answer is no, you didn't follow all of the procedures, correct?
A Correct.
Q Okay. And I guess -- and the only way for us to determine which procedures you did or didn't follow is we're going to need to look pretty closely at ASTM 2488, right?
A Okay.
Q Would you agree with that as a general proposition?
A Okay, right.
Q And there's nothing on the test pit log itself that says ASTM 2488 was being employed, is there?
A No.

Q (By Mr. Hopkins) Mr. wilson, we're resuming after a lunch break here. And you have in front of you, I believe, Exhibit 8 which is a copy of Technical Specification 02222 from the contract documents that includes the test pit logs. And I wanted to ask you a question, do you agree with me that cobbles on the surface in the tidal zone of the project site are not necessarily an indicator of the existence of cobbles below the surface because the tidal action removes the finer smaller material int he tidal zone?
A That could be. I could agree with that in some cases, but it's not necessarily all -- .....
Q I'm talking about.....
A .....all true.
Q I'm talking about as a general proposition there's that proposition is one that is recognized in the geological community?
A In the wave action zone the beach tends to naturally armor itself with larger size material.
Q And you observed that here at the King Cove project site when you went out to do the test pits, didn't you?
A Yes.
Q And if you look at the log for test pit 4 which is part

of Exhibit 8 isn't that a good example of the very proposition that I was just discussing with you, the fact that cobbles on the surface are not necessarily indicative of cobbles below the initial surface tidal zone?

A That one does show that cobbles were on the surface one foot and they're underlaid by gravel.

Q Without cobbles?

A Without cobble.

Q In other words, the only cobbles found in test pit 4 were on the surface tidal zone, correct?

A That's all I observed.

Q Okay. And in the next section -- (Phone ringing) sorry. In the next section on the same document, the first page of your 1996 geotech report under the section labeled Subsurface. The first sentence says the test pits indicate the basin area to be underlain primarily by gravel containing some cobbles and boulders (photos 2 and 3), end quote, do you see that sentence?

A Uh-hum, yes.

Q Well, first of all, I think photo 2 in the report is labeled test pit 1 but in fact, I think, we've established here today it's not test pit 1, it's really test pit 2, correct?

A That's correct.

Q So that's -- that was outside of the dredge area, correct?

A Correct.

Q And am I right that that sentence that says the test pits indicate the basin area to be underlying -- underlain primarily by gravel containing some cobbles and boulders. Was that based on your overall conclusion or impression after being physically present and performing the test pit excavations?

A That's true.

Q Well, when you drew the overall conclusion and stated it here in this report that the basin area was underlain primarily by gravel containing some cobbles and boulders, when you used the term some did you have some percentage in mind? What were you thinking.....
A What I wanted to be conveyed was that there was cobbles and boulders present.
Q Did anyone within the Corps of Engineers ask you for a more definitive estimate? Did they come to you and they said well, Jerry (sic), I've read your report, it says some, what do you mean? Is some zero to five

percent, is some five to 10, is some 20 to 30, what does it mean?
A No one did.
Q No one ever asked you that?
A No.
Q And in your mind did you have some figure in mind? I mean don't you agree.....
A At the time I wrote that probably I w- -- I didn't have a number in my mind.
Q Fair enough. Turning to the next page of the report -- well, let me ask you this question before we go to the next page. I mean do you agree with me that generally speaking -- and I'm talking about using the English language, that some would be construed to mean more than a few?
A Yes.
Q And did you have at least that much in mind when you report this report?
A I wanted it to be conveyed to the -- for future uses that there were significant cobbles and boulders present within the subsurface conditions to my opinion at that time.
Q And that's what you intended to convey when you wrote this report?
A Yes.

Q Did you expect that the contractors bidding on and performing the work on the project would get a copy of this report?
A It would be available to them and I would assume that most prudent contractors would come to the office and get a copy of the report.
Q So when you drafted the report it was your expectation it would likely be read by the contractor?
A I would hope it would be.
Q And that was your expectation?
A Yes.
Q Turn to the second page of the report under the -- the section's labeled Discussion and Analysis and I'm at document EV 010323, do you see that?
A Yes.
Q And it indicates quote, the two items of concern for the dredging are (1) the dredgibility of the basin soils, and (2) the stability of the basin side slopes. These items are discussed below. The next section addresses Dredging Feasibility, correct?
A Yes.
Q And that section indicates bedrock is located in the extreme corner of the limits, right?
A Yes.
Q And then the other aspect of the discussion there goes

to the nature of the subsurface soils and the feasibility of dredging those soils, right?
A That's correct.
Q And that second sentence under the Dredging Feasibility discussion states, quote, the gravel soils containing cobbles and boulders should not present major problems, provided the equipment used to dredge these materials is commensurate with those conditions, end quote, do you see that?
A Yes.
Q Those were your words?
A Those were my words.
Q And we earlier discussed the fact that the Corps of Engineers needed to know the nature of the materials to determine the likely dredging methodology to do a cost estimate, correct?
A Yes.
Q And likewise, a contractor would have to determine the appropriate equipment to dredge the materials, you recognized that, didn't you?
A Yes.
Q And the information the contractor would have to make that determination would be the soils information contained in the contract documents, correct?
A Correct.

Q (By Mr. Hopkins) Can you identify Exhibit 12 as a copy of the 1993 edition of ASTM 2488?
A It is.
Q And this was the edition of the standard that was in effect at the time the test pit exploration for the King Cove project was performed and you prepared the report and the logs, correct?
A Correct.

Q (Inaudible) two things at once here. Okay. Let's focus for a minute on ASTM 2488. Paragraph 1.2, the second paragraph -- or excuse me, the last sentence of paragraph 1.2 states, quote, it must be clearly stated in reporting an identification that it is based on the visual manual procedures, end quote, do you see that?
A Where are you?
Q Paragraph 1.2
A Okay.
Q Of Exhibit 12. And do you understand that statement to be a requirement of the standard than when these procedures are used it should be so stated in the report that is based on those procedures?
A That's what it says.
Q And that makes sense, doesn't it? If someone is going to interpret a geotechnical report that was developed according to a certain methodology that the person probably needs to know what the methodology is?
A That's true.
Q Looking further on the first page of Exhibit 12, the

ASTM 2488 standard under Section 3 says Terminology, that has below that the basic definitions of cobbles and boulders, right, under Section 3.1.1?
A Yes.
Q And there are other terms defined in Section 3.1 of the standard such as gravel, sand, silt, right?
A Yes.
Q So those were the terms that you were using in the log, correct?
A Yes.
Q So you were using the definitions out of ASTM 2488, but not necessarily all the procedures that it provides?
A That's correct.
Q Looking at Part 4 of Exhibit 12, ASTM 2488, under 4.2 it says, quote, the soil can be given an identification by assigning a group symbol and name, end quote. And there's certain symbols under the ASTM 2488 standards that indicate certain gradations of percentages of certain types of material in a sample, right?
A Yes.
Q And I see one or two references to such symbols in the exploration logs for the test pits, but not very many. Is that an accurate characterization?
A Yes.
Q So, for example, test pit 1, you used -- there's a

column that says soil legend on the test pit logs?
A Uh-hum, yes.
Q And am I right that that column is where you would use the symbols out of the ASTM standard?
A That's true.
Q Okay. But that wasn't consistently done, that was done in a few places, but not to many, correct?
A That's correct.
Q Turning to the fourth page of the ASTM standard, Exhibit 12, Section 10 that's labeled Descriptive Information for Soils, and am I right that that section of the standard outlines a number of characteristics of the soil sample that should be described according to the standard such as angularity, shape, color, odor, moisture condition, correct?
A If it relates to the soils.
Q Yeah. I think you.....
A And it's important that -- and that it's important to include that based on what you're trying to.....
Q Accomplish?
A .....accomplish.
Q Right. So, for instance, in the case of the King Cove project you didn't care what the odor of the soil was very much, right?
A That's right.

Q But one thing you did indicate you were quite interested in was the range of particle sizes within the soil sample, gravel.....
A That and bedrock.
Q Correct?
A Yes.
Q Yes. So if we look at subpart 10.10 of ASTM standard, they provide some guidelines, in fact, Section 10.10 is titled quote, Range of Particle Sizes, end quote. And the standard provides guidelines on how to report the range of particle sizes in a sample, is that a fair characterization of how you understand that portion of the standard?
A That's correct.
Q So 10.11 on page 5 of Exhibit 12 addresses maximum particular size, do you see that
A Yes.
Q And 10.11.3 says if the maximum particle size is cobble or boulder size, describe the maximum dimension of the largest particle, and then they give an example, do you see that?
A Yes.
Q That means making an actual measurement and providing a dimension, right?
A Yes. And I -- I didn't do that. I just gave

terminology.

Q Understand. I want to make sure we know what procedures of ASTM 2488 were applied and which weren't. Now, you did have a measuring tape. I mean that was something you actually could have done, couldn't you?

A I could have done that.

Q So do I understand this aspect of the ASTM 2488 standard correctly to mean that cobbles and boulders should be estimated on the basis of volume percentage of the sample.....
A Yes.
Q .....is that what it provides? And it further provides that that estimate is a number, correct?
A It does.
Q The standard then provides that as to the portion of the sample that is less than three inches, meaning gravel, sands and fines the estimates of those percentages for those particles are by weight, right?
A That's right.

A .....you know, for estimating --.....
Q Right. And that's....
A .....for estimate purposes.
Q And that's.....
A For estimating purposes.
Q And that's different than what the ASTM standards provides, correct?
A That's what it says
Q Yeah. Now turning further to page 8 of the ASTM standard Section 15 is labeled Procedure for Identifying Coarse-Grained Soils. And I'm right that those are -- coarse-grained soils have less than 50 percent fines, correct?
A Yes.
Q And that would be the general description of the soils that you observed doing the test pit logs?
A Yes.
Q So under the ASTM methodology this procedure under Section 15 would apply -- if you were going to try to follow that precisely that would apply to the soils at the project site where you excavated the test pits?
A You could apply it. I didn't apply it strictly by this ASTM procedure.
Q I understand. And I'll just tell you frankly what I'm trying to figure out is where you followed the standard

and where you didn't.
A Okay.
Q It's not (indiscernible). But the soils, again, at the site were what would be called coarse-grain, correct?
A Yes.
Q So under the standard this procedure under Section 15 would apply if you were going to try to follow it to the letter?
A Yes.
Q So under Section 15.7 on page 8 of Exhibit 12 states, if the field sample contains any cobbles or boulders or both, the words, quote, with cobbles, or quote, with cobbles and boulders should be added to the group name, do you see that?
A Yes.
Q Am I correct in understanding the ASTM standard here to say that if you find one cobble or one million cobbles you use the term with cobbles?
A It could be interpreted that way.
Q In other words, if you find any cobbles at all regardless of their quantity you're going to say with cobbles in the description?
A It says if any cobbles or boulders are observed you add that to the description.
Q And elsewhere in the standard it requires then an

estimate by percentage volume of the cobbles, correct?
A Where's this?
Q Well, we earlier covered that.....
A Oh, earlier, yes.
Q And in fact, if we look closely again at this page 8 under Table 13 -- well, strike that. Page 8 of Exhibit 12 of the ASTM standard under Section 16 it's labeled Report, do you see that?
A Yes.
Q It says the report shall include the information as to origin, and the items indicated in Table 13. So Table 13 has a little checklist, these are -- again, if you were -- if one was going to follow the standard to the letter, right, these are the items that would be in there, correct?
A Okay.
Q I mean am I understanding that correctly?
A Yes.
Q You probably deal with this more than I do.....
A Yes.
Q .....I just want to make sure I'm describing it accurately. And so under the Table 13 checklist item 3 is percent of cobbles or boulders or both by volume, right?
A Yes.

Q Now we've earlier established that was not in the logs for the test pits, correct?
A Right.
Q And number 4 is percent of gravel, sand, or fines, or all three by dry weight, is that included in the test pit logs?
A No.
Q Well, perhaps you can tell me what of the items under the Table 13 checklist of the ASTM standard found on page 8 of Exhibit 12 were included in the test pit logs that you prepared for the King Cove project that we've earlier reviewed and were part of the contract documents, whether in whole or in part? You tell me.
A Group symbols included at the top where the soils weren't disturbed where I could look at it on the sidewalls. If it was really disturbed as in the pile, came from anywhere, I didn't describe it to that standard or sign -- assign a symbol because it was a mixture, a composite. I followed part -- particle angularity only on one where I saw it standing in the sidewall, or the boring for test pits. That's probably it from that list.
Q Okay. Let's go -- I'm still on the same page, page 8 of Exhibit 12 of the ASTM standard, under note 15, do you see that?

A Yes.
Q Which says, quote, if desired the percentages of gravel, sand and fines may e stated in terms indicating a range of percentages as follows, trace, particles are present but estimated to be less than five percent, few five to 10 percent, little 15 to 25 percent, some 30 to 45 percent, mostly 50 to 100 percent, end quote, do you see that?
A Yes.
Q There's no reference to cobbles in note 15, is there?
A No.
Q The English language terms trace, few, little, some, mostly as used in this note are intended to describe a range of percentages only for gravel, sand and fines, isn't that correct? Isn't that an accurate understanding of the standard here?
A Could you repeat that?
MR. HOPKINS: Can you read back my question.
(Off record)
(Record playback)
(On record)
A I believe that's correct.
Q (By Mr. Hopkins) Were you consulted by the Corps of Engineer personnel involved in administering the contract when Red Samm first notified of a differing

site condition?
A Would you repeat that?
Q At some point during the course of the project Red Samm notified the Corps of Engineers that it believed it had encountered a differing site condition on the project?
A I probably heard before the actual claim from construction per- -- personnel that there were rumors or inklings of rumors to that effect.
Q I -- did anyone come to you ever with a letter from Red Samm saying what do you think of this?
A I don't recall exactly if they came with a letter or not that I looked at.
Q Do you -- did you ever get an understanding that Red Samm interpreted the term few as used in the test pit logs to mean quote, small, little, not many, of small number, end quote?
A I think I've heard that.
Q In fact, do you recall seeing that in a letter written by Red Samm?
A I don't recall seeing it. I may have. I may have seen the letter, but I don't recall seeing the letter.

COURT REPORTER: Exhibit 13.

**(Deposition Exhibit 13 marked)**

Q I'm handing you what we've marked as Exhibit 13 which is Red Samm's serial letter 035 dated August 20, 2000.

Have you ever seen this letter?
A I believe I have.
Q Do you recall ever discussing it with any Corps of Engineer personnel?
A Not specifically, no. I don't recall discussing it. I may have.
Q Do you ever -- strike that. Do you recall that in November 2001 Red Samm submitted a request for equitable adjustment to the Corps for its differing site condition claim?
A I know they did send one. I don't know if it was in -- what the specifics were about it.
Q Do you recall ever reviewing that request?
A In don't recall reviewing it, but I probably did.
Q And you did understand the basic contention Red Samm was making is that the soils information contained in the contract documents let it believe there would be relatively few cobbles encountered and, in fact, found significant concentrations of cobbles? Did you understand.....
A I understood that.
Q When to you as far as you know is the first time that the Corps of Engineers explained in writing to Red Sam how the term, quote, few as used in the test pit logs should have been interpreted or understood?

A I don't know when that was.

Q Would -- was the contracting officer's decision the first time that was explained as far as you know?

A I can't answer for her or I don't -- I don't know.

Q I just want to make sure I'm clear about one thing. Did anybody in the Corps of Engineers ever come to you and say Mr. Wilson, what should we include in the contract documents in regard to the soils information for this project or words to that effect?

A I believe I worked in coordination with Alan Jefferies, the designer, to include that information.

Q So you probably did have those kind of discussions with Alan Jefferies?

A Yes.

Q The discussion in the geophysical survey prepared by Golder simply references the test pit logs, there's no reference or indication of the other existing written report by the Corps of Engineers, is there?
A No, I guess that's all that there is.
Q So a contractor reading the geophysical report wouldn't know that there's another written report he should even ask for, would he?
A It's possible that he wouldn't.
Q There's certainly no reference to your written report that's part of Appendix C of the detailed project report, there's no reference to that in the geophysical report?
A I'd have to read it closely, but that may be correct.

Q (By Mr. Hopkins) Let me show you Exhibit 19 and I'll just represent to you these are pictures of the stockpile taken by Red Samm in the latter part of July of 2001. Do you agree with me that generally these pictures depict a stockpile that is not necessarily homogenous and has areas with significant concentrations of cobbles and oversize materials?

A Well, let me clarify first what I meant by homogenous. I meant more or less uniform cross gradations from sand to cobbles that -- throughout the pile, the range -- say if there was a range of cobbles from five -- or two to 10 percent, that it would -- if it was uniform that range would be pretty much throughout the pile.

Q Well, how about answering my question.

A Okay.

Q Do you agree with me that these photographs in Exhibit 19 show a stockpile that has areas with significant concentrations of cobbles and over size materials and is not homogenous?

A They do show an extensive amount of cobbles and it's not homogenous.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, a Connecticut corporation | ) | NO. 04-487 |
| v. | ) | |
| THE UNITED STATES | ) | |

**DEPOSITION OF ALAN JEFFRIES**

APPEARANCES:

**FOR TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA:**
**MR. JAMES T. HOPKINS**
Schiffrin Olson Schlemlein & Hopkins
Attorneys at Law
1601 Fifth Avenue, Suite 2500
Seattle, Washington 98101
(206) 448-8100

**FOR THE UNITED STATES:**
**MR. REID PROUTY**
Trial Attorney
U.S. Department of Justice
Civil Division
1100 L Street, NW
Washington, D.C. 20530
(202) 305-7586

ALSO PRESENT: MS. CLAIRE BERRY

* * * * * *

# ERRATA SHEET

WITNESS NAME: ALAN JEFFRIES

CASE TITLE: TRAVELERS CASUALTY & SURETY VS. USA

CASE NUMBER: 04-487

| PAGE # | LINE # | SHOULD BE | TYPED |
|---|---|---|---|
| 10 | 9 | THE FIRST STEP | THE STEP |
| 10 | 22 | ? | ~~[illegible]~~ |
| 70 | 11 | FORMULATE | FORMULATED |
| 6 | 2 | THE | THEIR |
| 7 | 3 | I'VE BEEN WITH THE CORPS OF ENGINEERS | I'VE BEEN |
| | 8 | PRIMARILY, NO. THE DEPTH ---- | PRIMARILY, NO, THE DEPTH --- |
| 24 | 14 | NED, QUOTE, UNQUOTE | NED, QUOTE |
| 24 | 19 | COST/BENEFITS | COST BENEFITS |

COPY

[signature]

SIGNATURE OF WITNESS

Q Okay. Focusing on the King Cove project for a bit and I realize you're going from memory -- excuse me, I realize you're going from memory at this point, but can you give me a summary of your involvement in the project in a chronological fashion from when you first became involved to when you're involvement ceased in any sort of regular basis?
A The step is the reconnaissance phase and I participated in that. The feasibility study is the next step in a civil works project and I participated in the design and -- and preparing the technical appendix to that report. And then the plans and specifications is the next step and I basically assembled the package, plans and specs package.
Q Were you the primary designer of the King Cove project?
A Yes.
Q Did anybody else work with you in that regard?
A Yes, a whole team. I did (ph).....

Q And who are the individuals that you primarily dealt with from geotech in that regard?
A I can't remember exactly who -- who was -- probably Chuck Wilson in some -- in some form or fashion and it may have been others in his section. I think they had probably four or five engineers working in their section at that time.
Q How about Jerry Raychel who I understand was Mr. Wilson's superior in 1996, '97, '98, did you ever have any communications with him regarding the project?
A I don't remember.
Q The technical specifications to the King Cove project which we -- Section 02222 which we've previously marked as Exhibit 8 has an Appendix A that can -- that is labeled subsurface conditions, correct?
A Um-hum, yes.
Q And included in Appendix A are the logs of -- are logs for five test pits and logs for four borings with the boring logs being performed for an earlier project in 1985, correct?
A Yes.

Q What I'm trying to understand is how was the decision made as to what to include in the contract documents for the King Cove project as to the subsurface conditions and who was involved in that decision?

A I think probably geotech made recommendations for inclusion of certain data and I think the -- the information to be included would be the information we had that we developed.

Q You understood the test pit logs that are part of

Attachment A of the technical specification 02222 were the result of an investigation done by the geotech branch in 1996, correct?
A Yes, I was aware of that, yeah.
Q Were you aware that there was also a written two page report in connection with the test pit exploration performed by the geotechnical branch?
A Yes.
Q Did you have any dis- -- but the two page written report was not included in the contract docs, was it?
A No.
Q Did you have any discussions with anyone about whether or not that should be included in the contract documents? And I'm talking about the two page written report prepared by geotech when they did the test pit exploration in 1996.
A I probably asked geotech what data would you recommend including in the specs.
Q That would be normal procedure?
A Yes.
Q In other words, this wouldn't be a decision you'd make all on your own is what I believe you're telling me?
A No, it would not.
Q You would rely on their advise in that regard?
A Yes.

Q So if geotech had said include my full written report for the test pit logs it would have been included, correct?

A Yes.

A Yes.

Q The cost estimator needs to understand the design to figure out how much its likely cost is, correct?

A The cost estimator does depend on the designer to describe, you know, specifics of the project, yes.

Q And on the King Cove project develop a cost estimate for the feasibility study, the cost estimator would need to have some understanding of the likely dredging methods and equipment to be used in performing the dredging portion of the work, correct?

A I would assume they would need to know that to develop their estimate.

Q Can you turn to page 27 of Exhibit 4 of the feasibility study? There's a table on that page, and I'm referring to page 27 of Exhibit 4, Table 5-2 is titled Elements of Risk and Uncertainty, do you see that?

A Yes.

Q And under the item for dredging costs there's a statement that says "test pit logs indicate easily dredgable material", see that?

A Yes, I see it.

Q Okay. And the south alternative, what's described as Alternative 2 in the feasibility study is the alternative that was ultimately selected for the project, correct?

A I believe that's correct.

i

-

Q The members of the project study group who prepare the feasibility report communicate with one another in regard to their particular spheres of responsibility and expertise, correct?
A typically, yes.
Q So it would be highly unusual for the author of this

portion of the feasibility study, page 27 of Exhibit 4, to make a statement regarding the anticipated ease with which the material could be dredged without some bona fide input and basis to make that statement, correct?

A I don't know what level of input the project formulator had with our geotech folks in preparing.....

Q That wasn't my question.

A .....this statement.

Q It would be unusual for the project formulator to make such a statement without a sound basis for it, correct?

A Perhaps.

Q Wouldn't be good practice, correct?

A Probably not.

Q You wouldn't make statements in Appendix A regarding anticipated subsurface conditions without having a sound basis on information you received from geotech, correct?

A I would try not to do that, yes.

Q Do you recall that there was -- strike that. Do you recall receiving communications from state agencies expressing a desire, a strong desire, that the project be designed in such a fashion that the dredge material could be disposed of in an upland site so that the dredge material could be used on other projects?

A I -- I recall a desire to reuse the dredge material if possible, yes.

Q And that meant you had to dispose of it upland rather than dumping it in the ocean?

A Presumably, yes.

Q And that was a desire expressed on more than one occasion, correct?

A I don't recall, possibly.

Q (By Mr. Hopkins) Mr. Jeffries, I've handed you what we've marked as Exhibit 78 which is titled Trip Report for the Small Board Harbour Improvements, South Expansion King Cove, Alaska, July 1996, Bates number GE 0011078 through 89. Am I correct that this document, this Trip Report, Exhibit 78 was the initial geotech report prepared by the Geotechnical Section after they

excavated the test pits at the King Cove site in late June of 1996?

A Yes, I believe you are correct.

Q And this report was then included, I guess with a different title, in Appendix C of the feasibility study which is Exhibit 4? And you don't need to verify this word for word correct. We've discussed that with Mr. Wilson. Just want to get an understanding this is essentially the same document or information.

A Yes, it appears to be.

Q Okay. Now, I think, we had previously looked at Exhibit 75 that reflected that plans and specifications in a draft form were transmitted or circulated within the Corps of Engineers departments roughly around March 20, 1998, correct?

A Yes.

Q And, I think, we earlier covered the fact that the initial advertisement bid of the project was sometimes in May of 1998, correct?

A Yes.

Q And you received likely, in fact, perhaps, almost certainly you received comments on the draft plans and specs and took appropriate action, correct?

A Yes.

**(Deposition Exhibit 79 marked)**

Q Okay. Turning to -- let's put Exhibit 79 side by side of Exhibit 81 and let's look at comment number 8 on Exhibit 79 and your response on Exhibit 81? Have you had a chance to review paragraph 8 of Exhibit 81?

A Yes.

Q And that was your response to comment number 8 from Mr. Smith's comments in his May 1 fax, correct?

A Yes.

Q And the second sentence of paragraph 8 of Exhibit 81 states "geotechnical report states that the material to be dredged is sand and gravel and is dredgable mechanically", do you see that?

A Yes, I see it.

Q And that reflected your understanding of what the geotechnical report showed, is that correct?

A Yeah, probably did.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, a Connecticut corporation<br><br>v.<br><br>THE UNITED STATES | NO. 04-487 |

DEPOSITION OF LYNDEN E. BELIN

APPEARANCES:

FOR TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA:

**MR. JAMES T. HOPKINS**
Schiffrin Olson Schlemlein & Hopkins
Attorneys at Law
1601 Fifth Avenue, Suite 2500
Seattle, Washington 98101
(206) 448-8100

FOR THE UNITED STATES:

**MR. REID PROUTY**
Trial Attorney
U.S. Department of Justice
Civil Division
1100 L Street, NW
Washington, D.C. 20530
(202) 305-7586

ALSO PRESENT: MS. CLAIRE BERRY

* * * * * *

Q And did you -- were you promoted to a higher or different position after any period of time?

A I don't know if you call it higher, it's a -- it's a little different, it's doing more of the paperwork and that type of thing.

Q And that's the project.....

A So.....
Q .....engineer?
A Yes.
Q And that's the position you held on the King Cove project?
A Yes.
Q Can you tell for me generally what you understand the duties of a project engineer to be on a Corps' project?
A They're pretty varied, you're really responsible to make sure the -- the thing goes correctly. You hold the -- the meetings like the preconstruction conferences and that type of thing, you draft the letters, you don't have signature authority, but you do draft letters, you review daily reports, do the modifications, you know, start 'em out and then, of course, somebody else signs for money as they go down, that type of thing.
Q So would it be fair to say you're the primary point of contact with the contractor during the course of construction at least on the administrative side?
A Yes. Yes, as far as what happens in the field Earnie would have been,.....

Q So during the course of administering the work if an issue comes up relating to the design or even a different site condition, for example,.....
A Uh-hum. (Affirmative)
Q .....you might consult with the individuals who were involved in preparing the design?
A Yes.
Q Or in a soils issue you might consult with the members of the geology branch of the.....
A Correct.
Q .....Corps?
A Correct.
Q And did that happen on the King Cove project?
A To some degree, uh-hum.
Q Do you recall discussions with Chuck Wilson regarding the different site condition claim?
A Let me see, I believe -- I believe he's one that I talked to.