of the terms.....
A Well, I think -- I think we did talk about cobbles because that was starting to be verbally talked about as an issue and a -- so -- and we discussed what the few cobbles, you know, that's a little subjective so.....
Q Would it -- and was that discussion as you best recall fairly early in the process after you got a notice from Red Samm that they consider there was a differing site condition?
A I would say so.
Q And that would be.....
A Once we -- once we really got paperwork going.
Q Do you recall that in mid to latter July, 2001, two or three weeks after Red Samm had started the hydraulic dredging operation, you received a letter from Red Samm providing notice of what they viewed as a different site condition due to excessive cobbles, do you recall that?
A I remember receiving a letter and -- and I know they'd struggled for a weeks, you know, before they said anything.
Q So it would seem logical to me that at that point you might have some discussions at least initially with Mr. Wilson regarding what he meant by the terminology in

the test pip logs, correct?
A I would believe so.
Q And what do you recall him telling you, you mentioned you discussed a few cobbles, what do you recall Mr. Wilson telling you that meant in his mind?
A I -- boy that's -- that's a little hard to really pin point, but you know, we talked about a few, he saw some cobbles in there, he thought it was -- thought it was a few.
Q Did he.....
A I don't -- I don't recall him saying a certain percentage. I don't -- I don't know as we really spelled that out.

Q Is the contracting officer's decision sort of the -- is it fair to describe the contracting officer's decision as the collective and official position of the Corps of Engineers regarding the differing site condition claim?
A I would say it was.
Q And that was a process that involved input from all of the Corps' personnel involved on the project, correct?
A Correct.
Q So it's sort of the last and final word of the Corps of Engineers on the issue?
A I would say it was, uh-huh.

Q Did you ever learn or know that the Aleutians East Borough and the City of King Cove were very interested in getting a substantial portion of the dredge material deposited upland for use as a filler -- fill for various areas in the locality?

A Yes.

Q And did you know that they had that interest even during the design phase of the project?

A I wasn't aware of it during the design phase.

Q But it certainly became clear to you early on that the Aleutians East Borough and the City of King Cove were quite interested in getting the material upland?

A Yes, sometime after the partnering meeting, while they were building breakwater.

Q Let me show you what we've marked as Exhibit 36, can you identify this as Red Samm's letter dated July 18th, 2000, serial letter 109-034?
A Correct.
Q Do you recall receiving this letter?
A Yes, I believe so.
Q And this was Red Samm's notice that it had encountered differing site conditions?
A Correct.

A And put -- yeah. Yeah.

(Deposition Exhibit 37 marked)

Q Can you identify Exhibit 37 as your e-mail of July 21, 2000, to Ron Flodin and Deb Reidell regarding Red Samm's notice and claim of a different site condition at the King Cove project due to a higher percentage of cobble?

A Yes.

Q And the letter we've just looked at, Red Samm's letter of July 18, Exhibit 36, is what prompted this e-mail by you, right?

A I believe so, uh-huh.

Q And you prepared a draft response?

A Correct.

Q And that's the typical practice, the project engineer would draft the letter and then your superiors would review it and comment or modify it?

A Yes.

Q Did you -- do you recall any discussions with any of the Corps' personnel regarding your draft response or simply the notice of the claim at or about this time?

A I don't remember exactly what we said, but I'm sure we were talking about it.

Q Remember anything about -- anything standout in your mind about what was discussed?

A Yeah, I -- I don't remember really a specific of -- of what. I -- I know we had gone back and -- and looked at the -- the borings and the -- you know, that type of stuff.....
Q You.....
A .....to get an idea of what we thought was in the contract, you know.
Q And that would have been at or about the date of Exhibit 37 here, on July 21?
A Probably. Somewhere between that and Exhibit 36.
Q And do you recall seeing that test pit five which was the only test pit located within the dredge prism indicated few cobbles?
A I think there was -- the deal said few cobbles, I don't remember which test pit or.....
Q Do you recall test pit one also indicated few cobbles?
A There were several of them that -- I know that it was presented to us, few cobbles.
Q And was there any discussion about what the term few meant at or about this time.....
A The --.....
Q .....of Exhibit 37?
A I believe we did discuss what few means.
Q And what do you recall of those discussions and who were they with?

A I think probably Ron and -- and Deb, possibly Chuck Wilson and the consensus was that few is a little vague, what is that 10 percent, 20 percent, 5 percent, you know. So it was hard to put a handle on for exactly how many.

Q And no one at that point within the Corps suggested or told you that few meant a certain percentage, did they?

A No.

Q Have you had a chance to now review Exhibit 38 carefully?

A Yes.

Q And based on that review is -- can you tell me whether or not this is a draft that you prepared to respond to Red Samm's notice of the differing site condition?

A I would -- I would say it is.
Q And looking at the next to last paragraph on the second page, it says note -- it says quote, note the term, quote, few, end quote, and quote, high concentration, end quote, are somewhat subjective, do you see that?
A Yes.
Q And that reflects what you earlier testified to that the discussions you had among the Corps' personnel at or about this time, July 21, 2000, were that -- was that the term few was a little ambiguous?
A Correct.
Q And I assume you had Chuck Wilson's input since he was the guy that developed the exploration logs that you earlier indicated, correct?
A I believe by this time I'd talked to him.
Q Okay. Turning now to the first page of Exhibit 38 you -- the first large paragraph that indicates your contract revised data regarding the material excavated in five test pits, do you see that paragraph,.....
A Yes.
Q .....on Exhibit 38? You go on to discuss the fact that two of the tests pits indicated there were few cobbles?
A Yes.
Q And there's a later discussion in that paragraph regarding the soil boring logs?

A Okay.
Q And there's a suggestion in this draft is that the soil boring logs would not have provided any indication of cobbles because of the size of the split spoon sampler?
A Yes.
Q Do you recall ever getting any comment regarding that portion of your draft letter?
A I think I talked with Chuck about that issue 'cause we talked about split spoon and what -- the size and what would go in it. And I think maybe I talked to -- to Deb and Ron about that.
Q Again at the bottom of the first page of Exhibit 38, you again refer again to the fact that two of the test pits indicated few cobbles, do you see that?
A Yes.
Q Okay.

(Deposition Exhibit 39 marked)

Q Can you identify Exhibit 39 as a series of e-mail messages from which you are involved with a beginning date of July 21, 2000 and a final date of July 25, 2000?
A Yes.
Q And this reflected at least some of the comments that you received from various other Corps' personnel including Ron Flodin, Chuck Wilson and Jerry Raychel

(ph) regarding your draft letter?
A Correct.
Q And that's the draft letter that's Exhibit 38,.....
A Yes.
Q .....that was intended to respond to Red Samm's notice, correct?
A Yes.
Q And I'm right that Jerry Raychel said you should remove the language regarding the soil borings and the split spoon sampler, correct?
A You're correct.
Q And he indicated blow counts could be an indicia of large or oversized materials,
A Yes.
Q .....correct? And did you ever talk to anyone within the Corps why the soil boring logs from the earlier project were included in the subsurface data in the contract documents?
A I don't recall for sure on that, I may have.
Q Do you have any recollection of the discussions on that subject?
A If I -- if I did it was probably with -- with Chuck Wilson or maybe Jerry Raychel.
Q That information was included for the contractor's use, wasn't it?

A I'm sure it was if it was in the document.
Q I mean, it wouldn't make any sense for the Corps to include soils information that they felt was irrelevant or even misleading, would they?
A Correct.
Q That's not the typical practice of the Corps?
A Correct.

Q (By Mr. Hopkins) Can you identify Exhibit 41 as the official response now by the Corps of Engineers to Red Samm in response to its letter dated July 18, 1999?
A Correct.
Q And this is actually a copy out of Red Samm's files so it doesn't have all of your initials on the bottom, right?
A Yes.
Q So I'm correct that Exhibit 41, the official response

to Red Samm's notice of different site conditions deletes any discussion of the fact that two of the test pits indicated quote, few, end quote, cobbles that had earlier been found in your draft letter which is Exhibit 38?

A Okay. I would have to review this to confirm that, but -- yeah, I didn't see a reference for few cobbles in there.

Q So you and the other members of the Corps of Engineers decided it was best at this point in time, as of the date of Exhibit 41, August 4, 2000, to avoid any discussion of what the terms few meant in the test pit logs in regard to cobbles?

A I don't recall that I was really in a determination to take the few out. I've -- I might have been, I don't recall doing that.

Q But certainly your superiors did.

A So somebody, yes, uh-huh.

Q (By Mr. Hopkins) Mr. Belin, we were -- before we took a break we were reviewing the Corps' letter dated August 4, 2000, and its serial letter 038 that we marked as Exhibit 41 and which responded to Red Samm's notice of the differing site condition. Do you recall receiving a response from Red Samm to this letter?

A I think we probably did, I don't have it in -- in my mind exactly the letter that came back, but I -- I think we probably did.

(Deposition Exhibit 13 proffered)

Q Let me show you what we've previously marked as Exhibit 13, Red Samm's letter of August 20, 2000,.....

A Okay.

Q .....and do you recall receiving this letter from Red Samm?

A Yes, I do.

Q Had you understood this letter, Exhibit 13, to be responding to the Corps' serial letter 038?

A Correct.

Q And is it fair to say you understood Red Samm to be saying in its August 20, 2000, letter that look these test pits indicated few cobbles, particularly the test pits that was within the dredge prism and few means few, is that a fair characterization of how you understood the -- this letter?

A I -- I would say so.

Q I'm also correct, am I not, that the Corps never provided a written response to Exhibit 13?

A That may be, I don't know for sure.

Q Is that the best of your recollection?

A Probably is.

Q Do you recall any discussions with Earnie on the fact that the Red Samm hydraulic dredging equipment had been able to achieve certain productivity levels in quote, good material?
A Yeah, he was becoming optimistic at this point.
Q And do you recall him relaying to you that there had been a couple of days of good dredging?
A Yes, I remember that, un-huh.
Q And did you understood (sic) good material to mean material without -- did you understand good material to be material with only a few cobbles?
A I probably would.

Q And on July 21 and July 22, Earnie estimates 3,000 cubic yards of production each day, correct?

A Correct.

Q And is that generally what you understood to be the time period of the two or three days of good production?

A Yes.

Q Do you recall Earnie telling you as indicated in Exhibit 44 that in his view there were places on the site with 10 percent or more cobbles?

A That sounds familiar.

Q On this project wasn't the only reason for the subsurface information included in the contract documents was to provide the contractor information on which to make a decision as to the method and cost of the dredging?
A I believe so 'cause the contractor at bid time has to look at that type of thing, how -- how do you bid, you know.
Q Well, isn't it true that as far as construction of the breakwater went the contractor didn't need to know what the subsurface condition was, he was going to put rocks.....
A Correct.
Q .....right on top.....
A Correct.
Q .....of it,.....
A Right.
Q .....isn't that true?
A That's true, you're right.
Q So this contract really only had two things, it had a breakwater.....

A And a dredge.
Q .....and a dredge? And it's true the contractor didn't need to know the subsurface conditions to build a breakwater or bid it, correct?
A Correct. Correct.
Q So what -- the only real reason for the subsurface information included in the contract documents was to provide the contractor appropriate information to select the method and type of equipment to perform the dredging?
A Yeah, he has to know the material, that's true, it's so he can make choices.

Q Back to the second page of the Corps' December 29, 2000, letter under the 16B paragraph, those first two sentences I quoted reflect the Corps' assertion that the subsurface material provided accurately described the material to be dredged, correct?

A Yeah, it says the information was sufficient representative to determine the consistency of material.

Q The -- when you reviewed the plans and specifications for the project, do you recall reviewing the section that addressed the subsurface material?

A Are you talking about the specifications or are you talking about.....

(Deposition Exhibit 8 proffered)

Q Well, let me show you what we've previously marked as Exhibit 8.

A Okay.

Q Can you identify that as technical specification 02222,.....

A Yes.

Q .....from the contract documents for the project?

A Correct.

Q On the second page under character of material, do you see that?

A Yes, uh-huh.

Q The specification states, exploration logs for the area to be dredged and excavated are enclosed in Appendix A, do you see that?

A Correct, uh-hum.

Q And Appendix A had the test pit logs and the soil boring logs, correct?

A I believe so. It definitely has logs and -- and I think it was probably the -- that would be the excavation, John Deere (ph).

Q Those are the test pit logs, correct?

A The test pit, yes, uh-huh. Drilling report, this would be the -- the drilling logs. So they -- you're correct.

Q And don't you agree with me it would be reasonable for a contractor reading this specification to understand the government was telling the contractors these logs, this data, represents what you're going to encounter on this site?

A To the best that you can represent, probably true.

Q And isn't that what you're saying, isn't that what the government's saying in Exhibit 55, its letter of December 29, 2000, in paragraph 16B?

A Correct.

Q Do you recall that the contracting officer's decision also asserted that the subsurface information was representative of the material to be dredged at the project site?

A I believe it did, uh-huh.

low tide.

Q And most of the surface at low tide was a sandy, flat surface, correct?

A Yeah, pretty much. You'd see some rock in it, but it was mostly sandy.

COPY RECEIVED
NOV 10 2005
SCHIFFRIN OLSON SCHLEMLEIN & HOPKINS, PLLC

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, a Connecticut corporation, | |
| vs. | Case No. 04-487 |
| THE UNITED STATES. | **DEPOSITION OF EARNIE D. MENDENHALL** |

APPEARANCES:

| | |
|---|---|
| For Travelers Casualty and Surety Company of America: | JAMES T. HOPKINS, ESQ.<br>Schiffrin Olson Schlemlein & Hopkins<br>1601 Fifth Avenue, Suite 2500<br>Seattle, Washington 98101 |
| For the United States: | REID PROUTY, ESQ.<br>U. S. Department of Justice<br>1101 L Street NW<br>Washington, D.C. 20530 |

* * * * *

Pursuant to Notice, the Deposition of EARNIE D. MENDENHALL was taken on behalf of Travelers Casualty and Surety Company of America before Teresa E. Mielke, Notary Public in and for the State of Alaska and Reporter for Gemini Reporting Services, at the Offices of Gemini Reporting Services, 943 West Sixth Avenue, Suite 110, Anchorage, Alaska, on the 27th day of October, 2005, commencing at the hour of 9:10 a.m.

* * * * *

Q And you understood that this information was going to be used for a contracting officer's decision on the Red Samm differing site condition claim, right?
A That's correct.
Q And so you certainly made an effort to provide accurate information to your superiors, didn't you?
A That's correct.
Q And it's true that this document, Exhibit 156, reflects your overall estimate that 10,000 cubic yards were dredged by Red Samm's suction dredging operation, right?
A Yeah, okay. That's correct.
Q And out of that 10,000 cubic yards there were two days of good production that you estimate were 3,000 -- 3,000 yards on each of those two days?
A That is correct.

e0596d60-e53e-4cd8-9534-a3667c61b2f8

Q Do you recall that not too long after Exhibit 46, your weekly report dated August 7, 2000, that Red Samm decided to shut down the hydraulic dredging operation and go to a clamshell?
A That's correct.
Q Did you -- do you personally believe Red Samm made the right decision in that regard?
A That's correct.
Q Do you think they'd exhausted all avenues to make their suction dredging operation work?
A Yes, they did.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, INC., | ) | |
| Plaintiff, | ) | No. 04-487C |
| vs. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEPOSITION OF DEBORAH K. REIDELL

VOLUME I

January 12, 2006

Seattle, Washington

Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

One Union Square
600 University St.
Suite 2300
Seattle, WA 98101

2208 North 30th Street, Suite 202
Tacoma, WA 98403
(253) 627-6401
(253) 383-4884 Fax

(206) 340-1316
(800) 649-2034

scheduling@byersanderson.com
www.byersanderson.com

Serving Washington's Legal Community Since 1980



f13a06c3-5bc8-424f-bea2-39c4ca28b05b

Q So on the King Cove project, you were designated as the change order negotiator at the beginning of the project?
A Correct.



f13a06c3-5bc8-424f-bea2-39c4ca28b05t

Q And it certainly seems to me, based on what I've already reviewed with you here today, and a great deal of other documents I've looked at, is that, in fact, you had a rather significant role and were in the loop in all the communications relating to Red Samm's claim issues.

Do you think that's correct?

A It's very possible.



f13a05c3-5bc8-424f-bea2-39c4ca28b05b

Q And you were more than just being kept in the loop. You were part of the management team for the Corps of Engineers that was strategizing about how to deal with this claim, weren't you?

A To a certain extent.



f13a06c3-5bc8-424f-bea2-39c4ca28b05b

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, INC., | ) | |
| Plaintiff, | ) | No. 04-487C |
| vs. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEPOSITION OF DEBORAH K. REIDELL

VOLUME II

January 13, 2006

Seattle, Washington

Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

| | |
|---|---|
| One Union Square<br>600 University St.<br>Suite 2300<br>Seattle, WA 98101 | 2208 North 30th Street, Suite 202<br>Tacoma, WA 98403<br>(253) 627-6401<br>(253) 383-4884 Fax |
| (206) 340-1316 | scheduling@byersanderson.com |
| (800) 649-2034 | www.byersanderson.com |

Serving Washington's Legal Community Since 1980



42a9a01b-1bc0-4521-93c0-53102146b79c

Q In regard to Mr. Brown and Mr. Isaiou -- and you attended Mr. Isaiou's deposition; correct?
A I did.
Q Mr. Isaiou is a professional engineer; correct?
A Yes -- well, I believe that's what he is.
Q And he prepared some technical analysis and calculations regarding the DOP pump. Do you recall reviewing those?
A I read his -- I read -- I didn't read his portion of the stuff, that No. 4, until we were sitting here.
Q But you have read it?
A I glanced through it. I did not read it all the way through.
Q You don't consider yourself qualified to perform similar calculations, do you?
A No.



42a9a01b-1bc0-4521-93c0-53102146b79c

Q And you have not performed any technical engineering calculations regarding Red Samm's hydraulic dredging equipment, have you?
A No.
Q And you don't have any reason to question the accuracy of Mr. Isaiou's calculations, do you?
A The accuracy of his calculations?
Q Correct.
A No.
Q In fact, prior to preparing your report, Exhibit 10, you had not done any research to identify or review information published by the manufacturer of Red Samm's hydraulic dredging equipment, had you?
A No.



42a9a01b-1bc0-4521-93c0-53102146b79c

Q You've outlined two types of dredging: clamshell and hydraulic dredging. Right?
A Yes.
Q Those are two different methods; correct?
A They are.
Q A contractor would need to make a decision as to which method he was going to employ in this project; correct?
A He would have to determine the method of dredging, yes.
Q And he would be choosing between these two techniques, wouldn't he?
A These are very, very common. There are other techniques, but these are very common.
Q That's what you would expect on this contract, the contractor to make a choice whether to approach the project with a hydraulic dredging operation or a mechanical clamshell; correct?
A Yes.
Q You agree with me, don't you, that that decision depends to a large degree on the nature of the subsurface conditions; correct?
A Yes.
Q And that's because hydraulic dredging is not suitable



42a9a01b-1bc0-4521-93c0-53102146b79c

for all conditions, is it?
A No.
Q Hydraulic dredging does have certain advantages, in that where it is suitable, it's typically more cost-effective, is it not?
A Yes.
Q Hydraulic dredging also offers the possibility of disposing of the dredge material at an uplands site instead of an offshore disposal; correct?
A Any of the dredging methods can be disposed of upland.
Q Well, you're right. In fact, Western Marine ultimately did that. Western Marine double-handled the material with a clamshell operation; correct?
A That's correct.
Q But that generally would not be nearly as cost-effective as placing the material upland with a hydraulic dredging operation, assuming that was feasible; correct?
A I do agree with that.
Q And I also understand on the King Cove project, the contractor had two seasons to complete the work; right?
A Yes.
Q As a practical matter, that's what he had; right?
A Yes.



42a9a01b-1bc0-4521-93c0-53102146b79c

Q That the Aleutians East Borough was quite keen on getting the materials disposed of upland.
A Apparently.
Like I said, the first time I heard about it was when Red Samm sent their proposal. And then I can't remember how I learned that apparently the City of King Cove wanted the materials. I don't recall how I learned that.
Q But you were involved in reviewing and approving Red Samm's proposal to dispose of the material upland; correct?
A Yes.
Q And you understood as part of that proposal, Red Samm intended to use a hydraulic dredging operation; correct?
A Yes.
Q And you were involved in the Corps of Engineers' decision to approve that proposal; correct?
A Yes.
Q You didn't see any difficulties or reasons at that time why the site was not suitable for hydraulic



42a9a01b-1bc0-4521-93c0-53102146b79c

dredging; correct?
A Except for the sort of limitations I discuss in the third paragraph.
Q You thought there might be some need to deal with cobbles, but that may be true in any dredging operation; right?
A Depending where it is, yes.
Q And I think, as you earlier testified, you do recognize under certain conditions, a hydraulic dredging operation is simply not suitable; correct?
A Under certain conditions. You're not classifying what those conditions are?
Q Not at this point, no.
A Then I agree with that.
Q And at this point in time, October '99, you didn't view the King Cove site as falling into that category of projects that simply weren't suitable for hydraulic dredging; true?
A True; with the limitations that I say.



42a9a01b-1bc0-4521-93c0-53102146b79c

Q The contractor, on its October 12, '99 letter, indicated a twelve-inch hydraulic dredge; correct?
A Yes.
Q And you considered that type of dredge to be appropriate for the King Cove project, a twelve-inch pipeline cutterhead dredge; correct?
A I believed it could perform the project.
Q And that's what you basically say in your report; correct?
A I do.
Q Now, you know that there are -- that a -- well, strike that.
You agree with me that a twelve-inch pipeline cutterhead dredge is a relatively small cutterhead dredge within the overall family of that type of equipment; yes?



42a9a01b-1bc0-4521-93c0-53102146b79c

A Yes.



42a9a01b-1bc0-4521-93c0-53102146b79c

Q So Nehalem provided precisely the type of equipment that you expected a hydraulic dredge operation would involve on the King Cove project; correct?
A Yes.
Q And Nehalem, in your view, is a highly experienced hydraulic dredging operation; correct?
A Yes.
Q With a very experienced crew; correct?
A That's correct.
Q And who operated the equipment in the most efficient fashion on the King Cove project; correct?
A I believe that they did.
Q And you're not aware of any errors or inefficiencies or self-imposed delays on Nehalem's part; correct?
A I'm not aware.



42a9a01b-1bc0-4521-93c0-53102146b79c

Q And you indicate in your report your belief that the contractor had constructed it.
Do you still believe that?
A No, I don't believe that.
Q So now that you've reviewed the manufacturer's literature, it's fairly obvious to you that that grizzly was provided by the manufacturer; correct?
A You are correct.
Q And I think we earlier touched on the fact you didn't research any of the manufacturer's literature or data regarding the Red Samm dredge equipment prior to your report.
You also didn't do any research as to whether or not the U.S. Army Corps of Engineers had any research materials regarding Red Samm's hydraulic dredge equipment, did you?



42a9a01b-1bc0-4521-93c0-53102146b79c

A That's correct.
Q And you've subsequently learned through the expert reports provided by Mr. Brown and Mr. Isaiou, that indeed, the Corps of Engineers' technical departments have specifically reviewed and evaluated the Red Samm equipment; correct?
A I believe that there was a report in one of the -- one of the expert things that referenced that.
Q Have you read that report?
A I have not.
Q Have you looked at it?
A I have not.
Q Do you understand that report identified the DOP pump as one of 11 out of 91 technologies considered identified as being promising and providing more efficient dredging equipment?
A I believe that was quoted in one of the expert reports that I reviewed. I can't remember which one.



42a9a01b-1bc0-4521-93c0-53102146b79c

Q Do you understand now from the manufacturer's literature, that the pump was designed to be relatively easily mounted on a backhoe?
A That's what it said.
Q And if mounted on a backhoe, that would provide the equivalent to a rigid ladder, would it not?
A I would have to see it set up, but it sounds like it possibly could work that way.
Q That sounds reasonable and feasible, doesn't it?
A Yeah. The manufacturer said it could be done that way.



42a9a01b-1bc0-4521-93c0-53102146b79c

Q Didn't you -- wouldn't you expect on the King Cove project, that the contractor would use the contract soils information to make a decision as to the type of dredging equipment to be employed?
A If I was a contractor, when I was bidding the job, yeah.
Q That's what the Corps expects. That's why they publish the information. Correct?
A As far as I know.



42a9a01b-1bc0-4521-93c0-53102146b79c

:

Q You, however, didn't do any specific calculations or review any specific data to determine Red Samm's hourly or even daily production, did you?
A No.



42a9a01b-1bc0-4521-93c0-53102146b79c

Q So do you have any specific reason to doubt the accuracy of the 55,518 yards here?
A Based on how Nehalem computes it, no.
Q You consider them experienced and reliable and accurate; correct?
A Yes. But I want to qualify that we never accept their number as a pay quantity number. Not the number on these sheets.
Q Well, recognizing that Nehalem only did a limited portion of the project, wouldn't you agree with me this is the best source of data to determine their total quantity?
A Yes.



42a9a01b-1bc0-4521-93c0-53102146b79c

Q So if we take the daily averages as you analyzed them and we multiply them times the number of days that you determined, we get a total quantity of 66,000 cubic yards or greater; is that correct?
A That's correct.
Q And Nehalem's reports indicate a maximum quantity of 55; is that correct?
A They do.
Q Does this exercise lead you to conclude there's some error in your analysis as reflected in your report?



42a9a01b-1bc0-4521-93c0-53102146b79c

A I'd have to go through and -- there may be some error. Because what I did is, I kind of ignored his totals and just took the total yards excavated every time.
So I'd have to rerun my calcs and see if there's an error in him adding up his. There's obviously some difference here, but I'm not sure what's causing it.
Q But you don't have any reason to believe that Nehalem excavated 66,000 cubic yards in total, do you?
A I'm confused by this -- what you've just revealed to me. So I would have to go through and look at my numbers again.
Q So the answer to my question is, you don't have any reason to believe that Nehalem excavated 66,000 cubic yards in total; correct?
A Did or didn't either way. I mean, I would just have to see why the numbers are the way they are.
Q Obviously when you did this analysis, you didn't go back to check your averages against what you understood to be the total; correct?
A What he put as the total, no.



42a9a01b-1bc0-4521-93c0-53102146b79c

First of all, after taking a look at this, do you have any reason to doubt this is the COD?
A No, I have no reason to doubt that.
Q Page 10, top paragraph, last sentence. Will you read that out loud, please?
A "A total of approximately 10,000 cubic yards of material was pumped to the upland disposal site by the suction dredge."
Q Does this reflect the Corps of Engineers' agreement with Red Samm's estimate of the total quantity excavated by its hydraulic dredge?
A It apparently does.
Q And you would have expected the Corps of Engineers to come to a different conclusion if it felt Red Samm's estimate was inaccurate; correct?
A Yes.
Q As you sit here today, do you believe or do you agree with me that the 10,000 cubic yards acknowledged and recognized in the COD is a more accurate estimate of Red Samm's total hydraulic dredge production quantity than the 6,000 cubic yards used in your report?
A Yes.
(Exhibit No. 13 marked for identification.)
////





42a9a01b-1bc0-4521-93c0-53102146b79c