Q When we step back and look at your opinion as reflected in your report, which is Exhibit 10, Ms. Reidell, aren't the key aspects of your opinion -- in fact, even the key aspect of your opinion -- based upon the conclusion that, first, Nehalem employed the right equipment, with the right experience and the right technique; correct?
A That's part of it.
Q Secondly, that Nehalem's productivities far exceeded those of Red Samm, using its hydraulic dredge?
A I believe they did.
Q And those are the two or certainly two of the most fundamental aspects of your opinion; correct?
A They are two of.
Q And if you are incorrect in your conclusion that Nehalem's productivity far exceeded that of Red Samm, then the underlying logic behind your opinion is no longer accurate; isn't that true?
A I don't agree with that.

Q If Red Samm achieved the same productivity with its hydraulic dredge equipment as Nehalem, then your opinion is going to have to change, isn't it?
A If they achieved the same productivity.
Q Yes, you agree with me?
A Yes.
Q You've earlier mentioned you reviewed the Peter Douglass report and the Roger Brown report, but not in any detail.
A That's correct.
Q Can you tell me where you disagree with those reports? Are you prepared to state in any fashion that you disagree with them at this point?
A I'm not.
Q So at this point, you don't have an opinion whether you disagree with those reports?
A That's true.



42a9a01b-1bc0-4521-93c0-53102146b79c

Q Your opinion as expressed in Exhibit 10, your December 12 report, and then in your deposition here today, is based on the assumption that there was no differing site condition encountered by Red Samm; isn't that correct?

A My opinion is based on what I thought their operation was regarding dredging and how they did their dredging, went about doing their dredging.

Q Well, you haven't done any analysis or considered whether or not Red Samm's operation was impacted by a differing site condition; isn't that correct?

A I do not consider it in this opinion.



42a9a01b-1bc0-4521-93c0-53102146b79c

Q And you assume that there was no such impact, in this opinion; correct?
A Yes.



42a9a01b-1bc0-4521-93c0-53102146b79c

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, INC., | ) | |
| Plaintiff, | ) | No. 04-487C |
| vs. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEPOSITION OF CHARLES H. RIDDLE, JR.

January 11, 2006

Seattle, Washington

Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

| | |
|---|---|
| One Union Square<br>600 University St.<br>Suite 2300<br>Seattle, WA 98101 | 2208 North 30th Street, Suite 202<br>Tacoma, WA 98403<br>(253) 627-6401<br>(253) 383-4884 Fax |
| (206) 340-1316 | scheduling@byersanderson.com |
| (800) 649-2034 | www.byersanderson.com |

Serving Washington's Legal Community Since 1980



e8367888-da09-47a8-aa87-70e30c016e1f

Q Do you recall Mr. Douglass indicates that surface conditions are not an appropriate indicative -- or indicator of subsurface conditions in a beach environment?
A I remember that.
Q Do you agree with that proposition?
A Not entirely. Not entirely representative, yes, I think I can agree with that.
Q So you would agree that, hypothetically speaking, if you walked out to the King Cove site and you didn't see any cobbles, it would not be reasonable for the contractor to conclude there were no cobbles beneath the surface, would it?
A Correct.
Q And vice versa?
A Correct.
Q And that's the purpose of subsurface explorations to



e8367888-da09-47a8-aa87-70e30c016e1f

be included in bid documents; right?
A You give them what you have. Yes.
Q And that's why you're hired by owners -- you, R&M -- to go out and conduct subsurface explorations at project sites prior to bid?
A Yes.
Q Wouldn't you agree that it would be inappropriate for Red Samm on this project to rely on surface observations of cobbles and ignore the test pit data?
A The test pit data was given to them as a contract document. So they should rely on the data.
Q And the test pit data is far more accurate and far more informative as to subsurface conditions than observations of the surface?
A The surface is the surface. A test pit is from the surface to a given depth.
Q So you agree that the test pit data is more accurate and more reliable as to the subsurface conditions?
A And especially compared with, yes, a visual.



e8367888-da09-47a8-aa87-70e30c016e1f

Q You didn't see anything in the boreholes which indicated cobbles within the excavation limits, did you?
A I don't think I did.



e8367888-da09-47a8-aa87-70e30c016e1f

Q You recall reading Peter Douglass's report and his statement that geophysical refraction methods are not able to identify cobble-size particles?
A I remember reading that.
Q Do you agree with that?
A I'm not able to say one way or the other.



e8367888-da09-47a8-aa87-70e30c016e1f

Q And you're not offering any opinion as to whether the test pit logs properly implemented ASTM 2488; correct?
A No.
Q And you're not offering any opinion as to whether the test -- whether or not the test pit logs were misleading because they did not properly implement 2488?
A No.
Q And by "no," you mean you're not offering those opinions?
A I'm not offering those opinions.



e8367888-da09-47a8-aa87-70e30c016e1f

Q And is it your view that this manual says the Corps of Engineers should apply ASTM 2488 in preparing the test pit logs?
A Yes.
Q And whether or not this manual said it, would it be your view that that would be proper practice anyway?
A Yes.



e8367888-da09-47a8-aa87-70e30c016e1

Q Don't you agree with me there is a meaningful distinction in the information contained in the July 1996 trip report and the Golder report regarding the interpretation of the test pit data, because the July 1996 trip report is written by the very individual who observed the excavation of the test pit and prepared the test pit logs?

A Do I agree that there's a difference between the two reports?

Q No.

MR. HOPKINS: Read back my question, if you can.

(Question on Page 170, Lines 10 through 16, read by the reporter.)

////



e8367888-da09-47a8-aa87-70e30c016e1f

A There's a distinction, yes.
Q (By Mr. Hopkins) In other words, the statement in regard to some cobbles will have a different meaning depending upon the context it is used and who states it?
A Mr. Brown states that if he'd have known that there was some cobbles, it would have raised questions to the bidder.
Q Well, Mr. Brown is referring to two things. He says, quote, indicated the material to contain some cobble and boulders and cautioned that the excavation equipment must be commensurate with these materials.
That's what was contained in the July 1996 trip report; right?
A Okay. I don't think that Golder talked about equipment.
Q And Golder didn't do the test pits; correct?
A No, they didn't.
Q Don't you also agree with me, to the extent the test pit logs contained ambiguous terms, the only individual who could appropriately clarify and add more accurate meaning to the test pit logs was the individual who prepared them?
A I agree to that, yes.



e8367888-da09-47a8-aa87-70e30c016e1f

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, INC., | ) | |
| Plaintiff, | ) | |
| | ) | No. 04-487C |
| vs. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEPOSITION OF DAVID HEETER

September 27, 2005

Seattle, Washington

Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

One Union Square
600 University St.
Suite 2300
Seattle, WA 98101

2208 North 30th Street, Suite 202
Tacoma, WA 98403
(253) 627-6401
(253) 383-4884 Fax

(206) 340-1316
(800) 649-2034

scheduling@byersanderson.com
www.byersanderson.com

25th Anniversary 1980-2005

Q When you did the estimation yourself, did you look at the geotechnical data regarding the material to be dredged, or is that something you let the subcontractor look at?
A I looked at the material -- the subsurface information that was in the plans and specs.
Q Do you recall whether or not that changed your opinion about what the subcontractor would have to do in any way?
A No.
Q Was there anything in particular you might have been

looking for when you were looking at that geotechnical data provided with the plans and specifications?

A At the time of the bid, it was just an evaluation of what type of material. Obviously it was, from my point of view, was what type of material; whether it was rock or sand or gravel; and what type of dredging, you know, you would normally expect quotes on.

Q Where it says, "The Contractor acknowledges that it has taken steps reasonably necessary to ascertain the nature and location of the work, and that it has investigated and satisfied itself as to the general

and local conditions which can affect the work or its
cost."
Do you see that?
A Yes.
Q When you made a bid, had you in fact taken steps to
ascertain the nature and location of the work,
et cetera?
A Yes.
Q And what did those steps consist of?
A Primarily a site visit.
Q And what did you do on that site visit?
A Went to King Cove. That would have been in June of
'98. June of '98, I believe. The first time King
Cove was bid was the middle of June of 1998, I
believe. And then it was rebid again the second time
in November of '98.
So I took a site visit in June of '98, and
investigated the quarry in King Cove, as well as the
future harbor that they're trying to construct.
Q But was the quarry the area that was going to be used
as a breakwater?
A There was a quarry in King Cove that had a potential
to be used as a breakwater, yeah, material.
Q And the actual area that was to be dredged, what did
your investigation consist of during this site visit?

A Primarily visual.
Q You basically just walked around and looked at it?
A Yeah. Walked the beach, walked -- there was other work that was associated with the beach on the original bid. Basically looked for draft on the beach, as far as for the construction of the breakwater. Just physical appearance of the beach.
Q When you say looked for draft on the beach, what does that mean?
A How steep it drops off. So basically the available -- or the ability to bring in a barge full of rock.

Does anything in 1.2 tell you that the documents enclosed in Appendix A represent what the whole area is going to look like?

A Can you repeat that?

Q Sure. Does anything in 1.2 -- okay?

A Yes.

Q -- tell you that the documents included in Appendix A were going to describe completely the characteristics of the dredge area?

A Let me -- I'll say no, because what I'm -- I hear you saying is -- are you saying does Paragraph 1.2 describe what's in Attachment A? And I'll say no, if that's the question.

Q Okay. Let me ask -- that's not what I'm asking. And that's okay. We'll get to the bottom of it.

Does 1.2 tell you that it will answer all the questions about what's in the dredge area?

MR. HOPKINS: Object. Confusing.

Q (By Mr. Prouty) Do you understand the question?

A I understand the question, yes.

Q Okay. Can you answer?

A It doesn't necessarily describe the dredge material.

Q Now, earlier, when I first asked you about 1.2, you said something about, it was not the information you used to decide what was going to be found, or

something to that effect.
A Mm-hm.
Q Could you rephrase that, please?
A Well, most of this stuff that they're talking about -- incidental sunken logs, boulders, rocks, snags, debris, harbor debris and fishing operation debris -- those are all, in my mind, surface-oriented obstacles. They're not necessarily pertaining to the material that you're dredging.
Q Okay. How did you determine what the material was going to be like that you would be dredging?
A Primarily by the bore logs.
Q Now, if you sort of flip back to the Attachment A, the first couple pages are some test pits.
Now, when you said bore logs just a moment ago, did you include these test pits, or did you mean the drilling reports that follow this test pit information?
A I meant both of them.

Q Now, I want to go down to the third and final paragraph on the first page.

MR. HOPKINS: Just for the record, this has also been entered as Exhibit 13.

MR. PROUTY: Okay.

Q (By Mr. Prouty) In that paragraph, you talk about a few cobbles. And you say, "A 'few' cobbles generated by the volume of Test Pit #5 between elevations -1 and -8 yields a gradation of less than 1% cobbles."

Do you see that?

A Yes.

Q From where do you get the less than 1 percent?

A That was on our -- that was an interpretation of the definition of "few," based on the volume of the test pit. We anticipated that -- the depth that the test pit went and the volume it created, which yielded what we said was less than 1 percent of the materials

was cobbles.
Q Okay. How did the depth of the test pit and the volume it included change the meaning of the word "few" -- or make the meaning of the word "few" equal to less than 1 percent?
A Well, by definition, a few was not many, and whether it's three, four, five cobbles in a hole that was dug at a certain depth. So you could calculate the volume of each and divide it by one another and come up with something that's less than 1 percent.
Q I'm confused. Again, how does "not many" lead to four or five in a particular volume, and then leading to 1 percent?
A By a definition of few. A few cobbles, the way I interpret it, was three, four, five, six, eight. And by excavating to the depth that they show in test pit 5, you had to generate X amount of volume. And so the few cobbles volume, divided by the test pit 5 volume, would yield a value of less than 1 percent.
Q Okay. Isn't your choosing four or five or eight, or whatever number of cobbles, to equal a few, isn't it arbitrary?
A It's the best definition I can come up with.
Q Is there anything about the definition of "few" that actually assigns a number to it?

MR. HOPKINS: Objection. Vague, ambiguous.

Q (By Mr. Prouty) Can you answer the question?

A It's just, like I said, whatever the definition of few is. I mean, I went to the extent of trying to determine what few was. And in essence, it's not very many.

Q Now, the word "few" was actually used by the person who dug the test pit; correct?

A I don't know that.

Q Okay.

A Just whatever is in the bore logs.

Q And wouldn't you agree the best way to find out what the person meant by "few" would be to ask the person?

A At the time of the bid?

Q At any time.

A I thought the best thing to do was what we did, which was do our own exploration to determine really what the value of few meant.

Q Right. You're talking about, of course, the later test pits you dug --

A Yes.

Q -- after you bid the project.

A Mm-hm.

Q (By Mr. Prouty) Now, when you, in fact, went to Holland, did they express -- were there any concerns at all about cobbles or things of that nature discussed?

A No. The pump was rated to handle whatever could fit through the grizzly. At that point, there was no information that would lead us to believe that we

would run into more than a few cobbles.

Q Okay. What is a grizzly?

A It's the cage that goes around the inlet of the actual pump itself. It was -- it's a grid made out of three-quarter-inch-diameter steel bar. And it just prevents anything oversize from going through the pump.

Q Okay. I presume that you were in touch with Mr. Luterbach and other people on-site when you were not there?
A On a daily basis, yeah.
Q Was Mr. Luterbach there throughout that time?
A Yes.
Q And you said you were in touch with him on a daily basis?
A Yes.
Q So when the dredging started with the DeGroot equipment, what happened?

A Well, we essentially ran into cobbles right off the bat. We had to start in the mouth of the harbor so we can maintain draft for the dump scow, meaning we needed deep water that wasn't affected by the tide. So we had already constructed the breakwater. So we were at the entrance of that breakwater, and then our plan was to move forward towards the beach, and then over to the south of the harbor.

Q And you said there were problems. And you said the problems were the cobbles; right?
A Mm-hm.
Q And what kind of problems were there?
A Well, the cobbles themselves were the problem. The predominant number of them caused the -- basically, the cobbles were so many, that it sucked up into the grizzly and plugged up the openings in the grizzly, to a point where it wouldn't allow any of the fine material to be pumped.

Q Okay. And as a result of the cobbles being sucked in and sort of filling these holes in the grizzly, how did you all address this or attempt to address it?
A You mean as far as how we mitigated this?
Q Sure. Did you sort of pull it up and try to knock the cobbles out?
A Yeah. Basically, that's all we could do, is just

pound them out. But there was so many of them, we put it back down, and within two minutes, it would be plugged up again.

Q I presume that you tried to do some sort of troubleshooting with this problem when this first began to occur. Right?

A Well, there wasn't much we could do with the cobbles as far as troubleshooting. What we basically went into was more of an exploratory mode, to see if it was an isolated, small area.

So we moved from spot to spot. We tried to determine the limits of the cobbles, both horizontally and vertically, to see if we could start the dredge going. And so we spent two weeks doing everything we can imagine to basically facilitate the production of this dredge.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, INC., | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 04-487C |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEPOSITION OF PETER M. DOUGLASS

January 12, 2006

Seattle, Washington

Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

One Union Square
600 University St.
Suite 2300
Seattle, WA 98101

2208 North 30th Street, Suite 202
Tacoma, WA 98403
(253) 627-6401
(253) 383-4884 Fax

(206) 340-1316
(800) 649-2034

scheduling@byersanderson.com
www.byersanderson.com

Serving Washington's Legal Community Since 1980



333b2255-9685-44d4-8789-4823758b0782

Q Would you consider them -- would you consider the variation to be significant?

A I mean, you've got a situation, it would appear to me, where as you got Test Pits 2 and 4, for instance, being closer to shore and having cobbles and boulders,





333b2255-9685-44d4-8789-4823758b0782

reporting cobbles and boulders from the surface, it suggests that they are probably getting into that coarser nearshore material. And ones further out have less, it would appear to me, cobbles and boulders.
Q Okay.
A And the finer-grain materials further off.
Q Do these five test pits provide enough information for a person or an individual reviewing them to determine a trend with the cobbles and boulders in the area of the project?
A Well, I think there's enough material there to determine a trend, based on being inside the tidal zone or outside that intertidal zone, just based on where they're located and the information there.
It's my belief, I guess, that right just inside the -- just shoreward of the intertidal zone, you have an accumulation of coarse materials. And it would appear that that tends to be more the case for TP 2 and TP 4, where you have gravel and cobbles right from the get-go, and less as you get further out. You seem to have silty sands in the surface further out.



333b2255-9685-44d4-8789-4823758b0782

Q I'm just asking you --
A I'm telling you that my observations of the photographs would suggest to me there was very little coarse material on the surface.



333b2255-9685-44d4-8789-4823758b0782

US Army Corps
of Engineers
Alaska District

# Navigation Improvements
# Detailed Project Report
## and Environmental Assessment

# King Cove, Alaska



E-4

April 1997

EV_010084

DEPARTMENT OF THE ARMY
U.S. ARMY ENGINEER DISTRICT, ALASKA
P.O. BOX 898
ANCHORAGE, ALASKA 99506-0898

# NAVIGATION IMPROVEMENTS DETAILED PROJECT REPORT AND ENVIRONMENTAL ASSESSMENT

## KING COVE, ALASKA

April 1997

EV_010085




| ALASKA DISTRICT<br>CORPS OF ENGINEERS<br>CIVIL WORKS BRANCH | LOCATION AND VICINITY MAP<br>NAVIGATION IMPROVEMENTS<br>KING COVE, ALASKA | 1 |
|---|---|---|



EV_010098

- U.S. Army Corps of Engineers, Alaska District. April 1972. "General Design Memorandum No. 1, Proposed Harbor Improvements, King Cove, Alaska." The criteria and design analysis for the existing project are documented in this publication.

- U.S. Army Corps of Engineers, Alaska District. December 1986. "Small Boat Harbor Technical Report, King Cove, Alaska." The need for harbor improvements at King Cove was examined in this study. No plan could be conceived at that time to enlarge the King Cove harbor and provide annual benefits that would exceed the estimated annual cost. The report suggested, however, that 20 slips could be added by rearranging the existing float system and adding a fourth set of floats. The benefit-to-cost ratio of this alternative was 1.8. Because this alternative would not involve dredging or wave protection, it was not eligible for Federal participation. Modification of the inner harbor facilities was determined to be the responsibility of the local community.

- U.S. Army Corps of Engineers, Alaska District. October 1993. "Navigation Improvements, Preliminary Reconnaissance Report, King Cove, Alaska." A preliminary reconnaissance study conducted to investigate potential marine navigation improvements at King Cove. The preliminary benefit-to-cost ratio was positive, and a full reconnaissance study of navigation problems at King Cove was recommended.


### 1.5 Existing Project

An 11-acre harbor was authorized in 1968 as a General Investigations project and constructed by the Corps during 1973 and 1974 on the west side of King Cove (figure 2). The harbor and entrance channel are authorized to be maintained at a depth of -15 feet (ft) MLLW. Maintenance dredging in the harbor was accomplished in 1984, when 24,500 cubic yards of coarse material was removed from within the project limits. The material removed in 1984 appears to have been associated with the city's construction activities along the margin of the harbor since its construction, and sloughing of the entrance channel side slopes. A 1992 survey found a minimum harbor depth of -12.6 ft MLLW in the entrance channel, but the basin had not filled in enough to warrant additional maintenance dredging.


EXISTING
ENTRANCE CHANNEL
KING COVE
EXIST. CAUSEWAY,
FERRY DOCK
SCALE IN FEET
LAGOON ENTRANCE
EXISTING HARBOR
EXISTING CONDITIONS
NAVIGATION IMPROVEMENTS
KING COVE, ALASKA
ALASKA DISTRICT
CORPS OF ENGINEERS
CIVIL WORKS BRANCH
2



EV_010100




| | | |
|---|---|---|
| ALASKA DISTRICT<br>CORPS OF ENGINEERS<br>CIVIL WORKS BRANCH | ALTERNATIVE 2<br>NAVIGATION IMPROVEMENTS<br>KING COVE, ALASKA | 6 |

16

EV_010112

TABLE 4-4 --*Detailed cost estimate, alternative 2*
*(October 1996 price level)*

| Item | Qty. | Unit | Unit price ($) | Shared NED costs ($000)[a] Federal | Local | TOTAL |
|---|---|---|---|---|---|---|
| Mobilization & demob. | 1 | LS | 587,000 | 440 | 110 | 550 |
| Breakwater | | | | | | |
| Armor rock | 28,800 | $yd^3$ | 57 | 1,196 | 299 | 1,496 |
| Secondary rock | 10,700 | $yd^3$ | 43 | 376 | 94 | 470 |
| Core (quarry run) | 20,500 | $yd^3$ | 23 | 378 | 94 | 472 |
| Hydrographic surveys | 2 | ea | 10,000 | 16 | 4 | 20 |
| Navigation aid foundation | 1 | ea | 5,000 | 4 | 1 | 5 |
| Entrance and access channel dredging | | | | | | |
| Entrance channel | 5,400 | $yd^3$ | 3.62 | 16 | 4 | 20 |
| Maneuvering channel | 30,800 | $yd^3$ | 5.20 | 146 | 37 | 183 |
| Hydrographic survey | 1 | ea | 14,057 | 11 | 3 | 14 |
| Float system | 1 | LS | 1,926,000 | | 1,926 | 1,926 |
| Utilities (power, lights) | 1 | LS | 150,000 | | 150 | 150 |
| Moorage basin | | | | | | |
| Dredge sand | 303,000 | $yd^3$ | 3.62 | | 1,109 | 1,109 |
| SUBTOTAL | | | | 2,583 | 3,831 | 6,415 |
| Contingency | | | | 591 | 428 | 1,019 |
| CONSTRUCTION CONTRACT | | | | 3,174 | 4,259 | 7,434 |
| Lands and damages | | | | 30 | 40 | 70 |
| Engineering and design | | | | 441 | 173 | 614 |
| Supervision and administration | | | | 630 | 173 | 803 |
| Navigation aids (U.S. Coast Guard) | | | | 8 | 0 | 8 |
| TOTAL PROJECT COST | | | | 4,283 | 4,645 | 8,929 |
| Total NED construction cost | | | | | | 8,929 |
| NED interest during construction (7-5/8%, 6 mo.)[b] | | | | | | 180 |
| **NED investment cost** | | | | | | 9,109 |
| **Annual NED cost ($)** | | | | | | $713,000 |
| **Annual O & M** | | | | | | 27,000 |
| **Total annual NED cost** | | | | | | $740,000 |

[a] Features showing Federal costs are General Navigation Features. These can be paid in part by the Federal Government, subject to current cost-sharing laws and the Federal cost limit.
[b] Includes $36,000 interest on PED.



EV_010118