clays, OL or OH. Correlations between the dilatancy, dry strength, toughness tests, and laboratory tests can be made to identify organic soils in certain deposits of similar materials of known geologic origin.

14.9 If the soil is estimated to have 15 to 25 % sand or gravel, or both, the words "with sand" or "with gravel" (whichever is more predominant) shall be added to the group name. For example: "lean clay with sand, CL" or "silt with gravel, ML" (see Fig. 1a and Fig. 1b). If the percentage of sand is equal to the percentage of gravel, use "with sand."

14.10 If the soil is estimated to have 30 % or more sand or gravel, or both, the words "sandy" or "gravelly" shall be added to the group name. Add the word "sandy" if there appears to be more sand than gravel. Add the word "gravelly" if there appears to be more gravel than sand. For example: "sandy lean clay, CL", "gravelly fat clay, CH", or "sandy silt, ML" (see Fig. 1a and Fig. 1b). If the percentage of sand is equal to the percent of gravel, use "sandy."

## 15. Procedure for Identifying Coarse-Grained Soils (Contains less than 50 % fines)

15.1 The soil is a *gravel* if the percentage of gravel is estimated to be more than the percentage of sand.

15.2 The soil is a *sand* if the percentage of gravel is estimated to be equal to or less than the percentage of sand.

15.3 The soil is a *clean gravel* or *clean sand* if the percentage of fines is estimated to be 5 % or less.

15.3.1 Identify the soil as a *well-graded gravel*, GW, or as a *well-graded sand*, SW, if it has a wide range of particle sizes and substantial amounts of the intermediate particle sizes.

15.3.2 Identify the soil as a *poorly graded gravel*, GP, or as a *poorly graded sand*, SP, if it consists predominantly of one size (uniformly graded), or it has a wide range of sizes with some intermediate sizes obviously missing (gap or skip graded).

15.4 The soil is either a *gravel with fines* or a *sand with fines* if the percentage of fines is estimated to be 15 % or more.

15.4.1 Identify the soil as a *clayey gravel*, GC, or a *clayey sand*, SC, if the fines are clayey as determined by the procedures in Section 14.

15.4.2 Identify the soil as a *silty gravel*, GM, or a *silty sand*, SM, if the fines are silty as determined by the procedures in Section 14.

15.5 If the soil is estimated to contain 10 % fines, give the soil a dual identification using two group symbols.

15.5.1 The first group symbol shall correspond to a clean gravel or sand (GW, GP, SW, SP) and the second symbol shall correspond to a gravel or sand with fines (GC, GM, SC, SM).

15.5.2 The group name shall correspond to the first group symbol plus the words "with clay" or "with silt" to indicate the plasticity characteristics of the fines. For example: "well-graded gravel with clay, GW-GC" or "poorly graded sand with silt, SP-SM" (see Fig. 2).

15.6 If the specimen is predominantly sand or gravel but contains an estimated 15 % or more of the other coarse-grained constituent, the words "with gravel" or "with sand" shall be added to the group name. For example: "poorly graded gravel with sand, GP" or "clayey sand with gravel, SC" (see Fig. 2).

15.7 If the field sample contains any cobbles or boulders, or both, the words "with cobbles" or "with cobbles and boulders" shall be added to the group name. For example: "silty gravel with cobbles, GM."

## 16. Report

16.1 The report shall include the information as to origin, and the items indicated in Table 13.

NOTE 13—*Example: Clayey Gravel with Sand and Cobbles, GC*—About 50 % fine to coarse, subrounded to subangular gravel; about 30 % fine to coarse, subrounded sand; about 20 % fines with medium plasticity, high dry strength, no dilatancy, medium toughness; weak reaction with HCl; original field sample had about 5 % (by volume) subrounded cobbles, maximum dimension, 150 mm.

In-Place Conditions—Firm, homogeneous, dry, brown

Geologic Interpretation—Alluvial fan

NOTE 14—Other examples of soil descriptions and identification are given in Appendix X1 and Appendix X2.

NOTE 15—If desired, the percentages of gravel, sand, and fines may be stated in terms indicating a range of percentages, as follows:

*Trace*—Particles are present but estimated to be less than 5 %
*Few*—5 to 10 %
*Little*—15 to 25 %
*Some*—30 to 45 %
*Mostly*—50 to 100 %

16.2 If, in the soil description, the soil is identified using a classification group symbol and name as described in Test Method D 2487, it must be distinctly and clearly stated in log forms, summary tables, reports, and the like, that the symbol and name are based on visual-manual procedures.

## 17. Precision and Bias

17.1 This practice provides qualitative information only, therefore, a precision and bias statement is not applicable.

## 18. Keywords

18.1 classification; clay; gravel; organic soils; sand; silt; soil classification; soil description; visual classification

**TABLE 13 Checklist for Description of Soils**

1. Group name
2. Group symbol
3. Percent of cobbles or boulders, or both (by volume)
4. Percent of gravel, sand, or fines, or all three (by dry weight)
5. Particle-size range:
   Gravel—fine, coarse
   Sand—fine, medium, coarse
6. Particle angularity: angular, subangular, subrounded, rounded
7. Particle shape: (if appropriate) flat, elongated, flat and elongated
8. Maximum particle size or dimension
9. Hardness of coarse sand and larger particles
10. Plasticity of fines: nonplastic, low, medium, high
11. Dry strength: none, low, medium, high, very high
12. Dilatancy: none, slow, rapid
13. Toughness: low, medium, high
14. Color (in moist condition)
15. Odor (mention only if organic or unusual)
16. Moisture: dry, moist, wet
17. Reaction with HCl: none, weak, strong

*For intact samples:*

18. Consistency (fine-grained soils only): very soft, soft, firm, hard, very hard
19. Structure: stratified, laminated, fissured, slickensided, lensed, homogeneous
20. Cementation: weak, moderate, strong
21. Local name
22. Geologic interpretation
23. Additional comments: presence of roots or root holes, presence of mica, gypsum, etc., surface coatings on coarse-grained particles, caving or sloughing of auger hole or trench sides, difficulty in augering or excavating, etc.

# APPENDIXES

(Nonmandatory Information)

## X1. EXAMPLES OF VISUAL SOIL DESCRIPTIONS

X1.1 The following examples show how the information required in 16.1 can be reported. The information that is included in descriptions should be based on individual circumstances and need.

X1.1.1 *Well-Graded Gravel with Sand (GW)*—About 75 % fine to coarse, hard, subangular gravel; about 25 % fine to coarse, hard, subangular sand; trace of fines; maximum size, 75 mm, brown, dry; no reaction with HCl.

X1.1.2 *Silty Sand with Gravel (SM)*—About 60 % predominantly fine sand; about 25 % silty fines with low plasticity, low dry strength, rapid dilatancy, and low toughness; about 15 % fine, hard, subrounded gravel, a few gravel-size particles fractured with hammer blow; maximum size, 25 mm; no reaction with HCl (Note—Field sample size smaller than recommended).

*In-Place Conditions*—Firm, stratified and contains lenses of silt 1 to 2 in. (25 to 50 mm) thick, moist, brown to gray; in-place density 106 lb/ft$^3$; in-place moisture 9 %.

X1.1.3 *Organic Soil (OL/OH)*—About 100 % fines with low plasticity, slow dilatancy, low dry strength, and low toughness; wet, dark brown, organic odor; weak reaction with HCl.

X1.1.4 *Silty Sand with Organic Fines (SM)*—About 75 % fine to coarse, hard, subangular reddish sand; about 25 % organic and silty dark brown nonplastic fines with no dry strength and slow dilatancy; wet; maximum size, coarse sand; weak reaction with HCl.

X1.1.5 *Poorly Graded Gravel with Silt, Sand, Cobbles and Boulders (GP-GM)*—About 75 % fine to coarse, hard, subrounded to subangular gravel; about 15 % fine, hard, subrounded to subangular sand; about 10 % silty nonplastic fines; moist, brown; no reaction with HCl; original field sample had about 5 % (by volume) hard, subrounded cobbles and a trace of hard, subrounded boulders, with a maximum dimension of 18 in. (450 mm).

## X2. USING THE IDENTIFICATION PROCEDURE AS A DESCRIPTIVE SYSTEM FOR SHALE, CLAYSTONE, SHELLS, SLAG, CRUSHED ROCK, AND THE LIKE

X2.1 The identification procedure may be used as a descriptive system applied to materials that exist in-situ as shale, claystone, sandstone, siltstone, mudstone, etc., but convert to soils after field or laboratory processing (crushing, slaking, and the like).

X2.2 Materials such as shells, crushed rock, slag, and the like, should be identified as such. However, the procedures used in this practice for describing the particle size and plasticity characteristics may be used in the description of the material. If desired, an identification using a group name and symbol according to this practice may be assigned to aid in describing the material.

X2.3 The group symbol(s) and group names should be placed in quotation marks or noted with some type of distinguishing symbol. See examples.

X2.4 Examples of how group names and symbols can be incororated into a descriptive system for materials that are not naturally occurring soils are as follows:

X2.4.1 *Shale Chunks*—Retrieved as 2 to 4-in. (50 to 100-mm) pieces of shale from power auger hole, dry, brown, no reaction with HCl. After slaking in water for 24 h, material identified as "Sandy Lean Clay (CL)"; about 60 % fines with medium plasticity, high dry strength, no dilatancy, and medium toughness; about 35 % fine to medium, hard sand; about 5 % gravel-size pieces of shale.

X2.4.2 *Crushed Sandstone*—Product of commercial crushing operation; "Poorly Graded Sand with Silt (SP-SM)"; about 90 % fine to medium sand; about 10 % nonplastic fines; dry, reddish-brown, strong reaction with HCl.

X2.4.3 *Broken Shells*—About 60 % gravel-size broken shells; about 30 % sand and sand-size shell pieces; about 10 % fines; "Poorly Graded Gravel with Sand (GP)."

X2.4.4 *Crushed Rock*—Processed from gravel and cobbles in Pit No. 7; "Poorly Graded Gravel (GP)"; about 90 % fine, hard, angular gravel-size particles; about 10 % coarse, hard, angular sand-size particles; dry, tan; no reaction with HCl.

## X3. SUGGESTED PROCEDURE FOR USING A BORDERLINE SYMBOL FOR SOILS WITH TWO POSSIBLE IDENTIFICATIONS.

X3.1 Since this practice is based on estimates of particle size distribution and plasticity characteristics, it may be difficult to clearly identify the soil as belonging to one category. To indicate that the soil may fall into one of two possible basic groups, a borderline symbol may be used with the two symbols separated by a slash. For example: SC/CL or CL/CH.

X3.1.1 A borderline symbol may be used when the percentage of fines is estimated to be between 45 and 55 %. One symbol should be for a coarse-grained soil with fines and the other for a fine-grained soil. For example: GM/ML or CL/SC.

X3.1.2 A borderline symbol may be used when the percentage of sand and the percentage of gravel are estimated to be about the same. For example: GP/SP, SC/GC, GM/SM. It is practically impossible to have a soil that would have a borderline symbol of GW/SW.

X3.1.3 A borderline symbol may be used when the soil could be either well graded or poorly graded. For example: GW/GP, SW/SP.

X3.1.4 A borderline symbol may be used when the soil could either be a silt or a clay. For example: CL/ML, CH/MH, SC/SM.

X3.1.5 A borderline symbol may be used when a fine-grained soil has properties that indicate that it is at the boundary between a soil of low compressibility and a soil of high compressibility. For example: CL/CH, MH/ML.

X3.2 The order of the borderline symbols should reflect similarity to surrounding or adjacent soils. For example: soils in a borrow area have been identified as CH. One sample is considered to have a borderline symbol of CL and CH. To show similarity, the borderline symbol should be CH/CL.

X3.3 The group name for a soil with a borderline symbol should be the group name for the first symbol, except for:

CL/CH lean to fat clay
ML/CL clayey silt
CL/ML silty clay

X3.4 The use of a borderline symbol should not be used indiscriminately. Every effort shall be made to first place the soil into a single group.

## X4. SUGGESTED PROCEDURES FOR ESTIMATING THE PERCENTAGES OF GRAVEL, SAND, AND FINES IN A SOIL SAMPLE

X4.1 *Jar Method*—The relative percentage of coarse- and fine-grained material may be estimated by thoroughly shaking a mixture of soil and water in a test tube or jar, and then allowing the mixture to settle. The coarse particles will fall to the bottom and successively finer particles will be deposited with increasing time; the sand sizes will fall out of suspension in 20 to 30 s. The relative proportions can be estimated from the relative volume of each size separate. This method should be correlated to particle-size laboratory determinations.

X4.2 *Visual Method*—Mentally visualize the gravel size particles placed in a sack (or other container) or sacks. Then, do the same with the sand size particles and the fines. Then, mentally compare the number of sacks to estimate the percentage of plus No. 4 sieve size and minus No. 4 sieve size present. The percentages of sand and fines in the minus sieve size No. 4 material can then be estimated from the wash test (X4.3).

X4.3 *Wash Test (for relative percentages of sand and fines)*—Select and moisten enough minus No. 4 sieve size material to form a 1-in (25-mm) cube of soil. Cut the cube in half, set one-half to the side, and place the other half in a small dish. Wash and decant the fines out of the material in the dish until the wash water is clear and then compare the two samples and estimate the percentage of sand and fines. Remember that the percentage is based on weight, not volume. However, the volume comparison will provide a reasonable indication of grain size percentages.

X4.3.1 While washing, it may be necessary to break down lumps of fines with the finger to get the correct percentages.

## X5. ABBREVIATED SOIL CLASSIFICATION SYMBOLS

X5.1 In some cases, because of lack of space, an abbreviated system may be useful to indicate the soil classification symbol and name. Examples of such cases would be graphical logs, databases, tables, etc.

X5.2 This abbreviated system is not a substitute for the full name and descriptive information but can be used in supplementary presentations when the complete description is referenced.

X5.3 The abbreviated system should consist of the soil classification symbol based on this standard with appropriate lower case letter prefixes and suffixes as:

| *Prefix:* | *Suffix:* |
|---|---|
| s = sandy | s = with sand |
| g = gravelly | g = with gravel |
| | c = with cobbles |
| | b = with boulders |

X5.4 The soil classification symbol is to be enclosed in

parenthesis. Some examples would be:

| *Group Symbol and Full Name* | Abbreviated |
|---|---|
| CL, Sandy lean clay | s(CL) |
| SP-SM, Poorly graded sand with silt and gravel | (SP-SM)g |
| GP, poorly graded gravel with sand, cobbles, and boulders | (GP)scb |
| ML, gravelly silt with sand and cobbles | g(ML)sc |

## X6. RATIONALE

Changes in this version from the previous version, D 2488 – 90, include the addition of X5 on Abbreviated Soil Classification Symbols.

*The American Society for Testing and Materials takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.*

*This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, 100 Barr Harbor Drive, West Conshohocken, PA 19428.*

# RED SAMM CONSTRUCTION, INC.

P.O. BOX 3097
BELLEVUE, WASHINGTON 98009

BELLEVUE (425) 827-2955
FAX (425) 827-0256

August 20, 2000

Serial Letter 109 – 035

US Army Engineer District, Alaska
Southern Alaska Area Office
PO Box 898
Anchorage, Alaska 99506-0898

Attention: Lynden Belin

Re: DACW85-99-C-0003, Harbor Improvements, King Cove, AK; Differing Site Conditions

Gentlemen:

Red Samm Construction is in receipt of your serial letter SAO / 038 dated August 4, 2000. The Government does not agree that Red Samm has incurred differing site conditions. The Government feels that it has provided Bore Logs and Test Pits that indicated the type of material to be encountered for the dredging work. Red Samm does not agree with the Governments position.

Please review the Project Plans and Specifications. Of all the Test Pits and Bore Logs shown on plan sheet 3 of 5 only one, Test Pit #5, is inside the dredging work area. None of the test pits provide information between elevation –10 and the maximum dredge depth of elevation –17. Only the Test Borings indicate what type of material is to be encountered below elevation –10. This material consists predominately of sand, which is what Red Samm expected as the dredging work progressed to lower elevations.

The Government did not provide gradations for the material encountered in Test Pit # 5. Red Samm took the given information in Test Pit # 5 to determine the percentage of cobbles to encounter. A "few" cobbles generated by the volume of the Test Pit # 5 between elevation – 1 and –8 yields a gradation of less that 1% cobbles. A "few" as defined by Webster's means "small, little, not many, of small number". Red Samm has, and is currently encountering cobbles in excess of 10% and up to 20 % of the dredging quantity throughout the entire dredging limits.

Ex 13

orig (Fax)

RECEIVED
21

SL

SAO 005285

The quantity of cobbles encountered is well in excess of a "few". The dredge material encountered is different than what could have been expected from the Test Pits and Test Borings located within the dredging limits as shown in the Project Plans and Specifications. Consequently, Red Samm could not perform dredging by the pumping method. Red Samm is currently documenting sample locations and gradations of the dredge material.

Red Samm reserves it rights to claim for all cost associated with the dredging differing site conditions. Red Samm will seek compensation, as a minimum, for all cost incurred to procure equipment and supplies, step up costs, production costs, delay costs and potential liquidated damages associated with the dredging by pumping method. It is Red Samm's position that the government failed to provide adequate and reliable subsurface information within the given area of work.

If there are any questions regarding the above subject, please do not hesitate to contact me at (425) 827-2955.

Sincerely,

David Heeter

David Heeter
Vice President



Ex 13

SAO_005286

**ABSTRACT OF OFFERS - CONSTRUCTION**

1. Solicitation: DACW85-98-B-0022

2. DATE ISSUED: 10/07/98

3. DATE OPENED: 11/10/98

PAGE 1 OF 2 PAGES

4. ISSUING OFFICE
U.S. Army Engineer District, Alaska
PO Box 898
Anchorage, AK 99506-0898

I CERTIFY that I have opened, read, and recorded on this abstract all offers received in response to this solicitation >

NAME AND TITLE OF CERTIFYING OFFICIAL (TYPED)
Gail M West
Chief, Contracts Branch

SIGNATURE: Gail M West

DATE SIGNED: 13 Nov 98

5. PROJECT TITLE
HARBOR IMPROVEMENTS
KING COVE, ALASKA

6. NUMBER OF AMENDMENTS ISSUED: ONE

8. GOVERNMENT ESTIMATE (Check A, B, C and complete D, E, and F)
A. HIRED LABOR
X B. REASONABLE CONTRACT (Without Profit)
C. REASONABLE CONTRACT (Including Profit)

9. OFFERS

1st Low LG
OFFEROR/ RED SAMM CONSTR
PO Box 3097
Bellevue, WA 98009-3097
B. BID SECURTIY (TYPE AND AMOUNT): 20%
C. AMENDEMENTS ACKNOWLEDGED: 1

2nd Low SM LG
A. OFFEROR/ OSBORNE CONSTR
PO Box 97010
Kirkland, WA 98033-9710
B. BID SECURTIY (TYPE AND AMOUNT): 20%
C. AMENDEMENTS ACKNOWLEDGED: 1

| 7A. ITEM NUMBER | 7B. DESCRIPTION OF OFFERED ITEM | 7C. EST. QUANTITY | D. UNIT | Gov. Est. E. UNIT PRICE | Gov. Est. F. ESTIMATED AMOUNT | 1st Low D. UNIT PRICE | 1st Low E. ESTIMATED AMOUNT | 2nd Low D. UNIT PRICE | 2nd Low E. ESTIMATED AMOUNT |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Mob/Demob, complete | 1 | Job | Lump Sum | 1,077,240.00 | Lump Sum | 1,200,000.00 | Lump Sum | 1,545,373.00 |
| 2 | Construct breakwater core, complete | 30,000 | CY | 38.40 | 1,152,000.00 | 45.00 | 1,350,000.00 | 33.30 | 999,000.00 |
| 3 | Construct breakwater "B" rock layer, comp | 17,500 | CY | 44.49 | 778,575.00 | 45.00 | 787,500.00 | 62.10 | 1,086,750.00 |
| 4 | Construct breakwater "A" rock layer, comp | 28,500 | CY | 68.21 | 1,943,985.00 | 45.00 | 1,282,500.00 | 63.70 | 1,815,450.00 |
| 5 | Dredge/Excavate/Dispose of Entrance | | | | | | | | |
| | Channel, Maneuvering Area, & Mooring | | | | | | | | |
| | Basin material, complete | | | | | | | | |
| | a. First 134,100 CY | 134,100 | CY | 6.88 | 922,608.00 | 5.00 | 670,500.00 | 4.83 | 647,703.00 |
| | b. All over 134,100 CY | 10,800 | CY | 6.88 | 74,304.00 | 5.00 | 54,000.00 | 4.83 | 52,164.00 |
| 6 | Construct "core" rock slope protection on | | | | | | | | |
| | dredged sideslopes to Entrance Channel | | | | | | | | |
| | complete | 900 | CY | 44.37 | 39,933.00 | 45.00 | 40,500.00 | 57.55 | 51,795.00 |
| 7 | Provide Hydrographic Surveys for Items | | | | | | | | |
| | 2 thru 6, complete | 1 | Job | Lump Sum | 37,200.00 | Lump Sum | 50,000.00 | Lump Sum | 36,400.00 |
| 8 | Constr Navigation Aid Marker Base, comp | 1 | Job | Lump Sum | 4,980.00 | Lump Sum | 5,000.00 | Lump Sum | 9,100.00 |
| | | | | | | | | | |
| | **TOTAL ITEMS 1 THRU 8** | | | | **6,030,825.00** | | **5,440,000.00** | | **6,243,735.00** |
| | | | | | | | | | |
| | **OPTIONAL ITEMS** | | | | | | | | |
| 1A | Dredge/excavate/dispose of add'l Mooring | | | | | | | | |
| | Basin material, complete | | | | | | | | |
| | a. First 20,700 CY | 20,700 | CY | 6.88 | 142,416.00 | 5.00 | 103,500.00 | 4.90 | 101,430.00 |
| | b. All over 20,700 CY | 2,000 | CY | 6.88 | 13,760.00 | 5.00 | 10,000.00 | 4.90 | 9,800.00 |



Ex 28

CT_000226

| 7A. ITEM NUMBER | 7B. DESCRIPTION OF OFFERED ITEM | 7C. EST. QUANTITY | D. UNIT | E. UNIT PRICE | F. ESTIMATED AMOUNT | D. UNIT PRICE | E. ESTIMATED AMOUNT | D. UNIT PRICE | E. ESTIMATED AMOUNT |
|---|---|---|---|---|---|---|---|---|---|
| 1B | Provide Hydrographic Surveys for | | | | | | | | |
| | Item 1A, complete | 1 | Job | Lump Sum | 4,980.00 | Lump Sum | 1,000.00 | Lump Sum | 3,800.00 |
| | **TOTAL OPTIONAL ITEM 1** | | | | **161,156.00** | | **114,500.00** | | **115,030.00** |
| 2A | Dredge/excavate/dispose of add'l Mooring | | | | | | | | |
| | Basin Material, complete | | | | | | | | |
| | a. First 116,700 CY | 116,700 | CY | 6.88 | 802,896.00 | 5.00 | 583,500.00 | 4.90 | 571,830.00 |
| | b. All over 116,700 CY | 8,300 | CY | 6.88 | 57,104.00 | 5.00 | 41,500.00 | 4.90 | 40,670.00 |
| 2B | Provide Hydrographic Surveys for | | | | | | | | |
| | Item 2A, complete | 1 | Job | Lump Sum | 17,420.00 | Lump Sum | 1,000.00 | Lump Sum | 3,800.00 |
| | **TOTAL OPTIONAL ITEM 2** | | | | **877,420.00** | | **626,000.00** | | **616,300.00** |
| | **TOTAL BASE & OPTIONAL ITEMS** | | | | **7,069,401.00** | | **6,180,500.00** | | **6,975,065.00** |
| | | | | | | 60 DAY | BID ACCEPT | 60 DAY | BID ACCEPT |
| 7A. ITEM NUMBER | 7B. DESCRIPTION OF OFFERED ITEM | 7C. EST. QUANTITY | D. UNIT | E. UNIT PRICE | F. ESTIMATED AMOUNT | D. UNIT PRICE | E. ESTIMATED AMOUNT | D. UNIT PRICE | E. ESTIMATED AMOUNT |

2

CT_000227

ABSTRACT OF OFFERS - CONSTRUCTION
CONTINUATION SHEET

| 1. SOLICITATION NUMBER | DATE ISSUED | DATE OPENED | PAGE OF | PAGES |
|---|---|---|---|---|
| DACW85-98-B-0022 | 10/07/98 | 11/10/98 | 2 | 2 |

2. Project Title
HARBOR IMPROVEMENTS
KING COVE, ALASKA

INSTRUCTIONS: Attach this form to OF 1419. Abstract of Offers - Construction when more than 2 offers are received on a constuction project. Each Continuation Sheet will accomodate 14 contract items to conform to the number of items which can be entered on the OF 1419. Use of additional OF 1419s for contract items in excess of 14 and attach additional Continuation Sheets (OF1419A) as needed.

4. OFFERS (Continued)

| | 3rd Low LG | 4th Low LG | 5th Low LG | 6th Low LG |
|---|---|---|---|---|
| OFFEROR | A. OFFEROR/ SOUTH COAST INC, PO Box 8620, Ketchikan, AK 99901-8620 | OFFEROR/ KIEWIT PACIFIC CO, PO Box 1769, Vancouver, WA 98668 | A. OFFEROR/ KNIK CONSTRUCTION, PO Box 3757, Seattle, WA 98124-3757 | B. OFFEROR/ INTERNAT'L BRIDGE CORP, PO Box 21149, GMF, GU 96921 |
| B. BID Security (Type & Amount) | 20% | 20% | 20% | 20% |
| C. AMENDMENT ACKNOWLEDGED | 1 | 1 | 1 | 1 |

3. Contract Items

| 7A. ITEM NUMBER | 7C. EST. QTY | D. UNIT | E. UNIT PRICE | F. ESTIMATED AMOUNT | E. UNIT PRICE | F. ESTIMATED AMOUNT | D1. UNIT PRICE | E1. ESTIMATED AMOUNT | D2. UNIT PRICE | E2. ESTIMATED AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | Job | Lump Sum | 750,000.00 | Lump Sum | 1,130,000.00 | Lump Sum | 1,945,000.00 | Lump Sum | 907,000.00 |
| 2 | 30,000 | CY | 30.00 | 900,000.00 | 55.00 | 1,650,000.00 | 30.00 | 900,000.00 | 53.00 | 1,590,000.00 |
| 3 | 17,500 | CY | 50.00 | 875,000.00 | 55.00 | 962,500.00 | 40.00 | 700,000.00 | 102.00 | 1,785,000.00 |
| 4 | 28,500 | CY | 62.00 | 1,767,000.00 | 55.00 | 1,567,500.00 | 100.00 | 2,850,000.00 | 102.00 | 2,907,000.00 |
| 5a | 134,100 | CY | 14.00 | 1,877,400.00 | 9.00 | 1,206,000.00 | 7.50 | 1,005,750.00 | 15.00 | 2,011,500.00 |
| 5b | 10,800 | CY | 6.00 | 64,800.00 | 9.00 | 97,200.00 | 6.60 | 71,280.00 | 3.00 | 32,400.00 |
| 6 | 900 | CY | 150.00 | 135,000.00 | 30.00 | 27,000.00 | 50.00 | 45,000.00 | 53.00 | 47,700.00 |
| 7 | 1 | Job | Lump Sum | 100,000.00 | Lump Sum | 85,000.00 | Lump Sum | 30,000.00 | Lump Sum | 43,900.00 |
| 8 | 1 | Job | Lump Sum | 30,000.00 | Lump Sum | 20,000.00 | Lump Sum | 20,000.00 | Lump Sum | 18,000.00 |
| TOTAL | ITEMS | 1-8 | | 6,499,200.00 | | 6,745,200.00 | | 7,564,030.00 | | 9,342,500.00 |
| | OPTIONAL | ITEM 1 | | | | | | | | |
| 1A.a. | 20,700 | CY | 6.00 | 124,200.00 | 9.50 | 196,650.00 | 5.50 | 113,850.00 | 3.00 | 62,100.00 |
| 1A.b | 2,000 | CY | 6.00 | 12,000.00 | 9.00 | 18,000.00 | 5.00 | 10,000.00 | 3.00 | 6,000.00 |
| 1B | 1 | Job | Lump Sum | 10,000.00 | Lump Sum | 20,000.00 | Lump Sum | 2,000.00 | Lump Sum | 19,600.00 |
| TOTAL | OPTIONAL | ITEM 1 | | 146,200.00 | | 234,650.00 | | 125,850.00 | | 87,700.00 |
| | OPTIONAL | ITEM 2 | | | | | | | | |
| 2A.a. | 116,700 | CY | 6.00 | 700,200.00 | 8.00 | 933,600.00 | 5.50 | 641,850.00 | 3.00 | 350,100.00 |
| 2A.b | 8,300 | CY | 6.00 | 49,800.00 | 8.00 | 66,400.00 | 5.00 | 41,500.00 | 3.00 | 24,900.00 |

CT_000228

| TEM NUM | EST. QUANTITY | D. UNIT | E. UNIT PRICE | F. ESTIMATED AMOUNT | E. UNIT PRICE | F. ESTIMATED AMOUNT | D1. UNIT PRICE | E1 ESTIMATED AMOUNT | D2. UNIT PRICE | E2 ESTIMATED AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| 2B | 1 | Job | Lump Sum | 5,000.00 | Lump Sum | 20,000.00 | Lump Sum | 4,000.00 | Lump Sum | 36,500.00 |
| TOTAL | OPTIONAL | ITEM 2 | | 755,000.00 | | 1,020,000.00 | | 687,350.00 | | 411,500.00 |
| TOTAL | BASE & | OPT | | 7,400,400.00 | | 7,999,850.00 | | 8,377,230.00 | | 9,841,700.00 |
| | | | 60 DAY | BID ACCEPT | 60 DAY | BID ACCEPT | 60 DAY | BID ACCEPT | 60 DAY | BID ACCEPT |

2

CT_000229

DACW85-98-B-0022
1 AMENDMENT

HARBOR IMPROVEMENTS
KING COVE HARBOR, AK

10 NOV 98
1400 HRS
RM 60

| | | TOTAL ITEMS 1 - 8 | TOTAL OPTIONAL ITEM 1 | TOTAL OPTIONAL ITEM 2 | TOTAL BASE & OPTIONAL ITEMS |
|---|---|---|---|---|---|
| 1. | INTERNATIONAL BRIDGE CORP<br>PO BOX 21149<br>GMF, GU 96921 | 9342500- | 87700- | 411500- | 9841700- |
| 2. | KNIK CONSTRUCTION<br>PO BOX 3757<br>SEATTLE, WA 98124-3757 | 7564030- | 125850- | 687350- | 8377230- |
| 3. | SOUTH COAST INC<br>PO BOX 8620<br>KETCHIKAN, AK 99901 | 6499200- | 146200- | 755000- | 7400400- |
| 4. | RED SAMM CONSTRUCTION INC<br>PO BOX 3097<br>BELLEVUE, WA 98009 | 5440000- | 114500- | 626000- | 6180500- |
| 5. | OSBORNE CONSTRUCTION<br>PO BOX 97010<br>KIRKLAND, WA 98033 | 6243735- | 115030- | 616300- | 6975065- |
| 6. | KIEWIT PACIFIC CO<br>PO BOX 1769<br>VANCOUVER, WA 98668 | 6745200- | 234650- | 1020000- | 7999850- |
| 7. | GOV'T EST. | 6030137- | 161156- | 877420- | 7068713- |

'98 NOV 10 PM 2 01

WILSON JONES COMPANY G7512 GREEN

CT_000230

# RED SAMM CONSTRUCTION, INC.

P.O. BOX 3097
BELLEVUE, WASHINGTON 98009

BELLEVUE (425) 827-2955
FAX (425) 827-0256

July 18, 2000

Serial Letter 109 – 034

US Army Engineer District, Alaska
Southern Alaska Area Office
PO Box 898
Anchorage, Alaska 99506-0898

Attention: Lynden Belin

Re: DACW85-99-C-0003, Harbor Improvements, King Cove, AK; Differing Site Conditions

Gentlemen:

Red Samm Construction has encountered differing site conditions near 13+00 of the EC-MB line at an elevation of –5 to –8 feet. Per the Special Clauses of the Contract Specifications 52.236-2, Differing Site Conditions, this letter serves as notice of such conditions. The subsurface material encountered differs substantially from that indicated in the Contract Specifications. The material encountered contained a high concentration of large cobbles, which prevented Red Samm from dredging in this area. Red Samm has relocated the dredging operation to another area where the material gradation is similar to those shown in the Contract Specifications.

Red Samm has performed all of the requirements outlined in section 52.236-3 of the Special Clauses.

If there are any questions regarding the above subject, please do not hesitate to contact me at (425) 827-2955.

Sincerely,

David Heeter

David Heeter
Vice President

RECEIVED
JUL 19 2000

SL

Ex 36

SAO_005284

Quality Assurance Branch - Richardson RRO/

SUBJECT: Differing Site Condition, Contract DACW85-99-C-0003, Harbor Improvements, King Cove, Alaska

Red Samm Construction
P.O. Box 3097
Bellevue, Washington 98009-3097

Gentlemen:

Reference your Serial Letter number 109-034, dated, July 18, 1999.

You claim a differing site condition due to a high concentration of large cobbles, which prevented you from dredging near 13+00 of the EC-MB line.

Your contract provides data regarding material excavated in five test pits along the west side of your excavation prism. Most of these results indicate gravel with cobbles and boulders. Two of the five samples indicated that there were few cobbles and boulders. The area in question is on the opposite side of your dredge prism from these test pits. Your contract also provides data regarding material sampled in four bore logs north of your dredge prism. The largest inside diameter of the split spoon sampler used during boring was two and a half inches. Since this diameter is smaller than the minimum size for cobbles, these borings can not help determine whether cobbles were present.

Technical Specification 02222 paragraph 1.2 also indicates incidental sunken logs, boulders, rock, snags and other miscellaneous debris from harbor and fishing operations should be expected. Therefore your dredging equipment should be able to handle these items. Technical Specification 01016 paragraph 1.23 requires you to keep equipment on the job site sufficient to meet the requirements of the work. Possibly your suction dredge can not handle the twelve inch upper limit for cobbles or boulders which are above twelve inches. You are just now getting the start up problems worked out of your suction dredge. Your dredge was not working at full capacity when you tried to dredge the area in question.

The Government provided data for five test pits with two indicating that the cobbles and boulders were few. This only provides information at these locations. Your Serial Letter number 109-028 indicated that you also took three samples of the

Ex 38

SAO_00645

basin material. Therefore you have corporate knowledge beyond that of the Government regarding the nature of the dredge material.

The Government does not consider a possibly higher percentage of cobbles to differ materially from the conditions indicated or to be of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract. The Government does not consider this to be a differing site condition. However if you want to demonstrate the percentage of cobbles in the area of concern, the Government will observe your demonstration.

Note, the terms "few" and "high concentration" are somewhat subjective. The Government did not perform gradation test results to determine the percentage of cobbles. Your Serial Letter 109-028 indicates you analyzed your three samples for percentage of material passing the #200 sieve but did not indicate any other gradation analysis.

If you have any question, please contact Lynden Belin at 384-0445.

Sincerely,

Thomas A. Johnson, P.E.
Administrative Contracting Officer

Enclosure:

OREC: CENPA-CT (415-10c)
FILE: CONTRACT
QAR
RF
SF

BELIN/ /384-7442
21 JUL 00
G:9903DifS.doc

CONCUR
LESTOCHI
WOOD
FLODIN

SAO_00645

**DEPARTMENT OF THE ARMY**
U.S. ARMY ENGINEER DISTRICT, ALASKA
SOUTHERN ALASKA AREA OFFICE
P.O. BOX 898
ANCHORAGE, ALASKA 99506-0898

REPLY TO
ATTENTION OF:

AUG 10 2000

August 4, 2000

Anchorage Engineer Resident Office SAO/038

SUBJECT: Differing Site Condition, Contract DACW85-99-C-0003, Harbor Improvements, King Cove, Alaska

Red Samm Construction
Post Office Box 3097
Bellevue, Washington 98009-3097

Gentlemen:

Reference your Serial Letter number 109-034, dated, July 18, 1999.

Your letter indicates a Differing Site Condition due to a high concentration of large cobbles, which you claim has prevented you from dredging near 13+00 of the EC-MB line. The Government does not agree that you have encountered a differing site.

Your contract provides data regarding material excavated in five test pits along the west side of your excavation prism. All the test pits indicated gravel with cobbles and/or boulders. The Government did not perform gradation test to determine the percentage of cobbles. The contract does not indicate an expectation of encountering material different than that found in the test pits, i.e. gravel with cobbles and/or boulders.

Technical Specification 02222, Paragraph 1.2, also indicates incidental sunken logs, boulders, rock, snags and other miscellaneous debris from harbor and fishing operations should be expected. Technical Specification 01016, Paragraph 1.23, requires you to keep equipment on the job site sufficient to meet the requirements of the work. Therefore, your dredging equipment should be able to handle these items. Possibly your suction dredge can not handle the twelve inch upper limit for cobbles and lower limit of boulders. According to our field representative, you are just now getting the start up problems worked out of your suction dredge. Your dredge was not working at full capacity when you tried to dredge the area in question.

Ex 41

RSC01719
RSC01719

Your notice of Differing Site Conditions does not provide documentation to support your conclusion. Based on review of the contract documents, the Government does not agree that you have encountered a differing site. If you wish to pursue this issue, provide documentation to support your position.

If you have any questions, please contact Mr. Lynden Belin at 384-0445.

Sincerely,

Thomas A. Johnson, P.E.
Administrative Contracting
Officer

RSC01720
RSC01720

# INSPECTOR'S QUALITY ASSURANCE REPORT (QAR)
# WEEKLY UP DATE OF CONSTRUCTION

**PROJECT: Harbor Improvements, King Cove, AK**
**CONTRACTOR: Red Samm Construction**
**CONTRACT NO: DACW85-99-C-0003** Date: 8/7/00

Received Notification from Lynden that contractor intends to bring Tug on Scow to site to start Clamshell Dredging the Project. He will work 20 hours a day.
This will take a few days to set up and would like to know when this will happen. By conservation with the Superintendent they intend to use the Mud Hog, which is a 700 Cubic yard Scow I think. The Contractor has his Crane set up in the mid section of his Barge which means to load his scow will not be as efficient as setting the crane on the bow. Cycle Time and Scow turnaround time may not be as anticipated.

The Suction Dredge is not producing as anticipated. The suction intake screen, which will allow only a 4-inch diameter Cobble threw gets stopped up with an acumination of cobbles has to be stopped and cleaned.
The 12-inch Suction Dredge is not suitable for this site.

The Contractor has now used 40 Days to Put Dredge pump on line. There is 94 days left. That would mean 361,000 Cubic Yards giving estimate of 21,000 CY. Of material dredged leaves 340,000 Cubic yards. They will need time for Core Rock Entrance slope Protection, Survey and Close out.

Ex 46



SAO_007108

DEPARTMENT OF THE ARMY
U.S. ARMY ENGINEER DISTRICT, ALASKA
SOUTHERN ALASKA AREA OFFICE
P.O. BOX 898
ANCHORAGE, ALASKA 99506-0898

REPLY TO
ATTENTION OF:

DEC 20 2000

Quality Assurance Branch - Richardson SAO/049

SUBJECT: Interim Unsatisfactory Performance Appraisal, Contract DACW85-99-C-0003, Harbor Improvements, King Cove, Alaska

Red Samm Construction
P.O. Box 3097
Bellevue, Washington 98009-3097

Gentlemen:

Your Serial Letter number 109-040, dated, December 6, 2000 has been included as documentation in you interim unsatisfactory performance appraisal.

This letter is a response to your comments in Serial Letter number 109-040.

The date in block 10B of your unsatisfactory performance appraisal has been changed to November 8, 2000. However the date in block 10C was entered correctly as November 8, 2000. Your seven pay-estimates that have been processed, cover work associated with construction of the breakwater. You maintained your schedule during this time frame. Your schedules submitted with each pay-estimate reflect this with a completion date of November 8, 2000. In Serial Letter 109-040 you point out the erroneous date in block 10B of your unsatisfactory performance appraisal. You reason that Red Samm Construction Incorporated can not be assessed liquidated damages since the contract completion date has not concluded. However your letter is dated December 6, 2000 which is after your contract completion date of November 8, 2000. Liquidated damages will be assessed for the amount of time after November 8, 2000 that it takes to complete your contract.

Ex 55

SAO_005478

You listed the following items in your interim unsatisfactory performance appraisal.

15c. Implement of the CQC Plan. You failed to give the 24-hour notice before your survey to determine the quantity dredged. You failed to coordinate this interim survey with the Government QAR as required by Technical Specification 02222 paragraph 3.3.2 The Government QAR requested a preparatory inspection and initial inspections for this surveying. You failed to hold these additional inspections as required by Technical Specification 014521 paragraph 3.6.4. You failed to review the surveys and submit them officially. The Government acquired survey data directly from your survey subcontractor. You did not include your daily soundings in your daily reports. You often failed to deliver your quality control's daily reports by 1200 the on the day following your activity reported. This represents some of the more significant deviations from your CQC Plan.

16b. Management of resources / personnel. The Government provided information about the material to be dredged. This information was sufficiently representative to determine the consistency of the material to be dredged. You failed to provide equipment that would efficiently dredge this material. In addition Technical Specification 01016 paragraph 1.22 required you to make daily soundings and submit them to the Government daily. If this had been done, you could have determined your true level of production before receipt of your surveyor subcontractor's data. This should have helped you make a more timely adjustment in equipment. Since this is one of the main contributing factors for you not completing by the contract completion date, your performance was rated unsatisfactory in this category.

16e. Effectiveness of job site supervision. This item is closely related to item 16b and was included as an unsatisfactory category. There was ample opportunity to determine the nature of the dredge material the previous year while your were building the break water. A large percentage of the area was uncovered during low tides. Your excavator was available for sampling as indicated by the three samples you took.

17d. Submission of required documentation. Technical Specification 01016 paragraph 1.19 required you to submit details regarding the equipment you intended to use. You verbally indicated that you intended to use a suction dredge but did not submit any details. Such a submittal should have made it clear that your equipment might not handle the material. This would have afforded the Government increased opportunity to state concerns regarding your equipment.

17f. Submission of updated and revised progress schedules. The Government agrees that your construction schedule was acceptable until you're dredging operation started. After you started dredging, you failed to submit an updated time schedule until after it was requested by three separate letters and several phone conversations. Serial Letter SAO/035 dated August 8, 2000 notified you that the Government does not consider the dredge material to be a differing site condition. Your choices regarding scheduling can not rely on a differing site condition that does not exist.

This letter will be included with your Serial Letter number 109-040 as documentation for your interim unsatisfactory performance appraisal

If you have any question, please contact Lynden Belin at 384-0445.

Sincerely,

Thomas A. Johnson, P.E.
Administrative Contracting
Officer

OREC: CENPA-CT (415-10c)
FILE: CONTRACT ≠ DONNA
QAR
RF

BELIN/ kb/384-0445
26 DEC 00

CONCUR
LESTOCHI
WOOD
FLODIN

SAO_00548

# WALKER & LEVESQUE, LLC

ATTORNEYS AT LAW

William M. Walker
Donna P. Walker
Joseph N. Levesque

731 N Street
Anchorage, AK 99501
(907) 278-7000 | Fax (907) 278-7001

Harbor Court, Suite 204
P. O. Box 872
Valdez, Alaska 99868
(907) 835-2225

E-mail: joe-wwa@ak.net

April 2, 2003

2003 APR 4 AM 6:45

CEPOA-OC

Reply to: Anchorage

Alaska District
Office of Counsel
P.O. Box 6898
Elmendorf, AFB
Alaska 99506-6898

Attention: Greg Vanagel, Counsel, U.S. Army Corps of Engineers

RE: KING COVE HARBOR IMPROVEMENTS PROJECT DACW85-99-C-0003
Our File No. 200-1801

Dear Mr. Vanagel:

The following letter summarizes the current status of the King Cove Navigation Improvements Project and requests that the U.S. Army Corps of Engineers ("Corps") return all unexpended Aleutians East Borough ("Borough") funds, including funds remaining in Escrow and funds held as liquidated damages back to the Borough. Currently, bank charges are being made against some of the funds and the Borough would prefer that the funds not be depleted.

The King Cove Navigation Improvements Agreement was entered into between the Corps and the Borough on or about April 1, 1998.

Red Samm Construction, Inc., ("Red Samm") submitted the low bid on or about November 20, 1998, and was awarded the construction project on or about January 8, 1999. Red Samm actually arrived in King Cove on or about June 27, 2000 and was at full dredging production by the middle of July 2000.

However, Red Samm shut down its dredging operation on or about August 8, 2000, prior to completing the project work. As a result of the abandonment of the project, prior to completion, the Corps began assessing liquidated damages at the rate of $50,000.00 per month against Red Samm. It is believed that a sum totaling $218,460.00 in liquidated damages was ultimately withheld from Red Samm.

Ex 61

SAO_006544

In an attempt to mitigate its damages, Red Samm's surety Traveler's Insurance Company (hereinafter collectively referred to as "Red Samm") elected to subcontract the uncompleted dredging work to Western Marine Construction. In the end, the project was completed on or about September 10, 2001.

On or about November 5, 2001, Red Samm submitted a 'Request For Equitable Adjustment' to the Corps, arguing that it was entitled to $4,641,996.70 due to 'Differing Site Conditions'. Red Samm asserted that this amount equaled the additional expenses incurred by Red Samm due to the 'Differing Site Conditions'.

A meeting was held on May 17, 2002, between the Borough, the Corps and Red Samm to discuss both the claim for an adjustment and the alleged differing site conditions found at the project site.

At the meeting, Red Samm offered the testimony of its expert and argued that the Corps soil borings and testing information was inconsistent with the actual conditions found on site. According to Red Samm, the Corps indicated that the areas to be dredged would contain gravel with few cobbles and boulders; while the actual site conditions revealed gravel with many cobbles and boulders.

At the conclusion of the meeting, the Corps indicated that it was not persuaded by the Red Samm testimony and ultimately advised Red Samm to proceed with its administrative remedies. To date, Red Samm has not submitted its administrative claim.

Also, the Corps expressed a belief during the meeting that the word "few" was liberally interpreted and that its data showed the true nature of the material at the project site. Regarding this belief, the Corps promised to review the definition of "few". To date, the Corps has not shared any additional research with the Borough.

Almost one year has passed since the May 17, 2002, meeting and the Borough's funds held by the Corps continue to have charges made against them. Rather than seeing its money depleted by bank charges, the Borough requests that all project funds be returned to it.

Accordingly, the Borough demands that the Corps release all of the unexpended Borough funds. These funds include left over Borough project funds, as well as funds remaining in the Escrow account and the liquidated damages funds which were collected when Red Samm abandoned the King Cove project.

As to the Escrow funds, pursuant to the Escrow Agreement the funds should be earning interest and both the principle amount and the accrued interest should be returned to the Borough as local sponsor.

Regarding the liquidated damages, it is believed that the funds were deposited into the United States Treasury. However, based upon conversations with former Corps Attorney Abigail F. Dunning-Newbury (during February 2001) it appears that the liquidated damage funds should be retained in the appropriation originally charged (i.e. the liquidated damage fund should be directed back to the project rather than be deposited into the U.S. Treasury).

Once the liquidated damage funds are directed back into the project, they should be paid to the Borough as the local sponsor of the dredging project.

Should you have any questions regarding this letter, please call me at 278-7000.

Sincerely,

WALKER & LEVESQUE, LLC

Joseph N. Levesque

Joseph N. Levesque

JNL
cc: Bob Juettner

SAO_006546

**Flodin, Ronald S POA02**

**From:** Wierzbicki, Boguslaw J POA02
**Sent:** Friday, September 14, 2001 10:18 AM
**To:** Wood, Walter D POA02; Reidell, Deborah K POA02; Scott, David M POA02; West, Gail M POA02
**Cc:** Dunning, Abigail A POA02; Flodin, Ronald S POA02
**Subject:** RE: King Cove Liquidated Damages

Changed it to Wednesday afternoon.

Bo

-----Original Message-----
**From:** Wood, Walter D POA02
**Sent:** Friday, September 14, 2001 7:33 AM
**To:** Wierzbicki, Boguslaw J POA02; Reidell, Deborah K POA02; Scott, David M POA02; West, Gail M POA02
**Cc:** Dunning, Abigail A POA02; Flodin, Ronald S POA02
**Subject:** RE: King Cove Liquidated Damages

This is very short notice. Deb is on leave today and I don't think she was aware that you wanted a meeting today. I MAY be able to attend, but because of security concerns impacting our contractor's work effort, I need to be upward reporting our situation twice a day. DW.

-----Original Message-----
**From:** Wierzbicki, Boguslaw J POA02
**Sent:** Friday, September 14, 2001 7:21 AM
**To:** Reidell, Deborah K POA02; Scott, David M POA02; West, Gail M POA02
**Cc:** Dunning, Abigail A POA02; Wood, Walter D POA02; Flodin, Ronald S POA02
**Subject:** RE: King Cove Liquidated Damages

I would like to meet on this, have room 60, small section reserved for 1 PM today. I want to modify the contract and free up the funds. I think that we should keep some money for S&A and send the rest back. Really, the funds are needed for False Pass, Akutan, and Sand Point. If there any claims, we will deal with them then.

Let me know if you can't make it.

Bo

-----Original Message-----
**From:** Reidell, Deborah K POA02
**Sent:** Thursday, September 13, 2001 6:43 AM
**To:** Scott, David M POA02; Wierzbicki, Boguslaw J POA02; West, Gail M POA02
**Cc:** Dunning, Abigail A POA02; Wood, Walter D POA02; Flodin, Ronald S POA02
**Subject:** RE: King Cove Liquidated Damages

Dave - at this point, I think we should wait to see when and if Red Samm is going to file a claim. The LD's would certainly be a "card" we want to hang on to in that event. I find it only somewhat hopeful that Red Samm has not yet filed their claim. Since it would be based on their efforts last season, it seems they would have put one in by now. However, based on my experience with them in the past, I suspect they are waiting until all the bills are in from Western Marine before they file their claim. And I actually think the likelihood of NOT getting a

Ex 68

claim from them is pretty slim. So unless Contracting or Office of Counsel thinks otherwise, I believe we should just continue to sit on the LD money.

DEB

-----Original Message-----
**From:** Scott, David M POA02
**Sent:** Thursday, September 13, 2001 6:39 AM
**To:** Wierzbicki, Boguslaw J POA02; West, Gail M POA02
**Cc:** Dunning, Abigail A POA02; Wood, Walter D POA02; Flodin, Ronald S POA02; Reidell, Deborah K POA02
**Subject:** King Cove Liquidated Damages

Bo, Gail,
Work is 99% done on the King Cove Harbor Improvements project with Red Samm. We have been holding $218,460 for potential liquidated damages. Last discussion I remember about the liquidated damages was that everyone was unsure of how we go about changing the contract to deduct for the liquidated damages. Has anything been decided on this issue?
thanks
Dave

# RED SAMM CONSTRUCTION, INC.

P.O. BOX 3097
BELLEVUE, WASHINGTON 98009

BELLEVUE (425) 827-2955
FAX (425) 827-0256

October 30, 2001

Serial Letter 109 – 060

US Army Engineer District, Alaska
Southern Alaska Area Office
PO Box 898
Anchorage, Alaska 99506-0898

Attention: Thomas A. Johnson

Re: DACW85-99-C-0003, Harbor Improvements, King Cove, AK: Differing Site Condition Equitable Adjustment

Gentlemen:

Enclosed please find three copies of Red Samm's Request for Equitable Adjustment for the differing site conditions encountered on the above referenced project. The total amount requested is $2,729,242.09. In addition, Red Samm Construction requests a time extension of 335 calendar days to negate potential Liquidated Damages.

I certify that the above requests are made in good faith, that the supporting data is accurate and complete to the best of my knowledge and belief, that the amounts requested accurately reflect the contract adjustments for which the contractor believes the Government is liable, and that I am duly authorized to certify these claims on behalf of the contractor.

If there are any questions regarding the above subject, please do not hesitate to contact me at (425) 827-2955.

Sincerely,

David Heeter

David Heeter
Vice President

Orig to Deb R Return to D Scott

RECEIVED
NOV 05 2001
SAAO

Ex 70

SAO_005508

| **SOLICITATION, OFFER, AND AWARD** (Construction, Alteration, or Repair) | 1. SOLICITATION NO. DACW85-98-B-0015 | 2. TYPE OF SOLICITATION ☒ SEALED BID (IFB) ☐ NEGOTIATED (RFP) | 3. DATE ISSUED 05/13/98 | PAGE OF PAGES 1/ 162 |
|---|---|---|---|---|

IMPORTANT - The "offer" section on the reverse must be fully completed by offeror.

| 4. CONTRACT NO. | 5. REQUISITION/PURCHASE REQUEST NO. CTCOM8-W98B-0015 | 6. PROJECT NO. DACW85-98-B-0015 |
|---|---|---|

| 7. ISSUED BY | CODE NPACTCOM | 8. ADDRESS OFFER TO |
|---|---|---|
| U.S. ARMY CORPS OF ENGINEERS<br>CEPOA-CT-CO-M<br>P.O. BOX 898<br>ANCHORAGE ALASKA 99506-0898 | | ADDRESS<br>U.S. ARMY CORPS OF ENGINEERS<br>BUILDING 21-700, ELMENDORF AFB<br>P.O. BOX 898<br>ANCHORAGE ALASKA 99506-0898 |

| 9. FOR INFORMATION CALL: ▶ | A. NAME Gail M. West C02 | B. TELEPHONE NO. (Include area code) (NO COLLECT CALLS) (907) 753-2552 |
|---|---|---|

## SOLICITATION

NOTE: In sealed bid solicitations "offer" and "offeror" mean "bid" and "bidder".

10. THE GOVERNMENT REQUIRES PERFORMANCE OF THE WORK DESCRIBED IN THESE DOCUMENTS (Title, identifying no., date):

SIC CODE: 1629 - HEAVY CONSTRUCTION, NOT ELSEWHERE CLASSIFIED
**PROJECT TITLE AND LOCATION:** NAVIGATION IMPROVEMENTS, KING COVE, ALASKA
**OPEN TO LARGE AND SMALL BUSINESSES**
**DESCRIPTION OF WORK:** Construct navigation improvements at King Cove, Alaska, which involves a 1,750 l.f. rubble mound breakwater, a dredged entrance channel to -17 ft. MLLW, and a dredged mooring basin to -16 ft. MLLW. Armor rock protection on the breakwater will consist of stone ranging from 2,500 lbs. to 4,200 lbs. Dredged material (approximately 333,000 c.y.) will be disposed of offshore in deep water near the site. Construct a concrete navigation marker base at the end of the breakwater. A contractor's staging area will be provided at the harbor site.

11. The Contractor shall begin performance within 10 calendar days and complete it within SEE SCR-1 calendar days after receiving ☐ award, ☒ notice to proceed. This performance period is ☒ mandatory, ☐ negotiable. (See SCR-1 .)

| 12A. THE CONTRACTOR MUST FURNISH ANY REQUIRED PERFORMANCE AND PAYMENT BONDS? (If "YES," indicate within how many calendar days after award in Item 12B.) ☒ YES ☐ NO | 12B. CALENDAR DAYS 010 |
|---|---|

13. ADDITIONAL SOLICITATION REQUIREMENTS:

A. Sealed offers in original and 1 copies to perform the work required are due at the place specified in Item 8 by 1400 (hour) local time 06/16/98 (date). If this is a sealed bid solicitation, offers must be publicly opened at that time. Sealed envelopes containing offers shall be marked to show the offeror's name and address, the solicitation number, and the date and time offers are due.

B. An offer guarantee ☒ is, ☐ is not required.

C. All offers are subject to the (1) work requirements, and (2) other provisions and clauses incorporated in the solicitation in full text or by reference.

D. Offers providing less than 60 calendar days for Government acceptance after the date offers are due will not be considered and will be rejected.

NSN 7540-01-155-3212 1442-101 STANDARD FORM 1442 (REV. 4-85)
Prescribed by GSA
FAR (48 CFR) 53.236-1(e)

Ex 76 EN_009144

# TRIP REPORT
for the
SMALL BOAT HARBOR IMPROVEMENT - SOUTH EXPANSION
KING COVE, ALASKA

July 1996

## 1. Scope

The results of a reconnaissance visit and test pit exploration for the south expansion to the small boat harbor in King Cove are presented in this report.

The scope of the visit was to explore for bedrock within the south expansion area and to evaluate subsurface conditions with regard to dredging.

## 2. Project Location and Description

King Cove is located on the Alaska Peninsula about 600 miles southwest of Anchorage. The south expansion alternative entails dredging a new basin and constructing associated breakwaters just south of the existing boat harbor. Basin dredging is proposed to extend to about elevation -15 with side slopes of 3 horizontal : 1 vertical.

## 3. Field Exploration

The subsurface exploration for the project was conducted 29 July 1996. Five test pits were excavated to depths of about 5 to 10 feet with a John Deere 690 backhoe owned by King Cove and operated by City personel. The excavation of the test pits was supervised and logged by an engineer with the Corps of Engineers. The test pit locations were measured by the engineer with a cloth tape referencing the existing causeway. The location of the test pits are shown on the enclosed Test Pit Location Map.

## 4. Site Conditions

Surface: The tidal fluctuation at King Cove ranges approximately from elevation 10.5 to -3.5 based on U.S. Coast and Geodetic Survey records. The areas to be dredged are located within this intertidal zone and also within the subtidal zone. The ground surface in the areas to be dredged range in elevation

Ex 78

GEO_011078

from about 4 to -6 and is covered primarily with gravel, cobbles and boulders above -2 and silty sand below -2 (Photo 1).

Subsurface: The test pits indicate the basin area to be underlain primarily by gravel containing some cobbles and boulders (Photo 2 and 3). Where encountered, the surfacial silty sand was found to extend to depths less than 1 1/2 feet (Photo 4). The soils were easy to excavate with the backhoe, but caving of the sidewalls limited excavation depth to about 10 feet. The exception to these conditions is that bedrock was encountered in test pit 3 located in the southwest corner of the proposed basin. The upper portion of the bedrock was weathered and The backhoe was able to excavate about 4 feet into the bedrock due to the weathered nature (Photo 5).

5. **Discussion and Analysis**

The two items of concern for the dredging are 1) the dredgibility of the basin soils and 2) the stability of the basin side slopes. These items are discussed below:

Dredging feasibility: Bedrock appears to be within the extreme southwest corner of the proposed basin limits and is therefore of concern. The gravel soils containing cobbles and boulders should not present major problems provided the equipment used to dredge these materials is commensurate with those conditions.

Stability: The gravel soils will be influenced by tidal fluctuation and wave erosion. A maximum slope of about 3 horizontal : 1 vertical is estimated for these materials based on experience and observations of existing slopes at the site.

6. **Conclusions**

The improvements to the small boat harbor can be accomplished as planned. If this site is selected, it is recommended that an appropriate geophysical exploration be conducted to locate the bedrock surface within the southwest corner of the proposed basin. If the bedrock is indeed within dredging limits, appropriate removal action will be required.

GEO_011079