Enclosures

1. Test Pit Location Map
2. Test Pit Logs (TP-1 thru TP-5)
3. Photographs

| | | |
|---|---|---|
| DEPARTMENT OF THE ARMY<br>North Pacific Division<br>U S Army Engineer District Alaska<br>EXPLORATION LOG | Project King Cove, Alaska Boat Harbor Expansion<br>Location Coordinates: Northing 0 Easting 0<br>Drilling Agency: [ ] Corps of Engineers [XXXX] Other City of King Cove | Sheet 1 of 1 |
| Hole Number: Field TP-1 Permanent TP-1 | Name of Driller: Dennis Cochran | Weather: Ptly Cldy, 40° |
| Type of Hole: [XXXX] Test Pit [ ] Auger Hole | Depth To: 0.0 / Depth Drilled: 0.0 | Total Depth: 10.0 |
| Size and Type of Bit: Backhoe | Elevation Datum: [ ] MSL | Type of Equipment: John Deere 690B |
| Number of Samples: 0 | Type of Samples: Grab / Depth to Groundwater: | Date: June 29, 1996 |
| Top of Hole Elevation: 0.00 / Inspector: C. Wilson | Chief, Soils Section: J. Raychel | Chief, Geotechnical Branch: D. Thomas |

| Depth in Feet | Water | Sample | Soil Legend | Classification | Max Size | Description and Remarks |
|---|---|---|---|---|---|---|
| 0–1 | | | SM | Silty SAND | | |
| 1–10 | | | | Gravel w/ few Cobbles & Boulders | | Easy digging<br>Sidewalls Caving-Refusal |
| 10 | | | | | | Bottom of hole 10.0<br>No Bedrock Encountered<br>Tidal Zone |

Depth scale: 5, 10, 15, 20, 25, 30

NPA Form 19-E
Jun 92 Prev. Ed. Obsolete

Project King Cove, Alaska Boat Harbor Expansion | Hole Number TP-1

GEO_011082

| | | | |
|---|---|---|---|
| DEPARTMENT OF THE ARMY<br>North Pacific Division<br>U.S Army Engineer District Alaska<br>EXPLORATION LOG | Project King Cove, Alaska Boat Harbor Expansion | | Sheet 1 of 1 |
| | Location Coordinates: Northing 0 Easting 0 | | |
| | Drilling Agency: [ ] Corps of Engineers [XXX] Other City of King Cove | | |
| Hole Number: Field TP-2 Permanent TP-2 | Name of Driller: Dennis Cochran | Weather: Ptly Cldy, 40° | |
| Type of Hole: [XXX] Test Pit [ ] Auger Hole | Depth To 0.0 | Depth Drilled 0.0 | Total Depth 10.0 |
| Size and Type of Bit: Backhoe | Elevation [ ] MSL Datum [ ] | Type of Equipment: John Deere 690B | |
| Number of Samples: 0 | Type of Samples: Grab | Depth to Groundwater | Date: June 29, 1996 |
| Top of Hole Elevation 0.00 | Inspector: C. Wilson | Chief, Soils Section: J. Raychel | Chief, Geotechnical Branch: D. Thomas |

| Depth in Feet | Water | Sample | Soil Legend | Classification | Max Size | Description and Remarks |
|---|---|---|---|---|---|---|
| 0 | | | | Gravel w/ Cobbles & Boulders | | Easy digging |
| 9.5 | | | | | | Sidewalls Caving-Refusal |
| 10 | | | | | | Bottom of hole 10.0<br>No Bedrock Encountered<br>Tidal Zone |

NPA Form 19-E
Jun 92 Prev. Ed. Obsolete

Project King Cove, Alaska Boat Harbor Expansion — Hole Number TP-2

GEO_011083

DEPARTMENT OF THE ARMY

North Pacific Division
U.S. Army Engineer District Alaska

EXPLORATION LOG

| | |
|---|---|
| Project | King Cove, Alaska Boat Harbor Expansion |
| Sheet | 1 of 1 |
| Location Coordinates | Northing 0 Easting 0 |
| Drilling Agency | [ ] Corps of Engineers; [XXXX] Other City of King Cove |
| Hole Number | Field TP-3 Permanent TP-3 |
| Name of Driller | Dennis Cochran |
| Weather | Ptly Cldy, 40° |
| Type of Hole | [XXXX] Test Pit [ ] Auger Hole |
| Depth To | 0.0 |
| Depth Drilled | 0.0 |
| Total Depth | 5.0 |
| Size and Type of Bit | Backhoe |
| Elevation Datum | [ ] MSL [ ] |
| Type of Equipment | John Deere 690B |
| Number of Samples | 0 |
| Type of Samples | Grab |
| Depth to Groundwater | |
| Date | June 29, 1996 |
| Top of Hole Elevation | 0.00 |
| Inspector | C. Wilson |
| Chief, Soils Section | J. Raychel |
| Chief, Geotechnical Branch | D. Thomas |

| Depth in Feet | % Water | Sample | Soil Legend | Classification | Max Size | Description and Remarks |
|---|---|---|---|---|---|---|
| | | | | Gravel and Cobbles | | |
| | | | | Weathered Bedrock | | |
| 5 | | | | | | Difficult Digging-Refusal |
| | | | | | | Bottom of hole 5.0 |
| | | | | | | No groundwater observed |
| 10 | | | | | | |
| 15 | | | | | | |
| 20 | | | | | | |
| 25 | | | | | | |
| 30 | | | | | | |

NPA Form 19-E
Jun 92 Prev. Ed. Obsolete

Project King Cove, Alaska Boat Harbor Expansion | Hole Number TP-3

GEO_011084

| | | |
|---|---|---|
| DEPARTMENT OF THE ARMY<br><br>North Pacific Division<br>U.S. Army Engineer District Alaska<br><br>EXPLORATION LOG | Project King Cove, Alaska<br>Boat Harbor Expansion<br>Location Coordinates<br>Northing 0 Easting 0<br>Drilling Agency [ ] Corps of Engineers<br>[XXX] Other City of King Cove | Sheet 1 of 1 |

| | | | |
|---|---|---|---|
| Hole Number<br>Field TP-4 Permanent TP-4 | Name of Driller<br>Dennis Cochran | Weather<br>Ptly Cldy, 40° | |
| Type of Hole<br>[XXX] Test Pit [ ] Auger Hole | Depth To<br>0.0 | Depth Drilled<br>0.0 | Total Depth<br>9.0 |
| Size and Type of Bit<br>Backhoe | Elevation Datum [ ] MSL [ ] | Type of Equipment<br>John Deere 690B | |
| Number of Samples<br>0 | Type of Samples<br>Grab | Depth to Groundwater | Date<br>June 29, 1996 |
| Top of Hole Elevation<br>0.00 | Inspector<br>C. Wilson | Chief, Soils Section<br>J. Raychel | Chief, Geotechnical Branch<br>D. Thomas |

| Depth in Feet | Water | Sample | Soil Legend | Classification | Max Size | Description and Remarks |
|---|---|---|---|---|---|---|
| | | | | Gravel & Cobbles | | |
| | | | | Gravel | | Angular to Subangular<br>Easy Digging<br><br>Sidewalls Caving-Refusal |
| | | | | | | Bottom of hole 9.0<br>No Bedrock Encountered<br>Tidal Zone |

NPA Form 19-E
Jun 92 Prev. Ed. Obsolete

Project King Cove, Alaska
Boat Harbor Expansion

Hole Number TP-4

GEO_011085

| | | |
|---|---|---|
| DEPARTMENT OF THE ARMY<br>North Pacific Division<br>U.S. Army Engineer District Alaska<br>EXPLORATION LOG | Project King Cove, Alaska Boat Harbor Expansion | Sheet 1 of 1 |
| | Location Coordinates: Northing 0 Easting 0 | |
| | Drilling Agency: [ ] Corps of Engineers [XXX] Other City of King Cove | |

| Hole Number | Name of Driller | Weather |
|---|---|---|
| Field TP-5 Permanent TP-5 | Dennis Cochran | Ptly Cldy, 40° |

| Type of Hole | Depth To | Depth Drilled | Total Depth |
|---|---|---|---|
| [XXX] Test Pit [ ] Auger Hole | 0.0 | 0.0 | 8.0 |

| Size and Type of Bit | Elevation Datum | Type of Equipment |
|---|---|---|
| Backhoe | [ ] MSL [ ] | John Deere 690B |

| Number of Samples | Type of Samples | Depth to Groundwater | Date |
|---|---|---|---|
| 0 | Grab | | June 29, 1996 |

| Top of Hole Elevation | Inspector | Chief, Soils Section | Chief, Geotechnical Branch |
|---|---|---|---|
| 0.00 | C. Wilson | J. Raychel | D. Thomas |

| Depth in Feet | % Water | Sample | Soil Legend | Classification | Max Size | Description and Remarks |
|---|---|---|---|---|---|---|
| 0 | | | SM | Silty SAND | | |
| | | | | Gravel w/ few Cobbles | | Easy Digging |
| 8 | | | | | | Sidewalls Caving-Refusal |
| | | | | | | Bottom of hole 8.0 |
| | | | | | | No Bedrock Encountered |
| | | | | | | Tidal Zone |

NPA Form 19-E
Jun 92 Prev. Ed. Obsolete

Project King Cove, Alaska Boat Harbor Expansion — Hole Number TP-5

GEO_011086




| | STATION | *OFFSET |
|---|---|---|
| TP-1 | 10+00 | 170' |
| TP-2 | 10+00 | 70' |
| TP-3 | 10+50 | 20' |
| TP-4 | 9+00 | 30' |
| TP-5 | 8+00 | 170' |

* OFFSET FROM HIGH TIDE MARK

| | |
|---|---|
| SCALE: | NTS |
| DATE | JULY 1996 |
| DWG/RVW | CRW/JR |

ALASKA DISTRICT
CORPS OF ENGINEERS
CIVIL WORKS BRANCH

**TEST PIT LOCATION MAP**

NAVIGATION IMPROVEMENTS
KING COVE, ALASKA

**C-1**



Photo 1 : Test Pit 5 - Silty Sand Surface



Photo 2: Test Pit 1 - Gravel and Cobbles

GEO_011088



Photo 3: Test Pit 4 - Gravel, Cobbles and Boulders



Photo 4: Test Pit 5 - Surface Silty Sand Overlying Gravel

DEPARTMENT OF THE ARMY
U.S. ARMY ENGINEER DISTRICT, ALASKA
P.O. BOX 6898
ANCHORAGE, ALASKA 99506-6898

REPLY TO ATTENTION OF:

NOV 26 2003

**VIA FACSIMILE &**
**CERTIFIED RETURN RECEIPT**

Office of Counsel

Red Samm Construction
P.O. Box 3097
Bellevue, Washington 98009

Dear Gentlemen:

Enclosed is my Findings of Fact and Contracting Officer's Decision regarding your claim for differing site conditions, DACW85-99-C-0003, Harbor Improvements, King Cove Harbor, Alaska.

If we can be of further assistance, please contact Mr. Phillip Santerre of our Office of Counsel at (907) 753-2532.

Sincerely,

Sandra J. Davidson
Contracting Officer

Enclosure

SAO_004981

**FINDINGS OF FACT TO ACCOMPANY**
**CONTRACTING OFFICER'S DECISION**

**Claim for Differing Site Condition**

**CONTRACT NUMBER:** DACW85-99-C-0003

**NAME AND ADDRESS OF CONTRACTOR:** Red Samm Construction, Inc.
P.O. Box 3097
Bellevue, WA 98009

**DATE OF CONTRACT:** 14 December 1998

**CONTRACT DESCRIPTION:** Harbor Improvements
King Cove Harbor, Alaska

Construct harbor improvements at King Cove, Alaska, which include a 1,750 lf. rubble mound breakwater, a dredged entrance channel to -17 ft. MLLW, and a dredged maneuvering and mooring basin to -16 ft. MLLW. Armor rock protection on the breakwater will consist of stone ranging from 2,500 lbs. to 4,200 lbs. Dredged material of approximately 144, 900 CY plus two options for an additional 147,000 CY will be disposed of offshore in deep water near the site. Construct a concrete navigation marker base at the end of the breakwater.

**ORIGINAL CONTRACT AMOUNT:** $5,440,000.00

**AMOUNT OF DISPUTE:** $2,729,242.09 and 335 calendar days

**THE DISPUTE:**

The contractor contends a differing site condition was encountered during the dredging portion of this contract. The contractor alleges the material to be dredged contained more cobbles than indicated in the contract plans and specifications and the work could not be accomplished as originally planned. The contractor is pursuing recovery of costs related to suction dredge work, clam dredge work, shoreline excavation work and subcontractor dredge work.

The Government contends the dredge material encountered by the contractor was as indicated in the contract documents and is not a differing site condition. The Government maintains that the contractor's difficulties and inefficiencies were solely the result of the equipment the contractor chose to use.

**PERTINENT CORRESPONDENCE:**

1. Reserved.
2. Reserved.
3. Schiffrin Olson Schlemlein & Hopkins Letter, dated March 31, 2003, with attached expert opinions and resumes.
4. Government Serial Letter No. SAO/078, dated April 29, 2003.
5. Schiffrin Olson Schlemlein & Hopkins Letter, dated March 27, 2002.
6. Government Serial Letter No. SAO/073, dated January 24, 2002.
7. Government Serial Letter No. SAO/070, dated December 4, 2001.
8. Contractor Serial Letter No. 109-060, dated October 30, 2001.
9. Government Serial Letter No.SAO/068, dated September 26, 2001.
10. Contractor Serial Letter No. 109-059, dated September 10, 2001.
11. Contractor Serial Letter No. 109-056, dated July 30, 2001.
12. Government Serial Letter No. SAO/059, dated April 26, 2001.
13. Contractor Serial Letter No. 109-050, dated April 13, 2001.
14. Government Serial Letter No. SAO/053, dated February 22, 2001.
15. Contractor Serial Letter No. 109-044, dated February 8, 2001.
16. Government Serial Letter No. SAO/048A, dated December 22, 2000.

to Proceed was acknowledged on January 13, 1999 and the contract completion date for the base contract, plus subsequently awarded options, was November 8, 2000.

The contract was for construction of a breakwater and dredging of the mooring basin and entrance channel at the harbor in King Cove, Alaska. The breakwater construction occurred during the first year of the contract, summer 1999, and is not in dispute. The contractor is alleging a differing site condition was encountered during the dredging portion of the contract.

The contract contains FAR 52.236-2, DIFFERING SITE CONDITIONS, which defines the two types of differing site conditions that are compensable. A Type I differing site condition exists if subsurface or latent physical conditions at the site differ materially from those indicated in the contract. A Type II differing site conditions exists if the contractor encounters unknown physical conditions, of an unusual nature, which differ materially from those ordinarily encountered in the type of work required by the contract. FAR 52.236-2 also requires the contractor to promptly notify the Contracting Officer of the differing site condition and the Contracting Officer to investigate those conditions.

Technical Specification (TS) 02222, DREDGING, EXCAVATION AND DISPOSAL, provides information on the dredging and disposal requirements of the contract and on the material to be anticipated. TS 02222-1.2, Character of Materials, states:

> Exploration logs for the area to be dredged and excavated are enclosed in Appendix A. Incidental sunken logs, boulders, rock, snags, and other miscellaneous debris from harbor and fishing operations should be expected. Geophysical data for this area can be obtained from the Corps of Engineers, Geotechnical Branch – Soils and Geology Section, Alaska District.

Appendix A of TS 02222 contains exploration logs from five test pits excavated in June 1996 and drilling reports from four soil borings performed in November 1985 for a previous

King Cove project. Per TS 02222-1.2, this information was representative of the area to be dredged and excavated under this contract. Additionally, the nature of the material to be dredged could be seen at low tide when approximately 1/4 to 1/3 of the dredge area was exposed.

The soil descriptions in the exploration logs are in accordance with ASTM Specification 2488-93. Per the standard, the words **with cobbles** or **with cobbles and boulders** are to be used if a field sample contains any cobbles or boulders. There is no provision for using the term **and cobbles** in lieu of **with cobbles.** The standard also includes the option to provide an approximate percentage range for the material by using the terms trace, few, little, some or mostly. In the case of two test pits the soil was described as gravel w/few cobbles. According to the ASTM standard, this would equate to 5 to 10 percent cobbles by weight.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, a Connecticut Corporation,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

No. 04-487C
(Judge Block)

EXPERT REPORT OF DEBORAH K. REIDELL

December 12, 2005

REIDELL
Ex 10

I recall some discussions in our office about the contractor using a pipeline dredge at this site. There would have been problems with the discharge pipe going out to the deep water site provided in the original contract, but since an upland disposal site was now available, we did not think it was unreasonable to use a pipeline dredge. We discussed that the cobbles noticed on the surface of the dredge area at low tide might cause some work stoppages to clean out the pipe or pump, but we suspected the contractor was hoping to realize enough of a cost benefit from using the upland site that the potential slower work rate was not a concern. We also discussed that the contractor might intend to use the hydraulic dredge along with the original clamshell, since the upland site was merely added to the contract and did not affect the availability of the off-shore disposal site for a clamshell operation. The contractor had not indicated they would use the upland site exclusively. In any event, I was not particularly concerned at the time of the settlement of the change for the additional dredging, when the contractor indicated they would use a hydraulic dredge. When the contractor indicated in their 12 October 1999 letter that they would use a 12" pipeline dredge, I assumed they would use a pipeline dredge with a configuration consistent with industry standard.

RIDDLE (Ex. 10)

Designation: D 2487 – 93

AMERICAN SOCIETY FOR TESTING AND MATERIALS
1916 Race St. Philadelphia, Pa 19103
Reprinted from the Annual Book of ASTM Standards. Copyright ASTM
If not listed in the current combined index, will appear in the next edition.

# Standard Classification of Soils for Engineering Purposes (Unified Soil Classification System)[1]

This standard is issued under the fixed designation D 2487; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision. A number in parentheses indicates the year of last reapproval. A superscript epsilon (ε) indicates an editorial change since the last revision or reapproval.

*This standard has been approved for use by agencies of the Department of Defense. Consult the DOD Index of Specifications and Standards for the specific year of issue which has been adopted by the Department of Defense.*

## 1. Scope

1.1 This standard describes a system for classifying mineral and organo-mineral soils for engineering purposes based on laboratory determination of particle-size characteristics, liquid limit, and plasticity index and shall be used when precise classification is required.

NOTE 1—Use of this standard will result in a single classification group symbol and group name except when a soil contains 5 to 12 % fines or when the plot of the liquid limit and plasticity index values falls into the crosshatched area of the plasticity chart. In these two cases, a dual symbol is used, for example, GP-GM, CL-ML. When the laboratory test results indicate that the soil is close to another soil classification group, the borderline condition can be indicated with two symbols separated by a slash. The first symbol should be the one based on this standard, for example, CL/CH, GM/SM, SC/CL. Borderline symbols are particularly useful when the liquid limit value of clayey soils is close to 50. These soils can have expansive characteristics and the use of a borderline symbol (CL/CH, CH/CL) will alert the user of the assigned classifications of expansive potential.

1.2 The group symbol portion of this sytem is based on laboratory tests performed on the portion of a soil sample passing the 3-in. (75-mm) sieve (see Specification E 11).

1.3 As a classification system, this standard is limited to naturally occurring soils.

NOTE 2—The group names and symbols used in this test method may be used as a descriptive system applied to such materials as shale, claystone, shells, crushed rock, etc. See Appendix X2.

1.4 This standard is for qualitative application only.

NOTE 3—When quantitative information is required for detailed designs of important structures, this test method must be supplemented by laboratory tests or other quantitative data to determine performance characteristics under expected field conditions.

1.5 This standard is the ASTM version of the Unified Soil Classification System. The basis for the classification scheme is the Airfield Classification System developed by A. Casagrande in the early 1940's.[2] It became known as the Unified Soil Classification System when several U.S. Government Agencies adopted a modified version of the Airfield System in 1952.

1.6 *This standard does not purport to address all of the safety problems, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use.*

## 2. Referenced Documents

2.1 *ASTM Standards:*

C 117 Test Method for Materials Finer Than 75-μm (No. 200) Sieve in Mineral Aggregates by Washing[3]
C 136 Method for Sieve Analysis of Fine and Coarse Aggregates[3]
C 702 Practice for Reducing Field Samples of Aggregate to Testing Size[3]
D 420 Guide for Investigating and Sampling Soil and Rock[4]
D 421 Practice for Dry Preparation of Soil Samples for Particle-Size Analysis and Determination of Soil Constants[4]
D 422 Test Method for Particle-Size Analysis of Soils[4]
D 653 Terminology Relating to Soil, Rock, and Contained Fluids[4]
D 1140 Test Method for Amount of Material in Soils Finer than the No. 200 (75-μm) Sieve[4]
D 2216 Test Method for Laboratory Determination of Water (Moisture) Content of Soil and Rock[4]
D 2217 Practice for Wet Preparation of Soil Samples for Particle-Size Analysis and Determination of Soil Constants[4]
D 2488 Practice for Description and Identification of Soils (Visual-Manual Procedure)[4]
D 4083 Practice for Description of Frozen Soils (Visual-Manual Procedure)[4]
D 4318 Test Method for Liquid Limit, Plastic Limit, and Plasticity Index of Soils[4]
D 4427 Classification of Peat Samples by Laboratory Testing[4]
E 11 Specification for Wire-Cloth Sieves for Testing Purposes[3]

## 3. Terminology

3.1 *Definitions*—Except as listed below, all definitions are in accordance with Terminology D 653.

[1] This standard is under the jurisdiction of ASTM Committee D-18 on Soil and Rock and is the direct responsibility of Subcommittee D18.07 on Identification and Classification of Soils.
Current edition approved Sept. 15, 1993. Published November 1993. Originally published as D 2487 – 66 T. Last previous edition D 2487 – 92.
[2] Casagrande, A., "Classification and Identification of Soils," *Transactions*, ASCE, 1948, p. 901.

[3] *Annual Book of ASTM Standards*, Vol 04.02.
[4] *Annual Book of ASTM Standards*, Vol 04.08.



Copyright ASTM International
Reproduced by IHS under license with ASTM
No reproduction or networking permitted without license from IHS

Sold to:SCHIFFRIN OLSON SCHLEMLEIN, W0300590
Not for Resale 2005/12/28 17:2:15 GMT

NOTE 4—For particles retained on a 3-in. (75-mm) U.S. standard sieve, the following definitions are suggested:

*Cobbles*—particles of rock that will pass a 12-in. (300-mm) square opening and be retained on a 3-in. (75-mm) U.S. standard sieve, and

*Boulders*—particles of rock that will not pass a 12in. (300-mm) square opening

3.1.1 *gravel*—particles of rock that will pass a 3-in. (75-mm) sieve and be retained on a No. 4 (4.75-mm) U.S. standard sieve with the following subdivisions:

*Coarse*—passes 3-in. (75-mm) sieve and retained on ¾-in. (19-mm) sieve, and

*Fine*—passes ¾-in. (19-mm) sieve and retained on No. 4 (4.75-mm) sieve.

3.1.2 *sand*—particles of rock that will pass a No. 4 (4.75-mm) sieve and be retained on a No. 200 (75-µm) U.S. standard sieve with the following subdivisions:

*Coarse*—passes No. 4 (4.75-mm) sieve and retained on No. 10 (2.00-mm) sieve,

*Medium*—passes No. 10 (2.00-mm) sieve and retained on No. 40 (425-µm) sieve, and

*Fine*—passes No. 40 (425-µm) sieve and retained on No. 200 (75-µm) sieve.

3.1.3 *clay*—soil passing a No. 200 (75-µm) U.S. standard sieve that can be made to exhibit plasticity (putty-like properties) within a range of water contents and that exhibits considerable strength when air dry. For classification, a clay is a fine-grained soil, or the fine-grained portion of a soil, with a plasticity index equal to or greater than 4, and the plot of plasticity index versus liquid limit falls on or above the "A" line.

3.1.4 *silt*—soil passing a No. 200 (75-µm) U.S. standard sieve that is nonplastic or very slightly plastic and that exhibits little or no strength when air dry. For classification, a silt is a fine-grained soil, or the fine-grained portion of a soil, with a plasticity index less than 4 or if the plot of plasticity index versus liquid limit falls below the "A" line.

3.1.5 *organic clay*—a clay with sufficient organic content to influence the soil properties. For classification, an organic clay is a soil that would be classified as a clay except that its liquid limit value after oven drying is less than 75 % of its liquid limit value before oven drying.

3.1.6 *organic silt*—a silt with sufficient organic content to influence the soil properties. For classification, an organic silt is a soil that would be classified as a silt except that its liquid limit value after oven drying is less than 75 % of its liquid limit value before oven drying.

3.1.7 *peat*—a soil composed of vegetable tissue in various stages of decomposition usually with an organic odor, a dark-brown to black color, a spongy consistency, and a texture ranging from fibrous to amorphous.

3.2 *Descriptions of Terms Specific to This Standard:*

3.2.1 *coefficient of curvature*, Cc—the ratio $(D_{30})^2/(D_{10} \times D_{60})$, where $D_{60}$, $D_{30}$, and $D_{10}$ are the particle diameters corresponding to 60, 30, and 10 % finer on the cumulative particle-size distribution curve, respectively.

3.2.2 *coefficient of uniformity*, Cu—the ratio $D_{60}/D_{10}$, where $D_{60}$ and $D_{10}$ are the particle diameters corresponding to 60 and 10 % finer on the cumulative particle-size distribution curve, respectively.

## 4. Summary

4.1 As illustrated in Table 1, this classification system identifies three major soil divisions: coarse-grained soils, fine-grained soils, and highly organic soils. These three divisions are further subdivided into a total of 15 basic soil groups.

4.2 Based on the results of visual observations and prescribed laboratory tests, a soil is catalogued according to the basic soil groups, assigned a group symbol(s) and name, and thereby classified. The flow charts, Fig. 1 for fine-grained soils, and Fig. 2 for coarse-grained soils, can be used to assign the appropriate group symbol(s) and name.

## 5. Significance and Use

5.1 This standard classifies soils from any geographic location into categories representing the results of prescribed laboratory tests to determine the particle-size characteristics, the liquid limit, and the plasticity index.

5.2 The assigning of a group name and symbol(s) along with the descriptive information required in Practice D 2488 can be used to describe a soil to aid in the evaluation of its significant properties for engineering use.

5.3 The various groupings of this classification system have been devised to correlate in a general way with the engineering behavior of soils. This standard provides a useful first step in any field or laboratory investigation for geotechnical engineering purposes.

5.4 This standard may also be used as an aid in training personnel in the use of Practice D 2488.

5.5 This standard may be used in combination with Practice D 4083 when working with frozen soils.

## 6. Apparatus

6.1 In addition to the apparatus that may be required for obtaining and preparing the samples and conducting the prescribed laboratory tests, a plasticity chart, similar to Fig. 3, and a cumulative particle-size distribution curve, similar to Fig. 4, are required.

NOTE 5—The "U" line shown on Fig. 3 has been empirically determined to be the approximate "upper limit" for natural soils. It is a good check against erroneous data, and any test results that plot above or to the left of it should be verified.

## 7. Sampling

7.1 Samples shall be obtained and identified in accordance with a method or methods, recommended in Recommended Guide D 420 or by other accepted procedures.

7.2 For accurate identification, the minimum amount of test sample required for this test method will depend on which of the laboratory tests need to be performed. Where only the particle-size analysis of the sample is required, specimens having the following minimum dry weights are required:

| Maximum Particle Size, Sieve Opening | Minimum Specimen Size, Dry Weight |
|---|---|
| 4.75 mm (No. 4) | 100 g (0.25 lb) |
| 9.5 mm (⅜ in.) | 200 g (0.5 lb) |
| 19.0 mm (¾ in.) | 1.0 kg (2.2 lb) |
| 38.1 mm (1½ in.) | 8.0 kg (18 lb) |
| 75.0 mm (3 in.) | 60.0 kg (132 lb) |

Whenever possible, the field samples should have weights two to four times larger than shown.



Copyright ASTM International
Reproduced by IHS under license with ASTM
No reproduction or networking permitted without license from IHS

Sold to:SCHIFFRIN OLSON SCHLEMLEIN, W0300590
Not for Resale,2005/12/28 17:2:15 GMT

U. S. ARMY




## NOTES

1. EXISTING GROUND CONTOURS BASED ON 1997 SURVEY BY DOWL ENGINEERS AND 1993 CORPS OF ENGINEERS HARBOR CONDITION SURVEY.
2. TEST PITS EXCAVATED BY THE CORPS OF ENGINEERS JULY 1998.
3. TRANSITION "A" ROCK TOE FROM STA. 11+00.00 TO STA. 11+50.00 ON SEA SIDE OF BREAKWATER.
4. TRANSITION "A" ROCK TOE FROM STA. 25+72.83 TO STA. 26+22.90 ON HARBOR SIDE OF BREAKWATER.
5. TEST BORINGS FROM GEOTECHNICAL REPORT BY AGRES INTERNATIONAL FOR KING COVE DOCK AND BOAT HAULOUT JANUARY 1998.
6. GEOPHYSICAL EXPLORATION CONDUCTED BY GOLDER ASSOCIATES OCTOBER 1997. TOP OF BEDROCK CONTOURS WERE INTERPRETED AS SHOWN IN THE SOUTHWEST CORNER OF THE MOORING BASIN. THE JOHN DEERE 490E BACKHOE USED DURING THE COE TEST PIT EXPLORATION WAS ABLE TO EXCAVATE 4 FEET INTO THE BEDROCK ENCOUNTERED IN TEST PIT #3.

## BREAKWATER COORDINATES

| | | | |
|---|---|---|---|
| 1 | N 385198.06 | E 631342.30 | B.C.P. 10+00 |
| 2 | N 384923.32 | E 632058.07 | P.C 17+88.99 |
| 3 | N 384980.84 | E 632187.27 | P.T. 19+23.77 |
| 4 | N 385560.21 | E 632409.87 | P.C. 25+44.38 |
| 5 | N 385807.41 | E 632467.95 | P.T. 26+22.90 |
| 6 | N 385825.89 | E 632504.63 | E.O.P. 27+41.03 |

## ENTRANCE CHANNEL, MANEUVERING AREA, AND MOORING BASIN COORDINATES

| | | | |
|---|---|---|---|
| 1 | N 385775.60 | E 632835.37 | B.O.P. 10+00.00 |
| 2 | N 385927.54 | E 632230.54 | A.P. 14+23.89 |
| 3 | N 385650.25 | E 631981.54 | A.P. 17+79.85 |
| 4 | N 385128.25 | E 631779.24 | E.O.P. 23+64.53 |
| 5 | N 385711.97 | E 632626.72 | Angle Point |
| 6 | N 385718.83 | E 632581.57 | Angle Point |
| 7 | N 385711.75 | E 632512.81 | Angle Point |
| 8 | N 385785.47 | E 632294.30 | Angle Point |
| 9 | N 385883.60 | E 632388.88 | Angle Point |
| 10 | N 385838.34 | E 632844.09 | Angle Point |
| 11 | N 385896.71 | E 633417.35 | Angle Point |
| 12 | N 385488.63 | E 632358.70 | Angle Point |
| 13 | N 385005.31 | E 632102.11 | Angle Point |
| 14 | N 385253.19 | E 631458.36 | Angle Point |
| 15 | N 385484.52 | E 631545.18 | Angle Point |
| 16 | N 385397.88 | E 631771.35 | Angle Point |
| 17 | N 385274.86 | E 632081.33 | Angle Point |
| 18 | N 385572.18 | E 632205.46 | Angle Point |
| 19 | N 385728.72 | E 632285.94 | Angle Point |
| 20 | N 385783.75 | E 632280.52 | Angle Point |
| 21 | N 385867.67 | E 632384.96 | Angle Point |
| 22 | N 385778.06 | E 631857.84 | Angle Point |
| 23 | N 385912.04 | E 631780.88 | Angle Point |

## CURVE DATA (BW LINE)

| CURVE | R | Δ | T | L |
|---|---|---|---|---|
| A | 100.00' | 90°00'00" | 100.00' | 157.08' |
| B | 75.00' | 60°00'00" | 43.30' | 78.54' |

| REV. | DATE | C.O. | ACTION | DESCRIPTION | BY | APP'D |
|---|---|---|---|---|---|---|

CONTRACT NO. ______
CONTRACTOR ______
CITY ______ STATE ______

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, a Connecticut corporation<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 04-487C<br>(Judge Block) |

DEFENDANT'S RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES, FIRST REQUEST FOR PRODUCTION OF DOCUMENTS, AND FIRST REQUEST FOR ADMISSIONS

Pursuant to Rules 26, 33(b), and 34(b) and 36 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, submits its responses to plaintiff Travelers Casualty and Surety Company of America's ("Travelers") first set of interrogatories, first request for production of documents, and first request for admissions.

**GENERAL OBJECTIONS**

Defendant asserts and incorporates by reference the following general objections to plaintiff's interrogatories and document and admission requests as though they were set forth in full in each response to each interrogatory and document request:

1. Defendant objects to the interrogatories, request for production of documents and request for admissions upon the grounds, and to the extent, that plaintiff seeks the discovery of information which is irrelevant, immaterial, and not reasonably calculated to lead to the discovery of admissible evidence.

2. Defendant objects to the interrogatories, request for production of documents and

Interrogatory Number 2:

Describe with specificity the amount and method of calculation of any liquidated damages withheld by the government from payment under the contract for the project.

Response to Interrogatory Number 2:

The total amount of liquidated damages withheld is $218,460. This amount was calculated by determinating the daily rate for liquidated damages – $1,655. Per modification P00015, the contract was required to be completed on or before November 8, 2000. The Government assessed liquidated damages from November 8, 2000, until March 20, 2001 – or 132 days of liquidated damages. Multiplying $1,655 by 132 yields $218,460 -- the amount withheld. The Government suspended liquidated damages after March 20, 2001, because on March 20, 2001, the Government executed a contract with Western Marine to complete work on the project.

Interrogatory Number 3:

Describe with specificity when and by what manner the government first disclosed to Red Samm Construction, Inc. that exploration logs for test pits included within Appendix A of technical specification section 02222 of the contract documents were prepared utilizing the procedures of ASTM D 2488-93. Identify any documents reflecting or containing such information or disclosures.

Response to Interrogatory Number 3:

The contracting officer's final decision, November 26, 2003.

**RESPONSE TO REQUEST FOR ADMISSIONS**

Request for Admission Number 1:

Admit that Appendix A of technical specification 02222 of the contract documents contains explorations logs from five test pits excavated in June 1996 by the government and drilling reports from four soil borings performed in November 1985 for another project.

Response to Request for Admission Number 1:

Admit.

Request for Admission Number 2:

Admit that the government intended the information contained in Appendix A of technical specification section 02222 of the contract documents to be representative of the subsurface conditions of the area to be dredged and excavated for the project.

Response to Request for Admission Number 2:

Deny. The Government intended the information to represent specific conditions at specific locations.

Request for Admission Number 3:

Admit that the government intended for Red Samm Construction, Inc. to rely upon the information contained in Appendix A of technical specification section 02222 of the contract documents in bidding and performing work on the project.

Response to Request for Admission Number 3:

Admit.

Request for Admission Number 4:

Admit that the government prepared the exploration logs for test pits included in Appendix A of technical specification section 02222 of the contract documents.

PHILLIP SANTERRE
U.S. Army Corps of Engineers
Anchorage, AK

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

Brian M. Simkin /by Deborah A. Bynum
BRIAN M. SIMKIN
Assistant Director

David R. Feniger
DAVID R. FENIGER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20005
Tel. (202) 307-0290
Fax. (202) 305-2118

Attorneys for Defendant

December 1, 2004

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, a Connecticut corporation<br><br>v.<br><br>THE UNITED STATES | NO. 04-487<br>(J. Block) |

## DECLARATION OF DAVID HEETER

I, DAVID HEETER, make the following declaration in accordance with 28 USC § 1746. I am aware that this declaration will be used in the United States Court of Federal Claims, and that this declaration is the legal equivalent of a statement under oath.

1. I was vice-president of Red Samm Construction ("Red Samm") during the period of its bidding and performance of work on the King Cove Harbor Improvements Project. I prepared Red Samm's estimate for the project, as well as its Request for Equitable Adjustment ("REA") in connection with differing site conditions encountered on the project. I managed Red Samm's performance of the work on the project and made Red Samm's



SCHIFFRIN OLSON SCHLEMLEIN & HOPKINS, P.L.L.C.
1601 Fifth Avenue, Suite 2500
Seattle WA 98101
(206) 448-8100 Fax (206) 448-8514

decision as to selection of dredging equipment and the type of dredging methodology to employ.

2. During preparation of Red Samm's estimate and prior to bidding of the project, I visited the site and reviewed the contract subsurface data which consisted of five test pit logs and four soil boring logs included in the contract documents.

3. The project was bid twice with an initial advertisement for bid in May 1998 and a second advertisement in October 1998. There were approximately four bidders during the first round of bidding and six bidders on the second round. Red Samm submitted bids on both occasions.

4. In my experience, if a prospective bidder asks a question or seeks clarification for which the Corps provides an answer, such information is shared with all bidders via and addendum or other notice. At no time during the course of bidding on the King Cove Project, or thereafter, did the Corps ever inform Red Samm that any bidder had sought clarification as to the terminology used, or meaning of, information contained in the test pit or soil boring logs contained in the contract documents.

5. In submitting its bid for the second round of bidding on the project, Red Samm relied on American Construction Company's November 10, 1998 quote to perform the dredging work on the project for $4.15 per cubic yard, plus mobilization. After Red Samm's attempts to perform the dredging with its own forces using a hydraulic dredging operation were unsuccessful due to excessive cobbles, American provided a revised quote in its letter of December 17, 2000 of $7.55 per cubic yard plus mobilization. I understood American's revised and much higher price to reflect its knowledge of far more difficult conditions than



SCHIFFRIN OLSON SCHLEMLEIN & HOPKINS, P.L.L.C.
1601 Fifth Avenue, Suite 2500
Seattle WA 98101
(206) 448-8100 Fax (206) 448-8514

originally indicated by the test pit logs and soil boring logs contained in the contract documents.

6. After award of the contract to Red Samm, representatives of the City of King Cove contacted me and requested that Red Samm consider the possibility of upland disposal of the dredge material if the City could arrange for a suitable disposal site. I understood the City was very interested in reusing the dredge material.

7. I considered a hydraulic dredging operation to be the only cost effective method to accomplish upland disposal. Therefore during construction of the breakwater in the first construction season in 1999, Red Samm evaluated the feasibility of using hydraulic dredging techniques to dredge the boat harbor and deposit the spoils at an upland location. In making this determination, I relied first and foremost on the information contained in the test pits logs and soil borings published in the contract documents. I believe this was reasonable and appropriate for several reasons. First, neither Red Samm nor any other bidder needed knowledge of the subsurface conditions to construct the breakwater. The only meaningful purpose or reason for subsurface data at the project site was to allow both the contractor and the Corps to make a determination as to the appropriate type of dredging methodology and equipment to employ on the project. Secondly, the subsurface data found in the contract was described in Section 02222 of the specifications as "for the area to be dredged and excavated." A reasonable explanation for this statement, from my perspective, was that the Corps intended such information be indicative and representative of the area to be excavated. The test pit and soil boring logs were also described in Appendix A to Section 02222 as "Subsurface Conditions."



SCHIFFRIN OLSON SCHLEMLEIN & HOPKINS, P.L.L.C.
1601 Fifth Avenue, Suite 2500
Seattle WA 98101
(206) 448-8100 Fax (206) 448-8514

8. I have explained Red Samm's interpretation of the contract subsurface data in contemporaneous correspondence to the Corps, Red Samm's REA, and my deposition. I believe the test pit logs did indicate the extent or concentration of subsurface cobbles by using the term "few" in the logs for Test Pits 1 and 5. These two test pits were also the closet to, or in the case of Test Pit 5 within, the actual dredge limits and located the furthest distance from the shoreline in the lower tidal zone. The indications of Test Pits 1 and 5 were also consistent, in my mind, with the overall geology of the area, which suggested that cobbles found in the upper tidal zone were the product of a bedrock outcropping above the shore in the southwest portion of the site and as one moved away from that area and into the actual dredge area minimal, if any, cobbles were encountered. Soil boring logs included in the contract documents also supported this conclusion, since those boring logs reflected exploration farther from the shore, at greater depths, and in the vicinity of the northeast portion of the project. None of the soil boring logs indicated cobbles had been encountered within the dredge excavation limits. Four of the test pit logs also indicated "easy digging" and "sidewalls caving". I understood these indications to mean loose, unconsolidated soil which was another factor leading me to conclude the site was suitable for hydraulic dredging.

9. While not numerically precise, I believed that the term "few" had a reasonably well understood, ordinary meaning of "small, little, not many, of small number" and, therefore, was reasonably interpreted as indicating less than 1% of cobbles within Test Pits 1 and 5, based on the likely test pit volume. I did not see any reason to seek clarification of this term from the Corps since I believed the term had an understood meaning within a reasonable range and I further assumed that if the Corps had more specific or detailed information



SCHIFFRIN OLSON SCHLEMLEIN & HOPKINS, P.L.L.C.
1601 Fifth Avenue, Suite 2500
Seattle WA 98101
(206) 448-8100 Fax (206) 448-8514