regarding the test pit explorations that would have been provided in the contract documents. As noted above, I do not believe any other bidders sought clarification of this term.

10. My interpretation of the contract subsurface data was provided to the Corps during the initial stages of dredging in Red Samm's serial letter no. 109-035 dated August 20, 2000. The Corps never provided a specific response to this letter. Neither did the Corps ever provide a remotely contemporaneous explanation of its own interpretation of the term "few" as used in the test pit logs. The Corps' letter of January 24,2002, issued several months after completion of the work, responded to Red Samm's REA. While that letter disputed our interpretation of the term, the Corps offered no interpretation of its own. Such interpretation was not provided by the Corps until issuance of the Contracting Officer's Decision dated November 26, 2003, more than two years after completion of the work, which asserted for the first time the Corps' belief that the term "few" as used in the test pit logs meant 5-10%. Neither did the Corps or the Contracting Officer in her final decision ever assert that the terminology in the test pits logs was "patently ambiguous" and that Red Samm should have sought clarification.

11. I believe Red Samm did act prudently in excavating several of its own test pits and taking samples with the clamshell during the 1999 construction season. This was done to verify and confirm our interpretation of the contract subsurface data. However, this additional information simply supplemented that provided in the contract documents. It makes little sense to me to now argue, as I understand the government does, that Red Samm ceased to rely upon the contract soil data in making its decision to attempt hydraulic dredging and selecting its dredging equipment. To the contrary, Red Samm continued to fully rely upon that information as indicating minimal cobbles within the subsurface area of the project. Had we



SCHIFFRIN OLSON SCHLEMLEIN & HOPKINS, P.L.L.C.
1601 Fifth Avenue, Suite 2500
Seattle WA 98101
(206) 448-8100 Fax (206) 448-8514

been informed by the Corps that it, in fact, observed 5 to 10% cobbles within Test Pits 1 and 5 and over 5% cobbles within other test pits, we would have determined that hydraulic dredging was not feasible with such concentrations of cobbles and never attempted it in the first place.

12. Unfortunately, the Corps never provided that information and by October, 1999 we had determined that the subsurface conditions were suitable for hydraulic dredging, based on our review and interpretation of the test pit and soil boring logs provided in the contract documents, an interpretation confirmed by our supplemental investigations. Red Samm's serial letter 109-028, dated October 12, 1999 informed the Corps that we intended to implement a hydraulic dredging operation. The Corps voiced no concern regarding this plan, other than require that appropriate regulatory and other arrangements be made for the upland disposal site. At this point we had made no final decision regarding the specific equipment to employ and Red Samm therefore began serious efforts to identify and acquire suitable hydraulic dredging equipment. In February 2000, Don Luterbach and I traveled to Holland to meet with DeGroot representatives, which lead to our purchase and delivery to the site of the DeGroot DOP dredge pump and system.

13. However, our efforts to effectively implement the hydraulic dredging operation were thwarted by excessive cobbles in the subsurface materials, in concentrations far exceeding the minimal amounts indicated in the contract documents. Our visual observations of the material dredged by our clamshell after we were forced to abandon the hydraulic dredge, estimated concentrations of cobbles in areas exceeding 10% and up to 20%. As further explained in the REA, gradations of ten samples taken by Red Samm later in the 2000 construction season, revealed concentrations of cobbles ranging from 6.5 to 34.3% with an average of 22%.



SCHIFFRIN OLSON SCHLEMLEIN & HOPKINS, P.L.L.C.
1601 Fifth Avenue, Suite 2500
Seattle WA 98101
(206) 448-8100 Fax (206) 448-8514

14. Due to the excessive cobbles, Red Samm had no choice but to abandon the hydraulic dredging and shift to a clamshell dredge—an operation that had not been planned for and which was difficult to efficiently implement in the 2000 construction season due the remote location of the site and the limited availability of appropriate equipment. Red Samm suspended its hydraulic dredging operation on August 8, 2000 and resumed work with a clamshell operation on August 21, 2000. On September 18, 2000 we began concurrent activities with shore based operation using an excavator and dump trucks. On November 9, 2000 we shut down due to winter weather. At that point Red Samm had dredged about one third of the approximately 360,000 cubic yards required under the contract. A third construction season was required in 2001 for which we employed Western Marine as a subcontractor. This all resulted in substantial added expense which in my view is the responsibility of the government due either to a differing site condition or the inaccurate and misleading information provided in the test pit logs. The REA calculated this total added cost at $2,729,242.

I have read the foregoing declaration and I certify under penalty of perjury that it is true and correct.

Executed at Juneau, Alaska, this 1st day of May, 2006.

David Heeter
DAVID HEETER



SCHIFFRIN OLSON SCHLEMLEIN & HOPKINS, P.L.L.C.
1601 Fifth Avenue, Suite 2500
Seattle WA 98101
(206) 448-8100 Fax (206) 448-8514

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, a Connecticut corporation

v.

THE UNITED STATES

NO. 04-487

(J. Block)

**DECLARATION OF DONALD H. LUTERBACH**

I, DONALD H. LUTERBACH, make the following declaration in accordance with 28 USC § 1746. I am aware that this declaration will be used in the United States Court of Federal Claims and that this declaration is the legal equivalent of a statement under oath.

1. I was superintendent for Red Samm Construction Inc. on the King Cove Harbor Improvements Project.

2. I assisted David Heeter in evaluating whether the conditions of the project were suitable for hydraulic dredging and the selection of appropriate hydraulic dredging equipment.



SCHIFFRIN OLSON SCHLEMLEIN & HOPKINS, P.L.L.C.
1601 Fifth Avenue, Suite 2500
Seattle WA 98101
(206) 448-8100 Fax (206) 448-8514

3. I accompanied David Heeter on a trip to Holland in early 2000 to meet with engineers and representatives of DeGroot, the manufacturer of the DOP dredge pump and system.

4. I took with me on this trip a copy of the plans, the contract soils data, consisting of test pit and soil boring logs, photographs, and gradations of material samples performed by Red Samm. I provided all this information to the DeGroot engineers and discussed it with them. It is my understanding all this information was considered by DeGroot in their recommendation to us of appropriate dredging equipment for the project.

I have read the foregoing declaration and I certify under penalty of perjury that it is true and correct.

Executed at Billings, Montana, this 20 day of April, 2006.

DONALD H. LUTERBACH



SCHIFFRIN OLSON SCHLEMLEIN & HOPKINS, P.L.L.C.
1601 Fifth Avenue, Suite 2500
Seattle WA 98101
(206) 448-8100 Fax (206) 448-8514

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, a Connecticut corporation<br><br>v.<br><br>THE UNITED STATES | NO. 04-487<br>(J. Block)<br><br>**DECLARATION OF ROGER L. BROWN** |

I, ROGER L. BROWN make the following declaration in accordance with 28 USC § 1746. I am aware that this declaration will be used in the United States Court of Federal Claims and that this declaration is the legal equivalent of a statement under oath.

1. I am a principal and managing partner for the R. Brown Consulting Group, LLC, a construction consulting firm based in Portland, Oregon. My firm and I were retained to provide expert analysis and opinion on behalf of the plaintiff in this matter. A copy of my resume, as included in my written report prepared for this case dated December 7, 2005, is attached as Ex. A.



**SCHIFFRIN OLSON SCHLEMLEIN & HOPKINS, P.L.L.C.**
1601 Fifth Avenue, Suite 2500
Seattle WA 98101
(206) 448-8100 Fax (206) 448-8514

2. Attached as Ex. B is the narrative section of my report that summarizes the opinions and basis for such opinions of Mr. Jordan Isaiou and myself. I have annotated on this copy typographical or other corrections to which I testified at my deposition.

3. Attached as Ex. C is a copy of a portion of Ex. 1 to my deposition, which reflects a summary of my calculations comparing the actual productivities achieved by Red Samm and Newhalem during their hydraulic dredging operations on the project.

4. The conclusions and opinions in these reports, all of which I reaffirm, are the product of over 1,000 hours of effort and analysis by myself and other members of my firm. That analysis has involved the review of thousands of documents, photographs, deposition testimony, and the majority of the written record relating to the project.

5. I understand the government now characterizes a portion of my deposition testimony, at pages 37 and 38, as stating a belief on my part that information contained in the Golder geophysical report would have informed Red Samm of the extent and nature of the actual subsurface conditions encountered in regard to cobbles. I do not believe that is an accurate characterization of my testimony and that is certainly not my opinion. I was not shown the Golder report by government counsel during my deposition nor questioned specifically regarding it. My testimony in this portion of my deposition was in regard to my opinions as stated in paragraph 3, page 6 of my report regarding the Geotechnical/July 1996 Trip Report prepared by Charles Wilson. I understood the questions, and my answers, were in regard to the statements made and information contained in Mr. Wilson's July 1996 Trip Report.

6. In my opinion, the Golder report does not provide any meaningful information to the contractor regarding the likely extent of subsurface cobbles, nor indicate to the



**SCHIFFRIN OLSON SCHLEMLEIN & HOPKINS, P.L.L.C.**
1601 Fifth Avenue, Suite 2500
Seattle WA 98101
(206) 448-8100 Fax (206) 448-8514

contractor the actual extent of cobbles encountered. Golder performed no test pit explorations. Its geophysical refraction methods did not identify cobbles either specifically or generally. The Golder report contained essentially a single sentence summarizing Golder's offhand comment that the Corps' test pit data reflected "some" cobbles and boulders. This general, non-specific statement from a third party, who was uninvolved in the test pit exploration itself, would have only informed the contractor of the existence of cobbles and boulders at the site. This added nothing to the test pit data itself.

7. My opinions in regard to the July 1996 Trip Report prepared by Mr. Wilson are different for valid and rational reasons. While Mr. Wilson also uses the term "some" to describe his overall conclusions as to the results of the test pit data, his report further adds a cautionary note in regard to the equipment. More importantly, these comments come from the individual who actually performed the test pit exploration and was in the most appropriate position to provide additional information or interpretation as to the results of the test put explorations. In summary, there is an important difference between the authors and the extent of their involvement in the test pit explorations, and therefore, the significance of the two reports.

8. I believe the government also mischaracterizes my testimony and opinions if it asserts I believe the term "few" as used in the test pit logs is a patent ambiguity which Red Samm had a duty to clarify. That is not my opinion. As I explained in my deposition, I believe it was appropriate in these circumstances for Red Samm to use the ordinary, dictionary meaning for the term that lessened any ambiguity and reasonably allowed Red Samm to conclude the extent of cobbles found in the test pit was a very small number less than 1%. Moreover, in my view the important issue here is not the degree of ambiguity of the term



SCHIFFRIN OLSON SCHLEMLEIN & HOPKINS, P.L.L.C.
1601 Fifth Avenue, Suite 2500
Seattle WA 98101
(206) 448-8100 Fax (206) 448-8514

"few", but the election by Mr. Wilson to use such terminology, rather than provide the specific estimates of percentage of cobbles he observed in the test pits as required by ASTM 2488.

I have read the foregoing declaration and I certify under penalty of perjury that it is true and correct.

Executed at Portland, Oregon this 21 day of April 2006.

ROGER L. BROWN



SCHIFFRIN OLSON SCHLEMLEIN & HOPKINS, P.L.L.C.
1601 Fifth Avenue, Suite 2500
Seattle WA 98101
(206) 448-8100 Fax (206) 448-8514

Roger Brown brings over forty-five years experience as on-site project supervisor, as well as senior vice-president and construction manager for two national contractors, to the firm. Roger has been responsible for estimating, operational departments, and field staff for projects that exceed a total of one billion dollars. As the managing partner for the R Brown Consulting Group LLC, Roger provides consulting services, arbitration services, expert witness testimony, and serves on Dispute Review Boards. For all of these services, Roger maintains his original core business philosophy of providing clients with opinions based on evidence and expertise so they can make the most informed decision for their business.

## PROFESSIONAL EXPERIENCE

***MANAGING PARTNER*** **1991-Present**
**R Brown Consulting Group LLC,** Portland, Oregon

Construction consulting firm serving clients throughout United States

- Provides consulting services to contractors and owners in preparation and/or defending of claims, which include review of means and methods, schedule analysis, technical problem solving, and cost evaluations, including labor productivity impacts.
- Provides expert witness services when litigation is required.
- For the last ten years has continuously served as a Dispute Review Board member or chairman for projects totaling in excess of 800 million dollars. Has heard and has given both verbal and written recommendations on over 100 disputes.
- Serves as a third party neutral, mediator and arbitrator to the construction industry.
- Provides on-site management of construction projects for sureties due to contractor defaults.
- Estimates and manages competitive bid projects as partner with general contractor.
- Prepared detailed construction estimates for general contractors totaling in excess of 500 million dollars.
- Provided constructability reviews and budget estimates to design firms for major public works projects.

Key Projects:

- Prepared expert opinion report for Port of Los Angeles defense regarding a contractor claim of 35 million dollars and counter-claim in excess of 100 million dollars. Offered opinions regarding construction means and methods plus reasonable costs of cofferdams, piling, and dredging.
- Prepared expert opinion reports for subcontractor's labor productivity impacts during construction of steam turbine power facilities. Identified cause-and-effect relationships specifically for acceleration, crowding and stacking of trades and excessive changes for over 60,000 man hours.
- Prepared schedule and cost analyses for contractor in defense of owner lawsuit for construction of assisted living facility.
- Analyzed project schedule and cost impacts due to differing site conditions, changes and owner interferences for general contractor, including opinions on wrongful termination by public agency during construction of a sea wall.

- Managed concurrently the completion of three public works projects in excess of 6 million dollars for surety after general contractor default.
- Provided estimates, schedules and constructability reviews for the San Francisco Airport Authority for new parallel runways, including pile-supported, floating concrete pontoons and dike fill alternatives.
- Procurement and management of low level radioactive waste cleanup projects totaling in excess of 30 million dollars for Hanford Nuclear Reservation.
- Procurement and management of 12 million dollar pier at Navy Home Port, Everett, Washington.

***SENIOR VICE PRESIDENT*** **1986-1991**
**Brinderson Corporation,** Irvine, California

Senior Vice President responsible for marketing, estimating and operations of major contracts for national general contractor with annual volume of 200 million dollars per year. Responsible for estimating projects totaling over one billion dollars in construction volume. These projects included highway structures, marine facilities, process and industrial facilities, commercial and government buildings, and infrastructure work. Also directly responsible for construction of:

- Sewer and water treatment plants, totaling over 300 million dollars in volume for projects located throughout the United States.
- Power facilities including steam, water, and cogeneration, totaling over 120 million dollars in volume.
- Defense projects totaling over 160 million dollars. They include a site facilities contract for Navy Home Port in Washington and a dry dock and mooring facility for Trident submarines in Georgia.

Key Projects:

| | |
|---|---|
| • Site facilities contract with US Navy at Everett, Washington | $ 36 m |
| • Cogeneration facility for Orange County, California | $ 20 m |
| • Light rail foundations for Metro, Los Angeles, California | $ 17 m |
| • Power plant for California Department of Water Resources | $ 11 m |
| • Dry dock and mooring facility, US Navy, Kings Bay, Georgia | $121 m |
| • Treatment plant upgrade for Sewer District, Webster, Massachusetts | $ 34 m |
| • Treatment plant for City of Harwoods Mill, Virginia | $ 37 m |
| • Waste treatment plant for City of Orlando, Florida | $ 32 m |
| • Treatment plant for City of Lynn, Massachusetts | $ 50 m |
| • Water treatment plant, City of Henrico, Virginia | $ 46 m |
| • Steam plant for US Navy, Bremerton, Washington | $ 86 m |
| • Solids processing facility for City of Renton, Washington | $ 51 m |

*VICE PRESIDENT, HEAVY CONSTRUCTION DIVISION* **1971-1985**
**Riedel International,** Portland, Oregon

Responsible for procurement and construction operations of heavy civil projects for multi-faceted international company. The Heavy Construction Division's volume was approximately 50 million dollars annually.

- Constructing bridges, both rail and highway, throughout the West Coast including direct management of the Interstate 205 Glenn Jackson Bridge.
- Directly responsible for construction of over 12 marine projects totaling over 200 million dollars in volume.
- Participated in preparation and review of estimates of bridge and marine work totaling over 500 million dollars in volume.

Key Projects:

| | |
|---|---|
| • Interstate bridge over Columbia River, Oregon Department of Transportation | $66 m |
| • Shiplift facility for Todd Shipyards, San Pedro, California | $30 m |
| • Dock facility for Port of Portland at Terminal 2, Portland, Oregon | $15 m |
| • Federal Building for BPA, Portland, Oregon | $ 5 m |
| • Jetty reconstruction for US CORP in Eureka, California | $ 8 m |
| • Small boat mooring facility at San Francisco, California | $11 m |
| • Coal loading dock facility, Prince Rupert, Canada | $50 m |
| • Coal dock and car dumper facility for Ridley Terminals, Vancouver, BC | $25 m |
| • Dock facility for Port of Vancouver, Washington | $ 7 m |
| • Dock facility for Pacific Coal, Portland, Oregon | $11 m |
| • Dock project for Port of Portland, Term 6, Portland, Oregon | $ 7 m |
| • Trident submarine Delta pier US Navy, Bangor, Washington | $16 m |
| • Second powerhouse at Rock Island Dam, Wenatchee, Washington | $ 8 m |
| • Dock facilities for Port of Portland, Terminals 4 and 6, Portland, Oregon | $ 6 m |
| • Dock facility for Port District, Oxnard, California | $ 6 m |

*FIELD ENGINEER* **1968-1971**
**Al Johnson Construction Company,** Minneapolis, Minnesota

- Engineer on 100 million dollar Eisenhower Tunnel in Colorado.
- Engineer on 12 million dollar pump facility for California Department of Water Resources.

*ASSISTANT HIGHWAY ENGINEER* **1959-1968**
**California Department of Transportation,** San Diego, California

- Supervised Design Squad for major interstate freeway contracts.
- Inspector on variety of highway projects throughout Northern California.

- Lead Engineer in Advance Planning Department.

## ASSOCIATIONS & CERTIFICATIONS

- American Arbitration Association, Arbitrator on Commercial Panels
- Disputes Review Board Foundation, Inc., Charter Member
- Associated General Contractors, Member, former Board Member
- Member of the Beavers

## EDUCATION

| | |
|---|---|
| 1954-56 | Linfield College, Liberal Arts |
| 1959-67 | Yuba College and San Diego City College, Engineering |

Special Studies including training courses in CPM scheduling, claim preparation and defense, construction accounting, management techniques, and Wharton School of Business.

# CONSULTANT'S OPINION

## Travelers vs. United States, USCFC No. 04-487C

## KING COVE HARBOR IMPROVEMENTS PROJECT

The R Brown Consulting Group LLC (RBCG) has been asked to review the Request for Equitable Adjustment (REA) submitted by Red Samm Construction Company (RSC) dated October 30, 2001, the government (COE) Contracting Officer's Decision dated November 26, 2003, certain evidence developed in discovery in this matter, and to opine on specific issues related to the REA and the COE's position.

**PROJECT DISPUTE**

RSC completed the contract breakwater work in 1999. In 2000 RSC attempted the second phase of the contract work: excavation of over 358,000 CY of material with a hydraulic dredge purchased in Holland. RSC had relied on the contract documents for the classification of the *insitu* materials. However RSC had also taken additional samples of the materials to verify its interpretation of the soils data and the capabilities of the dredge to excavate and pump the material on shore.

Immediately upon commencing the work, RSC encountered excessive cobbles beyond what they had anticipated based on the soils information provided by COE, which prevented the dredge from successfully handling the materials. After notifying the COE of a differing site condition, RSC attempted to complete the excavation in 2000 with a clamshell dredge and disposing the material at sea. However, RSC was unable to complete the work that year.

RSC then subcontracted the remaining work to Western Marine Construction, Inc. (Western Marine), which completed the project in 2001. Even with knowledge of the actual site conditions Western Marine had difficulty completing the work and employed Nehalem River Dredging, Inc. (Nehalem) to assist in completion of the project. Nehalem also encountered difficult dredging due to the changed conditions and found areas of the work which could not be accomplished with its equipment, a ladder-mounted cutterhead suction dredge.

EXHIBIT B

The COE ultimately denied RSC's claim for additional cost as the contracting officer opined that a differing site condition did not exist and that RSC's equipment was not adequate for the project conditions.

## R BROWN CONSULTING GROUP QUALIFICATIONS

The R Brown Consulting Group (RBCG), formerly the Roger Brown Corporation, has been providing consulting services to the construction industry for the past 12 years. These services have included estimating, scheduling, change order preparation or review, contract administration, surety take over work, claim preparation and/or defense. Our clients have included public and private owners, engineers, sureties, contractors and sub-contractors.

We feel that we have exceptional qualifications for the King Cove project, as the two experts who have reviewed the claim and offered opinions for this report have an extensive background in marine construction. Roger Brown, managing partner of RBCG, was employed by Riedel International for 15 years and was vice president in charge of the heavy construction division. During that time he was involved with many marine projects that included both hydraulic and bucket dredging. Riedel was then the largest marine contractor on the West Coast. Jordan Isaiou, the second expert who assisted with this report was also was employed at Riedel for over 23 years. He was president of Sceptre Dredging, a Canadian subsidiary of Riedel, and later served as vice president of Riedel's dredging division. The detailed resumes and compensation of both Brown and Isaiou are attached to this report in Ex 1-A-1, 2.

Previous testimony in trial or depositions and publications by Brown and Isaiou are also contained in Ex 1-A-1, 2.

Mr. Brown will testify to issues identified in item No's 1-3 and 5-8. Mr. Isaiou will testify to item No 4. The documents or other evidence we have reviewed to form our opinions on are listed in Ex 1-A-3.

Issues addressed in this report are:

1. Was RSC's interpretation of the soils information contained in the contract documents as to the *insitu* soils conditions reasonable?
2. Was the soils information prepared by the government misleading or inaccurate to the bidders?

3. Did the July 1996 geotechnical report contain material information which should have been disclosed to the bidders? If there was material information contained in this report, did the government's failure to disclose it mislead the contractor?
4. Was RSC's hydraulic dredging equipment reasonable and appropriate for excavation of soils as indicated in the contract documents?
5. Were the actual subsurface soils at the project site materially different from those indicated in the contract documents?
6. After abandoning the hydraulic dredging equipment due to cobbles, was RSC's utilization of a clamshell dredging operation a reasonable action and was it a substantially greater expense?
7. Was Nehalem's cutterhead dredge equipment and operation feasible for excavation of the majority of the site as the *insitu* soils actually existed?
8. What was the additional cost incurred by RSC due to the different site conditions or misleading soils data?

**EXECUTIVE SUMMARY**

Based on our review of the contract documents, and site conditions that a bidder would have observed, it is our opinion that RSC's interpretation of the *insitu* soils was reasonable. In addition to information given with the test pits, we would also weigh the data contained in the soil borings that were provided in order to determine the character of the soils throughout the entire excavation site. The government's failure to follow ASTM standards and the use of ambiguous terms such as the word "few," as stated in the COE test pit descriptions, not only mislead the contractor, but was inaccurate. Information contained in the COE's July 1996 Trip Report, which the COE did not disclose to the bidders, indicated the material to contain "some" cobble and boulders and cautioned that the excavation equipment must be commensurate with these materials. This information would certainly have raised questions to the bidder which would have impacted their anticipated productivity and equipment selection..

We have investigated the hydraulic dredging equipment that RSC utilized and have performed detailed calculations which indicate it would have been suitable to perform the majority of the basin excavation as anticipated by RSC, but for the excessive cobbles. We have further reviewed detailed project documents that indicate a substantial portion of the project site subsurface soils contained a concentration of cobbles materially greater than what was indicated in the contract documents. Thus a differing site condition exists. The presence of these cobbles prevented RSC from utilizing the hydraulic dredging equipment as a

cost effective tool that would accomplish the work within the contract time limits. RSC immediately mobilized additional equipment and attempted to complete the project with a clamshell dredge at a much greater expense. Western Marine was then employed to complete the project in 2001. Western Marine also utilized a clamshell excavation method but achieved productivites significantly less than RSC, other bidders and the government's estimators had originally contemplated. Western Marine also employed Nehalem, which utilized a ladder mounted cutterhead suction dredge to assist with its operation. Due to the volume of cobbles and cementation of the entire soil matrix, this cutterhead dredge achieved less than half the productivity of which it was capable had the soils been as represented by the contract documents. We have reviewed RSC financial documents and other project records. Based on that review and our own experience, we have determined that RSC incurred additional costs in the amount of $2,459,228.00, which were explicitly due to the differing site conditions and/or misrepresentations or misleading soils data compared to the actual subsurface material encountered.

## OPINIONS AND BASIS

**1. Was RSC's interpretation of the soils information contained in the contract documents as to the *insitu* soils conditions reasonable?**

- The contract bidding documents contained soils information consisting of five test pits and four soils borings. Of the five test pits that were dug with a backhoe at low tide only one, No. 5, was actually located in the excavation area. TP No. 1, located approximately 20 ft. from the excavation perimeter, was the next closest. All five of the test pits were closely grouped in the far SW corner of the basin. All four of the soil borings were located at the far NE corner of the project and outside of the excavation area.
- Based on our experience, the only reason for both the test pit logs and boring logs to be included in the bidding documents was to provide information to the bidders, which would enable them to determine the least cost method for dredging the harbor.
- The testimonies of Mr. Wilson, on p. 43; Mr. Jeffries, p. 100; and Mr. Belin, p. 100, confirm this opinion.
- The COE recognized that appropriate geotechnical information was necessary for the purpose of determining excavation methods and ultimate cost of the work. The COE expected that RSC would so rely on the contract soils data.

- When reading the word "few" in the test pit logs we would utilize the common and ordinary meaning of the word to determine an estimated amount. Webster's New World Dictionary and Thesaurus defines the word few to be: "not many, a small number, scarcely any, less, sparse, scanty, thin, inconsiderable, negligible, infrequent, not too many, rare, seldom, a small number, a handful." Therefore, in our opinion a reasonable interpretation of the test pit data indicating "few" cobbles in TPs 1 and 5 would be considerably less than 5 percent and more on the order of 1 percent or less.
- We would not assume that large materials: gravel, cobbles and boulders which were readily visible in the beach tidal zone surface, would be indicative of the underlying soils. It is our experience to find the larger materials in similar environments. In addition the close proximity of the bedrock outcropping would produce an abundance of larger material at the beach zone surface area. TP 4 is a good example of this proposition.

**2. The soils information prepared by the Government for the bidders was misleading and inaccurate.**

- The COE used the word "few" to describe the amount of cobbles found in the test pits, which would mean considerably less than 5 percent and reasonably understood by the contractor as 1 percent or under. Yet Mr. Wilson testifies that his observations and intent was to indicate 5 to 10 percent. The COE employees involved in reviewing RSC's notice of a differing site condition and assisting the contracting officer with the government's response opinion concluded the word "few" was vague and subjective. (See Belin's testimony on p.s 56 to 59.) We further note that it took the COE nearly two years to explain to the contractor what the word "few" meant.
- The COE soils engineer's failure to utilize the standards of ASTM 2488 in describing the soils encountered in test pits 1 through 5 lead to inaccurate and misleading information for the bidding contractors. A review of Mr. Wilson's deposition testimony between p.s 133 and 146 confirms that he did not follow the standard and could have been more descriptive. He agreed that he did not state that the ASTM standard was being utilized and that he did not state that the identification of the material is based on a visual manual procedure, both of which are requirements. The most significant aspect of ASTM 2488 that Mr. Wilson failed to follow was the requirement that, if cobbles or boulders are present, the actual estimated

percentage or range must be stated, as well as a dimension and description of the largest cobble or boulder. Lastly, he testified, that he wanted to convey to the bidders that there were "significant cobbles and boulders" present within the subsurface conditions, yet he chose to use the word "few" to describe what he observed.

- In addition, it is our opinion that the COE misinterpreted the provisions of ASTM 2488 in the contracting officer's decision on p. 7. The contracting officer states that Paragraph 16, Note 15, allows the usage of the word "few" to mean 5 to 10 percent when describing the volume of cobble in the field sample. Note 15 is clear, however, that the terms utilized for percentages are only for gravel, sands and fines. This does not include cobble. Paragraph 12.2 is very clear that if cobbles and boulders are present the percentage "will" be noted.

**3. The Geotechnical Report/July 1996 Trip Report contained material information which should have been disclosed to the bidders. The lack of this information mislead the contractors.**

- The trip report (Dep Ex. 78) describes the test pits as reflecting the underlying basin material to be "primarily gravel containing some cobbles and boulders." It further expresses concerns for dredgibility of the soils and states. "The gravel soils containing cobbles and boulders should not present major problems provide the equipment used to dredge these materials is commensurate with those conditions." Although this language is still not specifically descriptive as far as a percentage range for cobbles and boulders, it certainly would have waved cautionary flags about the volume of cobbles and boulders. The word "some" would imply considerably more emphasis than the word "few." In addition, the author is suggesting equipment "commensurate with the conditions," which implies the amount of cobbles and boulders observed by the author would have a definite impact on excavation productivity and ultimate cost.

**4. RSC's hydraulic dredging equipment was reasonable and appropriate for excavation of the soils as indicated in the contract documents.**

- Mr. Isaiou's technical analysis, Ex 4-A, concludes that the hydraulic dredging equipment provided had more than ample capacity to excavate the soils at RSC's anticipated production, but for the differing site condition. We also note that the COE has favorably reviewed the DeGroot DOP dredge pump system as one of 11 out of 91 technologies considered

"promising" and "identified as having a high potential for increasing efficiency or productivity of the dredging operations." McLellan, T.N., and Hopman, R.J. (2000). "Innovations in dredging technology: Equipment, operations, and management," ERDC TR-DOER-5, U.S. Army Engineer Research and Development Center, Vicksburg, MS.

- Mr. Mendenhall's daily records indicate that on two occasions the equipment was producing the anticipated production of 3,000 c.y. per day for a 10 hour working day.
- During an interview with Mr. Jan Oskam, a dredging consultant who was onsite during the initial attempts to use the hydraulic dredge, he stated that the equipment was producing 200 cubic meters per hour, which is 262 cubic yards per hour, very close to Mr. Medenhall's observations.
- During our interview with Mr. Heeter, he indicated that RSC measured the volume of water and product at the hydraulic dredge discharge site and by utilizing standard hydraulic engineering equations calculated that with 20 percent solids the dredge would produce 300 cubic yards per hour.
- RSC took samples of the materials to Holland and discussed the dredge capabilities with the DeGroot Engineers prior to making its final decision to purchase the equipment. These engineers ran an engineering computer analyses similar to Mr. Isaiou's that confirmed the dredge could produce approximately 300 CY/HR assuming the materials were similar to the samples.
- We understand the COE has expressed concerns and opinions that the dredge equipment did not have the capability to "break up" or loosen cemented soils. First, the soils information provided in the contract documents indicated that the soils would be loose. The test pits that were dug could not go deeper as the *insitu* material was flowing into the test pit hole faster than it could be excavated. A review of the soil drill logs indicates very little dense or cemented material, very low blow counts and often material not even recovered in the sampler. All four of the boreholes have similar characteristics for a depth of 40 to 50 feet. There was simply no indication that the soils in the excavation area would have been cemented. We have not been able to confirm through photographs how much and where the cemented soils were encountered during excavation as the material was obviously broken up during the dredging process, whether it was clamshelled or hydraulically excavated. We do know through interviews with Nehalem, RSC and Western Marine personnel, however, that there was considerable cementation of the excavated soils, especially at the entrance channel and at elevations near the cobbles and final excavation limits. Nehalem not only had serious

repairs to their cutterhead equipment, but found some areas that they could not excavate and those areas had to be completed by Western Marine's clamshell equipment. Secondly, RSC's hydraulic dredge did have capability to break up or loosen the materials prior to entering the suction screen. A cutterhead attachment was on site but never utilized, as it was the volume of cobbles being encountered that prevented the dredge from any cost effective work. If the material needed to be "crowded," such as the action that a ladder mounted dredge can employ, the RSC dredge equipment could have been mounted to a backhoe which was onsite.

**5. The actual subsurface soils at the project site were materially different from that indicated in the contract documents.**

- We have reviewed project photos, videotapes, logs, daily reports, depositions, interviews, and other data, which confirm that the amount of cobbles contained in the site excavation was materially greater than what was described in the contract bidding documents.
- Ex 5-B-1 contains a soils map that summarizes our analysis. This reflects that over 80 percent of the project limits contained areas with a differing site condition. Ex 5-A-1 is a copy of photos of the excavated materials pertinent to our analysis. Ex 5-A-2 contains logs of all photos reviewed with the source document reference and additional information taken from the project records.
- While we believe concentrations of cobbles in excess of 1 percent would constitute a differing site condition, we have been more conservative in our analysis. We have identified an area as a differing site condition only where photographs or other data allow us to definitely conclude that cobbles in concentrations of 5 percent or greater were found.
- Ex 5-B-2 is a calculation of the volume of material identified in the Ex 5-B-1 soil map which indicates that 38 percent by volume of the material in 2000 and 22 percent in 2001 constituted a differing site condition. As the soils map indicates, however, the change in character of the material occurs over such short distances and so frequently that it would be impractical, if not impossible, to segregate the classification and ultimately the means and methods of performing the work.
- Ex 5-B-3 is an additional calculation which utilizes our review of photos and daily reports that shows 30 percent of the materials in 2000 and 21 percent in 2001, by barge measure, (utilizing barges and photos that were identifiable only) constitutes a differing site condition due to the excessive cobbles.

- Ex 5-B-5 is a summary of subcontractor bid prices received by RSC when the project was bid in November 1998. It also shows some of the same bidders' estimated costs when they were asked to re-bid the project after the extent of cobbles and actual conditions were known. This exhibit also shows the estimated dredging costs by COE estimators prior to the project bidding. We have also reviewed all of the previous COE estimates beginning in October, 1996. Ex 5-B-6. Based on this document alone it is obvious that the original bid costs, along with the COE estimates, reflected an entirely different understanding of the materials anticipated, which further supports our opinion that the actual site conditions were materially different. American Construction's direct cost, without mobilization, went from $4.15 per CY to $7.55. Its estimated productivity for its second bid was only 88 c.y. per hour. American had been the original low bidder.
- Ex 5-B-4 is a summary of QAR daily report notations by the inspector as well as a reference to barge loads.
- Ex 5-B-7 is an additional work product, which was prepared from information in the QAR reports. It identifies the dredging working hours and volume of excavated materials for each day, as well as the location of work and comments from the QAR reports. Utilizing this information we were able to review productivities for various periods of time and specific locations at the project site for alternate dredging methods. EX 5-B-7-b, c, and d are quantity summary sheets comparing QAR recorded quantities to COE pay quantities and hydrographic surveys. In addition, these documents summarize various excavation productivities. We have concluded, as shown on the soils map and confirmed in photos, that the soils changed characteristics rapidly from area to area both horizontally and vertically. Within hours and or days the soil would change from sandy-silty fines with very minor amounts of gravel to barges containing significant amounts of gravel and cobble with almost no fines. Productivities likewise varied widely throughout the site. This conclusion is also supported by our discussions with personnel who were on site performing the work.

**6. In light of the differing site conditions encountered, RSC's decision to employ a clamshell dredging operation was a reasonable action at a substantially greater expense.**

- We feel that RSC made every reasonable attempt to overcome of the differing site conditions and its decision to abandon the hydraulic dredge operation was reasonable.

- Due to the remoteness of the project site, RSC was limited as to the equipment that could be mobilized which would be capable of completing the site excavation work that season.
- Utilizing the barge and crane that was already on site as a primary excavation tool was a reasonable decision. It is our understanding that the dump scow utilized in 2000, the *Mud Pup*, was the only offshore dump scow readily available in the area.
- Ex 8-A-5-f, our calculations of RSC's clamshell excavation cost, indicates that its cost of over $11.00 per CY was substantially greater than what RSC and other bidders contemplated as indicated in EX 5-B-5.

**7. Nehalem's cutterhead dredge equipment and operation was not feasible for excavation of the majority of the site as the insitu soils actually existed.**

- Nehalem's dredge is capable of excavating soils at a rate of 200 cubic yards per hour. If the soils had been as described in the contract documents, this dredge should have produced at least 150 to 175 cubic yards per hour considering head loss for elevation and pumping gravels.
- Our review of the contract records summarized in EX 5-B-7-d indicates that Nehalem's average production was only 79 cubic yards per hour. It would have taken Nehalem a total of 247 workdays or 9 months to complete the entire project, far beyond what the COE and contractor estimators ever considered.
- Both Nehalem and Western Marine advised us that due to the excessive cobbles and cementation of the soils, their production was severely impacted. In some areas Nehalem could not complete the excavation and Western Marine had to employ its heavy-duty clamshell excavation bucket to obtain required final grade elevations. Newhalem's operations were also confined to a specific area in the southwestern portion of the site, which the contractors believed would have material more suitable to Newhalem's equipment.
- The COE contends that it was RSC's inadequate dredging equipment, not the amount of cobbles that led to poor production and higher costs. It is interesting to note that for the period between 7/13/00 and 8/8/00 RSC's hydraulic dredge produced approximately 62 CY/HR. A ladder mounted cutterhead dredge as recommended by the COE, and provided by Nehalem, could only produce 79 CY/HR and then encountered areas it could not dredge at all. In addition Nehalem's actual bid and costs were just under $6.00 CY compared to the COE estimate of a cutterhead dredge at $3.85 CY. These comparisons alone should satisfy

RSC's contention that the soils encountered were materially different than represented in the contract documents.

**8. The additional compensable cost incurred by RSC in our opinion is $2,459,228.00**

- Ex 8-A-5-a is a summary of various cost estimates which we have prepared. The actual estimates are contained in Ex 8-A-5-b through i. The purpose of these various estimates was to determine what costs RSC actually incurred for the excavation work performed during the 2000 and 2001 period. Utilizing the same equipment, cost factors, and methodology, we then prepared a "but for" of cost that RSC would have incurred had the actual soils been as represented in the contract documents and no differing site condition encountered. The difference in those two calculations is what we consider to be a reasonable compensable cost in the amount of $2,459,228.00 excluding any cost for bond. We utilized the same rate for home office overhead and profit that RSC submitted with their REA, as we did not have financial documents or audits to support the home office overhead. However, such markups are entirely reasonable in our experience.
- We have utilized RSC financial documents and cost reports for specific consumable costs. However, we have reclassified them into field overhead in instances where we feel they should have been originally coded as such. See Ex 8-A-1-c. Labor rates for our estimates were developed by dividing total booked payroll dollars by recorded man-hours. Labor man-hours were summarized in Ex 8-A-2. Equipment ownership rates were developed by utilizing applicable bluebook monthly costs, which in our opinion best reflect a contractor's actual cost of ownership. We also utilized bluebook recommendations for equipment operating cost, but adjusted the labor for the cost of fueling and minor repairs as it was not segregated in RSC costs and thus would have been duplicated. For equipment costs of the hydraulic dredge and barge *Susitna*, which cannot be found in equipment bluebook or any equipment ownership guidelines, we have utilized our own experience for a reasonable rate. Where equipment was rented from other sources we utilized the cost RSC paid based on information in its financial documents. All of the equipment cost data is contained in Ex 8-A-4. To determine operating hours of the equipment we utilized both the information RSC had prepared for the original claim and verified the data by reviewing the daily QAR reports. That information is contained in Ex 8-A-3

- In determining the "but for" cost for the dredging we considered all of the information available for the hydraulic dredge and then assigned a productivity factor based on our experience and the soils conditions that we would have anticipated and discussed earlier in this report. All of the same equipment and labor rates for this estimate were the same as utilized to determine the actual cost. The field overhead daily rate estimated as the actual cost was used for the "but for" estimate also. We increased the crew size in the "but-for" estimate compared to what RSC had actually utilized, due to our experience for similar operations.

ROGER L. BROWN
MANAGING PARTNER

JORDAN I. ISAIOU, P.E.
ASSOCIATE

## COMPARISON OF HYDRAULIC DREDGE PRODUCTIVITIES

| | RSC | Productivity CY/HR | NEHALEM | Productivity CY/HR |
|---|---|---|---|---|
| Quantity in CY's | 10,000 | | 50,783 | |
| Available production hours | 236 | 42 | 1008 | 50 |
| Hours available when some work accomplished | 206 | 49 | 864 | 59 |
| Pumping hours | 127 | 79 | 641 | 79 |
| Percent running time | 54% | | 64% | |

1 RSC total days on site excluding mob/demob was 7/13/00 through 8/8/00
On 7/16, 7/30 & 8/6 no work (Sundays). On 8/1 no dredging work-samples being taken.
Net available work days was 23. Available work hours was 236
On 7/26,27 & 28 no work was accomplished, waiting for parts, maintenance and high winds.
Net work days when some production was accomplished was 20 - Available work hours 206 (RSC working 10 hr shift)
Running hours was 112 (from pump meter 7/16 through 8/8 per Heeter diary 8/8/00 EX 99)
plus 7/13-3 hrs, 7/14-6 hrs, 7/15 -6 hrs (estimated from logs) equals 127 total

RSC dredge quantity. From Draper 11/04/00 fax of cross sections & calculation of on shore piles 46,681 CY.
From CQC logs shore excavation was 35,376 CY leaves 11,305 CY
For purposes of this comparison use 10,000 CY (per COD & Mendenhall Preliminary findings of fact EX 156)

2 Nehalem total days on site excluding mob/demob was 7/19/01 through 8/29/01
Net available work days was 42. Available work hours was 1008 (Nehalem working 24 hr/day)
On 8/4, 8/11, 8/12, 8/13, 8/14 & 8/18 no work was accomplished, waiting for parts or repairs
Net days when some production was accomplished was 36. Available work hours was 864
From Nehalem dredge logs reported "Number of hours running" was 641

Nehalem reported quantity from logs was 54,888 CY- estimated pay quantity 50,783 CY (Report EX 5-B-7-d)

EXHIBIT C

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, a Connecticut corporation<br><br>v.<br><br>THE UNITED STATES | NO. 04-487<br><br>(J. Block) |

**DECLARATION OF PETER M. DOUGLASS**

I, PETER M. DOUGLASS, make the following declaration in accordance with 28 USC § 1746. I am aware that this declaration will be used in the United States Court of Federal Claims and that this declaration is the legal equivalent of a statement under oath.

1. I am a registered professional engineer licensed in the state of Washington and a registered geologist and certified engineering geologist in the state of Oregon. I was retained to provide geotechnical analysis and opinion on the behalf of plaintiff in this matter. A copy of the first page of my resume, as included in my written report prepared for this case dated December 8, 2005, is attached as Ex. A.



**SCHIFFRIN OLSON SCHLEMLEIN & HOPKINS, P.L.L.C.**
1601 Fifth Avenue, Suite 2500
Seattle WA 98101
(206) 448-8100 Fax (206) 448-8514

2. Attached as Ex. B is an accurate copy of my December 8, 2005 report, which outlines my analysis, findings, and opinions, all of which I reaffirm.

3. I understand the government now contends the term "few" as used in the test pit logs was "patently ambiguous". Assuming such an ambiguity is defined as "glaring, substantial, or patently obvious", I disagree. While the term "few" as used in the test pit logs on the King Cove project lacked numerical precision and was therefore ambiguous, it also had a relatively well understood ordinary meaning and was reasonably interpreted by Red Samm as outlined in my report. It was far more reasonable for Red Samm to conclude that if the Corps had more specific information it would have been provided when the contract documents were issued. Moreover, this was not a situation where there was a significant and glaring omission or conflict in the contract documents of which the government was unaware. The geotechnical engineer who performed the test pit explorations for the Corps and prepared the test pits logs had an advanced degree and an understanding of the English language, including the lack of precision in regard to use of the term "few" in the test pit logs. He was also aware of the requirements of ASTM 2488, although he chose not to follow those requirements in preparing the test pit logs. That standard does not provide for use of the term "few" to describe the percentage of cobbles observed in a test pit. Rather, ASTM 2488 requires that a numerical percentage estimate of the volume of cobbles observed be stated in any report. Thus, in my opinion, the government was plainly already on notice of any ambiguity in regard to use of the term "few" and there was simply no new or additional information that Red Samm could have brought to its attention.

4. I also understand the government argues the Golder geophysical report would have informed Red Samm as to the extent of cobbles actually encountered by it on the project.


**SCHIFFRIN OLSON SCHLEMLEIN & HOPKINS, P.L.L.C.**
1601 Fifth Avenue, Suite 2500
Seattle WA 98101
(206) 448-8100 Fax (206) 448-8514

Again, I disagree. As stated in my report, the geophysical refraction methods employed by Golder would not identify cobbles. Golder performed no test pit explorations and its statement that the test pit logs showed "some" cobbles simply reflected the comment of a third party who interpreted the test pit logs, but had no first hand knowledge or involvement in the actual test pit explorations. This statement in any event provided no meaningful information and simply indicated the existence of cobbles. Finally, I also believe Red Samm acted reasonably in not requesting the Golder report. The only meaningful information from that report---the location of bedrock, had already been provided through contour lines for the bedrock added to the plans provided with the contract documents.

I have read the foregoing declaration and I certify under penalty of perjury that it is true and correct.

Executed at Seattle, WA this 20th day of April, 2006.

Peter M Douglass

PETER M. DOUGLASS



SCHIFFRIN OLSON SCHLEMLEIN & HOPKINS, P.L.L.C.
1601 Fifth Avenue, Suite 2500
Seattle WA 98101
(206) 448-8100 Fax (206) 448-8514

***Peter M. Douglass, Inc.***

8427 NE 175th St. Kenmore, WA 98028
Telephone (425) 485-2349
Fax (425) 488-2979
e-mail pmdouglass@aol.com

**RESUME**

**PETER M. DOUGLASS, P.E.**
Geotechnical Engineering Consultant

**EDUCATION**

M.S. Civil Engineering
(Geotechnical), 1975
University of Illinois
M.S. Geology
(Rock Mechanics), 1968
Pennsylvania State University
B.A. Geology, 1965
Antioch College

**PROFESSIONAL REGISTRATION**

Professional Engineer
State of Washington
Professional Geologist
State of Oregon
Certified Engineering Geologist
State of Oregon

**PROFESSIONAL SOCIETIES**

DRBF (Dispute Review Board Foundation - Officer, 1997 to 2005, President-Elect 2006)
UTRC (Underground Technology Research Council - Past Chairman and current Exec. Committee)
ASCE (American Society of Civil Engineers - Past Chairman, Seattle Geotechnical Group)
AUA (American Underground Construction Association)
AEG (Association of Engineering Geologists)
ISRM (International Society for Rock Mechanics)
SME (Society for Mining, Metallurgy, and Exploration)

**PROFESSIONAL EXPERIENCE**

1992 to Present - & 1989 to 1990 — Peter M. Douglass, Inc., Seattle, WA.
Independent Geotechnical Consultant

1990 to 1992 - Woodward-Clyde Consultants, Seattle, WA.
Vice President, Senior Consultant and Director of Geotechnical Services for the Pacific Northwest.

1979 to 1989 - Hart Crowser, Inc., Seattle, WA and Anchorage, AK.
Vice President and Senior Principal Engineer
Responsible for all tunneling, mining and rock mechanics work, and other major projects.

1968 to 1979 - Shannon and Wilson, Inc., Seattle, WA.
Staff Engineer to Principal Engineer in charge of the tunneling, instrumentation, and rock mechanics group.

EXHIBIT A

**Peter M. Douglass, Inc.**

8427 NE 175th St. Kenmore, WA 98028
Telephone (425) 485-2349
Fax (425) 488-2979
e-mail pmdouglass@aol.com

**D-235 REPORT**
December 8, 2005

Schiffrin Olson Schlemlein & Hopkins, P.L.L.C.
Westlake Center Office Tower
1601 Fifth Avenue, Suite 2500
Seattle, WA 98101

Attn: Mr. James T. Hopkins

**Re:** DACW85-99-C-0003, Harbor Improvements, King Cove, AK

**Subject:** Geotechnical Expert Report on Differing Site Conditions

Dear Mr. Hopkins,

This report presents my findings and conclusions regarding the geotechnical issues surrounding the differing site conditions claim by Red Samm Construction, Inc (RSC) on the above referenced project. The purpose of my assignment on this project, as I understand it, is to provide my assessment of the differing site conditions and/or misrepresentation claim from the perspective of a geotechnical engineer who has been practicing as a consulting engineer in the northwest for over 35 years in conjunction with projects throughout the U. S. and abroad.

I am a registered engineering geologist in the state of Oregon and a registered civil engineer in the state of Washington, specializing in the field of geotechnical engineering. I have worked on a number of jobs in Alaska and opened the office of Hart/Crowser Assoc. in Anchorage, AK in the mid-eighties. I have also worked on a number of projects involving the identification and assessment of over-sized materials in conjunction with both surface and underground construction as such over-sized materials frequently have a significant impact on the work.

Over the past 15 years I have been self-employed as a consulting engineer (Peter M. Douglass, Inc.) specializing in underground construction but with considerable involvement on surface projects as well. A copy of my current resume is attached. I have prepared and reviewed several Geotechnical Baseline Reports (GBRs) that are frequently included within the Contract Documents (CDs) to define the geotechnical conditions that are established for bidding purposes. These GBR baselines are subsequently used as the basis for establishing a Differing Site Condition (DSC) and have done much to minimize, if not eliminate, the arguments over DSCs. I also provided final review of the 1997 ASCE publication on GBRs. Since 1990 I have served on over 15 Dispute Review Boards (DRBs) in the U.S. and abroad, have been an officer in the DRB



EXHIBIT B