Foundation (DRBF) since 1997 and am currently President-Elect of that international organization.

During my career I have served as an expert witness on six other projects (including one in Ketchikan, AK) but only one other project in the past four years in which I was deposed. Fowler v. ACE American Ins. Co., USDC Western District of Washington, Tacoma, Case No. CV 04-5400 FDB. My services on the King Cove project have been compensated on an hourly basis (plus expenses at cost) at a rate of $175.00 per hour. As of September 9, 2005, I have invoiced a total of $10,850 on this matter.

In arriving at my findings and conclusions I have reviewed all of the materials that have been provided to me (a list of materials reviewed is presented in Exhibit 1) and have met with both Mr. Hopkins and Mr. Roger Brown to discuss the issues. This report is organized into the following three main sections: General, Background Information, and Findings and Opinions.

## I. GENERAL

It is generally understood that both the Owner and the bidder on a competitively bid construction project have certain responsibilities, as follows:

It is the Owner's responsibility to provide information on the anticipated subsurface conditions at the project location that the bidding contractor can rely on, including all pertinent information in their possession. The Owner is not entitled to be selective in the information provided, if this could be misleading to the bidder. The Owner/designer should always strive to minimize potential misunderstandings or ambiguities by describing/defining ambiguous or anomalous conditions or terms. It is the Owner's decision as to the extent that the subsurface conditions need to be determined in advance of seeking bids in order to obtain responsible bids. This decision should include consideration of the following factors:

- The subsurface information needed to properly design the project elements;
- The subsurface information needed by the Contractor in selecting its means and methods for accomplishing the work;
- The degree of variability of the subsurface conditions that are anticipated;
- The funds that the Owner is prepared to expend at this pre-construction stage; and
- The degree of risk that the Owner is willing to accept with respect to potential differing site conditions (i.e. the ground belongs to the Owner, not the contractor).

The bidding contractor also has a number of responsibilities that include:

- Reviewing all the Contract Documents to fully understand the work, including an assessment of the anticipated surface and subsurface conditions, as represented in the CDs, that would impact the work to be accomplished; and

- Make reasonable interpretations of the conditions likely to be encountered that are consistent with the factual information provided by the Owner as representative of the conditions to be anticipated;
    - In a competitive bidding environment, it is not necessary, nor even reasonable, for the bidder to assume "worst case" conditions, as this would almost certainly result in that bidder not being competitive.
    - In fact, the bidder is entitled to assume the most optimistic conditions that can reasonably be assumed based on the CDs.

## II. BACKGROUND INFORMATION

### A. Pre-Bid Investigations and Project Planning

It is the Owner's duty to provide information that will help the bidder to understand the site conditions that will impact the work in order to obtain responsible, yet cost competitive bids. For this project the subsurface conditions that could impact the work included:

- The gradation, density and distribution of the materials that would be encountered in the dredging operations and would therefore affect the means and methods that could be utilized to accomplish the work; and
- The depth of bedrock to identify any such materials with the limits of the dredging work.

The original scope of the planned subsurface investigations was fairly comprehensive with a total estimated cost of $193,111 (Dep. Ex. 1). The scope of subsurface investigations actually accomplished over the total 13 acre project was reduced to only 5 test pits in one corner of the site and a geophysical refraction study. The investigation and planning of the project reflects that the Owner recognized :

- Subsurface conditions at the breakwater were not an issue to the bidding contractor once the size and slopes of the breakwater were defined in the CDs;
- The depth of bedrock was important in that encountering bedrock within the dredging limits would greatly affect the means, methods, costs and rate of excavation;
- The nature of the soil deposits to be excavated would affect means, methods and production rate;
- Based on earlier investigations (borings conducted in 1985 for the existing causeway), indications were that the soil deposits were granular and in a loose to medium dense state within the depths to be excavated. The April 1997 detailed project report (Dep. Ex. 4) reflects the expectation in numerous references that the cobbles will be less than 6 inches in size.;

- Aleutians East Borough (the local sponsor of the project) had expressed a desire to place such granular material upland of the project site to serve as a source of granular materials for future construction, particularly as such granular materials were in short supply at existing upland sites;

- The most cost effective means and methods for upland disposal was by hydraulic dredge as this would not require re-handling of the dredged soils, as would be required with a clamshell operation;

- In granular deposits, the presence of oversized material (cobbles and boulders) would affect the feasibility of a hydraulic dredge operation; and

- Borings are not a suitable method of determining oversized material as sampling equipment is generally limited to less than 3" diameter (the minimum dimension for cobble sized material). However, Mr. Wilson has testified that at the eleventh hour, during a final review of draft plans and specifications, his superior, Jerry Raychel, requested that the 1985 soil borings be included in the contract documents as he believed such information would be useful and helpful to bidding contractors to determine the nature of the subsurface conditions and the appropriate equipment to employ;

Presumably, based on this sampling limitation and the expectation of loose to medium dense granular materials throughout the depth and limits of excavation, it was decided to eliminate borings as an exploration method (reasonable in my opinion) in favor of geophysical methods to define the top of bedrock and test pits to define both top of bedrock and the nature of the soil deposits, including the presence of oversized materials (>3" in diameter) and the density (excavation ease) of the material. A geophysical refraction investigation was commissioned by the Corps. of Engineers ("COE") after the initial test pit explorations identified bedrock in the far SW corner of the project. (Note: geophysical refraction is an indirect method of investigation relying on contrast of energy wave propagation (travel times) to identify contacts between varying materials. Geophysics will not provide a reliable indication of oversized materials less than 12" in diameter, and, in fact, is not a reliable means to identify individual boulders (>12" in diameter) unless they are very large (say greater than 36" in diameter)).

For this project, direct subsurface investigations consisted of five test pits that were dug at the SW corner of the site, near the only existing bedrock outcrop along the shoreline near the project limits (bedrock was anticipated at shallow depths in this area). The results of these test pits were as follows:

- All of the test pits were dug to a maximum depth of 10 feet, or less;

- With the exception of one test pit (TP-3) that encountered bedrock at a depth of 1 foot, all of the test pits reported only "easy digging" with "sidewalls caving";

- Only one test pit (TP-5) was located within the dredge limits and it encountered "silty SAND" in the upper foot and then "Gravel with few Cobbles" (underlining added) to a depth of 8 feet";

- One other test pit (TP-1) was excavated near the dredge limits and was dug to a depth of 10 feet and encountered exactly the same soil deposits, similarly reporting "few Cobbles," with the addition of "and Boulders" in the Gravel unit below the finer "silty SAND" surface layer;

- The other 2 test pits (TP-2 and TP-4) were excavated closer to shore than TP-1 and TP-5 and encountered "Gravel with Cobbles and Boulders" to a depth of 9.5 feet (TP-2) and "Gravel and Cobbles" in the top foot and then "Gravel" to the full depth of 9.0 feet (TP-4);

- All test pits were excavated with a backhoe in a matter of hours within or upslope of the inter-tidal zone at a time near low tide;

- All test pits were included in the CDs but did not include a definition of the ambiguous qualitative term "few";

- Photos of the test pits, at least one mislabeled, were taken by Mr. Wilson, but not included in the CDs;

- Mr. Wilson's narrative report that accompanied the field test pit logs and photos, **and included some useful comments on the occurrence of oversized material**, was not included in the CDs.

The 1985 borings (all located outside the dredge limits beyond the NE corner of the project site) were included in the CDs. The results were as follows:

- All of the borings encountered very loose to medium dense SAND from the surface of the soil to a depth of at least 17 feet, with the exception of boring BH-4 where the sample attempts (no recovery) at 10 and 15 feet reported gravelly soils (based on drilling action) and that the sampler was probably driving or sitting on "small cobbles". The "casing advanced easily, however, indicating the gravel is in a soft matrix" (underlining added); and

- Boring BH-3 was advanced without sampling in the upper 30 feet but reported the material as "silty sand with occasional gravel" based on the "drill wash".

The CDs stated that the materials encountered in the borings, test pits, and geophysical investigation (report referenced but not included in the CDs) were **representative of the conditions to be encountered within the dredge limits**. No other pre-bid investigations of the subsurface conditions were accomplished.

Red Samm's primary contact during the bidding and subsequent construction phases was Mr. David Heeter, then Vice President of Red Samm, who testified in deposition that:

- He had visited the site prior to bidding, had reviewed the CDs (including the test pit logs and soils borings) and that he had prepared the bid for Red Samm;
- At the time of the initial bid he relied on a subcontractor quote for dredging and did not concern himself with the amount of cobbles, as this was quoted as a clamshell operation with offshore disposal;
- The subcontractor estimated that the dredging could be accomplished in one season.

B. <u>Construction Phase</u>

Red Samm was awarded the contract following bid opening on November 10, 1998, at which Red Samm was the apparent low bidder. Red Samm was given Notice to Proceed (NTP) on January 13, 1999 with completion required on November 8, 2000. As a practical matter RSC was allowed two construction seasons to accomplish the work, given the typically severe winter weather in the area.

During the first construction season (1999) Red Samm constructed the breakwater and entered into discussions with the City of King Cove over upland disposal of dredged materials, including identification of an upland disposal site. At this point, Red Samm was faced with selecting suitable means and methods for the dredging operation, recognizing that hydraulic dredging would provide the most economic means for upland disposal, provided that the material was suitable for hydraulic dredging.

Red Samm studied the information included in the CDs regarding the nature of the subsurface materials to be dredged, including the aforementioned borings (little or no oversized material within the dredge depths) and the test pit information (reporting "few" cobbles within the dredge limits).

In deposition, Mr. Heeter described how he arrived at a determination of "few" both by Webster's definition ("not many") and as a percentage (less than 1 percent based on an estimated number of "few" and a calculation of the volume of the test pit excavation). Although this supported Red Samm's conclusion that a hydraulic dredging operation was feasible, Mr. Heeter testified that he thought the best thing to do to determine what was meant by "few" was "do our own exploration to determine really what the value of few meant". Red Samm accomplished its own investigation of subsurface conditions by excavating 4 additional backhoe test pits from shore and by excavating 50 yards of material by clamshell and shipping all of the clamshell materials (and samples from the test pits) to their laboratory in Sand Point, AK to perform gradation analyses.

Mr. Heeter testified at deposition that the Red Samm explorations reported no cobbles (>3") in either the test pits or the clamshell sampling operation. Hence, these additional investigations, located within the dredge limits and between the borings and the test pits included in the CDs,

confirmed Red Samm's understanding of the term "few" cobbles as meaning "not many". Following this confirmation, Red Samm reached an agreement with the City of King Cove on an upland disposal site, investigated hydraulic dredge equipment and went to Holland to observe the operation of the preferred equipment, purchased new equipment and had this equipment delivered to the project site to be used in the second construction season to accomplish the required project dredging.

Even though Red Samm's investigations and the borings included in the CDs did not indicate oversized materials, Red Samm and its dredge equipment supplier recognized the potentially dire consequences of even a "few" large cobbles entering the dredge pipeline. Therefore, the equipment sent to the site included a "grizzly" (rebar cage) that could be installed around the suction dredge intake that would only allow maximum 4" to 5" material to pass into the pipeline (the grizzly consisted of a steel rebar basket constructed with 4" by 4" grid openings.)

Further, even though the test pits and borings consistently indicated "easy digging" and very loose to medium dense granular soils, respectively, within the dredge depths, Red Samm ordered a "cutter head" for their dredge and was prepared to install this equipment if required, based on the dredging conditions actually encountered.

On July 13, 2000, Red Samm began hydraulic dredging of the material onsite and was immediately stopped from reasonable production rates due to excessive large cobbles (>5") clogging the grizzly openings. Mr. Heeter testified that within 3-4 minutes the grizzly became clogged to the extent that it had to be brought to the surface and the cobbles pounded out of the grizzly.

In its letter dated July 18, 2000, RSC notified the COE that it had encountered differing site conditions due to the excessive cobbles. The COE's project manager, Lynden Belin, received Red Samm's notice and had considerable discussion, at that time, with other COE personnel involved on the project, including Chuck Wilson. These discussions included consideration of the test pit data, particularly the meaning of the term "few" used in the Test Pits 1 and 5 logs, the purpose being to "get an idea of what we thought was in the contract." Mr. Belin's testimony acknowledges that the term "few" was vague and "hard to put a handle on exactly how many."(underlining added) The reference to "how many" indicates that Mr. Belin thought of the cobbles as a **count or number of cobbles**, rather than as a percentage by weight. No one informed Mr. Belin during these discussions that the term "few" should be understood to mean a certain percentage of cobbles. Belin Dep. p. 55-57.

Based on his discussions with other COE personnel, Mr. Belin prepared a draft response to RSC's notice which stated that the term "few" was "somewhat subjective." Belin Dep. Ex. 38. However, the final version of the COE response to RSC's initial notice, dated August 4, 2004, deleted any discussion of the test pit data or the term "few."

Red Samm's letter of August 20, 2000 responded to the COE's August 4, 2000 letter and emphasized the contractor's interpretation of the test pit data and its description of "few" cobbles. Mr. Belin acknowledged in his deposition that the COE never responded to Red Samm's August 20 letter.

Following unsuccessful attempts in the immediate vicinity of the initial dredge setup location, Red Samm moved the dredge operation to other locations in search of suitable materials with a lesser percentage of cobbles. They finally located such conditions and proved the feasibility of the hydraulic dredging operation in suitable materials by dredging 3,000 yards of material in 10 hours on 2 consecutive days (6,000 yards total). This rate equals 300 yards per hour average or roughly 5 yards a minute. At this rate, a single shift operation at 10 hours per day would have required 120 days to dredge all 360,000 yards of material. However, a double shift operation could have dredged all the material in as little as 60 days, well within the remaining construction season.

These low percentage cobble subsurface conditions, and hence this production rate, were short lived and by August 8, 2000, Red Samm had only been able to dredge a reported 10,000 yards. At this point, it became obvious to Red Samm that they needed to abandon the hydraulic dredge operation and go to a clamshell dredging operation in order to have any chance of completing the dredging within the 2000 construction season.

Clamshell dredging operations on a 24 hour per day basis began on August 21, 2000, with open ocean disposal in an effort to complete dredging operations in the 2000 construction season. By mid-November 2000, Red Samm had concluded that they would not be able to complete the dredging in the 2000 season and stopped further operations for 2000.

In late 2000 and early 2001, Red Samm obtained outside bids for dredging the remainder of the contract by clamshell during the following construction season. These bids were significantly higher than the original subcontractor bids, reportedly as a result of the bidder's knowledge of the actual conditions encountered in the 2000 season.

In an apparent effort to evaluate Red Samm's DSC claim of excessive cobbles, the COE, on July 25, 2001, obtained four bulk samples from the stockpile of the dredged material disposed of at upland sites and transported some of these samples (<1-inch material) to their laboratory for gradation and water content determinations (these lab tested samples ranged from 14 to 19 pounds). In the field, samples were collected in five gallon buckets from each bulk sample and field screened using a 3-inch screen (cobble size) and a 1-inch screen (gravel size). The cobble size material was further subdivided into greater than 5-inch material that was hand picked from the 3-inch screened material. The >5-inch, 3 to 5-inch and <1-inch materials were placed in separate buckets for weighing.

Two of the reported sample locations were on or near the top surface of the stockpile and two of the sample locations were roughly mid-slope on the stockpile. The wet weight of the samples used for field gradation testing ranged from 1,236 pounds to 1,674 pounds. The COE Findings Report (dated July 2001) stated that "very infrequent" boulders (>12") were observed on the surface of the spoil pile (estimated at 30) but that boulder size material was not included in any of the samples. Test results on the four samples were reported as 5.5%, 7.9%, 2.2% and 5.9% cobbles by weight with sample moisture contents (measured in the laboratory) that ranged from 5.3% to 10.4%.

Comments added by Chuck Wilson to a draft of the COE's Findings Report for the July 25, 2001 stockpile sampling asserted that the results compared well with the description of the subsurface material contained in the July 1996 Trip Report prepared by Mr. Wilson who conducted the test pit explorations. However, Mr. Wilson's superior, Jerry Raychel, noted that the July 1996 Trip Report had not been provided to bidders and Mr. Wilson's comments should be revised in any final report. (Steven Henslee testimony. Dep. Ex. 22 and 25.) Ultimately, the COE elected to defer finalization of its report until the contractor had submitted a formal claim and then "tailor" the report appropriately. Henslee Dep. Ex. 25.

On September 10, 2001, the dredging operations were completed.

On October 30, 2001, Red Samm submitted its formal Request for Equitable Adjustment due to the differing site conditions.

A letter signed by Mr. Ron Flodin (signature dated January 23, 2002) presents the COE's Administrative Contracting Officer's denial of Red Samm's request stating:

- "The surface of the area that was dredged within the inter-tidal zone was primarily covered with gravel, cobbles and boulders". Photos that I have observed of the site within the dredging limits suggest a predominantly Sand deposit with only occasional cobbles and boulders.

- "...... ignores the data presented in the four remaining test pits and the observation of cobbles and boulders on the surface of the inter-tidal zone." This statement is contrary to the surface layer of "silty SAND" shown on the logs of both TP-5 and TP-1 (the only test pits located within or near the dredge limits) and suggests that the coarser materials on the shore, well outside the dredge limits, (TP-2, TP-3 and TP-4) are representative of conditions within the dredge limits.

- "No reference was made in the contract documents regarding the maximum or minimum percentages of cobbles or the limit on the cobble size." Although the COE later maintains that the logs were prepared in accordance with generally accepted standard ASTM D 2488 procedures, failure to note the estimated percentage of over-sized material and the maximum size of the cobbles and/or boulders on the logs is contrary to those recommended ASTM procedures.

- "Nevertheless, the results presented of cobble amounts ranging from 34.3% to 6.5% are within the realm of what a contractor should expect and plan for based on the information presented in the contract and visual inspection of the site." I certainly would take exception to this statement, especially that a percentage of cobbles on the order of 34.3% should have been expected.

- "The gradation tests of the samples (my note: this is referring to the sampling of the dredged spoils pile in July 2001) resulted in percentages of cobbles between 7.9% and 2.2%,...". This appears to be the first time that the COE shared these results with Red Samm and they were

understated due to the COE's apparent failure to adjust for moisture content. The correct percentages of cobbles from these test results should be 8.9% to 2.3%.

- Nowhere in this letter does Mr. Flodin assert that Red Samm should have understood the term "few" in the test pit logs to mean 5 to 10 percent, explain what the COE meant by this term, or indicate that the test pit logs were presumably prepared in accordance with ASTM D 2488 procedures.

In their letter to the COE dated April 2, 2003, attorneys for the Aleutian East Borough expressed concern that the COE, even as of that date, had not explained for the Borough its interpretation or reasoning as to the meaning of the term "few" as used in the test pit logs.

On April 25, 2003, Greg Carpenter, a project engineer within the COE's geology section who had been hired in July 2002, prepared a memorandum entitled "King Cove Harbor Improvements-Geotechnical Consideration." Dep. Ex. 20. That memorandum articulated a theory (incorrect in my opinion) that the term "few" could be equated to 5 to 10 percent by applying the suggested procedures of ASTM D 2488-93.

On November 26, 2003, the COE sent out the Contracting Officer's Decision ("COD") denying Red Samm's claim of a DSC due to excessive cobbles stating that conditions were consistent with those represented in the CDs.

Travelers, Red Samm's surety, filed a complaint on March 29, 2004, against the government in the United States Court of Federal Claims, seeking recovery on Red Samm's claims.

On January 27, 2003, I was retained by the surety's counsel, James T. Hopkins, to review the pertinent information and provide my expert opinions, as a registered geotechnical engineer, on the various aspects of the claim.

The documents and information that I have received and generally reviewed are identified in Ex. 1, attached to this report.

## III. FINDINGS AND OPINIONS

Following is a discussion of my findings and opinions based on my review of the information identified on Ex. 1 and my discussions with Mr. Roger Brown and Mr. James Hopkins:

### A. <u>Pre-Bid Investigations</u>:

The level of subsurface investigation that was performed for a project of this nature and size was, in my opinion, minimal. However, I believe the selection of the scope of pre-bid investigations was up to the COE based on consideration of a number of issues including, but not limited to:

- Availability of existing subsurface information at or near the project site;

- The type of information that is needed; i.e., the nature (gradation and density) and distribution of the subsurface soil materials;

- The anticipated variability of the site soils (both composition and distribution);

- The cost of suitable investigations;

- The time required and time available to perform the investigations; and

- The level of risk that the COE is willing to accept with respect to encountering differing site conditions since the Owner, not the bidder, owns the ground.

I believe the test pits and geophysical studies were adequate to delineate the top of bedrock within the limits of the work and proved to be so.

However, I believe the pre-bid site investigations were insufficient to adequately describe and delineate the subsurface materials that would be encountered during dredging operations. This information was needed by the successful bidder to evaluate the most economical means and methods of dredging that could be employed to complete the work. In particular:

- Test pits, or other forms of direct bulk sampling of the over-sized materials, are the only suitable methods of determining the percentage of such material that, in turn, would govern the feasibility of hydraulic dredging.

- The only test pits (or other bulk sampling) that were accomplished pre-bid were located near the only rock outcrop exposed along the shoreline within (or immediately adjacent to) the area to be dredged. In my opinion, it is reasonable to anticipate that the proximity of such a bedrock outcrop to the test pits could result in a higher percentage of oversized material in this vicinity and, thus, may not be representative of overall site conditions. This could lead the Contractor to place less emphasis on the percentage of cobbles encountered in the test pits and thereby provide the bidder with ambiguous information to rely upon. This could have been clarified with a paragraph in the CDs that directed the bidder as to what he should assume in bidding the work, but it was not.

- The only other subsurface information provided to the bidder in the CDs were borings performed for an earlier project (drilled in 1985). These borings were located outside the area to be dredged and at elevations generally well below those in the area to be dredged, and at considerably greater water depths. In addition, such boring investigations could not sample oversize materials (>3") as the sampler tip opening was limited to 3" or less. The only potential indication of oversized material in those borings was the reported drill action or hard driving of the sampler. Boring BH-4 was the only boring that reported such conditions within the general elevation and/or depth range to be dredged. The two sample attempts in BH-4 that met these conditions within reasonably applicable depths and/or elevations were made at 10 and 15 ft. depths below ground using a standard split spoon sampler of 1.375–inch diameter. No samples were recovered in these attempts and, in my opinion, these were not reliable indications of oversized material (>3").

Despite the inadequacies of its pre-bid investigations, the COE elected, in my opinion, to indicate in the CDs that the contract soils data was representative of the entire area to be dredged. The COE reiterated this assertion in its letter of December 20, 2000 ("The Government provided information about the material to be dredged. This information was sufficiently representative to determine the consistency of the material to be dredged.") and in the COD ("Per TS 02222-1.2, this information was representative of the area to be dredged and excavated under the contract.") Although I disagree with the COE's assertions in this regard, these statements indicate that the information provided by the COE was, in their opinion, representative of the general site conditions as a whole and adequate for the bidder to select appropriate means and methods for dredging.

The generally accepted standard procedures for logging soils encountered in test pit and boring investigations is ASTM D 2488 (Standard Practice for Description and Identification of Soils (Visual-Manual Procedure)). Mr. Chuck Wilson acknowledges in his deposition that he did not strictly adhere to the suggested procedures in ASTM D 2488-93. Of particular importance in this case are the following procedures referred to in ASTM D 2488-93:

- "Subsection 15.7 If the field sample contains <u>any</u> cobbles or boulders, or both, the words "with cobbles" or "with cobbles and boulders" shall be added to the group name." (underlining added) Although Mr. Wilson employed this terminology, "with" refers to **<u>any</u>** cobbles and boulders and does not offer any indication of the number or percentage of cobbles or boulders. However, Mr. Wilson testified that by use of the term "with" in the TP-2 log he actually meant greater than 5%.

- Subsection 12.2. "Estimate and note the percentage of cobbles and the percentage of boulders. Performed visually, these estimates will be on the basis of volume percentage."

- Section 16 then requires such information be included in the report stating, "The report shall include the information as to origin, and the items indicated in Table 13." Item #3 on Table 13 is "Percent of cobbles or boulders, or both (by volume)"

- Note 15, under section 16. Report and subsection 16.1 states that "if desired, <u>the percentages of gravel, sand, and fines</u> may be stated in terms indicating a range of percentages, as follows:
    - Trace – Particles are present but estimated to be less than 5%
    - Few – 5 to 10%
    - Little – 15 to 25%
    - Some – 30 to 45%
    - Mostly – 50 to 100%"

  This clearly states that use of this terminology is for "gravel, sand and fines" and it is therefore not applicable to cobbles and boulders, or this distinction with respect to applicable particle size would not be made.

Mr. Chuck Wilson stated in his deposition that he intended that "few" meant 5 to 10% when referring to cobble percentages on the test pit logs. As noted above, this is not the intended use

of the term "few" and, in my opinion, is misleading, as was his use of the term "with" to convey a percentage of cobbles exceeding 5%.

Portions of Mr. Wilson's July 1996 field report on the test pit explorations included useful narrative regarding the amount of cobbles present from the test pit logger's perspective. The COE's decision to omit this narrative from the CDs, especially in light of the ambiguous nature of the term "few" was misleading, in my opinion, whether done intentionally or inadvertently. As noted previously, the COE acknowledged amongst themselves as early as July 2000 (Mr. Belin's testimony) that the term "few" was vague and "hard to put a handle on exactly how many".

B. <u>Visual Examination of the Site</u>:

The COE has suggested that visual examination of the site clearly indicates the presence of cobbles in significant percentages. However, visual examination of the surface and general site conditions is unreliable and of little use to the bidder in assessing the presence, let alone the percentage of cobbles at depth for the following reasons:

- The presence of cobbles and boulders shoreward of the high tide level provides no indication of the percentage of cobbles in the offshore deposits. Similarly, the inter-tidal zone surface is of no value in predicting subsurface conditions. Both the inter-tidal zone and the area immediately shoreward only provide an indication of the recent depositional environmental. A single large storm can change this surface (and the materials on it) drastically. The size of the material (grain size and attendant weight) that can be moved by the ocean's water is directly related to the wave energy acting on the shore and near shore materials. Routine ocean activity in the area is able to move sands and smaller gravels but not cobbles and boulders. As a result, the coarse materials are concentrated just shoreward of the inter-tidal zone as the finer materials are removed by normal wave action. Under normal ocean activity the finer materials are washed out and deposited in the intertidal zone and beyond.

- Intermittently, large storms occur with wave energies sufficient to move oversized material such as cobbles and boulders. Particularly at high tide, the existing accumulation of coarse material on the shore is an abundant source of oversized material to be moved into the intertidal zone, resulting in the deposition of a higher percentage of oversized material directly related to such storms.

- This cycle of routine ocean activity interspersed with major storm activity (larger storms occur on a less frequent occurrence than smaller storms; i.e. FEMA's 100 year flood level is lower than its 500 year flood level), results in a concentration (higher percentage) of oversized material that varies in depth and areal distribution. This natural phenomenon is what enabled Red Samm to locate an area (of limited extent) that was conducive to hydraulic dredging operations that enabled production rates of 300 cubic yards/hour for two consecutive days (estimated 6,000 yards total.)

- The test pit logs clearly illustrate that the surface conditions are an unreliable indicator of the underlying conditions. For instance, TP-1 and TP-5 are located furthest offshore in the inter-tidal zone with a 1.0 to 1.5 foot thick surface layer of finer "silty SAND" underlain by "Gravel with few Cobbles and Boulders". TP-4, on the other hand, was located shoreward and indicated a 1 foot thick surface layer of "Gravel and Cobbles" underlain by finer "Gravel", with no cobbles reported.

In my opinion, bulk sampling and gradation testing on a regular grid pattern is the only way to develop a fairly reliable estimation of the percentage of oversized material over an area of this project's magnitude. No testing of any bulk samples were done in the pre-bid investigations.

Visual examination of the site is, in my opinion, misleading in that it presents the appearance of soil conditions that represent fairly routine ocean activity, suggesting a finer grained deposit in the inter-tidal zone than is likely to actually exist at depth. Hence, the COE's reliance on such visual observation of site conditions as a basis for rejecting Red Samm's claim is, in my opinion, totally inappropriate.

C. Construction Phase:

Although Red Samm based their original bid on a clamshell dredging operation that was considered relatively unaffected by the percentage of cobble sized material, the contractor was entitled to rely on the COE representation of site conditions in their ultimate selection of dredging means and methods.

Based on its understanding of the COE representation of site soils as presented in the CDs (which understanding I consider was reasonable), Red Samm believed that a hydraulic dredging operation was feasible. Nevertheless, as a responsible contractor, Red Samm accomplished its own bulk sampling and testing of site soils to confirm this interpretation.

Red Samm accomplished four test pits at different locations along the shoreline in the inter-tidal zone within the project limits and obtained one large bulk sample (50 cubic yards) by clamshell at an offshore location within the dredge limits. The entire offshore sample and some of the test pit samples were shipped to Red Samm's lab at Sand Point, AK for gradation testing. Mr. Heeter testified in his deposition that no cobbles were reported in those sampling efforts and the Sand Point test results confirm this.

Since this additional investigation confirmed their interpretation of COE site representation, Red Samm concluded (correctly so in my opinion) that further investigations were not necessary and concluded that a hydraulic dredge operation was feasible.

Further, recognizing that even a "few" cobbles could have serious adverse effects on the operation if sucked into the pipeline, Red Samm purchased a grizzly that could be installed around the suction dredge intake that would allow only material smaller than 4 to 5 inches in diameter to pass into the pipeline system. Sizing of this grizzly (and a system that could handle up to 4-5" material) was consistent with other descriptions of the material that reported cobbles, when encountered, were generally less than 6" diameter.

Mr. David Heeter explained in his deposition how Red Samm had estimated that the percentage of cobbles in the materials at the site was on the order of 0.25%.

On July 27, 2000, dredging operations with the hydraulic dredge system began operation at the site. Mr. Heeter testified that almost immediately, the grizzly became clogged with >5" diameter cobbles and had to be brought to the surface to dislodge the oversized material. Mr. Heeter further testified that repeated attempts to dredge the site soils with this equipment had encountered the same condition, with the grizzly becoming clogged within 3 to 4 minutes of starting operations. (Earlier in this report, I described actual performance in suitable soils (i.e., finer soils with no large cobbles to clog the grizzly) that demonstrated achievable production rates of 300 cubic yards an hour. Such a production rate corresponds to 5 cubic yards a minute. Therefore, 3 to 4 minutes of operation (under ideal conditions) would dredge up 15 to 20 cubic yards. Clogging of the grizzly would obviously reduce this production rate significantly.

On July 18, 2000, Red Samm notified the COE that they had encountered a DSC consisting of a higher percentage of cobbles than indicated in the CDs, thereby satisfying their contractual obligation of notification. It does not appear that the COE did anything to investigate this claim at the time and on August 4, 2000 responded to Red Samm's notice, rejecting it on the basis that the site conditions described in the CDs identified the presence of cobbles. Although the draft of this letter (Dep. Ex. 38) acknowledges that the terms "few" and "high concentration" are "somewhat subjective", the final letter did not address the "somewhat subjective" nature of the terms, nor did it provide in any quantitative terms what percentage of cobbles was indicated, or intended to be indicated, by the use of these terms in the CDs. In my opinion, the COE failed to fulfill their contractual obligations by not investigating the contractor's claim of a DSC in a timely manner.

On August 8, 2000, Red Samm terminated its hydraulic dredging operation based on the very limited average production that it was able to achieve and the relative certainty that they would not be able to complete the dredging work within the allotted construction timeframe using the hydraulic dredge.

On August 21, 2000, Red Samm began dredging operations with a clamshell and, believing the excess percentage of cobbles was obvious, documented these conditions with photos of the materials dredged by clamshell operations.

As noted above, in July 2001, the COE's Steve Henslee went to the site to obtain bulk samples from the material stockpiled on land (then estimated at 200,000 cubic yards). Although, Mr. Henslee testified that this sampling operation was discussed with Chuck Wilson, who gave him guidance on what and how to accomplish it, Mr. Wilson denied this in his testimony.

In any event, this sampling and subsequent testing by the COE was, in my opinion, inadequate and biased in favor of the COE in the following respects:

- The sample size (<1500 lbs or ½ cubic yards per sample) was smaller than recommended by ASTM to ensure a representative sample of the material sizes encountered. This is

further emphasized by the comment in the July 2001 field report that boulders were specifically excluded from the sample. This may have been done to avoid having to handle such large material (even the minimum size boulder at 12" diameter would weigh approximately 80 pounds) or may have been simply the result of infrequent boulders. In any event, for the sample size collected and screened, elimination of a single 12-inch boulder could change the results by well over 5%. Similarly, the addition or elimination of a single 9-inch cobble (weighing roughly 35 pounds) could change the percentage of cobbles is this size sample by over 3%.

- Test pit samples were obtained from sample locations on the surface and mid-slope of the stockpile with no sampling done at the toe of the slope where the coarser materials (cobbles and boulders) tend to accumulate as they roll down the slope. Photos of the stockpile clearly show the accumulation of coarser materials (including cobble sized material) at the toe of the slope. Dep. Ex. 19.

- Reported percentages of the cobbles were based on the wet weight of the sample, contrary to normal ASTM procedures and contrary to a statement in the July 2001 report that "the field data was adjusted for moisture content by applying the moisture content values measured in the laboratory". Although Table 1 in this report (Combined Gradation Measurements) clearly adjusted the total weight based on the moisture content, the reported percentages of cobbles is exactly the same in this table as it is for the "Raw Field Data" contained in Table 2. By not correcting for moisture content, the Corps understated the percent cobbles in the samples by as much as 1%. The correct range in percentage of cobbles from these test results should be 8.9% to 2.3%.

In my opinion, a proper unbiased sampling and testing operation would have included:

- A larger sample at each sample location

- Samples taken at the top, middle and bottom of the slope and the results averaged to get a representative gradation.

- All size material (including boulders) in the screened sample.

- Calculated and reported percentages of each size of material on the basis of dry weight (per normal ASTM standards).

Based on consideration of the information discussed above, it appears to me that much of the disagreement over what was represented in the contract documents revolves around the question "What is a reasonable interpretation of the term "few" used on the test pit logs?". The COE maintains the term "few" refers to 5 to 10%. Mr. Heeter concluded that "few" means "not many" per Webster and 0.25% based on his calculations assuming 10-12 cobbles in a 10' deep test pit with conical side slopes.

In this regard, my findings and opinions are summarized as follows:

- The qualitative term "few", without stating a percentage that this refers to, certainly leaves the bidder with an ambiguity in terms of what does "few" mean. The COE could have avoided this ambiguity by providing a definition of the term "few." However, they did not do so until nearly 3 years following the bid and after receiving the results of their dredged material sampling and testing. Following receipt of those results (which I believe are biased toward a lower cobble percentage than may really exist) the COE, I believe, attempted to provide an interpretation in their final decision that was consistent with those test results.

- In my mind, and I believe consistent with ASTM's intention, "few" as used by ASTM is intended to apply to gravel, sand and finer material and should not be extended to include the oversized material. When referring to "few" with respect to oversized material (>3"), I believe "few" would refer to a number (count) and would require a rough conversion to provide a percentage in conventional terms (a percentage by dry weight). In this regard, I would agree with Mr. Heeter that "few" refers to "not many".

- Sand and gravel are terms that are understood as plural as "sand" or "gravel" are used in the test pit logs and boring logs in the CDs. However, when referring to cobbles or boulders, the plural form is always used unless a single "cobble" or "boulder" is referred to.

- "Few" is, however, a relative term. When one thinks of a "few" marbles say, I believe one might think of less than a dozen. If one put 20 marbles in a sand box, one would probably think of them as a "few." A hundred marbles in the same sand box, although a small percentage by weight, might be thought of as "numerous."

For visualization, I have included a breakdown of the number of "cobbles" of varying size that would be included in a cubic yard of material, assuming all of the cobbles were of one size, 3", 6", 9" or 12". I estimated that the dry unit weight of a cubic yard of granular soil material might weigh 3,000 pounds (dry unit weight of 111 pcf (pounds per cubic foot)). Then assuming the cobbles are all spherical with a unit weight of 150 pcf, the following results are found.

- 1 three inch diameter cobble weighs 1.2 pounds;
- 1 six inch diameter cobble weighs 9.8 pounds;
- 1 nine inch diameter cobble weights 33.1 pounds; and
- 1 twelve inch diameter cobble weighs 78.5 pounds

Further, I estimated that a test pit is on the order of 10' long by 2' wide, making each 1.5 foot of depth approximately equal to 1 cubic yard of material. A nine foot deep test pit would then equal about 6 cubic yards.

Then for 0.25% cobbles by weight there would be 7.5 pounds of cobbles per cubic yard, or:

| | | |
|---|---|---|
| 6-3 inch cobbles per yard | or | 36-3" cobbles per 9' deep test pit |
| 0.75-6 inch cobbles/yard | or | 5-6" cobbles per 9'deep test pit |
| 0.23-9 inch cobbles/yard | or | 1-9" cobble per 9'deep test pit |

| | | |
|---|---|---|
| 0.10-12 inch cobbles | or | <1-12 cobble per 9' deep test pit |

In my mind, the above would all be considered "few".

Then for 1.0% cobbles by weight there would be 30 pounds of cobbles per yard, or:

| | | |
|---|---|---|
| 25-3 inch cobbles per yard | or | 150-3" cobbles per 9' deep test pit |
| 3-6 inch cobbles per yard | or | 18-6" cobbles per 9' deep test pit |
| 1-9 inch cobbles per yard | or | 6-9" cobbles per 9' deep test pit |
| 0.3-12 inch cobbles per yard | or | 2-12" cobbles per 9' deep test pit |

In my mind, the 6", 9", and 12" cobbles would all qualify as "few", but the 150-3 inch cobbles per test pit does not.

Then for 5% cobbles by weight (the lower limit of "few" as indicated by the COE) there would be 150 pounds of cobbles per yard, or:

| | | |
|---|---|---|
| 125-3 inch cobbles per yard | or | 750 cobbles per 9' deep test pit |
| 15-6 inch cobbles per yard | or | 90 cobbles per 9' deep test pit |
| 5-9 inch cobbles per yard | or | 30 cobbles per 9' deep test pit |
| 2-12 inch cobbles per yard | or | 12 cobbles per 9' deep test pit |

In my mind, the 9" and 12" cobble count would probably qualify as "few" but the 750 per test pit and 90 per test pit for the 3" and 6" cobbles do not.

Then for 10% cobbles (the upper limit of "few" per the COE definition) there would be 300 pounds of cobbles per yard, or:

| | | |
|---|---|---|
| 250-3" cobbles/yard | or | 1500 per 9'deep test pit |
| 30-6" cobbles/yard | or | 180 per 9' deep test pit |
| 10-9" cobbles/yard | or | 60 per 9' deep test pit |
| 4-12" cobbles/yard | or | 24 per 9' deep test pit |

In my mind, the 12" size count per test pit would probably qualify as "few" (although 12" is also the minimum size for a boulder). The 9" size at 60 would not qualify as "few", particularly since it would equate to over ½ cubic yard of cobbles. Certainly, the 6" and 3" count at 180 and 1500, respectively, (the most common size per COE) would not qualify as "few" in my mind.

Based on this exercise, it is hard for me to believe that the bidder, or even the test pit logger, would have considered a cobble count for 3"-6" size cobbles (COE stated the cobbles were generally <6") on the order of 90 to 1500 cobbles per test pit to be "few." Yet, If Mr. Wilson indeed observed 5-10% cobbles in the test pit samples, as he has testified, then he must have observed cobbles in this range of numbers, an observation he inaccurately chose to report as "few." This is the percentage range, however, within which most of the COE results of their July

2001 bulk sampling and testing of the dredged spoil stockpile fell, even though I consider that sampling and testing to be biased in their favor.

This leads me to the conclusion that the COE, either inadvertently or knowingly, mislead the bidder into thinking that the percentage of cobbles was much less than the 5%-10% that they now claim was their assessment of conditions at bid time. Further, I am of the opinion that the Red Samm's interpretation of "few" as 0.25% may have been low, but that 1% certainly would be a reasonable interpretation. Further, I believe that the reported percentage of cobbles determined from the COE sampling of the stockpile of dredged materials alone (even though I consider it to be biased on the low side) demonstrates a DSC relative to the conditions represented in the CDs and that the actual percent cobbles significantly impacted the contractor's cost and time to perform the work.

Further, in my opinion, the COE's decision to perform minimal site investigation for a project of this size and nature, for whatever reason, must have included a willingness to accept the increased risk of encountering a DSC. A more extensive bulk sampling and testing program at the pre-bid stage, combined with greater disclosure in the CDs and stricter adherence to accepted ASTM standards could have avoided this DSC claim.

By *Peter M Douglass*

PETER M. DOUGLASS, P.E.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, a Connecticut corporation<br><br>v.<br><br>THE UNITED STATES | NO. 04-487<br><br>(J. Block) |

**DECLARATION OF JORDAN I. ISAIOU**

I, **JORDAN I. ISAIOU**, make the following declaration in accordance with 28 USC § 1746. I am aware that this declaration will be used in the United States Court of Federal Claims and that this declaration is the legal equivalent of a statement under oath.

1. I am a registered professional civil engineer licensed in the State of Washington. I am an associate of the R. Brown Consulting Group, LLC and performed engineering analyses and other evaluations of the DeGroot DOP dredge pump and system employed by Red Samm Construction, Inc. on the King Cove Harbor Improvements Project. I have spent the majority of my career as an executive with construction companies specializing in heavy civil and marine construction projects and have been involved in 50 to



**SCHIFFRIN OLSON SCHLEMLEIN & HOPKINS, P.L.L.C.**
1601 Fifth Avenue, Suite 2500
Seattle WA 98101
(206) 448-8100 Fax (206) 448-8514

100 dredging projects over the course of my career. My work product and findings were included in the December 7, 2005 report prepared by R. Brown Consulting Group, LLC for this case. My resume as included in that report is attached as Ex. A.

2. A summary of my opinions, as reflected in that report and testified to in my depositions, are as follows:

a. I found that US Army Corps of Engineers researchers had favorably reviewed the DeGroot DOP pump and system in an April 2000 publication and had identified it as one of eleven promising technologies selected out of ninety-one considered that were "identified as having a high potential for increasing efficiency of productivity of the dredging operation…" An accurate copy of the pertinent portions of that research report is attached as Ex. B.

b. I performed a detailed engineering analysis on the DeGroot DOP dredge pump and system that concluded the equipment was capable of producing approximately 300 cubic yards per hour in material as anticipated by Red Samm. These results were consistent with the results of a computerized dredging program run by DeGroot in Holland

c. On two days the Corps' on site inspector and a representative of the manufacturer onsite for the initial stages of the work, observed production quantities close to 300 cubic yards per hour achieved in material which did not have excessive cobbles, observations which are consistent with my calculations.

d. Red Samm's initial operation with the dredge pump suspended by the crane and the use of a backhoe to simulate the action of the cutterhead were exploratory in nature and did not reflect Red Samm's plan for the entire dredging of the project. These exploratory efforts were employed to determine whether significant areas without excessive cobbles could



SCHIFFRIN OLSON SCHLEMLEIN & HOPKINS, P.L.L.C.
1601 Fifth Avenue, Suite 2500
Seattle WA 98101
(206) 448-8100 Fax (206) 448-8514

be located; and to determine if the installation of the cutter head ( present on site) would make the use of the DOP dredge for the excavation feasible, without actually spending the time to mount the cutterhead.

e. DeGroot designed the DOP pump to be capable of mounting on the boom of a backhoe. Such a mounting would have provided a rigid structure for the pump and simulated the function of a traditional "ladder." I analyzed Red Samm's onsite equipment and barge and verified that it could have employed the DOP pump in this fashion and reached approximately 95% of the project area to be dredged.

f. Use by Red Samm of the cutterhead for the unit, which it had onsite, would not have alleviated the problems posed by the cobbles. In my experience, a cutterhead will not prevent cobbles from being taken into the dredge intake and in many circumstances will exacerbate the problems posed by excessive cobbles.

g. I have reviewed Roger Brown's analysis and comparison of the productivities achieved by Red Samm with the DOP pump and Newhalem Dredging, a subcontractor to Western Marine, who in the third season hydraulically dredged approximately 55,000 cubic yards of material with a conventional 12 inch cutterhead pipeline dredge. That analysis demonstrates Newhalem achieved no meaningfully better productivity at the site with its equipment than did Red Samm. This fact further confirms my view that fundamental problem with Red Samm's hydraulic dredging operation was not the nature of this equipment or the mode of its operation, but the excessive cobbles encountered in the material.



SCHIFFRIN OLSON SCHLEMLEIN & HOPKINS, P.L.L.C.
1601 Fifth Avenue, Suite 2500
Seattle WA 98101
(206) 448-8100 Fax (206) 448-8514

I have read the foregoing declaration and I certify under penalty of perjury that it is true and correct.

Executed at Vancouver, WA., this 21st day of April, 2006.

Jordan I. Isaiou

JORDAN I ISAIOU



SCHIFFRIN OLSON SCHLEMLEIN & HOPKINS, P.L.L.C.
1601 Fifth Avenue, Suite 2500

## PROFESSIONAL EXPERIENCE

*CONSTRUCTION ASSOCIATE* **2003-Present**
**Roger Brown Consulting Group LLC,** Portland, OR

- Engineering and construction management firm serving clients throughout the United States
- Consulting services to Contractors and Owners in preparation and/or defending of claims
- Provide on-site management and inspection services of construction projects for Sureties due to contractor defaults
- Provide technical expertise specifically regarding foundations, grouting, earthwork, and mass concrete

*ENGINEERING AND CONSTRUCTION CONSULTANT* **1995-2002**
**Self-Employed**

- Private consultant to the engineering, construction and legal professions
- Provide expertise regarding all types of piling, foundations, heavy civil work (marine and land), drilling, grouting, estimating, scheduling, claim preparation and review

*EXECUTIVE VICE PRESIDENT / U.S. MANAGER* **1992-1994**
**Graymar Construction Limited**

- Started a US Company for Fraser River Pile & Dredge of Vancouver, B.C., Canada
- Procurement and management of heavy civil and marine construction projects

*VICE PRESIDENT / VARIOUS POSITIONS* **1970-1992**
**Reidel International,** Portland, OR

- Held positions as chief engineer, project superintendent, project manager and vice president
- Involved with hundreds of projects of various types including construction of the Valdez Oil Terminal, installation of piles at Prudhoe Bay, Alaska, prototype sludge drying facility, installation of submarine fiber optic cable, cleanup of the Exxon Valdez oil spill, installation of deep wells at Trident Submarine Facility
- As manager of Riedel division offices and president of a Canadian subsidiary company, oversaw marketing and operations for performing heavy marine, civil and dredging work both hydraulic and clamshell
- Responsible for work in various parts of the world including the Middle East, Asia, South and Central America

EXHIBIT A

*VICE PRESIDENT / VARIOUS POSITIONS* **1956-1969**
**Prepakt Concrete Company,** Cleveland, OH

- Started a site investigation and drilling company in Hong Kong
- Estimated numerous piling jobs, based on soils information, specialized concrete work, drilling and grouting jobs, and was responsible for hundreds of contracts
- Started the auger cast piling business in the Western U.S. and in the Far East, Hong Kong, Thailand, Philippine Isles, and Macao
- Helped form a joint venture company with Theiss Brothers and Hume Pipe in Australia.
- Started the second tied back construction system in the Western U.S. Designed, bid and was responsible for the successful performance of the contracts
- Prepared claims, negotiated change orders, and assisted with litigation when it became necessary

## MILITARY EXPERIENCE **1953-1956**

**US Navy Lieutenant, J.G. – Civil Engineers Corps**

- Company Commander - Earth moving and road building company -Mobile Construction Battalion 2
- Cubi Point Naval Air Base, Subic Bay; Philippine Islands. Responsible for all excavation work – rock and soil, as well as, the construction of fills for roads and buildings.
- Assistant Resident Officer In Charge of Construction - US Naval Base, Newport, Rhode Island
- US Navy Representative on construction of docks and structures at the Naval Base

**Military Schools Attended**

- School of Naval Justice
- Heavy Equipment Operators School
- Instructors School

## EDUCATION

1953 **Rensselaer Polytechnic Institute** Troy, New York
*Bachelor of Science, Civil Engineering*

## LICENSES AND ASSOCIATIONS

Professional Engineer's License - Washington State #13430
Member of The American Arbitration Association
Member of the Committee to Standardize Auger Cast Piling Specifications in the United States

ERDC TR-DOER-5
April 2000

US Army Corps
of Engineers®
Engineer Research and
Development Center

*Dredging Operations and Environmental Research Program*

# Innovations in Dredging Technology: Equipment, Operations, and Management

*by T. Neil McLellan, Robert J. Hopman
Hartman Consulting Corporation*

Approved For Public Release; Distribution Is Unlimited

Prepared for Headquarters, U.S. Army Corps of Engineers

EXHIBIT B

Dredging Operations and
Environmental Research Program

ERDC TR-DOER-5
April 200

# Innovations in Dredging Technology: Equipment, Operations, and Management

by T. Neil McLellan, Robert J. Hopman

Hartman Consulting Corporation
10900 NE 8th Street, Suite 1300
Bellevue, WA 98004

Final report

Approved for public release; distribution is unlimited

Prepared for U.S. Army Corps of Engineers
Washington, DC 20314-1000

Under Work Unit: 33092, Demonstration of Innovative Dredging Technologies

Monitored by Environmental Laboratory
U.S. Army Engineer Research and Development Center
3909 Halls Ferry Road, Vicksburg, MS 39180-6199