IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, a Connecticut corporation,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 04-487C<br>(Judge Block) |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S**
**<u>PROPOSED FINDING OF UNDISPUTED FACTS</u>**

In accordance with Rule 56(h)(2) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully submits the following response to plaintiff's additional proposed findings of uncontroverted facts, dated May 5, 2006.

34. An existing eleven acre small boat harbor had been constructed by the Corps in King Cove, Alaska in 1973 and 1974. Pl. App. 185. In 1986, the City of King Cove constructed a causeway immediately to the south of the existing boat harbor to serve as a ferry dock. Pl. App. 187, 191.[1]

<u>Response</u>: Agrees.

35. In 1995 and 1996, the Alaska District of the US Army Corps of Engineers ("Corps") conducted investigations and feasibility studies of three potential sites for a new boat harbor in King Cove, Alaska. Pl. App. 8,9, 17, 182-206. The site identified as "Alternative 2" was located to the south of the existing causeway. Pl. App. 187. In 1996, the Corps recognized

[1] "Pl. App. __," as used by plaintiff, refers to a page of the appendix following Travelers' Proposed Findings Of Uncontroverted Facts, filed earlier in this case.

the need to conduct subsurface explorations at the Alternative 2 site to gain an understanding of the nature of subsurface materials in order to determine the likely method of dredging. Pl. App. 8-11. The Alternative 2 site was ultimately selected for the project. Pl. App. 20, 86-87.

Response: Agrees.

36. Charles Wilson acquired a Masters of Science and Geotechnical Engineering Degree in 1982 and began work with the Corps in 1986. Pl. App. 2-3. In 1996, Mr. Wilson was a geotechnical project engineer for the Corps and assigned to the King Cove project team. Pl. App. 4-6. Mr. Wilson was the primary source of information for Corps' project team members in regard to soils, geology or subsurface conditions at the project. Pl. App. 7.

Response: Agrees.

37. The Corps recognized that any contractor performing the work on the project must make a fundamental decision as to whether the dredging work would be accomplished with a hydraulic or clamshell dredging operation. Pl. App. 21, 118-119, 134. The Corps further recognized that a key factor in making such a decision was the nature of the material to be dredged and that material which was too coarse or too large was not suitable for hydraulic dredging. Pl. App. 21-22, 118-119, 134-135, 137.

Response: Disagrees. This proposed finding implies that the determination of using a clamshell dredger or hydraulic dredger was an either/or proposition, when, in fact, one could use both, as Red Samm ultimately did. See PPFUF 86.[2]

38. In the summer of 1996, Mr. Wilson conducted subsurface explorations at the

[2]"PPFUF__" refers to a paragraph of Plaintiff's Proposed Findings of Uncontroverted Fact.

project site which consisted of excavation of five test pits with a backhoe. The purpose of these test pit explorations was to explore for bedrock and evaluate subsurface conditions in regard to dredging. Pl. App. 27-28.

Response: Agrees.

39. Mr. Wilson reported the results of the test pit explorations performed by him at the project site in 1996 with the following documents: Pl. App. 27-28, 193-206.

a. A two page narrative report titled “Trip Report for the Small Boat Harbor Improvement – South Expansion, King Cove, Alaska, July 1996”; Pl. App. 193-194, 273-274.

b. A test pit location map. Pl. App. 195, 281.

c. Five test pit logs Pl. App. 196-200, 276-280; and

d. A selection of photographs. Pl. App. 202-206, 282-283.

Of this information, only the test pit logs were included or referenced in the contract documents. Pl. App. 81-83, 211-237.

Response: Agrees.

40. In April 1997, the Corps project team compiled a document titled “Navigation Improvements Detailed Project Report and Environmental Assessment – King Cove, Alaska. (“Detailed Project Report”) Pl. App. 182. The Detailed Project Report represented the summary and written reporting of the investigation and analysis performed by Corps in regard to the project as of April 1997. Pl. App. 17. Included as Appendix C to the Detailed Project Report under the title “Geotechnical Report” were the test pit logs and other documentation prepared by Mr. Wilson as a result of the test pit explorations performed for him at the project site in 1996. Pl. App. 17-19.

Response: Agrees.

41. The Detailed Project Report at page 27 reflected the Corps' interpretation of the test pit logs to "indicate easily dredgable material." Pl. App. 88-89, 189. A cost estimate for the Alternative 2 site contained in the Detailed Project Report described the material to be dredged as "sand." Pl. App. 188. The Detailed Project Report at page EA-6 reflected the expectation of the Corps that a hydraulic dredging operation "would most likely be used" in the form of a cutterhead dredge. Pl. App. 190.

Response: Agrees

42. A cost estimate prepared by Corps' cost estimator, Frank Antolin, dated May 5, 1997 for the Alternative 2 site reflected the Corps' interpretation of the test pit logs as indicating "that the dredging material is sand, gravel, and some boulders." Pl. App. 207-208. Mr. Antolin's estimate assumed the dredging would be performed by a hydraulic, cutterhead pipeline operation. Id.

Response: Agrees.

43. Alan Jeffries, the Corps' hydraulic designer for the project, who was responsible for compiling the plans and specifications, interpreted the results of the Corps' geotechnical investigations at the project site to indicate "that the material to be dredged is sand and gravel ." Pl. App. 88-89, 92-93.

Response: Disagrees. Mr. Jeffries merely testified that the quoted excerpt from a facsimile "probably" reflected his "understanding" of the report. Pl. App. 93.

44. ASTM 2488 is titled "Standard Practice for Description and Identification of

Soils (Visual-Manual Procedure)" (Pl. App. 239) and contains the following requirements among others:

a. Where ASTM 2488 procedures are used such fact "must be clearly stated" in the report. (Paragraph 1.2) Id.

b. If the maximum particle size found in a soil sample is a cobble or boulder "describe the maximum dimension of the largest particle." (Paragraph 10.11.3) Pl. App. 243.

c. "Estimate and note the percentage of cobbles and the percentage of boulders. Performed visually, these estimates will be on the basis of volume percentage." (Paragraph 12.2) Pl. App. 244.

d. "[I]t is recommended the report state the percentages of cobbles and boulders are by volume" (Note 8, p. 6) Id.

e. "If the field sample contains any cobbles or boulders, or both, the words 'with cobbles' or 'with cobbles and boulders' shall be added to the group name." (Paragraph 15.7) Pl. App. 246.

f. "The report shall include information as to origin, and the items indicated in Table 13." (Paragraph 16.1) Id. Table 13 on page 8 contains a check list of information to be included in any report provided pursuant to ASTM 2488. Id.

Response: Disagrees. Although ASTM 2488 includes the aforementioned procedures, they are not "required." To the contrary, the document states that, "Not all aspects of this practice may be applicable in all circumstances. This ASTM standard is not intended to represent or replace the standard of care by which the adequacy of a given professional

service must be judged, nor should this document be applied without consideration of a project's many unique aspects. The word "Standard" in the title of this document means only that the document has been approved through the ASTM consensus process." Pl. App. 239, note 1.6.

45. ASTM 2488 provides for an optional, specialized nomenclature to describe the percentages of gravel, sand, and fines in any sample as follows: Id.

Note 15 – If desired, the percentages of gravel, sand, and fines may be stated in terms indicating a range of percentages, as follows:

*Trace* - Particles are present but estimated to be less than 5%

*Few* - 5 to 10%

*Little* – 15 to 25%

*Some* – 30 to 45%

*Mostly* – 50 to 100%

ASTM 2488 does not provide for any other use of the term "few." Pl. App. 71, 239-249.

Response: Agrees.

46. Mr. Wilson admits ASTM 2488 does not provide for use of the term "few" to describe the percentage of cobbles observed in a test pit. Pl. App. 71.

Response: Disagrees. Mr. Wilson's testimony cited merely stated that note 15 of the ASTM did not refer to cobbles. Moreover, the ASTM includes an example in which another adjectival descriptor,

"trace," is used to describe a percentage of boulders, an "oversized" material, like cobbles. See App. 42, para X1.1.5.[3]

47. In excavating Test Pit 1, Mr. Wilson observed that cobbles comprised 5 to 10% of the test pit excavation, but chose to use the term "few" to describe such observations in the test pit log. Pl. App. 37-41. Mr. Wilson made no measurement of the largest cobble or boulder found within the Test Pit 1 excavation. Id. The term "Refusal" as used in the test pit log meant that the excavation was caving in as fast as the hole could be dug. Pl. App. 38.

Response: Generally agrees, except that the use of the word, "but," in the first sentence incorrectly implies that the description was inconsistent with Mr. Wilson's observations, which is not a statement of fact.

48. Mr. Wilson observed that cobbles comprised in excess of 5% of the Test Pit 2 excavation, but chose to use the term "with cobbles" to describe such observation in the Test Pit 2 log. Pl. App. 42-43. The notations "Easy digging" and "Sidewalls Caving - Refusal" in the Test Pit 2 log meant very loose, unconsolidated material which kept caving in. Pl. App. 43-44.

Response: Generally agrees, with the same caveats regarding the use of the word, "but" expressed in response to PPFUF 48 above.

49. Mr. Wilson observed that the upper one foot of Test Pit 3 was composed almost exclusively of gravel and cobbles and used the term "gravel and cobbles" to

[3] "App.__" refers to a page of the appendix which followed our originally-filed Proposed Findings Of Uncontroverted Facts.

describe such fact in the Test Pit 3 log. Pl. App. 44-45. Mr. Wilson had no percentage of cobbles in mind as he made such observation. Id. Test Pit 3 was fairly far removed from the actual dredge area and of little value in determining the nature of the subsurface materials to be dredged. Pl. App. 45-46.

Response: Agrees except that the last sentence of this proposed finding merely reflects Mr. Wilson's opinion regarding the value of Test Pit 3 in determining the subsurface materials to be dredged and Mr. Wilson's opinion upon the matter is not necessarily admissible evidence.

50. Mr. Wilson observed gravel and cobbles in the upper one foot of Test Pit 4 and gravels exclusively thereafter. Pl. App. 46-47. He observed no cobbles in Test Pit 4 below the one foot depth. Id.

Response: Agrees.

51. Mr. Wilson observed that cobbles comprised 5 to 10% of the Test Pit 5 excavation below the first foot of depth, but chose to use the term "Gravel w/ few cobbles" to describe such observation in the Test Pit 5 log. Pl. App.48-49.

Response: Agrees, with the same caveats relating to the use of the word, "but," as indicated in our responses to PPFUFs 47 and 48.

52. Mr. Wilson acknowledges that he did not "precisely" follow ASTM 2488 and that he "could have been more descriptive." Pl. App. 50-52 While Mr. Wilson used certain suggested definitions from ASTM 2488 he did not follow all its procedures. Id., Pl. App. 61-70. Mr. Wilson admits that:

a. Nothing in the test pit logs indicated ASTM 2488 was being employed. Pl. App. 52;

b. None of the test pit logs provided numerical estimates of the percentage of cobbles observed in the sample. Pl. App. 49-50.

c. None of the test pit logs contained a description or measurement of the largest cobble or boulder found in the sample. Id.

d. None of the items identified on the Table 13 check list under Paragraph 16 of ASTM 2488 were included in the test pit logs, with the exception of group symbols for Test Pits 1 and 5 and a description of particle angularity in Test Pit 4. Pl. App. 70.

Response: Agrees.

53. Mr. Wilson's overall determination was that "there were significant cobbles and boulders present within the subsurface conditions." He intended his two page narrative report to convey such fact and expected it would be provided to the contractor. Pl. App. 56-58. However, Mr. Wilson's narrative report was neither included, nor referenced, in the contract documents. Pl. App. 83. Alan Jeffries consulted with Mr. Wilson regarding the information to include in the contract documents and would have included the report had he been requested to do so. Pl. App. 83-84, 150.

Response: Disagrees. Mr. Wilson expected that his two-page report would be available to any "prudent contractor" which requested it, not that it would be included in the contract specifications as suggested here. Pl. App. 57.

54. Notations in four of the five test pits of "Easy digging" and "Sidewalls Caving" were an indication of relatively loose soil according to Mr. Wilson, who agrees it would be reasonable for the contractor to so interpret such information. Pl. App. 16.

Response: Agrees.

55. Test Pit 3 was located at an elevation of +8 and within 100 feet of a bedrock outcropping. Pl. App. 30-31, 209-210, 218. Test Pits 2 and 4 were at elevations of +1 and +4, respectively, and located within the tidal zone. Pl. App. 209-210, 217, 219. Test Pits 1 and 5 were located furthest to the east in the tide flats at elevations of -1. Pl. App. 32, 34-35, 209-210, 216, 220. Test Pit 5 was located within the actual dredge area. Pl. App. 34-35. Test Pit 1 was approximately 20 feet outside of the dredge limits. Id. A reasonable geological interpretation of the area and the test pits was that cobbles and boulders found on the surface in the upper portion of the tidal zone were the product of rocks from the bedrock outcropping, subjected to the tidal action overtime. Pl. App. 32-33, 180A-180B. Fewer cobbles would be expected in the lower tidal zone and actual dredge area, as demonstrated by the indications of "few" cobbles in Test Pits 1 and 5. Id.

Response: Agrees to the description of the test pit locations. The remainder is an exaggeration of the deposition testimony cited. Mr. Wilson only agrees that the bedrock could be "one source" of the cobbles.

56. Visual observations of cobbles on the surface of the tidal zone are not a reliable indicator of the extent of cobbles below the surface. Pl. App. 53-54, 345. Defendant's geotechnical expert, Charles Riddle, agrees. Pl. App. 154. Test Pit 4

illustrates this proposition, while cobbles were indicated in the first one foot of depth, none were found thereafter. Pl. App. 53-54, 219.

Response: Agrees generally, but notes that, whether Test Pit 4 reflects this proposition is speculative.

57. In the opinion of Red Samm's geotechnical expert, Peter Douglass, very little coarse material was visible on the surface of the dredge area. Pl. App. 181. The Corps' project manager, Lynden Belin, agrees that the visible surface was mostly sand. Pl. App. 123. Charles Riddle agrees the contractor should have relied on the more specific test pit data; rather than visual observations of the surface. Pl. App. 155.

Reponse: Disagrees. In the deposition testimony cited, Mr. Douglass was describing his interpretation of unspecified photographs, not his personal observation of the project area. Mr. Belin also noted in the referenced deposition testimony that "some rocks" were visible. Finally, in his referenced testimony, Mr. Riddle did not state that the contractor should not rely upon surface indications.

58. The Corps agrees that : (1) knowledge of the subsurface conditions was not necessary for Red Samm to construct the breakwater; (2) the only reason for the inclusion of subsurface information within the contract documents was to provide Red Samm appropriate information to select the method and type of equipment to perform the dredging; and (3) the Corps expected Red Samm to rely upon the contract subsurface data in making a decision as to the type of dredge equipment to employ. Pl. App. 118-119, 144, 297.

Response: Agrees.

59. During review of draft plans and specifications for the project, Mr. Wilson's superior, Jerry Raychel, requested that soil borings conducted in 1985 for the City of King Cove's construction of the causeway be included in the contract documents. Pl. App. 12-14. Mr. Raychel believed the soil borings provided useful information and it would be wise to include them within the contract documents. Id. By including such information the Corps intended the contractor to review it and rely on it. Pl. App. 14. The Corps believed the soil borings were useful information to determine the subsurface conditions at the project site. Id. Such information would not have been included in the contract documents if the Corps believed it to be of no value or use. Id., Pl. App. 109-110.

Response: Agrees only that Mr. Raychel directed the inclusion of the soil boring data. The statements regarding Mr. Raychel's motivation for including the boreholes are based upon Mr. Wilson's description and are not as definitive as represented by plaintiff. Mr. Wilson's deposition testimony upon Mr. Raychel's direction was: "As I recall, Jerry – it was – he thought it might be useful information because it was existing information in the vicinity and he thought that it would be wise to include it in the package." Pl. App. 13-14. The remaining statements upon the motivation were speculative. Id.

60. Four soil boring logs were also included in Appendix A to technical specification 02222 of the contract documents. Pl. App. 221-237. The soil borings were located in the northeastern portion of the project area and outside of the actual dredge limits. Pl. App. 293. Dredging was required to an elevation of -17. The government's geotechnical expert, Charles Riddle, agrees with Red Samm that none of the soil borings indicated cobbles at or above such elevations. Pl. App. 156, 302.

Response: Agrees, except that Mr. Riddle's report indicates that the borings were not a suitable method for identifying cobbles. Supp. App. 5.[4]

61. The government intended Red Samm to rely upon the subsurface soils data found in Appendix A of technical specification 02222 in both bidding and performing the work on the project. Pl. App. 297.

Response: Agrees.

62. Red Samm inspected the site prior to its bid. Pl. App. 165-167. Red Samm also reviewed the test pit logs and soil boring logs contained in Appendix A of technical specification 02222 of the contract documents prior to submitting its bid. Pl. App. 300. American Construction provided a quote to Red Samm to perform the dredging work prior to bid. Id., Pl. App.369-372. American reviewed and relied on the test pit logs and soil boring logs in preparing its quote. Pl. App. 369-370. Red Samm incorporated American's quote in its bid and estimate. Pl. App. 300.

Response: Agrees, but notes that the level of both Red Samm's and American's "review" of the specifications is unspecified.

[4] "Supp. App. __" refers to a page of the Supplemental Appendix attached to this filing.

Moreover, the declaration stating that American "relied" upon the specifications does not state what portions of the specifications were relied upon and what conclusions were drawn from them.

63. The Corps' letter of December 20, 2000 reflected its intention and belief that the contract subsurface data was "sufficiently representative to determine the consistency of the material to be dredged." Pl. App. 120-121, 264.

Response: Agrees.

64. The Corps' project manager, Lyden Belin, agrees that the technical specification 02222 was reasonably understood by Red Samm as representing that the subsurface data contained in Appendix A to the specification indicated the nature of the material to be dredged at the project site. Pl. App. 121.

Response: Disagrees. The cited deposition testimony by Mr. Belin did not include his agreement about what Red Samm "reasonably understood."

65. Technical specification section 02222 and the test pit logs and soil boring logs found in Appendix A of that specification section are reproduced in their entirety at pages 216 to 237 of Pl. App. Specification section 02222 represented the test pit logs and soil boring logs as "for the area to be dredged." Appendix A described such information as "Subsurface Conditions." Id.

Response: Agrees.

66. During the feasibility and design stages of the project and thereafter, the Corps' local sponsor, state agencies, and the City of King Cove all expressed a strong

desire for upland disposal of the dredge spoils so as to allow reuse of the material. Pl. App. 90, 101.

Response: Agrees

67. The City of King Cove approached Red Samm after award of the contract and requested Red Samm evaluate the possibility of upland disposal of the dredge material, provided the City of King Cove could arrange for a suitable upland disposal site. Pl. App. 301-304. During construction of the breakwater in 1999, Red Samm evaluated the feasibility of a hydraulic dredging operation to accomplish the dredging work. Id. In making that determination, David Heeter of Red Samm reviewed and relied upon the test pit and soil boring logs provided in the contract documents. Id. In interpreting the term "few" as used in the test pit logs, Mr. Heeter understood it to have an ordinary, dictionary meaning of "small, little, not many, small number." Pl. App. 170-171, 302. Applying such definition to a reasonably assumed volume of the test pit, Red Samm reasonably concluded that the term "few," as used in the test pit logs, indicated less than 1% cobbles within the test pit sample. Id. Mr. Heeter also reviewed and relied upon the soil boring logs which indicated no cobbles within the required dredging depth, as well as the indications in four of the test pits of loose, unconsolidated soil. Pl. App. 302.

Response: Agrees regarding the first sentence. Disagrees that Mr. Heeter relied upon the data included in the contract documents because he does not specify what he actually did. Travelers' implication that Mr. Heeter's calculation was performed prior to the use of the

hydraulic dredging is not necessarily demonstrated by the cited declaration, which is consistent with the calculation having been made at or near the time that Red Samm was asserting a differing site condition. Moreover, there is no factual basis provided to prove that the calculation was "reasonable."

68. In the opinion of plaintiff's experts, Mr. Brown and Mr. Douglass, Red Samm's interpretation of the contract subsurface data was reasonable. Pl. App. 319-320, 351.

Response: Agrees that plaintiff's experts have so testified.

69. The Golder Geophysical Report did not identify cobbles. Pl. App. 309-310, 330-331. The only meaningful information provided by the Golder Report was location of bedrock. Pl. App. 331. The location of bedrock, as determined by Golder, was also provided through contour lines added to the plans included with the contract documents. Id. Sheet H-3, "Site Plan," of the plans included in the contract documents for the project depicted the contours of the bedrock in the southwest portion of the site and contained a note which stated in relevant part as follows:

> Geophysical exploration conducted by Golder Associates, October 1997. Top of bedrock contours were interpreted as shown in the southwest corner of the mooring basin…"

Pl. App. 293.

Red Samm acted reasonably in not reviewing the Golder Report. Pl. App. 331.

Response: Disagrees that the Golder Report did not identify cobbles and had no meaningful information except for the location of bedrock, for it refers to cobbles existing throughout the area. DPFUF 18. Disagrees with the statement that Red Samm acted reasonably in not reviewing the Golder Report, because that is not a statement of fact. Agrees with the remainder of statements regarding the Golder Report information included in the specifications.

70. During the first construction season, Red Samm conducted supplementary test pit explorations and took samples of the material within the basin to confirm its interpretation of the contract subsurface data. Pl. App. 303.

Reponse: Agrees that Red Samm conducted supplementary test pit explorations, but disagrees that it was necessarily "to confirm its interpretation of the contract subsurface data." Mr. Heeter testified that it was done to determine cobble concentrations for himself. App. 68.

71. By October 1999, Red Samm had concluded that the subsurface material at the project site was suitable for hydraulic dredging. Pl. App. 304. Red Samm relied on the test pit logs and soil boring logs published in contract documents to make that determination. Pl. App. 301-304.

Response: Agrees that Red Samm concluded that the material was suitable for hydraulic dredging, but the facts reported in DPFUF 26 indicate

that Red Samm did not rely upon the contract documents to make this decision.

72. Red Samm also provided the test pit logs and soil boring logs from the contract documents to DeGroot engineers who considered and reviewed such information in making their recommendation to Red Samm as to the appropriate dredging equipment. Pl. App. 306-307.

Response: Disagrees. At most, Mr. Lutterback's declaration demonstrated that the logs were provided to DeGroot engineers. He does not demonstrate that he possesses any personal knowledge of what they considered.

73. Use by the Corps of the term "few" in the Test Pit 1 log to describe its observation of cobbles comprising 5 to 10% of the test pit sample was inaccurate, misleading, and did not comply with the requirements of ASTM 2488. Pl. App. 239-249, 301-304, 320-321, 351.

Response: Disagrees. These sweeping conclusions are not statements of fact, but are the subject of the legal arguments in the parties' respective motions for summary judgment.

74. Use by the Corps of the term "few" in the Test Pit 5 log to describe its observation of cobbles comprising 5 to 10% of the test pit sample was inaccurate, misleading and did not comply with the requirements of ASTM 2488. Id.

Response: Disagrees. These sweeping conclusions are not statements of fact, but are the subject of the legal arguments in the parties' respective motions for summary judgment.

75. The analysis of plaintiff's expert, Mr. Douglass, demonstrates that cobbles comprising 5 to 10% of Test Pits 1 and 5 would have resulted in cobbles of such numbers that use of the term "few" to describe them was inaccurate and misleading. Pl. App. 349-351.

Response: Mr. Douglass's mathematical analysis in the cited location is premised upon a numerical definition of "few" not included in any dictionary and which is fixed and not related to the relative size of a sample.

76. Use by the Corps of the term "with" in the Test Pit 2 log to describe its observation of cobbles comprising in excess of 5% of the test pit sample was inaccurate, misleading, and did not comply with the requirements of ASTM 2488. Pl. App. 239-249, 301-304, 320-321, 351.

Response: Disagrees. These sweeping conclusions are not statements of fact, but are the subject of the legal arguments in the parties' respective motions for summary judgment.

77. The government intended the test pit logs to accurately describe the conditions observed at the test pit locations. Pl. App. 297.

Response: Agrees.

78. Red Samm was mislead by the inaccurate information provided by the Corps in the test pit logs. Pl. App. 299-305. Had the actual percentages of cobbles observed by the Corps in the test pits been disclosed to Red Samm, the contractor would have concluded that hydraulic dredging was not feasible for the site and never attempted it. Id.

Response: Disagrees because Travelers has presented no evidence that the information provided in the test pit logs was inaccurate.

79. The percentages of cobbles observed by the Corps in the test pits was information vital to Red Samm's performance of the work. Pl. App. 239-249, 301-304, 320-321, 350-351.

Response: Disagrees. The portions of plaintiff's appendix cited do not support this conclusion.

80. The government's geotechnical expert, Charles Riddle, opines the Corps should have employed the procedures of ASTM 2488 in preparing the test pit logs. Pl. App. 159. Mr. Riddle agrees only the Corps could have provided Red Samm accurate information as to the percentage of cobbles observed by it in the test pits. Pl. App. 161. Mr. Riddle offers no opinion as to whether the Corps properly implemented the procedures of ASTM 2488 or whether the test pits logs, as prepared by the Corps, were misleading. Pl. App. 158.

Response: Agrees.

81. The Government's failure to disclose the percentages of cobbles observed in the test pits mislead Red Samm. Pl. App. 239-249, 301-304, 320-321, 350-351.

Response: Disagrees. The portions of plaintiff's appendix cited do not support this conclusion.

82. Due to the differing site condition, inaccurate or misleading information provided by the government in the test pit logs, and the government's failure to disclose the true percentage of cobbles observed in the test pits, Red Samm incurred substantial additional costs. Pl. App. 304-305, 324-327. Red Samm's Serial Letter No. 109-060 dated October 30, 2001 submitted Red Samm's request for equitable adjustment in the amount of $2,729,242.09 and its request for time extension of 335 calendar days. Pl. App. 271. An independent analysis by plaintiff's expert, Mr. Brown, using a different methodology, has determined Red Samm incurred a total of $2,459,228 of additional cost due solely to the differing site conditions and/or the government's misrepresentations in the test pit logs. Pl. App. 324-327.

Response: Agrees that Red Samm submitted the request for equitable adjustment. Disagrees with the remainder of this proposed finding because it does not constitute a statement of fact, but rests upon conclusions of law.

83. Red Samm commenced its hydraulic dredging operations on or about July 12, 2000 but soon encountered problems with excessive cobbles. Pl. App. 175-179, 304-305. Between July 13 and August 8, 2000, Red Samm explored various areas of the site attempting to locate material without excessive cobbles. Id., Pl. App. 328. While on two days Red Samm managed to find such material and achieved production of approximately 3,000 cubic yards each day (Pl. App. 115-116), continued problems with

excessive cobbles plugging the intake to Red Samm's suction dredge lead Red Samm to conclude it could not achieve sufficient productivity to meet the required completion date. Pl. App. 305. Red Samm shut down the hydraulic dredging operation on August 8, 2000. Id. At such time, Red Samm had hydraulically dredged approximately 10,000 cubic yards of material which was pumped to an upland disposal site. Pl. App. 125.

Response: Agrees, except the connotation of the phrase, "excess cobbles" is ambiguous. To the extent that "excess cobbles" refers to a concentration of cobbles which Red Samm's hydraulic dredging equipment, as configured at King Cove, was unable to handle productively, agrees.

84. The Corps agrees with Red Samm that it exhausted all avenues to achieve adequate production with its hydraulic dredging operation and its decision to abandon that operation was prudent under the circumstances. Pl. App. 126, 179.

Response: Agrees.

85. Red Samm's Serial Letter No. 109-034 dated July 18, 2000 notified the Corps that Red Samm had encountered a differing site condition. Pl. App. 257. A draft response prepared by the Corps' project engineer, Lynden Belin, stated the term "few" as used in the test pit logs was "somewhat subjective." Pl. App. 258-259. While the Corps had considerable internal discussions on the subject (Pl. App. 102-114), the final version of the Corps' response, dated August 4, 2000, deleted such statement and did not provide any explanation of the Corps' interpretation of the term "few" as used in the test pit logs. Pl. App. 112, 260-261. Red Samm responded to the Corps' August 4, 2000

correspondence with its Serial Letter No. 109-035 dated August 20, 2000, which explained Red Samm's interpretation of the contract subsurface data. Pl. App. 250-251, 303. The Corps did not respond to Red Samm's August 20, 2000 letter. Pl. App. 114, 303. In an April 2, 2003 letter, an attorney for the Aleutians East Borough, the Corps' local sponsor for the project, expressed concern that as of that date the Corps had not provided an explanation of its interpretation of the term "few" as used in the test pit logs. Pl. App. 266-268. The Corps did not provide any explanation to Red Samm of its interpretation of the term "few" as used in the test pit logs until issuance of the Contracting Officer's Decision dated November 26, 2003, which erroneously asserted that under ASTM 2488 the term "few" used in regard to cobbles meant 5-10%. Pl. App. 288, 303.

Resonse: Agrees, except that there is no evidence supporting the allegation that the assertion regarding "few" under the ASTM was "erroneous."

86. Red Samm resumed work on August 21, 2000 with a clamshell dredging operation. Pl. App. 305. On September 18, 2000 Red Samm began concurrent activities with a land based operation using an excavator and dump trucks. Id. Red Samm shut down operations in November 9, 2000 due to winter weather. Id. As of such time, Red Samm had dredged approximately one third of the total 360,000 cubic yards required under the contract. Id. As a result, a third season of work was required in 2001. Id. Red Samm employed Western Marine as a subcontractor, who commenced a clamshell dredging operation at the project site on May 9, 2001. Id. Western Marine employed

Newhalem River Dredging as a sub-subcontractor to dredge a portion of the harbor. Newhalem implemented a hydraulic dredging operation employing a 12 inch pipeline cutterhead dredge in an industry standard configuration. Pl. App. 140. Newhalem's logs indicate Newhalem dredged a total of 55,518 cubic yards over a 40 day period. Pl. App. 146, 328. Of this amount, 50,783 cubic yards were within the pay limits. Pl. App. 328. The balance of the dredging was accomplished by Western Marine with a clamshell dredge. Pl. App. 305.

Reponse: Agrees.

87. Ms. Deborah K. Reidell was the Corps' change order negotiator for the project. Pl. App. 128. Ms. Reidell had a significant role in reviewing all communications relating to Red Samm's differing site condition claim and was part of the Corps' management team strategizing on how to deal with the claim. Pl. App. 129-130. The government has also offered the opinions of Ms. Reidell as an expert in regard to dredging methods and equipment. Pl. App. 289. Ms. Reidell agrees that: (1) any contractor performing work on the project would be required to choose between a hydraulic dredging operation or a mechanical clamshell dredging operation. Pl. App. 134.; (2) such decision depends to a large degree on the nature of subsurface conditions Id.; (3) hydraulic dredging is not suitable for all conditions Pl. App.134-135.; and (4) she would expect the contractor on the King Cove project to rely on the contract soils data in making a decision as to the type of dredging equipment to be employed. Pl. App. 144.

Response: Agrees, except that Ms. Reidell did not state, in the deposition testimony cited by Travelers, that there would be an either/or

choice between mechanical and hydraulic dredging. To the contrary, her report indicated that, when Red Samm first proposed using hydraulic dredging, she considered it to be possibility that Red Samm would use both hydraulic and clamshell dredging. Pl. App. 290.

88. In October 1999, Ms. Reidell considered the King Cove site one which was suitable for hydraulic dredging. Pl. App. 136-137, 290. Ms. Reidell was not concerned at that time when she learned Red Samm intended to employ a hydraulic dredging operation at the project site. Id. Ms. Reidell considered a 12 inch pipeline cutterhead dredge in an industry standard configuration as appropriate and suitable for the King Cove project. Pl. App. 138. Such a dredge is a relatively small cutterhead dredge within the overall family of that type of equipment Pl. App. 138-139. Newhalem River Dredging employed precisely the type of hydraulic dredging equipment Ms. Reidell considered suitable for the King Cove project. Pl. App. 140. In Ms. Reidell's view Newhalem was also a highly experience hydraulic dredging contractor who operated in the most efficient fashion possible on the King Cove project. Id.

Response: Agrees, except that a more accurate description of her deposition testimony is consistent with her report, which was that the project site was not necessarily unsuitable for hydraulic dredging, with limitations, such as frequent stoppages to clean out the pipe or pump and the use of a pipeline dredge consistent with industry standard. Pl. App. 136-37; 290.

89. At her January 12, 2006 deposition, Ms. Reidell testified to the following:

a. She had not researched or reviewed Corps technical reports which favorably evaluated the DeGroot DOP dredge pump employed by Red Samm. Pl. App. 141-142.;

b. She had not reviewed any DeGroot manufacturer's literature regarding the hydraulic dredging equipment employed by Red Samm, Pl. App. 133.;

c. Her calculations of Red Samm's hydraulic dredge productivity were erroneously based on the assumption of a total of 6,000 cubic hydraulically dredged by Red Samm rather than the more accurate figure of 10,000 cubic yards as acknowledged and recognized in the Contracting Officer's Decision. Pl. App. 148A.;

d. Ms. Reidell acknowledged inconsistencies and mathematical errors in her calculation of the daily average productivity achieved by Newhalem. Pl. App. 146-149.;

e. Ms. Reidell is not qualified to perform technical calculations comparable to plaintiff's expert, Jordan Isaiou, and has no reason to question Mr. Isaiou's analysis. Pl. App. 132-133.;

f. Ms. Reidell did no calculation of the average hourly or daily production achieved by Red Samm with its hydraulic dredging operation. Pl. App. 145.;

g. Ms. Reidell was unable to comment or offer any opinion on the analysis and comparison of hydraulic dredge productivities of Red Samm and Newhalem performed by plaintiff's expert, Roger Brown. Pl. App. 150.;

h. Ms. Reidell would be required to revise her opinion as to the adequacy and implementation of Red Samm's hydraulic dredging equipment, if Red Samm achieved substantially the same productivity as Newhalem. Id.; and

i. Ms. Reidell performed no analysis and did not consider whether the Red Samm's hydraulic dredging operation was impacted by a differing site condition. Pl. App. 151-152.

Response: Agrees, except with regards to statements d and e. Regarding statement d, Ms. Reidell acknowledged that there was a difference in daily average production calculation results performed by herself and those performed by Newhalem, but did not know the cause of the differences and did not admit that it was a result of an error upon her part. Regarding statement e, Travelers' statement regarding Ms. Reidell's qualifications is overbroad: in the deposition testimony cited, Ms. Reidell merely stated that she was not qualified to replicate particular calculations regarding the DOP pump.

90. The analysis of plaintiff's expert, Roger Brown, demonstrates that Red Samm and Newhalem achieved substantially the same productivity in their hydraulic dredging operations at the project site. Pl. App. 309, 325, 328.

Response: Disagrees. The referenced analysis on page 328 of Plaintiff's Appendix reflects that the Newhalem dredge operated a larger

percentage of the time and at a higher yield during available production hours.

91. Technical experts for the Corps have favorably reviewed the DeGroot DOP dredge pump employed by Red Samm, selecting it as one of eleven out of ninety-one technologies considered which were identified as having "a high potential for increasing efficiency of productivity of the dredging operation." Pl. App. 358-368.

Response: Agrees but notes that the Corps listed the potential applications as being: "Clean harbors, channels, marinas; clean locks; clean sediments behind dams at great depths; clean impounding reservoirs; empty barges; remove silt layers; [and] remove sediments adjacent to pilings, docks, and wharves." Pl. App. 368. The dredging of a new boat harbor at King Cove does not fit any of these descriptions.

92. In the opinion of plaintiff's expert, Jordan Isaiou, Red Samm's hydraulic dredge equipment was suitable for the project site in conditions as anticipated by Red Samm and would have achieved planned productivity but for excessive cobbles. Pl. App. 352-355.

Response: Agrees, except that Mr. Isaiou has no basis for determining what conditions Red Sam anticipated.

93. Red Samm visually observed portions of the site with concentrations of cobbles between 10 and 20% during its dredging operations in 2000. Pl. App. 304. The Corps' onsite inspector, Earnie Mendenhall, agrees portions of the site contained cobble

concentrations in excess of 10%. Pl. App. 117. Gradations of samples taken by Red Samm in ten locations after commencement of its clamshelling operation in the year 2000 found cobble percentages ranging from 6.5% to 34.3%, with an average of 22%. Pl. App. 304. An analysis by plaintiff's expert, Mr. Brown, of project photos, barge logs and daily reports determined that substantial portions of the project subsurface materials were materially different than indicated in the contract documents. Pl. App. 323-324. Limited and biased sampling by the Corps in July 2001 of the stockpile of dredged materials reflects percentages of cobbles ranging from 2.3 to 8.9% Pl. App. 348.

Response: Agrees regarding the cobble percentages measured in the particular locations. Disagrees with Mr. Brown's analysis because it is predicated upon his belief that anything over five percent cobbles is a differing site condition. See Pl. App. 323. Disagrees with the characterization of the Corps' 2001 sampling of the stockpile as "biased" as it is an expression of Travelers' expert's opinion, as opposed to fact. Finally, notes that, in the opinion of Mr. Riddle, Red Samm's sample size was "grossly inadequate" for testing. Supp. App. 4.

94. On November 26, 2003, Sandra J. Davidson, the Contracting Officer, issued Findings of Fact and the Contracting Officer's Decision ("COD"), which summarized her decision at page 2 as follows:

> The Government contends the dredge material encountered by the contractor was as indicated in the contract documents and is not a differing site condition. The Government maintains that the

> contractor's difficulties and inefficiencies were solely the result of the equipment the contractor chose to use.

Pl. App. 284-286.

The Contracting Officer's Decision did not assert that the term "few" as used in the test pit logs was a patent ambiguity which required clarification by Red Samm. Id. Rather, the Contracting Officer erroneously asserted that under ASTM 2488 such term meant 5-10% when used in regard to cobbles. Pl. App. 288.

Response: Agrees, except that there is no evidence that Ms. Davidson's statement regarding "few" is erroneous.

95. The Contracting Officer's Decision also states in part as follows:

> Appendix A of TS 02222 contains exploration logs from five test pits excavated in June 1996 and drilling reports from four soil borings performed in November 1985 for a previous King Cove project. Per TS 022222-1.2, this information was representative of the area to be dredged and excavated under this contract.

Pl. App. 287A.

Response: Agrees.

96. The contract documents for the project included a standard Federal Acquisition Regulation Differing Site Condition Clause. Def. App. 21.

Response: Agrees.

97. A solicitation for the project was initially published on May 13, 1998. Pl. App. 272. Approximately four bidders submitted bids on the first round of bidding. Pl. App. 300. The project was re-advertised for bid and a second solicitation issued on October 7, 1998. Pl. App. 252-256. Six bidders submitted bids the second round of bidding. Id. The Corps never advised Red Samm that any bidder during either round of

bidding of the project had sought clarification of the term “few” as used in the test pit logs or any other terminology employed in the soils data included in the solicitation. Pl. App. 300.

Response: Agrees.

98. In the opinion of plaintiff’s experts, Roger Brown and Peter Douglass, the term “few” as used in the test pit logs was not a patent ambiguity. Pl. App. 310-311, 330.

Response: Agrees that these experts have stated these legal conclusions in the declarations that they completed for this motion.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

s/ J. Reid Prouty
J. REID PROUTY
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20005
Tel. (202) 305-7586
Fax (202) 514-7969
Attorneys for Defendant

June 5, 2006

Supplemental Appendix Index

Excerpt from deposition of Peter Douglass . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Excerpts from expert report of Charles Riddle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Excerpt from expert report of Deborah Reidell . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6