NO. 04-487
(J. Block)

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA

Plaintiff,

v.

THE UNITED STATES,

Defendants.

# PLAINTIFF'S REPLY IN SUPPORT OF ITS CROSS MOTION FOR SUMMARY JUDGMENT

James T. Hopkins
Schiffrin Olson Schlemlein & Hopkins, PLLC
1601 Fifth Ave., Suite 2500
Seattle, WA 98101
Telephone: (206) 448-8100/Fax (206) 448-8514
Email: jth@soslaw.com
Attorneys for plaintiff Travelers Casualty and Surety Co. of America

June 22, 2006

## TABLES OF CONTENTS


I. Summary of the Argument 2

II. Red Samm Reasonably Interpreted the Contract as Indicating Relatively Loose Soil, Comprised of Sand and Gravel with Few Cobbles, Which Was Suitable for Hydraulic Dredging. 4

A. The Government Misstates the Applicable Law 4

B. The Corps' Interpretation of the Contract Was Identical to That of Red Samm and Is Highly Relevant 5

C. The Soil Boring Logs Did Not Indicate Cobbles and Were Properly Considered by Red Samm. 7

D. The Terms "Few" and "With" Used in the Test Pit Logs Did Not Indicate Significant Amounts of Cobbles Were Present. 9

E. The Golder Report Did Not Indicate Significant Cobbles 10

III. Plaintiff Has Proven that Red Samm Relied on the Contract Soils Data 11

IV. The Term "Few" as Used in the Test Pit Logs Was Not a Patent Ambiguity 12

V. The Government Misrepresented the Results of Its Test Pit Explorations 15

VI. Travelers Is Entitled to Judgment on Its Superior Knowledge Claim 18

VII. Conclusion 20

## TABLE OF AUTHORITIES

**CASES** **Page(s)**

All Power, Inc. v. United States,
60 Fed.Cl. 679 (2004)....................................................**4, 6**

Crest A. Apartments, Ltd. II v. United States
52 Fed. Cl. 607 (2002)....................................................**18**

Fehlhaber Corp. v. United States,
138 Ct.Cl. 571, 151 F.Supp. 817 (1957)....................................**4**

Foster Const. C.A. & Williams Bros. Co. v. United States,
193 Ct.Cl. 587, 435 F.2d. 873 (Ct.Cl. 1970) ..............................**4, 5, 6**

L. G. Everist, Inc. v. United States,
231 Ct.Cl. 1013 (1982)....................................................**19**

Lathan Company v. United States,
20 Cl.Ct. 122, 125 (1990).................................................**6**

L. Rosenman Corp. v. United States,
182 Ct.Cl. 586, 390 F.2d. 711, 713 (1968).................................**13**

Metcalf Constr. Co. Inc. v. United States,
53 Fed. Cl. 617 (2002)....................................................**13, 14**

J.A. Terteling & Sons, Inc. v. United States,
182 Ct.Cl. 691, 390 F.2d. 926, 927 (1968).................................**16**

Potashnick v. United States,
123 Ct.Cl. 197, 105 F.Supp. 837 (1952)....................................**16**

Randa/Madison Joint Venture III v. Dahlberg,
239 F.3d 1264 (Fed.Cir. 2001).............................................**6**

Record Steel & Const., Inc. v. United States,
62 Fed.Cl. 508 (2004).....................................................**13**

Stock & Grove, Inc. v. United States,
204 Ct. Cl. 103, 493 F.2d. 629 (1974).....................................**4**

United Contractors v. United States,
177 Ct.Cl. 151, 368 F.2d. 585 (1966)......................................**4, 5, 8, 11**

U.S. v. Atlantic Dredging Co.,
253 U.S. 1, 40 S.Ct. 423, 64 L.Ed. 735 (1920).............................**16**

Wilner v. United States
24 F.3d 1397 (Fed.Cir. 1994)..............................................**6**

**TABLE OF AUTHORITIES**
**-continued-**

Woodcrest Const. Co. v. United States,
187 Ct.Cl. 249, 408 F.2d 406 (1969)......................................**4**

WPC Enterprises, Inc. v. United States,
163 Ct.Cl. 1, 323 F.2d 874 (1964)..........................................**10**

.

**BOARD OF CONTRACT APPEALS** **Page(s)**

Appeal of Bernard McMenamy Contractor, Inc.,
77-1BCA §12,335, 1976 WL 1985 (ENGBCA No. 3413). )........................**8**

Appeal of Power City Electric, Inc.,
74-1 BCA §10376, 1972 WL 1323 (I.B.C.A. 1973)....................**14**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, a Connecticut corporation<br><br>v.<br><br>THE UNITED STATES | NO. 04-487<br>(J. Block) |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS CROSS MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Travelers Casualty & Surety Company of America ("Travelers"), submits this reply in support of its cross motion for summary judgment pursuant to RCFC 7.2(c) and (e). Plaintiff respectfully requests the court enter summary judgment in its favor because there are no genuine issues of material fact which would preclude such a ruling and plaintiff is entitled to judgment as a matter of law. In addition to this reply, plaintiff relies upon its response to the government's motion for summary judgment and plaintiff's cross motion, its response to the government's Proposed Findings of Uncontroverted Fact, plaintiff's Additional Proposed Findings of Uncontroverted Fact

("PPFUF"), plaintiff's Appendix accompanying its response and cross motion, and the pleadings in this matter.

## I. SUMMARY OF THE ARGUMENT

When stripped of its verbiage, the government's response[1] is revealed as a series of inconsistent and contradictory arguments that are not supported by logic, the facts or law. Its primary purpose is to obfuscate and divert the court's attention from the key facts which establish plaintiff's right to summary judgment. These include the following:

- The Corps interpreted the contract soils data in the same manner as Red Samm -- as indicating relatively loose soils, comprised of sands and gravels, with few cobbles, which were suitable for hydraulic dredging. PPFUF 41-43.
- The contract soils data was provided by the Corps for the express purpose of providing Red Samm appropriate information to select the method and type of equipment to perform the dredging work. PPFUF 58. The government intended the contractor rely on such information in both bidding and performing the work. PPFUF 61.
- Actual subsurface conditions encountered were materially different than indicated in the contract and contained excessive cobbles. PPFUF 93. As a result, neither the hydraulic dredging equipment employed by Red Samm, nor the hydraulic equipment deemed suitable and appropriate by the Corps, was able to achieve sufficient productivity to practically or cost effectively accomplish the dredging work. PPFUF 90, 92; Pl. App. 328.

---

[1] The terms "government's response" or "Def. Response" refer to the Government's Opposition to Plaintiff's Cross Motion for Summary Judgment and Reply in Support of Its Motion for Summary Judgment.

- The term "few" employed by the Corps in the test pit logs had a common, ordinary meaning appropriately understood by Red Samm to indicate a minimal number or concentration of cobbles. PPFUF 67. During the course of the project, the Corps internally recognized the term to be "somewhat subjective" but never believed or asserted that the term was "patently ambiguous." PPFUF 85.
- The Corps failed to follow the requirements of a ASTM 2488 in preparing the test pit logs. PPFUF 52. Use by it of the term "few," to describe observations of 5 to 10% cobbles in Test Pits 1 and 5, and use of the term "with" to describe concentration of cobbles in excess of 5% in Test Pit 2, was misleading and inaccurate. The uncontroverted analysis of plaintiff's expert, Peter Douglass, demonstrates that 5 to 10% cobbles within a test pit could not possibly be described as "few." PPFUF 75.
- Red Samm relied upon, and was mislead by, the inaccurate information contained in the government's test pit logs in making its determination that the site was suitable for hydraulic dredging. PPFUF 71, 78.
- Had the government disclosed its true observations of cobble concentrations in the test pits or accurately conveyed such information in the test pit logs, Red Samm would have concluded the site was not suitable for hydraulic dredging and would have never attempted it in the first place. PPFUF 78.

As demonstrated in both plaintiff's response[2] and this reply, the undisputed material facts and applicable law lead inevitably to a finding in favor of Travelers.

[2] The terms "plaintiff's response" or "Pl. Response" refer to Plaintiff's Response to Government's Motion for Summary Judgment and Plaintiff's Cross Motion for Summary Judgment.

## II. Red Samm Reasonably Interpreted the Contract as Indicating Relatively Loose Soil, Comprised of Sand and Gravel With Few Cobbles, Which Was Suitable for Hydraulic Dredging.

### A. The Government Misstates the Applicable Law

The government's assertion that Travelers must prove an "affirmative misrepresentation" of the site conditions to prevail on its differing site condition claim is a distorted and inaccurate statement of the applicable law. Travelers need only demonstrate that, from the perspective of a "reasonable" contractor, the contract documents indicated conditions that were otherwise than actually found during contract performance. All Power, Inc. v. United States, 60 Fed.Cl. 679, 684 (2004). Such contract "indications" may be proven by "inferences and implications, which need not meet the test for a 'misrepresentation' or 'representation.'" Foster Const. C.A. & Williams Bros. Co. v. United States, 193 Ct.Cl. 587, 435 F.2d. 873, 881 (Ct.Cl. 1970). Such indications "need not be explicit or specific, but only enough to impress or lull a reasonable bidder." Stock & Grove, Inc. v. United States, 204 Ct.Cl. 103, 493 F.2d. 629, 645 (1974).

Well established authority, which the government fails to address or recognize, holds that contract data showing that certain subsurface conditions or materials are not present, is an "indication" such conditions will not be found. United Contractors v. United States, 177 Ct.Cl. 151, 368 F.2d. 585 (1966); Woodcrest Const. Co. v. United States, 187 Ct.Cl. 249, 408 F.2d 406 (1969); Fehlhaber Corp. v. United States, 138 Ct.Cl. 571, 151 F.Supp. 817 (1957).

Similarly, this court has frequently articulated the general "principles" that specific test data – test pit logs and soil boring logs – are recognized as the "most reliable

and most specific indicator" of subsurface conditions. Foster 435 F.2d at 888, quoting United Contractors, 368 F.2d at 598. As stated by the court in Foster, "[u]nder the foregoing principles, the plaintiff and the other bidders had the right to rely on the indications of the subsurface in logs put in the contract for their use and reliance." 435 F.2d. at 888. (emphasis added). The government's attempt to relegate these recognized principles to case specific findings is simply inaccurate, as is its attempt to ignore the above authority under the rubric of "affirmative misrepresentation."

B. The Corps' Interpretation of the Contract Was Identical to That of Red Samm and Is Highly Relevant.

The government admits that:

a) The Corps conducted test pit explorations and included test pit logs and soil boring logs in the contract documents for the express purpose of providing the contractor sufficient information to determine both the method of dredging and the type of dredging equipment to employ. PPFUF 38,58.

b) The Corps found such information sufficient to make its own judgments as to the nature of the subsurface materials, likely costs, and appropriate dredging methods and techniques. PPFUF 40-42.

c) The Corps interpreted the contract soils data as indicating sands and gravel that were suitable for hydraulic dredging. PPFUF 41-43.

d) The Corps specifically asserted the contract soils data was "sufficiently representative to determine the consistency of the materials to be dredged." PPFUF 63.

e) The government intended Red Samm to rely upon the contract soils data in both bidding and performing the work on the project. PPFUF 61.

These facts are not merely inconvenient for the government, they are fatal to its argument that the contract did not indicate conditions as interpreted and understood by Red Samm. Therefore, the government simply asserts, without explanation or legal support, that such facts are "irrelevant." However, their relevance is obvious. Red Samm's interpretation of the contract indications is measured on a reasonableness standard. All Power, supra; Randa/Madison Joint Venture III v. Dahlberg, 239 F.3d 1264, 1274 (Fed.Cir. 2001) The fact the very government agency that conducted the soil explorations, prepared the contract, and administered the contract work also shared Red Samm's interpretation of the contract data is highly relevant to the question of the reasonableness of that interpretation.

This court has frequently considered the interpretation of the involved government agency in determining contract indications in a differing site condition context. All Power, 60 Fed.Cl. at 686-687 (testimony of Air Force project manager as to interpretation of contract and contents of Corps' "independent estimate" for the project relevant and considered); Foster, 435 F.2d at 892 ("this testimony shows that the [government] designer understood its specifications just as plaintiff understood them…"); Lathan Company v. United States, 20 Cl.Ct. 122, 125 (1990) ("this court may weigh the [contracting officer's] findings and conclusions as it would any other evidence").

The government also misconstrues Wilner v. United States, 24 F.3d 1397 (Fed.Cir. 1994) which it cites for the proposition that the contracting officer's final decision is "irrelevant." Def. Response p. 12. To the contrary, Wilner merely held that

such decision was not binding and plaintiff's claim was reviewed *de novo*. Indeed, Wilner emphasized that nothing in its decision "should be viewed as suggesting that a contracting officer is not competent to offer testimony in a board of contract appeals hearing or in a trial in the Court of Federal Claims." 24 F.3d at 1403.

C. The Soil Boring Logs Did Not Indicate Cobbles and Were Properly Considered by Red Samm.

The chief of the Corps' geotechnical branch, Jerry Raychel, recognized the soil boring logs provided "useful information," because they constituted "existing information in the vicinity" and that it would be "wise to include" such logs in the contract documents. Pl. App. 13-14. The government intended Red Samm to rely upon the soil boring logs in both bidding and performing work on the project. PPFUF 61. The government also admits the soil boring logs were described in the contract documents as "subsurface conditions" and "for the area to be dredged." PPFUF 65. The contracting officer further asserted in her decision that the contract soil data, including the soil borings, "was representative of the area to be dredged and excavated under the contract." Pl. App. 287A.

In the face of these significant and uncontroverted facts, the government's argument is reduced to the assertions that because the soil borings were not within the specific dredge limits and, according to the government, were of limited value in specifically identifying cobbles, they should be wholly disregarded by the court in determining the contract indications as to subsurface conditions. Neither argument is persuasive or legally supportable.

First, as noted above, the borings were clearly in relatively close proximity to the dredge area and were considered of definite value by the Corps in delineating subsurface

conditions. The government admits that it intended the contractor to rely upon them in making such a judgment. Moreover, this court can assume with absolute certainty that had the information contained in the soil boring logs supported the government's position, it would be the first to trumpet their preeminence and importance. However, because they do not, the government now argues the contractor had no right to rely upon them in determining subsurface conditions, despite the government's admission that it intended the contractor to do so.

This court has rejected the government's argument on essentially identical facts. In United Contractors, 368 F.2d 585, the contract documents included 40 soil borings, 13 of which were within the specific work limits, with the other 27 nearby, but related to a different contract. In holding the borings outside the specific work area were properly considered by the contractor in concluding that the contract did not indicate undue amounts of water within the excavation limits, the court stated as follows:

> If plaintiff had any doubt about the reliability of the borings connected with its own contract…it could properly look to this related source of information. Business sense and human nature would tell contractors not to shut their eyes to relevant data of this type…United could reasonably look at all the borings furnished by the Government, including those outside its particular project area; and the import of the borings was that undue amounts of water would not be met in excavation.

368 F.2d at 596-597.

Secondly, the real issue is what did the soil borings indicate in regard to cobbles? The answer is not disputed – the borings showed no cobbles within the dredge limits. PPFUF 60. The possible limitations of the sampling technique employed with the borings to detect cobbles does not change this fact, as specifically held in another highly analogous decision. Appeal of Bernard McMenamy Contractor, Inc., 77-1BCA §12,335,

1976 WL 1985 (ENGBCA No. 3413). There the contract board found a differing site condition where excessive cobbles and boulders were encountered in the subsurface materials, which were generally indicated by the contract to contain sand with some gravel and occasional boulders. The board rejected the identical argument made by the government here, that the contractor could not rely on the soil borings, none of which showed cobbles, because of the limitations of the samplings devices used in connection with the borings. Essentially noting that the key issue was not the limitation of the sampling device, but rather what the borings indicated, the board rejected the government's argument as follows:

> We are not persuaded by this argument. Knowledge of the limitations of the sampling devices would not convey information to the bidders that substantial amounts of large material were present.

Id. at p. 6.

D. The Terms "Few" and "With" Used in the Test Pit Logs Did Not Indicate Significant Amounts of Cobbles Were Present.

The government argues that because the test pit logs did not state a specific percentage of cobbles observed, they must be deemed a complete nullity for the purposes of determining whether Red Samm encountered a differing site condition. Aside from the irony presented by the fact that disclosure of such percentages was required by ASTM 2488, a standard which the government admits it did not follow (PPFUF 52), this argument again misses the fundamental point – the test pit logs did not indicate significant cobbles. Also contrary to the government's assertions, the term "few" was quite reasonably understood by Red Samm to indicate a number, and thus a "concentration," of cobbles in the test pits. While the government disputes this

contention, it is unable to offer any bona fide reasoning or authority to support its position. Further, to the extent the term "few" is ambiguous, it is only latently so, and therefore any ambiguity in its meaning must be construed in favor of Red Samm. WPC Enterprises Inc. v. United States, 163 Ct. Cl. 1, 323 F.2d 874 (1964)

E. The Golder Report Did Not Indicate Significant Cobbles.

The only real issue in regard to the Golder report is whether it indicated to Red Samm the actual subsurface conditions encountered at the project. To hold that it did so, the court must first reject the uncontroverted testimony of plaintiff's experts that the geophysical refraction methods employed by Golder did not reveal the extent of cobbles in the subsurface materials. PPFUF 68,69. Secondly, the court must conclude that the word "some" alone, a term defined as "an unspecified number,"[3] overruled the specific indications of the soil borings and test pit logs, and somehow indicated to Red Samm the actual concentrations of cobbles, exceeding ten percent, which were encountered in the subsurface materials. Plaintiff's respectfully submits that neither conclusion is possible.

All that the government has truly shown in regard to the Golder report is that through lawyerly misdirection, government's counsel elicited testimony from plaintiff's expert in one context, which the government now attempts to improperly apply in an entirely different setting. Mr. Brown's deposition testimony was given, not in regard to the Golder report, but in connection with the Geotechnical/July 1996 Trip report prepared by Charles Wilson, a different report, by a different individual, in a different context, and with a different meaning. Pl. App. 309. Mr. Brown's actual testimony in regard to the Golder report is as set forth in his declaration and his opinion is that it does not provide

---

[3] See Pl. Resp. p. 12, n. 3

"any meaningful information to the contractor regarding the likely extent of subsurface cobbles." Id.

Significantly, the government makes no effort to even address, much less distinguish, this court's decision in the directly analogous case of United Contractors, 368 F.2d. 585 (1966). There the generalized warning of "high ground water" was considerably more substantive and specific than the vague description of "some" cobbles found in the Golder report. United Contractors, however, emphasized that the "low-key message" of this "undefined and unexplained generality" could not be read to negate the specific information contained in the soil borings which failed to meaningfully indicate the presence of water. 368 F.2d at 598. As the government implicitly concedes, United Contractors cannot be distinguished from the present facts and a similar holding is appropriate here.

## III. PLAINTIFF HAS PROVEN THAT RED SAMM RELIED ON THE CONTRACT SOILS DATA.

In apparent recognition of its incorrect legal analysis, the government has abandoned its "pre-bid" reliance argument (Def. Response p. 7), but persists in its equally misplaced argument that Red Samm did not rely on the contract soils data. However, the government has no evidence to support such a conclusion and simply asks the court to assume Red Samm did not rely.

The government's entire argument is premised on only two facts. First, that Red Samm conducted some supplemental soil sampling on its own; and secondly, the soil gradations provided to DeGroot engineers for the specific selection of equipment were performed by Red Samm. Neither of these facts support a conclusion that the contract

soils data became irrelevant, meaningless and no longer an important consideration to Red Samm.

The evidence before the court is entirely otherwise. Red Samm's David Heeter "relied first and foremost" on the information contained in the test pit logs and soil boring logs in making Red Samm's fundamental determination that the site was suitable for hydraulic dredging. Pl. App. 301. This decision was made in the fall of 1999, several months before Red Samm personnel traveled to Holland to meet with DeGroot engineers and select specific equipment. Pl. App. 304. Red Samm's October 12, 1999 letter to the Corps advised it of the contractor's decision in that regard. Id. No concern was voiced by the Corps, who in fact shared Red Samm's interpretation of the contract data and similarly believed the site would be suitable for hydraulic dredging. PPFUF 41, 88. Most importantly, had Red Samm been provided the true information regarding the percentages of cobbles observed in the test pits, it would have determined hydraulic dredging was not feasible in the first place and never attempted it. Pl. App. 303-304. This evidence in uncontroverted and plainly proves that Red Samm relied upon the contract soils data.

## IV. THE TERM "FEW" AS USED IN THE TEST PIT LOGS WAS NOT A PATENT AMBIGUITY.

No one but the government believes that the term "few" as used in the test pit logs was a patent ambiguity and the government itself only came to such a conclusion quite recently. In its typical fashion, the government attempts to hide these inconvenient facts under the rock of alleged "irrelevance." Yet, their relevance here is again obvious. The court's determination of whether the term "few" as used in the test pit logs was a patent ambiguity should be made from the perspective of "what a reasonable man would find to

be patent and glaring." L. Rosenman Corp. v. United States, 182 Ct.Cl. 586, 390 F.2d 711, 713 (1968). The Corps' project manager, Lynden Belin, acknowledges considerable internal discussion occurred within the Corp project team regarding the meaning of the term "few" upon receipt of Red Samm's notice of a differing site condition. Pl. App. 97-100, 102-114. In those discussions the Corps recognized the term to be merely "a little subjective" or "somewhat subjective." Pl. App. 98, 107. Even with the formal contracting officer's decision, issued two years after completion of the project, the Corps never asserted the term was patently ambiguous. PPFUF 94. Neither did the government ever raise such an affirmative defense in its answers to plaintiff's original and amended complaints. Common sense suggests that if the ambiguity was indeed so "glaring," as the government now argues, it would have so appeared to both the Corps and the government far sooner. Another decision by this court, discussed in plaintiff's response but also ignored by the government, so holds. Record Steel & Constr., Inc. v. United States, 62 Fed.Cl. 508, 517 (2004).

The government's response also devotes considerable misplaced energy to speculate upon the knowledge of other bidders on the project. The only truly relevant and plainly established facts are that such bidders all had the same bid and contract documents as Red Samm and none viewed the term "few" as used in the test pit logs as sufficiently ambiguous to require clarification by the Corps.

Neither can the government escape the fact that it must be charged with knowledge of the requirements of ASTM 2488 and was already on notice in regard to any ambiguity as to use of the term "few" in the test pit logs. To avoid application of this recognized exception to the patent ambiguity doctrine, Metcalf Constr. Co. Inc. v. United

States, 53 Fed. Cl. 617 (2002), the government inaccurately asserts that the "Corps plainly thought its interpretation, 'resting upon ASTM,' was unambiguous." Def. Response p. 12. However, the true facts, as noted above, are quite otherwise. Discussion among the Corps project team during the actual performance of the work recognized only the latent ambiguity of the term. PPFUF 98, 107. The government's interpretation, "resting upon the ASTM," was never provided to the contractor during the performance of the work, when it most logically would have been offered in response to the contractor's specific communications and notices of a differing site condition. PPFUF 85. Indeed, as late of April 2003, the government had not provided any explanation of the term "few" or such "interpretation" to its local sponsor. Id. Neither is there any testimony from Mr. Wilson himself, to indicate that he believed he was in fact applying ASTM procedures in his use of the term "few." Rather, Mr. Wilson acknowledges he only followed ASTM procedures in two minor respects (Pl. App. 70) and that ASTM 2488 does not provide for use of the term "few" to describe percentages of cobbles observed in the test pit. Pl. App. 71. The evidence is clear that the Corps' interpretation of the term "few," based upon a misapplication of ASTM 2488, was never articulated, either externally or internally, until issuance of the contracting officer's decision.

Finally, the government does not successfully distinguish Appeal of Power City Electric, Inc., 74-1 BCA § 10376, 1973 W.L. 1323 (I.B.C.A., 1973) or application of its holding that the government's failure to disclose its actual observations of cobbles percentages in the test pits supersedes any possible duty of inquiry by Red Samm. The government argues Power City has no application because it was "not about a patent

ambiguity" and because it further dealt with a case in which the government "purposely" withheld data. Def. Response p. 13. Neither ground is a meaningful distinction.

The contract board in Power City found the contractor had a duty to inquire regarding an apparent error in the specification; a duty which the board also found superseded was by the government's failure to disclose material information. The government's "intent" in failing to make such disclosure was not a factor in the decision; nor is it a required element of Travelers' misrepresentation or nondisclosure claims.

In addressing this issue, the government also mischaracterizes the fundamental aspect of plaintiff's nondisclosure claim by suggesting it is limited to the government's failure to disclose its purported use of ASTM standards. While Travelers certainly contends such disclosure was required, the most significant failure to disclose by the government was its actual observations of cobble percentages, stated in numerical terms, as required by the ASTM standard. However, the circular and contradictory nature of the government's arguments in this section of its brief should not be lost on the court. On the one hand, the government asserts that, based upon a misapplication of ASTM 2488, the contractor should have understood the term "few" to mean 5 to 10%, yet argues here that it had no duty to disclose use of the ASTM standards to the contractor because the procedures of the standard were only selectively applied by the Corps. Def. Response p. 13.

## V. THE GOVERNMENT MISREPRESENTED THE RESULTS OF ITS TEST PIT EXPLORATIONS.

Travelers' misrepresentation claim focuses on the specific test pit logs prepared by the Corps, which were materially misleading and inaccurate in their use of the term "few," and the term "with," to describe observed percentages of cobbles of 5 to 10%, and

greater than 5%, respectively. The government's attempt to treat the misrepresentation claim as merely a "rephrasing" or "functionally no different" than the differing site condition claim (Def. Response p. 13-14) misconstrues the applicable law and demonstrates the lack of any bona fide defense on the government's part.

Plaintiff's misrepresentation claim is a legally distinct and different claim, requiring different elements of proof, none of which include a finding of intent to deceive on the part of the government. United States v. Atlantic Dredging, 253 US 1, 12, 40 Sup.Ct. 423, 64 L.Ed. 735 (1920). Accordingly, this court has made clear that a ruling against Travelers on its differing site condition claim would not be dispositive of its misrepresentation claim based on the same general events. J.A. Terteling & Sons, Inc. v. United States, 390 F.2d. 926, 927; Potashnick v. United States, 123 Ct. Cl. 197, 218-219, 105 F.Supp. 837 (1952).

Aside from its erroneous attempt to equate it to the differing site condition claim, the government offers nothing to rebut plaintiff's misrepresentation claim, except for the wholly unsupported and contradictory argument that the term "few" should have been understood by Red Samm as 5 to 10% under ASTM standards. The lack of any factual basis whatsoever for this argument is demonstrated by the undisputed procedures of the ASTM standard itself and the government's admissions, which include the following:

- Where its procedures are employed, ASTM 2488 requires that any report so state Pl. App. 239, Paragraph 1.2.
- ASTM 2488 does not provide for use of the term "few" to describe a range of cobble percentages observed in the test pit. Pl. App. 71, PPFUF 45.

- The only ASTM 2488 procedures followed by the Corps in preparation of the test pit logs was use of group symbols for Test Pits 1 and 5 and a description of particle angularity in Test Pit 4. Pl. App. 70, PPFUF 52.
- The government did not disclose its alleged use of ASTM 2488 in preparing the test pit logs until issuance of the Contracting Officer's Decision on November 26, 2003. PPFUF 85.
- The test pit logs provided only a "relatively indeterminate description of cobble percentages." Def. Response p. 1

Given these admitted or uncontroverted facts, it is not surprising that the government's argument is reduced to the assertion that somehow Red Samm should have known of the government's alleged and unorthodox application of ASTM 2488 and interpreted the term "few" to mean a specific range of cobbles between 5 and 10% observed in Test Pits 1 and 5. The government does not even make this farfetched argument in regard to Test Pit 2 and provides no explanation of why the term "with" accurately represented the Corps' observation of greater than 5% cobbles in that test pit.

The only support the government can muster for its argument is citation to an example of a soil description provided by ASTM 2488 in its Appendix (Pl. App. 247, para. XI.1.5), which uses the term "trace" in reference to boulders. Understandably, the government neglects to quote the full text of that example, because it includes a specific, reported percentage of observed cobbles and states in pertinent part:

> …original field sample <u>had about 5% (by volume) hard, sub-rounded cobbles</u>, and a trace of hard, sub-rounded boulders…(emphasis added)

Had the government in fact followed the very ASTM example it cites (which it essentially argues overrides the specific procedures found within the body of ASTM 2488 itself), this matter would not presently be before the court.

Finally, the analysis of plaintiff's expert, Peter Doulgass, demonstrates that concentrations of cobbles between 5 and 10% in the test pits would have resulted in cobbles of such numbers, that use of the term "few" to describe them was wholly inaccurate. PPFUF 75. That analysis is not meaningfully controverted nor rebutted by the government. Indeed, the government's geotechnical expert has declined to offer any opinion on whether the test pit logs, as prepared by the government, were misleading. PPFUF 80.

## VI. TRAVELERS IS ENTITLED TO JUDGMENT ON ITS SUPERIOR KNOWLEDGE CLAIM.

The government's procedural argument in regard to Travelers' superior knowledge claim provides it no defense. Such a claim is not "new" and has been asserted by Travelers from the outset of this litigation, although additional facts supporting the claim have evolved through discovery in this matter. At the heart of this litigation is the assertion by Travelers that the actual subsurface conditions encountered at the project site differed materially from those indicated in the contract documents and that the contract documents did not disclose, or accurately convey, the results of the government's investigations or observations. Neither the claims asserted nor the theories supporting them have materially changed. Crest A. Apartments, Ltd. II v. United States, 52 Fed. Cl. 607 (2002) has no application on these facts.

The government here failed to accurately disclose the results of its own test pit explorations, a failure accomplished through multiple omissions – a failure to recite the

specific percentages of cobbles observed in the test pits as required by ASTM 2488, a failure to disclose such standard was purpotedly applied in the first place, a failure to explain the government's adoption of an unorthodox and improper application of the ASTM standard, and an overall failure to convey to the contractor the "significant" extent of cobbles Mr. Wilson concluded were present in the subsurface based upon the test pit explorations. Travelers has neither abandoned these arguments nor fundamentally altered them.

The government was obviously aware that Red Samm was not present at the test pit explorations conducted by Mr. Wilson and had no ability to make its own independent observation of those explorations. This plain fact is acknowledged by the Corps' geotechnical expert, Mr. Riddle, who agrees only that the Corps could have provided Red Samm accurate information as to the extent of cobbles observed by it in the test pits. Pl. App. 161.

These facts wholly undermine the government's distorted and illogical argument that merely because Red Samm performed some sampling of its own, the prior observations by the government of cobbles concentrations in its test pits were somehow rendered unimportant. Under such a theory, the government could never be found liable for providing either inaccurate information or failing to disclose its superior knowledge. That is not the applicable law; nor does the authority cited by the government support such a conclusion.

As noted in our response, L. G. Everest, Inc. v. United States, 231 Ct.Cl. 1013 (1982) has no application here, because the court's holding was based upon its determination that the conclusions of the government's geologist were based upon "data

equally available to both parties." Here, the test pit logs did not accurately convey the true observations of cobbles in the test pits, a fact essentially admitted by Mr. Wilson, who acknowledges he "could have been more descriptive" in preparing the test pit logs. Pl. App. 100, 109. Had the Corps provided an accurate description of the percentage of cobbles observed, as required by ASTM 2488, Red Samm would have been alerted to the "significant" concentration of cobbles Mr. Wilson concluded were present in the subsurface materials and would have determined the site unsuitable for a hydraulic dredging. These facts cannot be legitimately contested by the government and require a finding for Travelers on this claim.

## VII CONCLUSION

Based on the foregoing reasons and authority, plaintiff respectfully requests the court deny defendant's motion for summary judgment and grant plaintiff's cross motion.

DATED 22nd day of June, 2006.

*S/ James T. Hopkins*
James T. Hopkins, WSBA #11856
Schiffrin Olson Schlemlein & Hopkins, PLLC
1601 Fifth Ave., Suite 2500
Seattle, WA 98101
Telephone: (206) 448-8100/Fax (206) 448-8514
Email: jth@soslaw.com
Attorneys for plaintiff Travelers Casualty and Surety Co. of America