# TRANSCRIPT OF PROCEEDINGS

| | | |
|---|---|---|
| TRAVELERS CASUALTY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. 04-487 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

Live Tape

(The following transcript was transcribed from a digital recording provided by the U.S. Court of Federal Claims to Heritage Reporting Corporation on October 12, 2006.)

Pages: 1 through 109

Place: Washington, D.C.

Date: October 11, 2006

**HERITAGE REPORTING CORPORATION**
Official Reporters
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| TRAVELERS CASUALTY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Docket No. 04-487 |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant. | ) |

Courtroom 5, Room 505

National Courts Building

717 Madison Place NW

Washington, D.C.

Wednesday
October 11, 2006

BEFORE: HONORABLE LAWRENCE J. BLOCK
Judge

APPEARANCES:

For the Plaintiff:

JAMES HOPKINS, Esquire

For the Defendant:

REID PROUTY, Esquire
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Washington, D.C. 20530

P R O C E E D I N G S

THE CLERK: All rise. The United States Court of Federal Claims is now in session, the Honorable Lawrence J. Block presiding.

THE COURT: Good morning.

ALL: Good morning, Your Honor.

THE COURT: All right. I understand we have cross-motions for summary judgment on Travelers Casualty Insurance Company v. United States. Is that correct?

A PARTICIPANT: Correct, Your Honor.

THE COURT: Okay. I'll let, for the record, the Plaintiff introduce himself. Mr. Hopkins.

MR. HOPKINS: Yes, Your Honor. I'm Jim Hopkins. I represent the Plaintiff.

THE COURT: Forgive me if I slip up and refer to you as Johns Hopkins.

MR. HOPKINS: Very well.

THE COURT: That would be distinguished, then.

MR. HOPKINS: It would certainly elevate me in status, I believe.

THE COURT: Mr. Prouty?

MR. PROUTY: Good morning, Your Honor. Reid Prouty for the United States.

THE COURT: I thought long and hard about the best way to proceed, and what I'm going to do -- is divide this motion hearing into three parts. The first part: I have some general questions about facts and the testing and how it's done.

Then I would just like to ask some general questions about the applicable law and the standards.

Now, the Court always has an advantage over litigants because I find too often that litigants arguing that it's their job to be good advocates, zealous advocates, for their clients. Sometimes they shoehorn the law into the facts, where I can apply the facts to the law, which is my job. I take a more neutral viewpoint. I'm always surprised by disagreements on how to apply law, so I just want to go back to basics.

And the third thing is, we're going to look at the facts far more in detail and what it means, given the superstructure of the law that we're going to establish in the hearing.

My understanding is, Mr. Prouty, that the government was the first movant. Is that correct?

MR. PROUTY: Yes, Your Honor.

THE COURT: Well, then you go first.

MR. PROUTY: Good morning, Your Honor.

THE COURT: Good morning.

MR. PROUTY: Given the structure Your Honor has, would you like to begin with questions, or shall I --

THE COURT: I would like to know exactly sort of the contour of the facts here.

MR. PROUTY: Sure, Your Honor. The way we see it is that when this project was first being investigated, a minor, geotechnical investigation was taken at the beach; that is, five test pits were taken --

THE COURT: Let's even be more basic than that.

MR. PROUTY: Okay, Your Honor.

THE COURT: Okay. This is in Alaska.

MR. PROUTY: Yes, Your Honor.

THE COURT: King Cove, Alaska.

MR. PROUTY: It is.

THE COURT: It's in the Aleutian Islands, my understanding?

MR. PROUTY: It is, indeed, Your Honor.

THE COURT: Okay.

MR. PROUTY: A tough place, especially in the winter.

THE COURT: And the contract calls for two

parts.

MR. PROUTY: That's correct, Your Honor. The first part is to go to breakwater, essentially take large boulders and rocks and giant (inaudible) and sort of make an area that would sort of act as a breakwater to prevent the area, which will later become the harbor, from being exposed directly to the sea; that is, to prevent storms and whatnot and the wave action from going directly to this area that they wanted to have as a protected harbor for small boats.

The idea was, let's make a small boat harbor. What you do is you basically dredge an area near King Cove so that it's deep enough for the boats, but, of course, that does us no good if that dredged area is exposed to unmitigated elements, and also it's possible that might also lead to the dredged area being refilled, much less the boats being subjected to waves coming all the way from Russia, et cetera.

The notion was, you build the breakwater first, which gives you a protected area, and then after you build the breakwater, in the next boating season, because you're boating by seasons in Alaska, (inaudible) during the winter, you come in, and you do a standard dredging operation where you take a specified area and dig it to a specified depth, and,

voila, at the end of the day, you have a protected, small boat harbor that the fishermen on King Cove can use.

THE COURT: That's what this is designed to do, to aid the fishermen.

MR. PROUTY: Generally, yes, Your Honor. It's a small boat harbor. Primarily, my understanding is that it's fishermen who use it. I'm sure there might be others who would use it for other reasons, but the general notion is that small boats for people in King Cove to use and primarily to work in the Aleutian Islands, is my understanding.

THE COURT: I understand it's very beautiful down there.

MR. PROUTY: It is at the right time of the year, Your Honor. It's also very scary at other times of the year.

THE COURT: I'm sure.

MR. PROUTY: In any event --

THE COURT: And does the darkness, the six-month darkness, affect this, too?

MR. PROUTY: I know it certainly changed the number of daylight hours in the days as time went on. However, I'm not so certain that the darkness, per se, was the concern because actually some of the dredging

operations just went around the clock, if memory serves --

THE COURT: Is that right?

MR. PROUTY: -- when the weather was right. It's far more important what the weather is than the darkness. Certainly, I think a pilot would say that the darkness is a weather condition, and I think that that's really when it would be less productive, with no light at all. Then you would be saying 23 hours of light, as you might in the right circumstances (inaudible).

THE COURT: The Aleutian Islands -- I looked at the map -- go way out into the Pacific. How far is this? It's not really relevant. I'm just curious.

MR. PROUTY: My understanding is it's one of the first of the Aleutian Islands.

THE COURT: It's pretty close to the coast of Alaska.

MR. PROUTY: Close, relatively.

THE COURT: Relatively, because we're going to get to that relatively shortly.

MR. PROUTY: Indeed, Your Honor, but it's still quite a flight in a plane from, say, Anchorage to get there.

So, in any event, the notion was that they

were going to build a small boat harbor, which is not saying it's (inaudible) difficult. It takes work. It's nothing novel or something that they have not done. People know how to build breakwaters out in the Aleutians. Yes, it's been difficult because of the weather, but they know how to do it, and, yes, they have to dredge because they have done it out there.

So the notion was, let's build this breakwater. When the Corps assembled and documented and (Inaudible) recently went through all of the review stages one has to do to do a contract like this. They did a geophysical investigation, and essentially there are different components of that. One component was, let's take a quick look and sort of see where bedrock is by digging to it, and that's what caused the test pits to be dug(inaudible) to be held. Mr. Wilson went out --

THE COURT: I'm sorry. More basic.

MR. PROUTY: Yes, Your Honor.

THE COURT: The distinction between a bore -- I'm sort of an alumnus as a park manager, so I think I know this, but I just want to make sure I understand how it's used in the context. A bore; my understanding is you're going to take some sort of pipe and then drill down and bore it and bring out a

sample.

MR. PROUTY: That's exactly right.

THE COURT: Is it? Okay. My understanding also from the documents is that that was not done in the area of the harbor.

MR. PROUTY: That's right. You can look actually at one of the maps, and it's included in the bid documents -- I can tell you what page it's on. You can look at Plaintiff's appendix, and you can see page 210, which shows a map of the test pits were [redacted] (inaudible), and the bore holes, at least a few of them, are far away. I only saw two when I looked at the map myself.

The notion was that these bore holes had been done earlier for a different project, and when they were assembling later on their documents, they said, Well, we do have this information -- it's in our possession -- that it's in the general area. So we're going to put it in (inaudible) because we don't know what use they might have, but somebody might have a use for them. So let's provide it, being overly generous as opposed to under generous (inaudible).

The test pit is simply taking an excavator, a John Deere in this case, and digging holes.

THE COURT: Get to that in a minute

(Inaudible) but in terms of the bore hole --

MR. PROUTY: Yes, Your Honor.

THE COURT: -- how relevant can it be if we're trying to find the degree or the amount or the percentile, depending on how you look at this, of cobbles?

MR. PROUTY: We don't think you can. In fact, that's been the government's argument all along because, by definition, the size of the bore hole, 2.5 inches in this case, is smaller than a cobble, which is three inches to 12 inches. So there is just no way in the world --

THE COURT: That's not disputed factually, is it?

MR. PROUTY: No, not at all, Your Honor. There is just no way in the world.

THE COURT: How far away is it from the site? You give me a ball park. We know it's not in the site.

MR. PROUTY: Your Honor, I want to say that it's thousands, if not tens of thousands, in yards, but I've got to say that that's not a very rigorous statement on my part. I don't mean to mislead the Court or anything like that.

THE COURT: Okay. We know it's undisputed

that it's not in the site.

MR. PROUTY: Absolutely. Again, generally, the notion was not that we're going to get these bore holes logged because we think they are going to (inaudible) what to tell you what kind of cobbles (inaudible)you are going to run into but merely to say, "We have information. You're the contractor. Do with it what you want. We don't want, later, to be second-guessed. We're not handing over information we had (inaudible), but one might argue (inaudible). So take it and do with it whatever it is you think you might want to do." It might be of no use whatsoever. That's fine. If that's the case, all we did is waste the paper(inaudible), but it's very clear, based on the bore halls, where they are taken, and they were not, in fact, taken at the relevance (inaudible).

THE COURT: I'm not clear why it was included in the contract.

MR. PROUTY: Again, the notion -- and Mr. Wilson explained this in his deposition that his boss, Mr. Rachel, head of the geophysical branch, said, We've got this information. We don't necessarily see how it's relevant, but what we have is information. Perhaps there might be some way that somebody could decide that they wanted some of this stuff. We'll be

overinclusive and provide it, telling you that it's bore holes of this size, which you would know without knowing anything about (inaudible) cobbles, and tell you where it's been taken so you can go actually to the site, if you're curious.

THE COURT: How many of these bore holes were there?

MR. PROUTY: I can tell Your Honor exactly. I apologize. It's four, Your Honor. The last bore hole is on page 237 of the Plaintiff's appendix.

THE COURT: And the purpose of this bore hole would be to determine, for lack of a better term, the soil content, whether it's sand or gravel, or maybe you're lucky and strike oil.

MR. PROUTY: They give you some information of what's down there, to the degree that you can find that information for a hole. It's obviously limited. Obviously, we would be tough if you're going to hit bedrock because if you hit bedrock, well, the bores will stop. You can tell that sort of thing.

You can see if it's perhaps organic material, which might change the way you do your digging. You can see whether it's a mud versus clay.

THE COURT: Sure.

MR. PROUTY: Who knows how that might affect

what you do?

THE COURT: My last question about bore hole is, in the record, I believe there was some -- I don't remember who, forgive me -- it may have been Mr. Wilson, who said that it's relevant to the extent that this is the same geological area.

MR. PROUTY: It is geologically the same area to the degree (inaudible).

THE COURT: I'm not using the right term. The make-up would be similar, or you're not even sure of that.

MR. PROUTY: I'm not even certain of that. I could tell you that there is talk -- one of the Plaintiff's experts had said that, Look, bore holes are not going to be used for determining cobble amounts. They just are not (inaudible), and that was, in fact, the case here.

THE COURT: Let's go on to something more important, then --

MR. PROUTY: Yes, Your Honor.

THE COURT: -- and that's the pits.

MR. PROUTY: Yes, Your Honor.

THE COURT: Can you tell me about that?

MR. PROUTY: Of course. Mr. Wilson essentially went out to King Cove one morning, got a

backhoe from the local government and dug some holes, had the backhoe operator dig the holes, and he made some specific notes on what he saw, and the notes are replicated in Test Pit Logs 1 through 5; that is, essentially used to describe Test Pit 1 --

THE COURT: I'll get to that in a minute.

MR. PROUTY: Yes.

THE COURT: I have it written down. How did he pick where to dig?

MR. PROUTY: I think his concern was that he was worried about where bedrock was because the big expense in a project like this is going to be blasting bedrock if there is bedrock. It's one thing to scoop up soil that is loose or even sort of consolidated, and it's quite expensive to have to blast(inaudible), and that was really what drove Mr. Wilson's determination.

He saw an area of exposed bedrock. He dug around there, and that's why those test pits were all clustered near that same corner of the actual digging area, of the actual dredge area(inaudible). In fact, only one of them was, it turns out, was in the dredge area, within the area being dredged.

What was important to him was not necessarily getting a beautiful sampling of what

you're going to find throughout the dredge area, but, frankly, if he you went out there worrying about bedrock and while there he took note of what (inaudible) because there was some he saw, which became the test pit logs which were provided (inaudible).

THE COURT: Okay. He testified to that effect.

MR. PROUTY: Yes, sir. Now, he also testified that -- Mr. Hopkins was asked, Wouldn't this also be information that could be used to determine what you're going to encounter for a contractor? He answered, Well, yes, sure. One can look at these test pit logs and say, I might encounter these things.

But the reason for his test pits being chosen where they were and the operation he undertook was whether to look at the bedrock (inaudible). After that, he decided, he recommended, that we use some seismic shooting, which they later did, to find out exactly where the bedrock was.

THE COURT: Okay. I take it that seismic shooting is not really relevant to this case.

MR. PROUTY: Well, it is, Your Honor, and it's relevant because it led to the Golder Report, and the Golder Report is --

THE COURT: Can we get to that in a minute?

MR. PROUTY: Yes, Your Honor.

THE COURT: I apologize, but I'm just trying to understand the best I can.

MR. PROUTY: Not at all, Your Honor.

THE COURT: Okay. Now, you said these were clustered in one area.

MR. PROUTY: Yes, Your Honor. If you look at the map, you can see they are essentially in one corner of the dredge area, and, in fact, 4 out of 5 are not actually in the borders (inaudible).

(Pause.)

THE COURT: All right. My understanding is Mr. Wilson reported his results in a two-page narrative entitled "Trip Report: Small Boat Harbor Improvement," July 1996 --

MR. PROUTY: He did, Your Honor.

THE COURT: -- a test pit map location, five test pit logs, a selection of photographs, and only the test pit logs were included or referenced in the contract.

MR. PROUTY: That's right.

THE COURT: Okay. The test pit logs are TP-1 through 5.

MR. PROUTY: Yes, Your Honor.

THE COURT: And I guess one of the core disputes here is what this means. TP-1 says "gravel with few cobbles or boulders." TP-2 is "gravel w/cobbles and boulders." TP-3 is "weathered bedrock." Is that right?

MR. PROUTY: Yes, Your Honor. The first foot of TP-3 said "gravel and cobbles."

THE COURT: TP-4 is "gravel," and TP-5 is "gravel with few cobbles."

MR. PROUTY: Your Honor, I would actually say that the first foot of TP-4 said "gravel and cobbles" and after that, (inaudible).

THE COURT: Okay. Could you repeat that again?

MR. PROUTY: Sure, Your Honor.

THE COURT: I have this wrong.

MR. PROUTY: For TP-4, the first foot of the test pit said "gravel and cobbles," and then it depicted after that, "gravel."

THE COURT: Okay. I'm skipping a little bit ahead. The contract itself --

MR. PROUTY: Yes, Your Honor.

THE COURT: -- says that "geophysical data for this area can be obtained from the Corps," and then it gives a location.

Okay. Is there a dispute whether the Wilson two-page narrative or conclusion -- I think you call it a conclusion -- was in the locale that the contract referenced?

MR. PROUTY: No, Your Honor. I'll be straightforward, though. Mr. Rachel's declaration says what is there, what is in that locale. He refers to the Golder Report, the geophysical report, for the seismic shooting. He does not refer to Mr. Wilson's. Now, Mr. Wilson, I believe, in his deposition, said, he believed that if you were to ask for this report you would have gotten the whole report You can (inaudible) who to ask to make sure whether they had gotten this from the report, but Mr. Rachel only went so far in his declaration to say, You would definitely have gotten the Golder.

THE COURT: Okay, but not the Wilson Report.

MR. PROUTY: He doesn't say you would not have gotten it. He just says that I wouldn't say you would have gotten the Golder Report.

THE COURT: Okay. So he is silent, then.

MR. PROUTY: I'm sorry, Your Honor?

THE COURT: He is silent.

MR. PROUTY: That's correct.

THE COURT: He is not referring to it in

your opinion a year.

MR. PROUTY: Precisely.

THE COURT: Okay. Is that in dispute here?

MR. PROUTY: I don't believe so, Your Honor.

THE COURT: Let me jump ahead and just ask Mr. Hopkins, is that in dispute?

MR. HOPKINS: Your Honor, I'm not 100-percent sure what the Court is referring to as being in the dispute skew.

THE COURT: Whether the Wilson document was available at the geophysical site.

MR. HOPKINS: It is in dispute in this sense: It was not disclosed --

THE COURT: No, no, no. I understand that.

MR. HOPKINS: -- or provided.

THE COURT: Did anyone testify? Is there evidence in the record that it was at that site? That's what I'm asking you.

MR. HOPKINS: Oh, yes. The Wilson Report definitely covers the site. I don't think there is any dispute --

THE COURT: No, no, no. I'm sorry. Let me start over again. I apologize.

Okay. There is a provision in the contract that says, generally, that "geophysical data for this

area can be found from the Corps," and he gives a particular site.

MR. HOPKINS: That's referring, I believe, to a different document, the Golder Geophysical Report, and I don't believe --

THE COURT: Right now, it doesn't refer to anything; it's just neutral.

MR. HOPKINS: Here is the distinction, I believe. The Wilson Report was not a geophysical report, and I don't believe there is any dispute over that fact. Mr. Wilson's written narrative report is just a narrative summarizing his test pit investigation. It was not a geophysical report.

THE COURT: So it's not what they call in the contract "geophysical data."

MR. HOPKINS: Correct Right.

THE COURT: Okay. So we're all in agreement.

MR. HOPKINS: The Golder Report was a geophysical report.

THE COURT: Okay. That's fine. I just wanted to make sure we're in agreement. Very well. That was a point of some confusion to me, anyway.

The Golder Report; why don't you summarize that issue?

MR. PROUTY: Golder and Associates was essentially a was essentially hired by the Corps of (inaudible) engineers to produce that produced a seismic profile of the dredge area of (inaudible), and they did that, I believe, by using blasting (inaudible) basically which would tell you how deep what they called the "basement" is, where you change from the overlying sediment, and it gets harder. That report told you how deep essentially the bedrock was, and it also told you more. The part we thought was important was it took those (inaudible) its results and melds them with Mr. Wilson's results, and that can be found on page -- the whole report itself can be found on page 51 of the government's appendix.

The part that sort of melds what they found with what Mr. Wilson found, you'll find at page 54 of the government's appendix under the area "Geological Interpretation and Expected Material Base." In there, they talk about what you found with the seismics was that the overlying sediment, the stuff that would have wound up being dredged, was coarse-grained materials with gravel and some cobbles and boulders which exist throughout the dredge area it said this (inaudible).

This signature that the seismics were showing is typical of coarse-grained sediments

deposited to in a high energy (inaudible) the environment. This interpretation is consistent with test pit data on the southwest end of the site which show mostly gravel with some cobbles and boulders in the upper ten feet (inaudible). The seismic signature from these upper sediments is uniform, and it was observed on the seismic records across the site, suggesting that coarse-grained sediments, consisting mostly of sand and gravel with some cobbles and boulders, exist throughout the site.

THE COURT: Now, you said there was a reference to the Wilson Report.

MR. PROUTY: Well, essentially, it talks about a the test pits case.

THE COURT: Okay.

MR. PROUTY: This information is consistent with the test pit data in the southwest end of the site(inaudible). That's the sort of reference to what Mr. Wilson said (inaudible). It doesn't say that they had the report, but they had the test pit data.

THE COURT: In the Wilson Report, a two-page conclusion --

MR. PROUTY: Yes, Your Honor.

THE COURT: -- how would you characterize it? When I say "conclusion," I'm not characterizing

it.

MR. PROUTY: I understand.

THE COURT: Okay. It also used the term "some cobbles and boulders." Is that correct?

MR. PROUTY: Yes, Your Honor. I think, when you actually read the Wilson Report, and by "Wilson Report," I'm taking about this two-page document --

THE COURT: Yes.

MR. PROUTY: -- I think you will see that it's very consistent with what was said in the Golder Report and materially no different, in our view, than what in what was referred to as the "test pit logs" It merely (inaudible) summarized that.

THE COURT: Okay. Now that I've cleared that up, I would like to switch topics for a second.

MR. PROUTY: Yes, Your Honor.

THE COURT: I'll do that just to make sure that we're on the same boat here.

I was interested in the effect of FAR 52.236-3, which is sort of the standard, I guess, boilerplate form that's stuck into these types of contracts, and exactly how we would interpret that, because the Court has a duty to interpret it. So (a) says that "the contractor acknowledges that it has taken steps reasonably necessary to ascertain the

nature and location of the work." I'm going to go skip down.

The contractor also acknowledges that it has satisfied itself as to the character, quality, and quantity of surface and subsurface materials were obstacles encountered insofar as this information is reasonably ascertainable from -- I'm going to put an (a) inspection of the site; (b) including all exploratory work done by the government, as well as drawings and specifications made part of this contract. So from its inspection and from the work that the government has done, is how I read that.

Then it goes on with what could be considered exculpatory: "Any failure of the contractor to take action described to destroy the knowledge in this paragraph will not relieve the contractor from the responsibility of estimating properly a difficulty in cost (inaudible).

I want to skip to (b): "The government assumes no responsibility for any provisions or interpretations made by the contractor based on misinformation made available by the government, nor does the government assume responsibility for any understanding reached or representation made concerning additions which can affect the work by any

of its officers or agents for the execution of this contract unless that understanding represented is expressly stated in the contract."

Okay. That last part, which was also in part (inaudible) exculpatory -- let me ask it this way. Is this contract fully integrated?

MR. PROUTY: Yes, I believe so.

THE COURT: Okay, because that certainly would work as a partial integration.

MR. PROUTY: Yes, Your Honor.

THE COURT: But it is fully integrated. That's important.

MR. PROUTY: I must say, until you asked the question, I had not actually thought about that issue. I see no reason to believe that it is not integrated(inaudible).

THE COURT: That's not good.

MR. PROUTY: I'm sorry, Your Honor.

THE COURT: No. There is a method to my madness.

MR. PROUTY: I'm sure. (Inaudible.)

THE COURT: Let me try to get the advice of Mr. Hopkins here. I'm sorry for jumping around.

Do you know if there is an integration clause?

MR. HOPKINS: Your Honor, I do not. I have not looked specifically to see if the contract has what would be considered an integration clause.

MR. PROUTY: It may.

THE COURT: Probably there is, but that affects what I'm going to say.

MR. Hopkins PROUTY: Yes, Your Honor.

THE COURT: Would you agree that all of this FAR is pretty broad in its interpretation, and it's exculpating the government that, I guess, cases since Foster have sort of construed this very, pretty narrowly?

MR. PROUTY: I think the cases since Foster have construed it narrowly, to some degree, but I think that the better way of looking at it is that there are a number of elements of a differing-site-conditions claim that require the contractor to act reasonably.

THE COURT: Yes. That's the key word.

MR. PROUTY: And I believe that those cases, integrating the work reasonably into the requirements from the contractor, are ones that have taken what's now FAR and begun to apply them to other preexisting type one differing-site-conditions cases; that is, for example, in Wheat's Weeks Dredging, one of the actual

six elements under the differing-site-conditions cases is cited in our motion, the fifth one: "The actual conditions were not reasonably foreseeable."

That would, again, sort of be bringing in some of what we've got in the FAR. The contractor has to be satisfied that he has reasonably acted and has actually satisfied himself. There must be a reasonable reliance on what he says, and I think that the Comptrol discussion of affirmative representation is required, and a type one differing site condition reflecting in (inaudible) you can point to many ways. the The concern that the FAR has is hard to say, but the government is a warrantee of all kinds of things by virtue of giving you these test pit logs, et cetera.

What we're saying is, here is the information, and we would rather you draw a conclusion from it yourself. Unless we actually tell you something else, unless we affirmatively tell you otherwise let's (inaudible) figure out the why's. We're not going to be held to a type one (inaudible) differing-site-condition case.

So I believe that when you look at Comptrol, in particular, but it's not just Comptrol; it's also in P.J. Matthew, the affirmative representation's

requirements really fit in nicely, I believe, with the FAR's requirement that the discussion is about the warranties the government is and is not making by providing what it has(inaudible). I hope I didn't --

THE COURT: What I'm driving at is that we could read this FAR pretty strictly as an exculpatory clause, and the Court, at least starting from Foster, said, no, we're not going to do that because we want -- part of the FARs, and the law of site(inaudible) investigation would have changed it, was to create an incentive for contractors to prevent cost overruns, and the contractor would reveal problems, and the government would reveal problems. So you put in all sorts of disincentives.

So the courts have stressed reasonableness. So, for instance, the courts have said the contractor will be charged with the information contained in data furnished as part of the docket, and that's one issue, exactly what's part of the docket -- I'll get to that in a minute -- and if they don't, as part of the contract, Randa Madison, a Federal Circuit case in 2001, held against the contractor for not reviewing(inaudible). It is their duty to review a case ...(inaudible).

MR. PROUTY: That's right, Your Honor.

THE COURT: But then again, the courts have said that if it's not in the docket, there is no duty to inspect documents.

MR. PROUTY: First of all, there is no duty to inspect documents that are not -- there is no separate duty, apart from the notion of acting reasonably and making reasonable determinations --

THE COURT: You know where I'm heading at. What I'm heading at is, if a provision says one can look in New York City for certain information that may be there, or can be there, is that considered part of the contract, or do you have to specifically list?

MR. PROUTY: I think Randa Madison doesn't stand for requiring for (inaudible) a specific listing of, I've got this document dated this date. Randa Madison is not the only case on point I'm pointing to. There is also (inaudible) Dauden as well. I believe that, even in Comptrol, where they are discussing the patent (inaudible) ambiguity issue, which is far afield, but I'll show you how this ties in. They didn't talk about how it's improper not to -- they cited a case which said it was wrong for the plaintiff not to look at data being used in the (inaudible) possession of the Corps. It all goes to, we know there is data possession because we told you there is

data in our possession(inaudible).

THE COURT: How would you square those two concepts, rules of law? Clearly, if the contractor said it may be a new exhibit, there would be no duty. Correct?

MR. PROUTY: I think that's correct.

THE COURT: But if they knew, I mean, (inaudible) acknowledge it otherwise.

MR. PROUTY: But it said, "We have geophysical data. It may be obtained from us [redacted] (inaudible) [redacted]." The only way to read that sentence about the geophysical data, the "may," is that it doesn't say, "We might have geophysical data." It says, "Geophysical data may be obtained from us."

THE COURT: The [redacted] contract said "can," "can be obtained," not "may."

[redacted]

[redacted] Mr. Prouty: Nevertheless, it's still permissible.

[redacted]: It basically says, we won't give it to you. I think that it would not have been mentioned that geophysical data may be obtained if there were no such data.

Why would you say, "Geophysical data may be

obtained," when you don't actually have use of the data? You might as well say, "Anything else you might ask for we'll obtain for you(inaudible).

THE COURT: One of the strong arguments the government makes is exactly that: Why would you put it in? Wouldn't a reasonable contractor -- a light would go off when he is talking.

MR. PROUTY: I think so. I think the idea is that there have been many cases where you didn't actually go into specific detail. A 10-page report, whatever, a 28-page (inaudible) document showing X, Y, and Z would be okay because he says, "We have additional documents. If you want to look at them you may." Would you like to look at them?" And that is precisely what happened here.

No reasonable contractor could look at that and parse it and say, "You know, I'm not really sure if they have it or don't. I'm not going to ask for it"(inaudible). A reasonable person would certainly be alerted by that kind of issue. I think that even an unreasonable person would could have looked at this data and known (inaudible) that there was this (inaudible).

THE COURT: I guess it's Black letter law that a "reasonable contractor," as opposed to a

"reasonable person," that it interprets the data as a contractor, not as an expert.

MR. PROUTY: Yes.

THE COURT: Let me ask another factual question. When the test pits are done, are they underwater?

MR. PROUTY: No, Your Honor.

THE COURT: They are not underwater.

MR. PROUTY: It is basically(Inaudible) low tide. Drove the John Deere out there. I believe that there may have been water at the bottom of the pit(inaudible). I must say, I'm sketchy on that issue. But the tides actually expose a large, large, large portion of the dredge area. I believe, if memory serves, you get 30 up top when the dredge area is exposed. It's a larger amount number.

THE COURT: The Plaintiffs did their own testifying.

MR. PROUTY: Yes, they did.

THE COURT: The case law seems to indicate that it may be reasonable for a prospective bidder to do his own site testing, but it is not fatal if he does not(inaudible).

MR. PROUTY: I think that's circumstantial, Your Honor.

THE COURT: Depending on the data, but I'll get to that in a second, exactly what the contract says.

You know, the key issue here is how to interpret the word "few" and what that means in the contract terms. We're, in a sense, lucky that the Federal Circuit is a restatement court (inaudible) of the Court. So I double-checked to make sure that I didn't veer from your statement. So what I did was I just Xeroxed your statement, reread it, and then reread the case, and I thought it was pretty interesting in the sense -- let me ask it this way. In interpreting the contract, your argument, as I understand it, is that the term "few" is vague.

MR. PROUTY: We think that as far as numbers, as far as telling us what percentage --

THE COURT: Let me interrupt you. I apologize. Let me rephrase that. What does the Court do when it interprets the contract? Really basic stuff.

MR. PROUTY: Well, it reads the contract, and it gives words the meaning that they are normally given, unless it's a special case or a special circumstance where you would expect it's a term of art, that seeks and I seek to reconcile those terms,

which it if I can, with the rest of the contract. If there might be, some you have to look at the context Some of you have got your staff (inaudible) the contract, but essentially it starts off with the bare words (inaudible).

THE COURT: That was a huge change in the first restatement itself. There was a huge debate in the early 20th century, and it was resolved, between Wilson and the Court. So the first restatement, I understand, followed both Williston (inaudible).

First, the Court looks at the claim, and then if it's ambiguous, then it goes to extrinsic evidence tools. The Court then said, no, we ought not to do that. One ought to be able to look at everything and determine the extrinsic evidence, but you start with the plain meaning and see if something contradicts it. That's where the integration clause comes in, because sometimes there are problems with the parole evidence rule, and that's why I mentioned that.

But the problem is, what meaning prevails? The restatement and the courts, in following the Corbin and the (inaudible) restatement, have come up with sort of structured rules of what the Court ought to follow. Of course, one of them, I've already

mentioned -- I'm reading from 202, the restatement: "Words and other conduct are interpreted in light of all circumstances, and if the purpose of the parties is ascertainable, it is given great weight."

And then 203 stands for(inaudible) a preference interpretation (inaudible). This is 203, and I'm reading from (b): "Express terms are given greater weight than course of performance (inaudible). Course of performance is given a greater weight than course of dealing or use of the trade. Course of dealing is given greater weight than usage of trade. Specific terms and exact terms are given greater weight than in the general language."

You all know the rule about construing, if it is an ambiguity, construing against the draftsman (inaudible), if it's ambiguous.

And then 209 deals with integrating agreements, and 212 is interpretation of integrated agreements. For our purposes, the question of interpretation of an integrated agreement is to be determined by the trier of fact.

And then 219 is usage, what is usage; customary (inaudible) practice.

I'm going to skip to 222, which is uses of trait, trait usage, and I want to get to that, as to

whether the contracting officer's determination of this was some specific language to have meant something under the ASTM standards, whether it fits under this rule, because I don't think it does, but we'll get to that.

Given all of that, let me turn to what the contract says. It's a good place to start. It says: "Exploration logs for the area to be dredged and excavated are enclosed in Appendix A." So Appendix A becomes part of the contract.

But here is the interesting part. Here is what follows right after. It says: "Incidental sunken logs, boulders, rocks, and snags...." So the question I had in my mind was, what does "incidental" modify? Is it just sunken logs or boulders? Or does If it modifies boulders, that seems to support the Plaintiff's position. I think it does because it then goes on and says: "... and other miscellaneous debris from harbor and fishing operation should be expected."

So if you read this, "Incidental sunken logs, boulders, rocks, and snags, and other miscellaneous debris from harbor and fishing operation should be expected," a reasonable person reading this would say, "Well, there they are incidental. I should expect incidental snags, rocks, boulders, et cetera"

Then it goes on -- something that might govern: "Geophysical data from this area can be obtained --" "can," not "may" "-- from the Corps at that location." Then we had to look at the Golder Report.

But let's just look at what's contained in the logs, just the plain meaning, given this second sense, but it's about incidental (inaudible).

Why should the Court apply "few" as something less than many?

MR. PROUTY: I guess the question is, it's just a wrong a relative term(inaudible) not to be considered in a contract. If I were to say, there are -- a few people in D.C. got the flu --

THE COURT: Pardon?

MR. PROUTY: If I were to say, a few people in D.C. got the flu --

THE COURT: -- or were the Marines. I think that's the one.

MR. PROUTY: That was the one that I used. But that was the few, the proud, and there's 170,000. That's a large number.

THE COURT: Let me explain why I don't think that argument works, with all due respect. Any term that one uses, a definition, that is a numerical or a

quantitative term is, by definition, relative (inaudible). That doesn't mean it's vague.

For instance, let's look the Marine exhibit. It means "less than many" in the context of 300 million Americans.

MR. PROUTY: The point being, though, that it is vague in terms of specifying an exact percentage, and that's where the real departure from the plaintiff and (inaudible) for the government (inaudible).

THE COURT: Ah, okay. You're trying to bill the contracting officer.

MR. PROUTY: I wouldn't necessarily say I'm trying to bill the contracting officer, but what I am saying is that --

THE COURT: What's your job?

MR. PROUTY: To do justice. However, I would suggest that "few" is not given any kind of percentage, by any definition, except for ASTM. The only definition that anybody espoused in any source whatsoever that actually puts(inaudible) a quantifiable number.

THE COURT: Yes, but as I said before, and I went to the restatement in the case law involving that, and I looked at that, when you apply magic

words, terms of art, and trade usage terms. Let me just say what it says.

First of all, the ASTM standard doesn't talk about cobbles or boulders. It's the term that's applied to graveling.

MR. PROUTY: Actually, Your Honor, the term is essentially applied to silts and gravels. It applies to more than just gravel but also --

THE COURT: Okay. Silts --

MR. PROUTY: -- but what they would call "nonoversized." Oversized materials are defined as cobbles and boulders. They essentially said that if you're going to use these adjectival descriptersions -- "a few," "trace," et cetera -- here the word "few" means an extra five or 10 percent; "trace" means --

THE COURT: I do recall that, but here is the conundrum, the rock and the hard place the government is in. In the first instance, we're applying a reasonable contractor, and then you're having me apply very narrow terms of art. I can only apply narrow terms of art -- this is 222, "Usage of Trade." A "use of trade" is usage having such regularity observance in a place, location and trade(inaudible) as to justify an expectation that it will be observed with respect to a particular

agreement."

Then it goes on: "It may include a system of rules regularly observed, even though particular rules are changed from time to time." A great example would be accounting books, and, of course, having dealt with GAAP and RAAP (inaudible) specifically.

Okay. Number 2 is "Existence of scope and the use of trade are determined as a question of fact. If usages embodied in the written trade code are somewhat (inaudible) interpretation of the (inaudible) is determined by the court as a question of law." I'm not sure we have a code.

Apparently, the Court is going to have to make a determination whether trade usage is appropriate here, and it doesn't seem to literally fit, and I don't have anything here on record -- or do I? -- that says, using this term in this situation, which doesn't seem to fit, rises to the level of regularity, observance, and a place, location, of trade.

MR. PROUTY: Where we can find the notion that we should go to the ASTM, and that is in the document where we used terms like cobbles and boulders, and (inaudible) cobble, boulder, we're now having (inaudible) to this case. Your rock

(inaudible) cobble 12 inches, or a boulder is 12 inches or greater. Those are, of course, the terms they use for gravel. They would not know that "gravel" is defined as being between this size and that size or by itself, and these are the terms that suffuse past performance because we're talking about very specific sorts of things (inaudible).

THE COURT: That's not what the government's argument is. The government's argument -- correct me if I'm wrong -- is a percentage argument, is it not? That's what makes this ambiguous.

MR. PROUTY: The basic argument is that the only place that anybody in the world, anybody says a few isn't a certain percent as the ASTM. It certainly does not say so in any dictionaries or the definitions that were seized upon by Plaintiff, and because of that, unless you know the ASTM definition, which we gladly probably do, and, in fact, just be clear, even though the ASTM says that "few," et cetera, should be used for undersized particles, and these is no oversized ones.

In one of his examples, it uses the adjective "trace" with boulders (inaudible). In that same example, of course, it also says "X percent extras like cobbles, (inaudible), boulders, but,

nevertheless, this remains a case where we see that there is not really such a prohibition against using an adjective to describe the occurrence of things, such as boulders and cobbles (inaudible). So, obviously, ASTM itself did so.

But our point is that the only place in the world that there is an application of percentages to "few" is in the ASTM. So it is cited --

THE COURT: Are you going by inference? I'm not sure I understand that it would apply to cobbles because it doesn't literally apply to cobbles, does it?

MR. PROUTY: But the ASTM says that you could these adjectives to describe fine materials. If you mean X percentage (inaudible).

THE COURT: You would have to go one step further than that. Assuming that's true, wouldn't you have to say that a reasonable contractor would follow this? Is that always the case? Surely, there will be contracts like this court has dealt with (inaudible).

MR. PROUTY: Reasonable contractors are very familiar with these terms and geotechnical terms, which use the ASTM to determine (inaudible) because they have to read these reports (inaudible). In order

to understand what a cobble is, that definition is not in the Random House Dictionary. That is a --

THE COURT: Oh?

MR. PROUTY: I believe so.

THE COURT: I live in Old Town.

MR. PROUTY: I'm sorry?

THE COURT: I live in Old Town Alexandria.

MR. PROUTY: Yes, Your Honor, of cobbled streets.

THE COURT: Yes, and a cobblestone has a particular meaning, which is not that dissimilar, since the 16th century.

MR. PROUTY: I am not so certain that a reasonable contractor would understand cobble stones to have that same meaning, based on our experience with the streets.

THE COURT: No, no. It does have sort of a general -- that's the origin.

MR. PROUTY: Your Honor has got cobble --

THE COURT: It's a small stone.

MR. PROUTY: But, again, the size of the stone actually is important because over three inches would cause problems with Clogging and the grizzly screen (inaudible). But the point is, when you're talking about cobbles, boulders, sands, and gravels in

a test pit log, you're talking about specific things. These are the kinds of materials we encountered, and these are the amounts that we have found that are actually described the case.

THE COURT: Okay. There used to be a show, when I was old enough to watch, "The $64,000 Question." (Inaudible.)

MR. PROUTY: Okay.

THE COURT: So, with inflation, it's probably $64 million now. Where in the record is support for your example? About Not trade usage. That's what's really bothering the Court.

MR. PROUTY: I believe, because I know that I was reviewing the deposition of Mr. Brown, which is in the government's appendix, and if you look at pages 27 and 28 of the appendix, actually going through to 29, there is a discussion of what the ASTM is by Mr. Brown Martin. It's a widely used guide on page 27, the Sorrels investigation, and the question was, "And is it an industry standard?" "Yes."

THE COURT: I'm just surprised that since the Corps does scores of these type of contracts, that there is not more evidence concerning this. And I don’t know how to read this (Inaudible.)

Here is what the contracting officer

concluded. Soil description of the logs were (Inaudible) in accordance with ASTM Specification 2488-9. Per the standard, the words "with cobbles" or "with cobbles and boulders" are to be used if a field sample contains any cobbles and(inaudible) boulders. The standard also includes the option to provide a (inaudible) percentage. That's not true, though, is it?

MR. PROUTY: (Inaudible) it doesn't say directly that "few" is to be used. The adjectival descriptions to be used are "cobbles and boulders," although it is used in assuming that it applies to the example it used with boulders(inaudible). But I think you're correct, Your Honor. You're correct that the ASTM does not say that you have the option of using an adjective to describe boulders or cobbles(inaudible).

THE COURT: So we have evidence in the record that would somehow construe, by implication, I suppose, that it does apply to cobbles and boulders, and that would have to be the industry standard(inaudible), and you're basing all of that for Mr. Brown.

MR. PROUTY: Well --

THE COURT: Remember, the guidance to this is <u>Celotex</u>. It's a summary judgment motion.

MR. PROUTY: I understand, Your Honor.

THE COURT: Is that enough to create a material issue of fact?

MR. PROUTY: I would suggest not, Your Honor, because, again, Mr. Brown does cite ASTM as the industry standard, and there is nothing else out there that points to any number at all in relation to the word “few” (inaudible). I would suggest that, even though the contracting officer hung her hat on the ASTM, the government is not doing so in its motion for summary judgment.

We're noting that, yes, the ASTM actually is the only place you’ll find this (inaudible), which makes it unreasonable -- if you're going to start guessing about what percentages are and doing the calculations that the Plaintiff was doing, at the very least, you should have looked at the one place where (inaudible) actually any kind of number associated with the word "few" at all. But by virtue of "few" being such an elastic term, and as Mr. Brown said, "It could be two percent, or it could be 20 percent. I don't know," and this is why we have a dictionary, which, frankly, doesn't help much either.

The point is, because "few" is such an elastic term, it encompasses such a broad spectrum --

a narrower spectrum, actually, if you use ASTM, but, otherwise, we would expect to get a broad spectrum.

We would say that that is not an affirmative representation which gets you there as far as the type one differing site condition (inaudible).

THE COURT: I understand the government's argument. I still think, from the government's point of view, that it would create a material issue of fact because the Plaintiff's argument, as I understand it, is that you apply the plain meaning, which is not vague. It has a specific meaning, "a few." When you apply it to the facts of the case, it is reasonable to construe that they could have used the type of dredging that they want (inaudible).

MR. PROUTY: Your Honor, there is a specific meaning which doesn't give you percentages. There is a definition in the dictionary (inaudible), but that definition cannot yield percentages. And again, the Plaintiff has said that if --

THE COURT: That would only -- I'm sorry to interrupt you -- the percentage would only come into play if the Court would apply trade usage. Would it not?

MR. PROUTY: Well, no, because Plaintiff is saying that the percentages for what was important to

it in determining what equipment to use was the term “few”. came (inaudible) use of the term "the equipment" because if they had known, as they have said in their motion and their amended (inaudible) complaint, if they had known the percentage was between five and 10 percent, there would have been a site condition which would not have allowed them to use the dredge.

THE COURT: Okay. That may be true, but one would argue, from their point of view, that five to 10 percent is putting into effect the word "few" in the Merriam Webster Dictionary. To them, it means less and may mean even what's workable for them, five to 10 percent.

Let me suggest a contract distinction between interpretation and construction. "Interpretation" is the meaning of a phrase, and "construction" is how it will apply here. I think what the government is arguing is construction, that it's vague because when you apply it, it's elastic. That's the term you used. That's construction, but that doesn't mean there is no meaning to it.

MR. PROUTY: Well, Your Honor, indeed, the meaning could be simply (inaudible) between two and 20 percent. That's a specific meaning, but it's a

meaning that gives you big error bars.

THE COURT: Maybe.

MR. PROUTY: And that's the point.

THE COURT: You're not going to construe that against the government, the draft.

MR. PROUTY: No, Your Honor, because what we're telling you, what we've told the Plaintiff, is that there are big error bars because you've used the word "few." When you get "few," that tells you that it's not 7.98 percent or .254 percent. What it tells you is that it is in this sort of grab bag area. Mr. Brown said he didn't know if he meant two or 20 percent.

THE COURT: Here is what I'm not following.

MR. PROUTY: Yes.

THE COURT: Okay. I'm trying to go step by step here.

MR. PROUTY: Yes, Your Honor, and I apologize.

THE COURT: No, no, no, no. It's the Court's fault.

Why, in interpreting the word "few," would the Court have to use a percentile definition, unless it was trade usage. I can understand you can argue that.

MR. PROUTY: The reason why the percentile definition is important is because that shows, if you're making a Type 1, differing-site-condition claim, Plaintiff has to show that the things described in the contract documents departed materially from what they actually encountered, a material departure, and what we arguably know is the percentages of cobbles actually encountered. So, in order to --

THE COURT: Absolutely. I agree with that 100 percent, but the starting point is the meaning of the word "few." You're going to have to define that to determine if you varied from it when you actually --

MR. PROUTY: Right.

THE COURT: And so the definitional point on the interpretation, not the instruction; why would we apply percentages?

MR. PROUTY: Because I almost want to say this is like quantum (inaudible) this is like a point in physics where you don't know these. Things are indeterminate until you actually apply them, things actually happen.

THE COURT: We're dealing with Heizenberg's uncertainty principle?

MR. PROUTY: I don't want to go bananas on

that, Your Honor, but the point is that the term "few," again, remains elastic in the interpretation. The interpretation, not just a construction, the interpretation is "few" is a broad, broad grab bag of natural percentages. That definition can run a spectrum of amounts, not many. What does that mean? Compared to what? (inaudible). One out of 20; is that few?

THE COURT: So what you're arguing, and maybe this is a good argument, is that since you're dealing with a qualitative term, just like the hypothetical you gave in your brief I could hypothetically give you (inaudible), if I said you have to deal with a hundred and seventy thousand out of 300 million (inaudible), you would say that "few" is an appropriate word, but you're saying that a reasonable contractor would interpret that "few" in terms of a percentage.

MR. PROUTY: Yes, we have to. You have to understand that, in his mind when it considered what was being represented by the word "few" in this context (inaudible), you would have to think of it as an apportion, some sort of apportion of the test pit (inaudible). I would consider other things as well, but among the things that are considered when it said

the word "few" in proportion to other things, it is few. (inaudible), we have to be in proportion to the rest of things (inaudible).

THE COURT: I would maintain that that still goes to construction, but that's not the end of the matter because the question is whether there is a latent ambiguity that could possibly go to construction because you look at it, and say, okay, I know, as a reasonable contractor, that 10 to 20 percent, is what I they can live with. Nevertheless, it should ring a bell when I see it. That's your argument.

MR. PROUTY: Yes, it is. In fact, in a way, it's like the pipeline in <u>Comptrol</u>. They knew it was pipeline, but they didn't know exactly where it was. It's even better than the pipeline in <u>Comptrol</u> because the pipeline in <u>Comptrol</u> is actually a step away removed from the contract because the reference to it was in a document that referenced the contract but nonetheless was integrated into it (inaudible).

But the point is that, in <u>Comptrol</u>, there was a pipeline, and they didn't know where it was. This is the case where Plaintiff alleges that he is going to make decisions based upon these test pits estimates. If that's the case, then it's something

that, gosh, we really want to have that resolved.

In all of these theories, the patent ambiguity the appropriate action (inaudible) always seems, of course, the web that they are connected. Obviously, (inaudible).

THE COURT: I have Mr. Brown's testimony sitting here. despite (Inaudible) that the term "few," as used in the test pit log, was ambiguous because it did not provide a specific percentage of cobbles observed in the test pit.

MR. PROUTY: I'm sorry, Your Honor. Which page?

THE COURT: I think it's Defendant's paragraph 15.

MR. PROUTY: Are you talking about the proposed finding of fact?

THE COURT: Yes, proposed finding of fact, paragraph 15. I'm sorry.

(Pause.)

MR. PROUTY: That's correct, Your Honor, which is also on pages 29 and 30 of the government's appendix.

THE COURT: Okay. Let's turn to the Golder Report. Is it clear that the Golder Report is talking about a percentage?

MR. PROUTY: It doesn't actually say a percentage (inaudible). Again, it uses terms which Mr. Brown says would have alerted a contractor to -- I think the term he used was "raise a flag." The reason why the discussion about raising a flag came about was in Plaintiff's misrepresentation and the third claim, the one about -- the word (inaudible) escapes me right now, but essentially its superior knowledge claim(inaudible) was that if only we had seen Mr. Wilson's written report, which used the word "some" and also had some other information in it as well, the other information being that as long as you use the proper permit, you're not going to have any problem.

But if they had only seen the word "some" along with that, that would have led them to understand that there were flags raised and acted accordingly(inaudible) that acted differently. Well, the Golder Report actually goes well beyond that, as far as saying, you've got coarse-grained sediments throughout, causing the high-energy environment. You have some cobbles and boulders, et cetera. When that portion of the report was read aloud to Mr. Brown, he said, yes, if they had read that information, they would have had the flags raised(inaudible).

He backs off of that in his later

declaration trial preparation, but his backing away from that, he says, well, he didn't understand the question, and he is not saying that he was wrong with his answer but that he had been generally thinking about Mr. Wilson's report. But, nevertheless, the answer remains the same. If information provided to a contractor included those words, a flag would have been raised, and you really can't put that toothpaste back in the tube (inaudible).

THE COURT: The last question is, the Plaintiff is arguing that, in the Golder Report, the terminology is not the same as in this one. Could you respond to that?

MR. PROUTY: I don't see how it makes it's a difference. The concern is, what would a reasonable contractor have done if he was presented with the information in the report? Although the Golder Report is not identical to the Wilson Report, again, a comparison with the Wilson Report shows us very clearly that the Golder Report is better, provides more information, more of this information which Plaintiff says would have raised a flag and caused action and raised more questions (inaudible)

THE COURT: All right. I did tell an untruth I have more questions. I said only one more.

(inaudible).

MR. PROUTY: As many as you like.

THE COURT: It seems to me that your argument doesn't necessarily rest on the ASTM trade usage argument (inaudible), which I have trouble with.

MR. PROUTY: That is Correct. I understand. In fact, if you'll note, the government's opening motion for summary judgment didn't say ASTM is dispositive. We never actually said that here is the ASTM and here is why we win(inaudible). All we've said is the only place in the world where there's percentages is the ASTM, which makes departing from that all the more reasonable on the part of the Plaintiff, when he says, I'm going to create a percentage that's going to be less than one percent.

THE COURT: Now, I would need some evidence in the record that would indicate that, as a general matter, that ASTM is something that's followed all of the time, and here's other examples, and I don't have that.

MR. PROUTY: Again, Mr. Brown gives us some of that, but --

THE COURT: A little bit.

MR. PROUTY: I agree, Your Honor. Because that was not the focus of the government's motion,

that there is, frankly, not evidence saying that, I don't know that it's seriously disputed that the ASTM is the primary go-to matter (inaudible).

THE COURT: Again, I think, as matter of law, that's what this circuit said relying on the restatement (inaudible). Thanks very much.

Could I ask both parties, if I didn't already, and if I have, I'll just be redundant, answer, please, is that if you could look and see what provision in the contract deals with whether this is fully integrated what is (inaudible)? You can just send an e-mail on that. I'm not sure that that is going to affect it, but it may be dealing with consistent or inconsistent term talk.

MR. HOPKINS: Could I ask for a brief, two-minute break before I start?

THE COURT: You know, I was going to suggest a 10-minute break. Do you need more than two minutes? Ten minutes?

MR. HOPKINS: Ten minutes will be fine.

THE COURT: All right. Why don't we come back at twelve-thirty?

(Whereupon, a short recess was taken.)

//

//

//

A F T E R N O O N   S E S S I O N

(12:30 p.m.)

THE CLERK: All rise.

THE COURT: Please be seated. Sorry for the little bit of delay. Good afternoon.

MR. HOPKINS: Good afternoon. May it please the Court, I'm Jim Hopkins, and I represent the Plaintiff.

Your Honor, I had prepared, as part of my initial argument, a quick summary of what I felt to be the key facts in the case. I'm prepared to dispense with that and go directly to questions. I also have some points I would like to make in regard to --

THE COURT: Okay.

MR. HOPKINS: -- some of the questions that you asked Mr. Prouty.

THE COURT: Of course, but I have a couple of Zinger (inaudible) questions really important to the Court.

MR. HOPKINS: Certainly.

THE COURT: Let me take the contract. I'm sure you agreed with at least part of my analysis of that provision. It says: "Exploration logs for the area to be dredged enclosed, Appendix A." Then I construed this "incidental sunken logs, boulders,

rocks, snags, and other miscellaneous debris in harbor should be expected." If one applies plain English, that supports your position.

MR. HOPKINS: The second clause, referring to "incidental materials," provides no specific information and basically describes what you might find in a harbor anywhere.

The specific soils data is found in the test pit logs and the boring logs.

THE COURT: Yes, but I don't think what we're seeing is inconsistent. I understand that. I'm just trying to construe the word "few" by reading the whole provision together.

MR. HOPKINS: Correct. And I think the Court hit on one of the key issues here. There is a distinction between interpretation and contract construction. Here, the Plaintiff simply needs to demonstrate that its interpretation of the information provided by the contract, or specifically referenced by the contract, was reasonable. That's an issue of interpretation.

When we look at the word, as opposed to what is in the contract, from a purely legal perspective and construction of the legal consequences, the rule, the applicable rules, are from the perspective of a

reasonable bidder, the plain, ordinary meaning of the language.

Here, what the contractor did is he looked at the test pit logs, and he saw the term "few," and it's important to recognize that he saw that the term "few" does not apply with regard to the number of residents in New York City with the flu or but the number of Marines. He talked about few cobbles in a test pit. A test pit is a reasonably defined area. A reasonable interpretation of that, based on the plain English language, is "not many," "small number."

Applying that to the fairly well-understood volume of a test pit, leads reasonably to the conclusion, on the part of the contractor here, that the concentration of cobbles in the test pit was less than one percent.

THE COURT: Where do you get "less than one percent"?

MR. HOPKINS: That was the testimony of Mr. Heider, and that's based upon an understanding that we've got a volume of test pit, and if we hit a greater number than that, you couldn't call it "few," and the analysis done by our expert, Mr. Douglas, supports that. Mr. Douglas did a quantitative exercise, and he said, Okay, here's cobbles at various

ranges of size. Here is how much they weigh. Here is the volume of a test pit, based on the information provided by the government.

If we do those calculations, what Mr. Douglas demonstrated was that five percent cobbles were in the range of 90 to 750, if we're talking about six-inch or three-inch cobbles. At 10 percent, those numbers double. You couldn't possibly describe that as few.

It is true, there is nothing in the contract that put a specific percentage on the word "few." The question is whether the contractor's interpretation of that number was reasonable. The contractor's interpretation was based on the plain language, plain English language, "not many," "small number," within the confines of the test pit, and he came to the conclusion that certainly that meant something on the order of less than one percent.

THE COURT: Is Douglas's reasoning backwards? Are you starting from a point, well, to do this job, it has to be X percentage, so "few" must mean this?

MR. HOPKINS: Mr. Douglas is a geotechnical engineer. He didn't opine really on the selection of the equipment. He was focused simply on, we have a

test pit, we can calculate the weight and quantity of cobbles of various sizes in the test pit, and we can make some pretty objective conclusions as to how many cobbles would appear in a test pit of varying sizes if there were one percent or five percent or 10 percent.

The fundamental point of his analysis is five-to-10-percent cobbles, which is what Mr. Wilson observed -- that's his uncontroverted testimony -- he observed that in Test Pits 1 and 5 -- you could not possibly describe that as few. That's one of the key issues in the Plaintiff's position in this case is that the test pit logs were inaccurate; they were erroneous. And the contractor reasonably interpreted those test pit logs as showing far less cobbles than Mr. Wilson actually observed.

THE COURT: I'll get to that in a minute because I'm not sure I understand that, but this is what Douglas said about this reasoning backwards. This is Appendix, 343 to 344.

Mr. Douglas states: "I believe the prebid site investigations were insufficient to adequately describe and delineate the subsurface materials that would be encountered during dredging operations. This information was needed by the successful bidder to evaluate the most economic means and methods of

dredging that could be employed to complete the work. Despite the inadequacy of its prebid investigations, the Army Corps of Engineers elected, in my opinion, to indicate in the CDs that the contract soil data was representative of the entire area to be dredged."

First, and this is picking up on your point, where does it say in a testing that it was representative of the entire site?

MR. HOPKINS: That comes from the language of the contract that the Court earlier quoted, where you said that the technical specification is 02222, and I think it's paragraph 1.2.

The contract documents specifically describe test pit logs and the boring logs as for the area to be dredged and excavated. The contract here did not just enclose some soils data and say, Here is some soils data, period. The contract said, Here is soils data. Moreover, we are telling you it is for the area to be dredged and excavated. That's a representation that this soils data represented the area to be dredged and excavated.

It's particularly true when we know that the bore holes were, in fact, not specifically within the dredge limits, and that was a topic that the Court earlier discussed with Mr. Prouty, that we did provide

the Court the complete contract documents. If you look at --

THE COURT: I appreciate that. Thank you.

MR. HOPKINS: -- Sheet H-4, the contract specifically represented this data shows what you were going to dredge and excavate. It said that in regard to bore hole logs that were not actually even in the specific dredge limits, clear indicia of the intent, certainly the reasonably inferable intent, of the contract is that you should accept and take these logs as representative of the area as a whole.

That is what the Corps personnel testified to. The Corps read a letter on December 20, 2000, where it said just that. The contracting officer said as much in her decision, that the contract soils data was representative of the area. That goes to one of the arguments that the government makes to defend the differing-site-condition claim.

Essentially, the government's position is "few" is ambiguous. It has no meaning whatsoever, and you've got to ignore the bore hole logs; and, therefore, there is nothing here, and you can't draw any conclusions, Contractor, and, of course, the logical extension of the government's argument is there could never be a differing site condition on

this project, yet that's contrary to what the Corps intended and understood it was doing.

It knew that the only practical purpose for subsurface data was to allow the contractor to make a determination as to the appropriate type of dredging method and equipment, and the key factor for that decision was the extent of cobbles, coarse material, in the subsurface.

THE COURT: You just said that you disagree with the government's position on boring.

MR. HOPKINS: Yes. I think the testimony of Mr. Wilson was that his superior requested that the bore hole logs be included because he thought it would be useful information because it was existing information in the vicinity, and he thought it would be wise to include it. That's our appendix, page 13. That's Mr. Wilson's testimony.

Bore hole logs; yes, it's true, it's a three-inch diameter approximately. You can't pull a very big cobble out of a three-inch hole, but bore hole logs can give information based upon blow counts. That's the force required to drive the boring into the subsurface material.

If the Court looks actually at Bore Hole 4, at elevations way below what we're talking about here,

that bore hole log does show cobbles. So it's incorrect to say the bore hole logs don't indicate cobbles. Bore Hole 4 did, again, at depths 30 to 40 feet below what we're talking about.

THE COURT: How is the Court to construe the relevancy of that?

MR. HOPKINS: The point is, it all boils down to this. From our perspective, it was reasonable for the contractor to place some weight on the information provided by the bore holes because, first of all, the government provided it; secondly, they said it represented the area to be dredged, and the bore hole logs showed no cobbles within the area of the excavation, within the elevations of the excavation.

By having that data, it is true that the test pits were roughly in the southwest corner of the site. The bore hole logs, though, were located on the northeast corner just outside the entrance channel into the face.

It helps provide a greater degree of information regarding the site as a whole. If the contractor had looked just at the bore hole logs and said, "No cobbles," I wouldn't be here today. That would not be a reasonable position. Was it

appropriate, though? Does it support the contractor's reasonable interpretation of the contract data to place some weight on the bore hole logs? Yes.

Certainly, that was not the primary source of information. The primary source of information was the test pit logs.

THE COURT: Back to the Bore Hole No. 4, you said that was 30 feet below. Thirty feet below what?

MR. HOPKINS: The bore hole logs show elevations from the mud line, and that's below the water. So when you read the bore hole logs, you will get a distance from sea level to the mud line, and then you will need to add that number to what the log shows as to its depth.

There was notations of cobbles on one bore hole log, Bore Hole 4, and that showed cobbles at the very end of the log, deep as part of the sample (inaudible).

THE COURT: That would refer to 50 feet below sea level. Is that what the minus means?

MR. HOPKINS: The minus in the logs actually put up was called the "mud line."

THE COURT: Okay.

MR. HOPKINS: You have the drill on a barge, which is floating at sea level, and then you have a

certain amount of water below the barge, and then you have the ground surface.

So, for instance, Bore Hole 4 on the first page, ground surface/water surface minus 12. So that tell us the device is 12 feet above the mud line. You will need to add that to the depth as shown in the bore log.

So there was some indication that Bore Hole 4 had 41 feet below the mud line, which I believe was on the order of 50 to 60 feet below sea level.

One notation cobble. No other notation in any of the bore hole logs of cobbles. The point is, bore holes can give some information regarding cobbles, and they didn't show it here anywhere near the elevations for the excavation. It's a piece, and the contractor's interpretation of the bore holes was entirely reasonable, and they are not a complete nullity, as the government would suggest.

THE COURT: Doesn't that cut, though? Doesn't that cut against the Plaintiffs here, in a sense, that, well, we should count this and show the cobbles? So doesn't that put you on notice?

MR. HOPKINS: Well, that's somewhat like the Daubert argument, and I would like to spend some time on that.

THE COURT: I'll get to that in a second.

MR. HOPKINS: If the Court concludes that any indication of cobbles, no matter how minor and no matter how far removed from the work, defeats our claim, then the answer is yes.

THE COURT: But that's not what the Court is doing. What the Court is trying to ascertain is, did the contractor act reasonably?

MR. HOPKINS: Right.

THE COURT: And what is reasonable, and whether there is a conflict of facts in the record

MR. HOPKINS: That means you have to interpret the data. So the question is, what was the reasonable interpretation of the bore hole log? The government says, you can't rely on these at all because they don't tell you anything about cobbles. My point here is bore logs can give some indicia as to whether any cobbles were down there. That's demonstrated on these logs.

The only place, though, any of the bore hole logs showed it was at an elevation dramatically removed from this work area. Therefore, what's the reasonable interpretation of the bore hole logs? The reasonable interpretation is, they didn't show any cobbles anywhere close to the elevations of the work

that we're required to do.

THE COURT: So that's about 50 feet, by your calculation, below sea level, Cobble 4. Am I repeating you correct?

MR. HOPKINS: Yes, Your Honor.

THE COURT: Okay. And what was the work site?

MR. HOPKINS: I'm sorry?

THE COURT: The work site.

MR. HOPKINS: Well, we would have to get Sheet H-4 of the plans, and it showed the bore holes were outside of the dredge area. They were in the general vicinity of the entrance channel.

THE COURT: I understand that. I'm sorry.

MR. HOPKINS: Excavation was required to minus 16 throughout the majority of the site. In the area of the entrance channel, it was required to minus 17.

My interpretation of Bore Hole 4 is that the T notations of cobbles all appeared at at least minus 50 (inaudible).

THE COURT: Let me go to what you appear you really want to talk about, and that's the Golder Report. My reading of the contract and the case law is the geophysical data for this area can be obtained

from the Corps, the case law seem to indicate, and it's all a matter of reasonableness, and I agree with you, that's what's key in this case, not necessarily the philosophical -- "semantic" is better than "philosophical" -- distinction between "vague" and "ambiguity," but it's reasonableness that's going to determine who wins or who loses.

So I tend to agree with not all of the Plaintiff's arguments, but I tend to agree with that gist.

Why wasn't it reasonable, given that, to check and see what data was there? Why wasn't it reasonable to get a hold of that Golder Report?

MR. HOPKINS: Well, I think there --

THE COURT: Forget what it says because case law it also says that it doesn't kill a claim like this if they don't do it.

MR. HOPKINS: I have two responses to that. The Golder Report is geophysical, which are seismic methods of exploration. They don't involve digging or excavation or drilling. The only purpose for the Golder Report was to identify bedrock.

THE COURT: Okay, but that's not my question. The initial question is, why didn't Plaintiffs, before they started the construction work,

go out and get --

MR. HOPKINS: For that reason (Inaudible.)

THE COURT: How did they know it was in there, if they didn't go in and look at it?

MR. HOPKINS: There is note in the plan --

THE COURT: Or did they go and look at it?

MR. HOPKINS: No. They did not look at it. We admit, we acknowledge, they are charged with the information in the Golder Report. We believe it was quite reasonable not to seek it because the geophysical --

THE COURT: After the fact.

MR. HOPKINS: Yes.

THE COURT: That's all -- I'm trying to go step by step for the record here.

MR. HOPKINS: We believe it was reasonable for the contractor not to ask for it at the outset because all it would show is bedrock, and the plans made very clear that the contours of bedrock had been shown.

THE COURT: I apologize. I'm just trying to get you on the record here. So your argument is that they should have possibly sought it, but there is no harm, no foul, because it's irrelevant.

MR. HOPKINS: It's not quite irrelevant.

THE COURT: Okay.

MR. HOPKINS: The information in the Golder Report --

THE COURT: Not material.

MR. HOPKINS: -- does not show significant cobbles and, in my view, confirm the contractor's interpretation. I have several reasons for coming to that conclusion.

THE COURT: Okay.

MR. HOPKINS: First of all, it's important to understand that the geophysical methods used by Golder would not identify cobbles, either specifically or their concentration. That's the testimony of our geotechnical engineer, which is found at pages 331 and 336 of our appendix. He is very clear on that, and that is, indeed, the case.

The government's geotechnology engineer, when I asked him did he have an opinion on that issue, he had none. That's page 157 of our appendix.

The testimony of the experts here is, first of all, that geophysical refraction methods do not identify cobbles.

Second, and the most important thing for the Court, is to look at the report itself. Mr. Prouty was successful with a classic lawyer's tactic, taking

testimony in one context and applying it elsewhere. Mr. Brown did not understand he was being questioned in his deposition regarding the Golder Report. He understood he was discussing Mr. Wilson's report. Mr. Brown's testimony regarding the Golder Report is put forth in his declaration.

I would submit, Your Honor should not be distracted by the tactics, and the Court's focus should be on the content of the Golder Report. And what that says, under the "interpretations" section, is that the seismic signature, which is the result of the method, is consistent, and this is important, consistent with the test pit data.

THE COURT: This is whose testimony again?

MR. HOPKINS: This is the Golder Report.

THE COURT: I'm sorry. Okay.

MR. HOPKINS: The Golder Report. This is the key passage from the Golder Report that Mr. Prouty read you.

THE COURT: Sure.

MR. HOPKINS: It's at page --

THE COURT: It's consistent with the data. Right?

MR. HOPKINS: Consistent with the test pit data, which show mostly, mostly, gravel with some

cobbles and boulders in the upper 10 feet.

The next sentence essentially says the same thing: "The seismic signature for these upper sediments is uniform and was observed on the seismic records across the site, suggesting that Coarse Grain sediments 7 was consisting mostly of sand and gravel, but some cobbles and boulders exist throughout the site."

The word "some" is totally indeterminate as to quantity or amount. All this says is there are some cobbles. That's a known fact. The test pit log showed some cobbles. It's entirely reasonable for the contractor, had he read this, to have said, "Yes, some cobbles, which are few in number, as we were told by the test pit logs and the bore hole logs."

So our fundamental point is it's important to focus carefully on what the Golder Report itself says, and certainly that information is entirely consistent with Redd Samm's (inaudible) interpretation of the test pit logs and the bore hole logs.

THE COURT: Okay. Assuming there is no harm, no foul (inaudible), and that's true, would you address the percentage issue on which the government seems to have spent quite a bit of time?

MR. HOPKINS: In the big picture, the

percentage issue is not crucial. The real issue is, was there a material difference? And I also want to make clear, this is in regard to the differing-site-condition claim. We have two other claims that have different elements and different facts, that in regard to --

THE COURT: I understand that. I'll get to that in a minute. I'll just digress for a second.

My understanding is that, and you may not agree, that if the Court resolves the site condition claim, the circuit would -- I'll put it this way. The circuit prefers that we deal with a site-condition claim as opposed to a breach-of-contract claim first, so if that's dispositive, and you win on that, would the Court have to deal with any other claims?

MR. HOPKINS: I think if the Court concludes that any one of the Plaintiff's claims is dispositive in its favor, it doesn't need to address the other two.

THE COURT: Okay. Yes, you win. I understand that, but that's not what I'm saying. Let me rephrase that. I have to deal, first, with the site condition as a matter of law.

MR. HOPKINS: I have not specifically researched whether there is a requirement that you

must take one issue or the other, and I can provide that if the Court --

THE COURT: No, no, no. That's fine. There is a little bit of difference in the misrep.

MR. HOPKINS: What I do think is clear, and I hope it's clear, when we discuss the material in our briefs, is that a ruling against the Plaintiff on the differing site conditions is not dispositive of misrepresentation. It's applying playing different elements and analyses.

Another final point --

THE COURT: Could we deal with the percentage? I'm not sure --

MR. HOPKINS: I'm sorry. I lost my train of thought.

THE COURT: My fault.

MR. HOPKINS: The big question is really this: Were the actual conditions materially different than the contractor's reasonable interpretation of the contract data? The fundamental decision the contractor had to make here, which the government acknowledges, clearly recognizes, is, was this site suitable for hydraulic dredging? Now, hydraulic dredging can handle some cobbles. What it can't handle is too many big.

What is clearly demonstrated here is that the contractor reasonably interpreted the contract data to conclude the site was suitable for hydraulic dredging, the same conclusion that the Corps issued. The actual conditions were much, much different. There were far more cobbles than, I submit, either party anticipated, certainly far more than the Plaintiff anticipated.

The exact equipment that the Corps deemed appropriate for hydraulic dredging achieved no better productivity than the contractor. The site clearly had a materially greater degree of cobbles than either party interpreted the contract data to indicate.

From the big picture, the specific percentages are not the issue. It is, as we focus on the details, we have, to some extent, discuss degrees and concentrations of cobbles. What did the contract data reasonably indicate versus what was found?

THE COURT: Okay. Let me try to clarify why it may or may not be relevant, a percentile range, because if the definition of "few" is five to 10 percent, that would change matters, would it not?

MR. HOPKINS: If the definition of "few" is five to 10 percent, then that certainly would be (inaudible) a finding quite favorable to the

government and would raise the bar for a differing-site-condition claim. I do not believe there is any basis for it whatsoever.

THE COURT: I understand that.

MR. HOPKINS: But it is true that, yes, if the contractor reasonably should have understood the word "few," as used in the test pits, to mean five to 10 percent, then that's --

THE COURT: So that when Red Sam and the experts you hired for this was (inaudible) the experts that, you hide from the litigation? We're talking about a percentile rate. We're talking about the application and construction of the terms used. Is that correct? That's your position.

MR. HOPKINS: Both of our experts, I think, clearly testified that an interpretation of the term "few" as one percent or less was reasonable, and that's what Red Sam -- that's how Red Sam viewed it.

What they have also testified to is it would not be reasonable to interpret the term "few," used in regard to cobbles, in a test pit as meaning five to 10 percent, and that's the analysis of Mr. Douglas, and, again, that's based on some objective work, looking at sizes and weights of cobbles and volumes of test pits.

THE COURT: I can see where the confusion

lies because basically what he is saying is, as a practical matter, it can't mean that.

MR. HOPKINS: Yes.

THE COURT: Okay. So as applied.

MR. HOPKINS: Yes.

THE COURT: Okay.

MR. HOPKINS: He is saying that if I dug a test pit that had 10 percent cobbles, here is how many I would see. There would be no way to apply it to the total volume the term "few" to describe this. That's what Mr. Douglas is saying, but he is not pulling that out of thin air. He has done some calculations and put some real thought into it. The government, I might add, has offered nothing comparable.

The government's whole argument is "few" is ambiguous, and it means nothing, or, based on our idiosyncratic and improper interpretation of ASTM 2488, a standard, by the way, we never told you we were using, it must mean five to 10 percent. And, finally, the government says, if it doesn't mean that, then it's patently ambiguous.

We don't think any of those arguments ultimately make sense or are supported by the facts.

THE COURT: Well, I think the Court would have a hard time, given the record and given the

burden that the circuit, through the document restatements, would require us to find a trade usage. There doesn't seem enough evidence in the record to apply that literal that exam as an ASTM is a standard.

MR. HOPKINS: Certainly. If the record is clear that the ASTM standard was not followed, it requires a stated percentage of cobbles. The government is crystal clear that it never told the contractor it was using it in any fashion.

THE COURT: Does this create a question of fact? I'm reading -- I believe this is, again, from the Defendant's statement of facts, paragraph 15, and I apologize for not having it in the record: "Mr. Brown testified that the term 'few,' as used in the test pit, was ambiguous because it did not provide a specific percentage of cobbles observed in the test pit."

So does that create a question of fact because he said that?

MR. HOPKINS: I don't believe so.

THE COURT: Is that an issue of law for the Court to decide?

MR. HOPKINS: I think the ultimate indications of the contractor are an issue of law. The language used in the test pit logs is not

disputed. It is ultimately the interpretation of whether the contractor's interpretation was reasonable and that ultimately is an issues of law (inaudible).

THE COURT: Mr. Douglas states -- in this appendix, 343 to 344 -- "I believe the prebid site investigations were insufficient to adequately describe and delineate the subsurface materials that would be encountered during the dredging. This information was needed by the successful bidder to evaluate the most economical means and methods of dredging that could be employed to complete the work."

I'm skipping some here: "Despite the inadequacies of the prebid investigation, the Army Corps of Engineers elected (inaudible), in my opinion, indicate in CDs that Plaintiff's soil data represented the entire area to be dredged."

That's the basis for your argument, is it not, that bit of information? Is there anything else that corroborates other than the Douglas statement?

MR. HOPKINS: I think the Corps felt it had sufficient information to make judgments and decisions regarding both the likely dredging technique and the materials to be encountered and that it was reasonable, given what the government provided in representations that the government made regarding the

material as representative of the site, to conclude the government-furnished data --

THE COURT: I have a listing here of statements that government representatives made, and I'm going to ask, in rebuttal -- the time wasn't right before.

Wilson: "The purpose of the subsurface test was, in part, to determine the method of dredging."

Wilson: "The cost estimate of the project was based upon the assumption of hydraulic dredging."

Wilson: "There were actually two purposes for you drawing 96 test pit exploration: exposure of bedrock and evaluate subsurface conditions for the anticipated dredging." Is it B-E-L-I-N? Is that how to pronounce that?

MR. HOPKINS: Balene, Mr. Lyndon Balene, I believe, is the way --

THE COURT: He is a project engineer?

MR. HOPKINS: He was the project engineer for the Corps of Engineers. He had primary, day-to-day responsibility for communication with the contractor once the work started.

THE COURT: He says, "The only real reason for the subsurface information, including the contract documents, was to provide the contractor appropriate

information to select the method and type of equipment to perform the dredging."

And then Rydell, who is the change order negotiator -- is that how you pronounce it, Rydell?

MR. HOPKINS: Yes.

THE COURT: "And you consider the type of dredge to be perfect for the King Cove project a 12-inch pipeline, cutter-head dredge." That's at 144, and at 155 he says, "Wouldn't you expect, on the King Cove project, that a contractor would use the contract soil information provided to make a decision as to how the dredging equipment is to be employed." Is it "Riddle," or is this "Rydell"?

MR. HOPKINS: That's the government's geotechnical engineer (inaudible).

THE COURT: I only put the last name, so I apologize. You can see how I could get that confused with "Rydell." "The test pit data was given to him as a contract document. They should rely on that data."

Given all of these things together, it seems to support your argument, does it not?

MR. HOPKINS: I believe so. That's what we proposed, and I believe that the Court's in part (inaudible) referencing findings of fact that we laid out in testimony from the Corps personnel as to the

reason for the subsurface data and how they interpreted it. I believe every finding of fact that we asserted in that regard is adequately (inaudible) cited, already supported by what we included in our appendix, which was their deposition testimony or their documents.

Ultimately, this contract was not terribly complex. First season, you go out and build a breakwater. You don't need to know the subsurface conditions to do that. You're dropping rocks on top of the sea bed floor, and the government personnel acknowledged that in their testimony.

The only real practical purpose and need for the subsurface data was to address the dredging. Yes, the government had to figure out if there was bedrock, but they also needed to know the nature of the materials to determine the method and equipment to use for dredging, and in that regard, there was really a pretty clear choice: a clam shell, which could handle a lot of cobbles; or hydraulic dredging, which could not handle a lot of cobbles.

Mr. Wilson, page 28 of our appendix, clearly acknowledges the purposes of the test pit explorations was to also evaluate subsurface conditions for the anticipated dredging.

"Q So it's true there were actually two purposes for your July 1996 test pit explorations: explore for bedrock and evaluate subsurface conditions for the anticipated dredging. Correct?

"A Yes."

THE COURT: That was the 64 million-dollar question, with the inflation rate. Are you contending that there is absolutely no material evidence on the other side?

MR. HOPKINS: A material issue of fact?

THE COURT: Yes.

MR. HOPKINS: Well, Your Honor, I certainly contend that there is no material issue of fact that would preclude a summary judgment in favor of the Plaintiff, and, to some extent, our arguments are diametrically opposed.

But to answer your question, I do not believe there is a material issue of fact that I can identify at this point.

THE COURT: Okay. Bear with me one second.

Here is something that I didn't touch on that I wanted to go over about the government's reliance argument on you. I'm not putting words in their mouth, Mr. Prouty's mouth. They argue that the

Plaintiff was planning on using clam shell dredging when it bid. Therefore, there was no prebid reliance (inaudible).

MR. HOPKINS: That is an argument the government made in its initial motion. In our initial response, we pointed out that the authority that the government cited for that proposition didn't stand for that rule. They cited Comptrol, where the contractor never read the subsurface data at any point in time.

We also pointed out that this Court has ruled, in the Sargent Mechanical case, that prebid reliance is not required in a differing-site-condition claim, and the court, in that decision, discusses that ruling at page 522 of its decision, footnote 24. There was reliance in that case. It wasn't necessarily demonstrated to be prebid.

We also pointed out that even in the latent ambiguity context, and our claim is not based on an ambiguity, per se, although we --

THE COURT: I understand.

MR. HOPKINS: -- we believe that the word "few," to the extent it's ambiguous, has to be interpreted against the government, but it's only latently so, at most.

We pointed out that, in WPC Enterprises, the

court held that reliance during the performance was sufficient to meet the reliance test, so long as the government didn't make known its competing interpretation. That certainly is the case here. The government never explained to the contractor what it meant by the term "few" until the contracting officer's decision was issued two years after the work was completed, more than two years.

So there is no authority that requires that reliance be prebid. There is authority that indicates reliance during performance is sufficient, and I think that's a practical and reasonable conclusion. In a multiyear project, the contractor may have reason to interpret and rely on the soils data at varying points of time (inaudible) very importance of time, not just when it bids (inaudible). And if a contractor is told, well, you only get to look at this one time, and we're only responsible for it once, and you can't make any decision relying on this data at any time after you did this job, then that could well engender the type of contingencies, big contingencies and differing-site-condition clauses and signed approval.

THE COURT: There seems to be a conflict of fact, although it may not be material. Did the Plaintiff provide the government's test pit logs to

DeGroot & in Holland?

MR. HOPKINS: I don't think there is any conflicting evidence of that. We submitted the declaration of Red Sam's superintendent on the Don Luterbach (inaudible). We went to Holland with Mr. Heeter Hader, and Mr. Leuterbach was responsible for putting all the data together, and he plainly states that he provided the contract data, the test pit logs, and the drawings, to a degree.

I think it's important that the Court recognize there was a two-step process in Red Sam's decision-making.

THE COURT: Okay.

MR. HOPKINS: It made the decision that the site was suitable for hydraulic dredging in the fall of 1999. It wrote a letter to the Corps on October 12, 1999, that says, okay, this is our plan now. We are going to hydraulically dredge. We're going to dispose of the material upland.

Ms. Rydell, the government's change order negotiator and presumed expert on dredging, received that letter at the time and testified, yes, she didn't have any concerns. She thought the site would be suitable for hydraulic dredging. Yeah, the contractor might have to deal with a few cobbles, a few cobbles,

but she viewed it as suitable.

What's important, the contractor hadn't selected the specific equipment at that point. That didn't happen until several months later when I went to Holland and consulted with the DeGroot engineers. The government would have the Court focus solely on the selection of equipment in regard to their reliance argument and then can ignore the most fundamental decision was, this site is suitable for hydraulic dredging, and we're making this decision based on what the contract data has shown us.

THE COURT: Anything else?

MR. HOPKINS: I guess, two quick points. Back in regard to the <u>Golder Report</u>, one of the other fundamental reasons that that issue is not a defense for the government is that I think this Court has addressed an identical issue in an identical context in both the <u>United</u> contract and <u>Christopher T. Robb Instructors</u> cases.

Patent ambiguity; I'm not sure the Court needs any argument on that. That argument was not asserted until these summary judgment motions were brought, multiple years after the work was performed. That fact alone dramatically underlies any conclusion that the ambiguity was gross, patent, glaring. I

mean, if it's that bad, somebody would have seen it far earlier.

The Corps of Engineers, during the course of the work, received notices from Red Sam, I've got a different site condition. Red Sam provided a letter, August 20, 2000, that explained its interpretation of the test pits. Corps personnel -- Mr. Balene, the project managers -- testified, yeah, we all sat down and talked about this. But they never wrote back and told the contractor it was patently ambiguous. In fact, they didn't provide any interpretation at all. The contracting officer didn't say it was patently ambiguous when she rendered her decision.

When the government answered both our original and amended complaints, it never raised it as an affirmative defense. That delay is significant, and this Court has said so in the Record Steel decision, that delay in raising the issue of patent ambiguity is a clear indicia that, in fact, it's not patent. Logic suggests, if it was patent, somebody would see it and see it relatively early.

The other terrible problem I have with that argument here is that if you accept the government's argument on the patent ambiguity, then the Court would be freeing of any duty to disclose Superior knowledge

(inaudible).

Our view is that the actual observations of the cobble percentages, the actual observations made by Mr. Wilson, was material information known only to the government that had to be disclosed. Under the government's theory and approach, any time it has superior knowledge, it can simply hide it in patently ambiguous language and escape all responsibility whatsoever.

If the contractor asked for it, well, the government might disclose it, like it had an obligation to do so in the first place. If the contractor doesn't ask for it, then the government says, oops, too bad. We were supposed to tell you this, but, instead, we described it with patently ambiguous language, and you didn't ask us for it.

I don't think that's really the state of the law, and the one board decision we cited, the Power City Electric case, I believe, came to the same conclusion.

THE COURT: In Power City, was there a clause in the contract that said, such-and-such documents are in New York City?

MR. HOPKINS: No.

THE COURT: What I'm driving at is --

MR. HOPKINS: I do not believe that analogy would apply to the decision. I'm not 100-percent sure.

THE COURT: Again, what the cases are confusing about is when one would apply reasonableness, as the contract requires, because the FAR is incorporated into the contract, and when it becomes a matter of definitional ambiguity. I guess, being somewhat of a stickler, a lot of these cases really ought to be decided under the rubric of construction, of reasonableness, and so there is some confusion.

MR. HOPKINS: Well --

THE COURT: But that's okay. Reasonable courts can disagree, too.

MR. HOPKINS: I think the traditional rules will guide the Court.

THE COURT: Of course.

MR. HOPKINS: I don't believe that you can interpret the word "few" as patently ambiguous without doing a complete violence to (inaudible) of the English language. If "few" is patently ambiguous, God help us; everything is, if "few" had a common, ordinary, understood meaning of not many, small.

So that's the first point. If it's not

patently ambiguous, it gets construed against the government, and the contractors are given even more of the benefit of the doubt.

THE COURT: I understand that. What I'm trying to drive at is you could win on that argument and lose on a reasonableness argument, hypothetically. That's all I'm saying, not --

MR. HOPKINS: And certainly hypothetically, but I don't believe so on the facts because the government --

THE COURT: Fair enough.

MR. HOPKINS: All the government says is, Gee, "few" is so might be, you, Contractor, couldn't draw any meaning from it. That's its fall-back argument. Even if it's not patent, it doesn't tell you anything, and we've already explained that it did tell us.

Our interpretation of what it told us was quite reasonable, but, beyond that, the government cannot escape the fact that if you accept its argument that "few" told us nothing, then the government clearly misrepresented the findings of its geotechnical engineer. Its geotechnical engineer testified unequivocally. He sat in front of that test pit, Test Pits 1 and 5, and he saw five to 10 percent

cobbles. In Test Pit 2, he saw more than five percent, and he used the words "with cobbles" to describe that. The government doesn't even try to explain why that was accurate.

So if you accept the government's argument on the differing site conditions that "few" conveys nothing, then that's effectively an admission by the government that they didn't accurately compile the test pit logs and did not accurately convey what Mr. Wilson observed.

THE COURT: I understand.

MR. HOPKINS: Thank you, Your Honor.

THE COURT: Thank you.

We have cross-motions. Is that correct? Okay. You actually get the last word. Do you believe the statements that, in part, read from Wilson, Balene, Rydell, gives gloss to the meaning of "few"?

MR. PROUTY: I don't think so, Your Honor.

THE COURT: No? Did some evidence, extrinsic evidence?

MR. PROUTY: No. I think statements you read from individuals gave (Inaudible) indications that part of why they did the test pits and part of the (inaudible) Wilson had mentioned. I think (Inaudible) Rydell; if memory serves, you read from her was her

statement that this might be suitable for hydraulic dredging (inaudible). And, by the way, one thing that should be made clear is that, even after the alleged differing site conditions was encountered of the government, when Red Sam's completion contractor came in, the following season you had already (inaudible) and began with its clam shell dredging.

After they had experienced it for a while, they brought in a hydraulic dredger. The notion that hydraulic dredging had no place, and nobody could have used hydraulic dredging in King Cove is just not right because the individuals who actually worked on the site for the Plaintiff, and, in a sense, worked for Travelers Insurance, did, in fact, use hydraulic dredgers later on in the game (inaudible).

The point is that the individuals did say that the quotes you read, yeah, we did some test pits, which we thought would be helpful to some degree, and it's not unhelpful in determining what kinds of items you would encounter when you're actually doing the work now.

The fact that the contracting officer and everybody else believed that the test pit accurately reflected what was found throughout the site gives some gloss, although obviously not that persuasive

because it's the government and it is in our best interest (inaudible) to say so. But, yeah, we thought that those test pits did show there were cobbles, enough cobbles to issue a warning that one should encounter them when they, in fact, do the work.

Now, again, of course, is a self-serving statement on our part so (inaudible) it doesn't have a whole lot of gloss, but the point is that it's consistent with what we've already said.

Now, in terms of the suggestion of it not being a patent ambiguity until now suggests somehow or other that it is a nonpersuasive argument, and we would suggest that that's not true. In Record Steel, Judge Lettow's opinion, which is cited by the Plaintiff, doesn't really give any analysis about the legal here is the reason why if you sit on a patent ambiguity claim too long it is not there. (inaudible) opinion be the true law is not there. Essentially, it sort of mentions, in passing, as part of a patent ambiguity, hey, these guys didn't bring it up until now, et cetera.

Now, the reason, in a sense, the fact that the government didn't bring up patent ambiguity until now -- that is, the Corps of Engineers didn't bring it because, obviously, it's not much of an issue that

must be plead (inaudible) once the case is in litigation -- demonstrates exactly why this is the kind of case for which there should be inquiry. The Corps thought, hey, few equals five to 10 percent -- you're on notice -- and they had no reason to believe that that was incorrect, that was a misreading of things.

It becomes patently ambiguous once you decide it's not five to 10 percent. If you decide it's not five or 10 percent, then, holy smokes, you've got this wide range of percentages it might be (inaudible) which makes it patently ambiguous the purposes the Plaintiff is using it for. After all, it is not that there is a list of words: Here are the words in the English language which are patently (inaudible) ambiguous.

It depends upon the context, how they are used, and it's in the context of the contract whether or not the phrases describing things are ambiguous or not, or sort of give a broad scope of meaning, or, again, I would suggest wide error bars; that is, when Mr. Wilson said "few," he certainly had in his mind it was 5 to (inaudible) [redacted] 10 percent. But anybody really would say, "Okay. 'Few' is a term which includes a range within its possibilities. The range

could be from slightly more than zero to whatever number it might be."

Now, Mr. Brown said, I saw it, and I thought it might be two to 20 percent, minimum, with the deletion error. Of course, then we have the mathematical exercises that Mr. Douglas went through. He said, Well, I'm going to add a number of cobbles and figure out their weight for a particular sized volume, and, therefore, derive that "a few" must be a certain percent, if I make all of these assumptions.

That's an interesting hypothetical exercise to undergo, but it doesn't really get us anywhere because "few" has to be relative to what the area is and what is within the area(inaudible) [redacted]. Again, two people in New York City, and two people in the United States; what might that be (inaudible)? Is the few in the Marine Corps 300 million, or the 1.2 million in the United States military? Who can say?

Maybe we would all agree that "few" is less than 50 percent, in fact, probably less than 25 percent, but, beyond that, it is inherently difficult to get our hands wrapped around, which is the exact point that the government has been making all of this time.

The difficulty in getting a reason to say, where did this number come from? Where did this less-than-one-percent come from? Tell me how you hang your hat on that. And it's just not inherently in any definition of "few," which is why, if you're going to need to make a determination based on very tight tolerances -- the type of tolerance we're talking about is that Plaintiff says that if they had known that it was between five and 10 percent or greater, they would not have used hydraulic dredging.

If you're going to make that kind of a determination, and if you're going to interpret a contract in such a way, you're going to have to have more than what both Plaintiff's experts call an ambiguous, qualitative quantitative term. There is just no way to make a reasonable determination, again, based upon two words in test pit, only one of which actually was within a small corner of the area to be dredged.

Now, as far as the bore holes go, Bore Hole 4 does, in fact, use the word "cobbles." That's true. What it doesn't do is give us percentages, and, in fact, if you look at the bore holes, generally, what you see is gravel, sand, et cetera, and then cobbles. It doesn't (inaudible) sort of split the percentages or

really (inaudible) doing or not doing to characterize the materials, which is exactly the a good point.

You're not going to be able to figure out all of the percentages, things of that nature, when you look at a bore hole. What you're going to see is this is what they predominantly found: sand, gravel, displaced (inaudible) cobbles. And, in fact, that fits in well with what everybody has agreed, which is that bore holes are not a good way of treating cobbles. You can't really look at a bore hole and say, "Hey, there's no cobbles." It doesn't make that (Inaudible) a representation. Of course, we also know that these bore holes were taken some distance away from the actual area to be dredged.

The question about reasonableness really comes down to whether you, as a contractor, rely upon a test pit using nonqualitative terms for making a determination, I'm going to not use the clam shell dredging, which I planned on using, but I'm going to use this hydraulic dredging, which I'm going to need to go and buy a new piece of equipment, and the answer is no. In fact, we do know is that, with Holland, they provided them the information and say, Here's the percentages of what you're going to find.

Now, the point, the suggestion, was that Mr.

Leuterbach said, Well, I gave him the contract documents. What good is that? You could give him a binder full of contract documents and say, Here is what we're doing, and, by the way, here also, what you'll see on the fax we sent you, are what we've got. We have no idea whether the DeGroot people read the test pit logs and came to the conclusions that Plaintiff claims they came.

What we do know is that they definitely looked at the information that was provided to them by Red Sam, which, when they did their own tests and found zero cobbles, despite the fact that they are (inaudible) complaining about how zillions cobbles suffused the area, despite the fact that they did poor test pits and actually went into the water to get 50 cubic yards and reported not a single cobble. That's information that they gave to DeGroot, who made the decision to use their dredger.

Now, the suggestions were made that it really doesn't matter what they told DeGroot because the decision was made in October that they were going to use the hydraulic dredger, and, therefore, what difference because the decision had already been made, so you've already made your reliance test.

But the point is, if they had given to

DeGroot the information that showed the existence of (inaudible) cobbles, the belief of DeGroot, of course, is that our machine can handle this or any other dredge manufacturer (inaudible) could handle it. Therefore, they came to the conclusion that, no, we have to go back to what we intended to do prebid, which was, in fact, using the clam shell dredger.

The question about whether or not the reliance should be pre- or post-bid is one where we said in our openings is brief, but it really needs to be prebid on the reliance. In Comptrol, it actually said those words. One of the cases we cited, we cited inaccurately, and we apologize for that (inaudible). But that's a good one because not only did Comptrol stand, but not Frucon but --

THE COURT: Yes. Too many of those Frucon cases.

MR. PROUTY: Yes. It's actually Fruen Cullen, which is the case that they distinguished by the them (inaudible) Sargent footnote (inaudible).

THE COURT: Yes.

MR. PROUTY: Pre-bid reliance. It does (inaudible). Now, the Sargent footnote doesn't really go into a whole a lot of detail about why it should conclude what it does (inaudible), why the court

concludes what it does. But, frankly, Fruen Cullen is controlling as opposed to the footnote from this court(inaudible) might be.

But I'll say that we've thought about this, but why should it be that there should be this arbitrary decision, or seemingly arbitrary decision, when whether it's pre-bid versus post-bid (inaudible) reliance. The reason why it's important is that's how you figure out damages (inaudible) recognized. You figure out, this is what we expected to do, and this is what we have to do, and that's why the court draws that line.

If you'll look at Comptrol, I would suggest that on page 1364 of the court's opinion is where there is a discussion about essentially prebid reliance, and, of course, we know that there was prebid reliance because, frankly, (inaudible) because it was going to be clam shell dredged, this was somebody else's problem.

Now, we heard briefly about the Golder Report and the question about whether or not it is a big deal. You don't have to take my word for it that it's a big deal in its characterization(inaudible). What you should do is take Plaintiff's word. Plaintiff, in trying to make it out as

misrepresentation and other claims, said, if only we had seen Charles Wilson's report, where he said "some." If only we had seen "some," that would have changed a lot of things, and, sure enough, that was in the Golder Report.

It doesn't matter that you can't identify individual cobbles in a refraction study of seismology. It doesn't matter. What does matter is that the (inaudible) speeds and what they have found in the strata were consistent with what we expect from test pit data, which is some boulders, gravel, some boulders, and some cobbles throughout the area. Because after all there (Inaudible) has been some suggestion that, in the discussion about test pits, it actually -- these areas were expected to have more cobbles, and you would have less as time went on.

Mr. Douglas, the argument you read, actually makes a very good case for the government about the unreasonableness of a reliance upon the test pits as being how you would decide what you were going to encounter (inaudible) work on time. Certainly, I agree with this witness about relying upon them with unspecific words, but Mr. Douglas said, This is not adequate for a person to determine what's going to be found. That's right.

A test pit that is actually in a small corner of the dredge area does not tell you what you're going to see throughout the rest of the area, and there is really nothing in the contract documents which represents to the individual (inaudible), or anybody, that we know that it will lead -- this is where to apply it throughout the test pit area.

I think I've addressed most of the issues that I think Mr. Hopkins has brought up. I suppose Your Honor has no further questions (inaudible).

THE COURT: I only have an observation, which probably contains a hidden question. I take the government's bottom-line argument to be that, in the section of the contract, which I think is entitled "Character of Materials,"

MR. PROUTY: No representations are really made there, no representations that throughout the area, you're going to find less than one percent cobbles.

[redacted] No representations are made that are materially different than what was encountered in the actual [redacted] dredge area (inaudible), and that's the key. They have got materially different representations, and no representations upon which a reasonable contractor

could conclude that you're not going to find any difference.

Again, one of the requirements of a Type I differing condition declaration is that conditions were not reasonably foreseeable. You join those with the affirmative(inaudible) representations required. We are not, as Plaintiff would have it, hiding behind the fact that he gave bad information on about the test pit data (inaudible). But that gives us danger of a Type II differing-site-conditions which we don't have (inaudible).

We chose to get to review the investigation, which we did. We were, frankly, most concerned about the bedrock because that's the big expense, and we found that out, which obviously, by the way, does drive your method of excavation because if you find bedrock, you wouldn't have to shoot your explosives (inaudible).

THE COURT: That certainly would make it more expensive. That's for sure.

MR. PROUTY: By far. And that is important(inaudible), moment, Your Honor. Thank you very much.

THE COURT: I appreciate it. Thank you very much.

MR. HOPKINS: Your Honor, I'll be brief. I would like to make, I think, no more than two, or perhaps (inaudible).

Mr. Prouty said that the government always believed the term "few" meant five to 10 percent, but I think the record shows precisely otherwise. Page 98 through page 105 of our appendix is a portion of the deposition testimony of Lynden Belin Linda Byley, who was the project manager. And I think the Court may recall that Red Sam gave notice of a differing-site-condition claim in July and followed that with a letter shortly thereafter that said, Here is how we interpreted this.

So I asked Mr. Balene, certainly you guys sat down and discussed this. On page 98 of our appendix, I said:

"Q So it would seem logical to me that, at that point, you might have some discussions, at least initially, with Mr. Wilson regarding what he meant by the terminology in the test pit logs. Correct?

"A I would believe so.

"Q What do you recall him telling you? You mentioned you discussed a few cobbles. What do you recall Mr. Wilson telling you what that meant

in his mind?

"A Boy, that's a little hard to really pin down, but, you know, we talked about a few. We saw some cobbles in there. He thought it was, he thought it was a few.

"Q Did he answer?

"A I don't recall him saying a certain percentage. I don't know as we really spelled that out."

Later in Mr. Balene's testimony, page 104, I came back to the subject.

"Q What do you recall of those discussions, and who were they with?

"A I think probably Ron and Deb (Deborah Rydell) and possibly Chuck Wilson, and the consensus consistence was that 'few' is a little vague. What is that? 10 percent? 20 percent? five percent? So it was hard to put a handle on exactly how many.

"Q Had no one, at that point, within the Corps suggested or told you that 'few' meant a certain percentage, did they?

"A No. The Corps did not come up with its interpretation that 'few' meant five to 10 percent, I believe, until they issued the

contracting officer's decision."

The other point is Mr. Wilson's written report. It contained more substantive information than use of the term "some." On page 2 of his report, which is 274 of our appendix, Mr. Wilson has a discussion and analysis. He has a section that says. "Dredging Feasibility." In his report, he says, "The gravel soils containing cobbles and boulders should not present major problems, provided the equipment used to dredge these materials is commensurate with those conditions."

Well, that statement doesn't use the term "few." It doesn't use "some." In fact, it could easily be read as saying, if you don't bring out some more equipment, some real horsepower here, you might have major problems.

So Mr. Wilson's report is not quite as innocuous as the government would characterize it, and the fundamental point is it has some substantive information and discussion that is inconsistent with the use of the term "few" in the test pit logs.

And, finally, Mr. Wilson's testimony was that, considered as a whole, he concluded that the test pit logs, the test pit exploration, showed significant cobbles, and that was simply never

communicated by the government in any fashion. In fact, what they told the contractor was the precise opposite, that there were few cobbles, and provided bore logs that showed them. Thank you.

THE COURT: Okay. I want to thank counsel for their patience, and I appreciate you elucidating the issues in the case, a very interesting case interpretation. I'll get back to you as soon as I can. Thank you for traveling.

MR. HOPKINS: One more question, Your Honor.

THE COURT: Certainly.

MR. HOPKINS: There is the question about the integration, and you wanted us --

THE COURT: Oh, yes. If you find it, just e-mail Eric here, the law clerk.

MR. HOPKINS: Okay. We won't discuss anything before an e-mail is sent to the Court.

THE COURT: That would be fine. That's something you should agree or not. There is usually a clause in there. I didn't see it.

MR. PROUTY: We will discuss that issue to see if we can reach an agreement. If we can't, we will figure out a very simple and short procedure to make the submission.

MR. HOPKINS: (Inaudible) his tax report,

Your Honor.

THE COURT: Sure. Usually, there is an integration clause even in these types of contracts, and if there is not, then I'm not sure that it matters because this is partial integration, the clause that I read in the FAR. I'm just trying to close loose ends. Thank you.

MR. PROUTY: Thank you, Your Honor.

(Whereupon, the hearing in the above-entitled matter was concluded.)

//

//

//

//

//

//

//

//

//

//

//

//

//

//