# The United States Court of Federal Claims

**No: 04-487 C**
March 19, 2007

---

**TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA,**

***Plaintiff*,**

**v.**

**THE UNITED STATES OF AMERICA,**

***Defendant*.**

---

**Summary Judgment; Contract Disputes Act, 41 U.S.C. § 609(a); Tucker Act, 28 U.S.C. § 1491(a)(2); FAR § 52.236-2 Type I Differing Site Condition; Misrepresentation; Superior Knowledge; Restatement (First) Contracts; Restatement (Second) Contracts; FAR § 52.236-3**

*James T. Hopkins*, Schiffrin Olson Schlemlein & Hopkins, PLLC for the plaintiff.

*J. Reid Prouty*, Commercial Litigation Branch, United States Department of Justice, for the defendant.

## OPINION AND ORDER

**Block, *Judge.***

This is a breach of contract case. Plaintiff, Travelers Casualty and Surety Company of America ("Travelers"), is the assignee of a claim by Red Samm Construction Company ("Red Samm") asserted against the United States, acting through its agent the United States Army Corps Engineers (the "Corps"). Red Samm entered into a contract with the Corps to improve a small boat harbor in King Cove, Alaska, part of the Aleutian Island chain. The contract called for the harbor improvements to be performed in two stages in consecutive seasons: the first stage consisted of building a breakwater, the second consisted of dredging the harbor behind the breakwater.

While the breakwater first stage proceeded without a hitch, Red Samm faced—literally faced—impediments in the second stage. These impediments were copious amounts of "cobbles"—rounded or ragged stones between three and twelve inches in diameter (not dissimilar in many ways to the cobblestones paving old-fashioned city streets). The presence of these abundant cobbles prevented Red Samm from timely completing stage two of the contract. Red Samm contends that the cobbles prevented it from employing a hydraulic dredge as the contract indications led them to attempt. As a result, Red Samm was forced to hire a subcontractor, which in turn used a combination of dredging techniques to complete the job the following year at the significant added

cost of $2,729,242. The Corps withheld payment of $218,460 from the contract balance as a result of the delay. After the assignment, Travelers brought suit in this court asserting, *inter alia*, Type I differing site condition, misrepresentation and failure to disclose superior knowledge claims demanding reimbursement of the added costs incurred by Red Samm as well as a claim for the alleged wrongfully-withheld payment.

The contract specifications are the heart of the controversy, as plaintiff maintains the specifications misled Red Samm into believing that the dredging site contained only a "few" cobbles. The parties primarily battle over the meaning and application of the word "few." Exhibits appended to the contract and incorporated by reference here help define the contract's terms and meaning. The court does not face a Gordian knot. Meaning is ascertainable.

Before the Court are the parties' cross-motions for summary judgment. As fully explained below, because Red Samm reasonably interpreted and relied upon the contract representations concerning the expected site conditions, and the actually-encountered conditions differed materially from those representations, plaintiff's motion is granted with respect to liability and defendant's motion is denied.

## I. FACTUAL BACKGROUND[1]

King Cove, Alaska is a small, rugged fishing town located on the southern side of the Alaskan Peninsula, on a sand spit fronting Deer Passage and Deer Island, some 625 miles from Anchorage. Bidding Documents SCR-3. King Cove is accessible only by air or sea. *Id.* Planes coming into King Cove commonly face gale force winds as they land on a 3,600-foot gravel runway. *Id.* at 3-4. Visitors may also visit King Cove via a state owned Ferry that operates bi-monthly between May and October. *Id.* King Cove's climate is relatively mild with average temperatures of 25° F to 55° F, extremes from -9° F to 76° F, and precipitation totaling about 52 inches of snow and 33 inches of rain, annually. *Id.* Founded in 1911 and incorporated in 1949, King Cove has a population of 723 inhabitants.[2] The King Cove economy is primarily dependent on the fishing and fish processing industries. *Id.* The present dispute centers on the Corps' project to improve a small boat harbor in King Cove.

In 1974, the Corps completed an 11 acre small boat harbor in King Cove. PPFUF ¶ 34. Twenty years later, the Corps decided to construct a new harbor and performed investigations and

---

[1] Facts from this section come from: Bidding Documents; Contract; Defendant's Proposed Findings of Uncontroverted Facts ("DPFUF"); Plaintiff's Response to Defendant's Proposed Findings of Uncontroverted Facts and Plaintiff's Additional Proposed Finding of Uncontroverted Facts ("PPFUF"); Defendant's Response to Plaintiff's Additional Proposed Finding of Uncontroverted Facts ("DRPPFUF"); Defendant's Appendix to Defendant's Proposed Findings of Uncontroverted Facts ("Def. App"); Plaintiff's Appendix to Plaintiff's Response to Defendant's Proposed Findings of Uncontroverted Facts and Plaintiff's Additional Proposed Finding of Uncontroverted Facts ("Pl. App.") and Plaintiff's Amended Complaint ("Pl. Am. Compl.").

[2] http://www.commerce.state.ak.us. (Click on "Alaska Community Database," then click "Detailed Community Information," and then click on "King Cove").

feasibility studies of three potential sites from 1995 to 1996. PPFUF ¶ 35. On June 29, 1996, the Corps' geotechnical engineer, Charles Wilson, excavated five tidal-zone test pits[3] at the project site. PPFUF ¶¶ 35, 38. The test pit explorations, excavated with a backhoe during low tide, were performed to explore for bedrock and to evaluate subsurface conditions with regard to dredging. PPFUF ¶ 38. Wilson documented his work with five test pit logs, a test pit location map, photographs, and a two-page report ("the Wilson Report"). PPFUF ¶ 39. Of the documentation compiled by Wilson, only the test pit logs were included or referenced in the contract documents. PPFUF ¶ 39.

The following year, the Corps' project team compiled the "Navigation Improvements Detailed Project Report and Environmental Assessment - King Cove, Alaska" ("the Detailed Project Report"), summarizing the investigation and analysis performed in the previous years. PPFUF ¶ 40. The Detailed Project Report was not included as part of the contract. *Id.* A Detailed Project Report appendix, entitled "Geotechnical Report," contained Wilson's five test pit logs, a test pit location map, and five photographs taken during the excavation. Pl. App. 182-06. The Detailed Project Report indicated that the Corps interpreted the test pit logs to show easily dredgable material conducive to hydraulic dredging. A cost estimate reflected this interpretation as well, indicating dredging material of "sand, gravel, and some boulders," and assumed that dredging would be performed by a hydraulic, cutterhead pipeline operation. PPFUF ¶¶ 41- 42.

On May 13, 1998, the Corps published an initial solicitation for the King Cove Harbor Improvements Project ("the Project"), calling for the construction of a breakwater[4] and the dredging of an entrance channel and mooring basin at the pre-existing harbor site. DPFUF ¶ 1; PPFUF ¶ 97. The solicitation included the standard Federal Acquisition Regulation ("FAR") Site Investigations Clause, providing, in part:

> The Contractor acknowledges that it has taken steps reasonably necessary to ascertain the nature and location of the work, and that it has investigated and satisfied itself of the conditions which can affect the work or its cost, including but not limited to . . . (5) the character of equipment and facilities needed preliminary to and during work performance. The Contractor also acknowledges that it has satisfied itself as to the character, quality, and quantity of surface and subsurface materials to be encountered insofar as this information is reasonably ascertainable from inspection of the site, including all the exploratory work done by the Government.

DPFUF ¶ 2. Additionally, the solicitation included a description of the area to be dredged. Section 02222, Dredging, Excavation, and Disposal, provided:

---

[3] A test pit is a subsurface excavation of materials conducted for the purpose of discovering the subsurface conditions (including depth of bedrock as well as the type of soils to be encountered); knowledge of which is necessary in making the decision as to what type of equipment will be employed during a dredging operation. PPFUF ¶ 38.

[4] A breakwater is an offshore structure (as a wall) protecting a harbor or beach from the force of waves. *See* Merriam-Webster OnLine Dictionary, http://m-w.com/.

> 1.2 - Character of Materials - Exploration Logs for the area to be dredged and excavated are enclosed in Appendix A. Incidental sunken logs, boulders, rock, snags and other miscellaneous debris from harbor and fishing operations should be expected. Geophysical data for this area can be obtained from the Corps of Engineers, Geotechnical Branch - Soils and Geology Section, Alaska District.

DPFUF ¶ 3.

The referenced exploration logs, included in the contract documents as Appendix A, were the five test pits logs created by Wilson in 1996. The exploration log for Test Pit 1, dug to ten feet deep, indicated "Silty Sand" for the first foot, "*Gravel w/ few Cobbles & Boulders*"[5] for the remaining nine feet, "Easy Digging" and "Sidewalls Caving - Refusal" at ten feet. DPFUF ¶ 5 (emphasis added). The exploration log for Test Pit 2, dug to nine and a half feet deep, indicated "*Gravel w/ Cobbles & Boulders*" throughout, "Easy Digging" and "Sidewalls Caving - Refusal" at nine and a half feet. DPFUF ¶ 6 (emphasis added). The exploration log for Test Pit 3, dug to five feet deep, indicated "*Gravel and Cobbles*" for the first foot, "Weathered Bedrock" for the remaining four feet, and "Difficulty of Digging - Refusal" at five feet. DPFUF ¶ 7 (emphasis added). The exploration log for Test Pit 4, dug to nine feet deep, indicated "*Gravel & Cobbles*" for the first foot, "Gravel" for the remaining eight feet, "Angular to Subangular," "Easy Drilling" and "Sidewalls Caving - Refusal" at nine feet. DPFUF ¶ 8 (emphasis added). The exploration log for Test Pit 5, dug to eight feet deep, indicated "Silty Sand" for the first foot, "*Gravel w/ few Cobbles*" for the remaining seven feet, and "Easy Digging" and "Sidewalls Caving - Refusal" at eight feet. DPFUF ¶ 9 (emphasis added).

The Wilson Report, not included or referenced in the contract documents, characterized the test pits as indicating that "the basin area to be (sic) underlain primarily by gravel containing some cobbles and boulders . . . . [T]he gravel soils containing cobbles and boulders should not present major problems provided the equipment used to dredge these materials is commensurate with those conditions." Pl. App. 274. Wilson contends that he intended to convey within his report the existence of "significant cobbles and boulders present within the subsurface conditions." DRPPFUF ¶ 53. Wilson also contends that he expected his report to be available to any "prudent contractor" who requested it. Pl. App. 57. There is no evidence, however, that shows the Wilson Report was obtainable. *See* Hr'g Tr. 17-18.

In addition to the test pit logs, the solicitation's Appendix A included drilling logs from four soil borings[6] performed in November 1985 in connection with a previous project. Pl. Am. Compl.

---

[5] The American Society for Testing and Materials ("ASTM") has developed standard definitions for terms used in soil investigations that are generally recognized as industry standards. DPFUF ¶ 10. The ASTM defines a "cobble" as a particle of rock that will pass through a twelve inch square opening, but be retained by a three inch sieve. DPFUF ¶ 11. The ASTM defines a "boulder" as a particle of rock that will not pass a twelve inch square opening. DPFUF ¶ 12.

[6] A soil boring is a three inch diameter coring of the subsurface that is abstracted by drilling down with a conical drill piece and removing the earth within the coring. The narrowness of a soil boring limits the information that can be inferred from it because it is incapable of giving information of

¶ 3.2. These soil borings were located in the northeastern portion of the project area, outside of the actual dredge limits. PPFUF ¶ 60.

The Corps also procured a seismic survey of the King Cove area in order to determine the depth and location of bedrock. The survey resulted in an eleven-page report known as the "Golder Report." DPFUF ¶ 17. The Golder Report was the "Geophysical data" referenced in Section 02222 of the solicitation (see above), that the Corps made available to potential bidders upon request. *Id.* The Golder Report included a section which read as follows:

> This [seismic] signature is typical of course grained sediments deposited in a high energy environment. This interpretation is consistent with the test pit data from the southwest end of the site, which shows mostly gravel with some cobbles and boulders in the upper 10 ft. The seismic signature for these upper sediments is uniform and was observed in the seismic records across the site, suggesting that course-grained sediments, consisting of mostly sand and gravel with some cobbles and boulders exist throughout the site.

DPFUF ¶ 18.

In response to the Corps' project solicitation, Red Samm prepared and submitted a bid for the contract. While preparing its bid, Red Samm visually inspected the project site's physical appearance, reviewed the Corps' geophysical data (including the five test pits logs and soil boring logs), and requested a quote for the dredging operation from subcontractor, American Construction Company ("American"). PPFUF ¶ 62. American reviewed the Corps' geophysical data and prepared a quote to dredge the project site, which was incorporated into Red Samm's bid. *Id.*

On December 14, 1998, Red Samm contracted with the Corps to complete the project in two construction seasons. Pl. Am. Compl. ¶ 3.1. The breakwater was to be constructed during the first construction season (1999), and the mooring basin and entrance channel were to be dredged during the second season (2000). *Id.*

After construction of the breakwater began, the city of King Cove approached Red Samm with a proposal to save and deposit the dredge materials upland so the city could reuse it as fill. PPFUF ¶ 67; DPFUF ¶ 23. The city further proposed that Red Samm keep a portion of the dredge material for its own use or sale. While Red Samm originally planned to hire a subcontractor to utilize the "clamshell"[7] dredging technique, it could better save the dredge materials per King Cove's

---

the existence of anything larger that three inches' in diameter. However, soil borings can indicate cobbles, and the presence of hard materials can be detected by the resistence encountered when the drilling is pushed through the ground. Def. App. 11-20.

[7] "Clamshell" dredging uses an excavator or crane with a "bucket" to mechanically gather the material to be dredged and place it upon a barge for disposal out at sea. DPFUF ¶ 23.

proposal if it utilized a "hydraulic"[8] or "suction" technique. DPFUF ¶ 23; Def. App. 60-61, 72; Pl. App. 301. It is important to note that, in general, hydraulic dredging cannot be used if the area to be dredged contains large debris such as cobbles and rocks. PPFUF ¶ 37.

In 1999, prior to dredging, Red Samm performed its own subsurface explorations. Red Samm dug several on-shore test pits, excavated fifty cubic yards of off-shore material, and sent the materials to their lab in Sand Point, Alaska for analysis. DPFUF ¶ 26; PPFUF ¶ 70. By October 1999, Red Samm decided that the subsurface material at the dredge site was suitable for hydraulic dredging. PPFUF ¶ 71; Pl. Am. Compl. ¶ 3.7. The following January, Red Samm sent its subsurface testing materials (and possibly the Corps' test pit and soil boring logs) to DeGroot Nijkerk Dredging Equipment ("DeGroot")[9] to determine the feasability of using a "DeGroot DOP" dredge pump system for the project. Defendant claims that Red Samm only sent its own test data to DeGroot and points to that as evidence that Red Samm relied on its own tests rather than the Corps' data. DPFUF ¶ 26. Plaintiff argues that Red Samm did provide the Corps' data to Degroot. PPFUF ¶ 26. While the record is unclear as to what test data was actually provided to DeGroot, what is undisputed is that Red Samm ultimately decided to use the DeGroot hydraulic dredging equipment. PPFUF ¶ 27.

Red Samm commenced its hydraulic dredging operation on July 12, 2000. PPFUF ¶ 83. From the beginning, the operation was severely hindered by large cobbles, which prevented efficient hydraulic dredging. PPFUF ¶ 83. Red Samm attempted various equipment modifications to overcome the conditions, and notified the Corps in a letter dated July 18, 2000, that it had encountered site conditions different than expected. Pl. Am. Compl. ¶ 4.6; PPFUF ¶ 85. In a written response dated July 21, 2000, the Corps noted that the test pits excavated by Wilson, upon which Red Samm had allegedly relied, were dug on the other end of the dredge area from where Red Samm encountered problems. PPFUF ¶ 85; Pl. App. 260.

Unable to make any meaningful headway with the hydraulic dredge, Red Samm halted its hydraulic dredging operations on August 8, 2000. Up to that point, Red Samm had dredged only 10,000 cubic yards of the 361,000 cubic yards required by the contract. Pl. Am. Compl. ¶ 4.6. Because it could not hydraulically dredge the entire site, Red Samm commenced clamshell dredging on August 21, 2000. Winter weather forced Red Samm to pause operations on November 9, 2000, having completed only a third of the necessary dredging. The remaining two-thirds of the dredging was delayed until a third construction season in 2001. DPFUF ¶ 29; PPFUF ¶ 86.

In 2001, Red Samm subcontracted the remaining dredge work to Western Marine Construction ("Western") at additional cost to itself. Pl. Am. Compl. ¶ 4.7. Western completed the dredging by using the clamshell dredging technique and by further subcontracting a portion of the work to Newhalem River Dredging ("Newhalem"), who employed a hydraulic operation for a portion of the work. PPFUF ¶ 86.

---

[8] "Hydraulic" or "suction" dredging uses a long tube, much like a vacuum cleaner, to suction the materials to be dredged. http://www.dredgeamerica.com/hydraulic-dredging.html

[9] DeGroot, now known as Damen Dredging Equipment, is a Dutch based dredging company that manufactured and sold to Red Samm the hydraulic dredge Red Samm ultimately employed at the site. *See* DPFUF ¶ 27; http://www.damendredging.com/html/en/index.htm

While Red Samm's contract with the Corps called for complete performance by November 8, 2000, Red Samm's subcontractors did not complete their work until September 10, 2001. DPFUF ¶¶ 29, 30; PPFUF ¶ 32. Pursuant to a liquidated damages provision for delayed completion, the Corp withheld $218,460 from Red Samm's payment. PPFUF ¶ 32. This provision provided that if: "The Contractor fails to complete the work within the time specified in the contract, or any extension, the Contractor shall pay to the Government, as liquidated damages, the sum of $1,655 for each day of the delay."[10] DPFUF ¶ 28.

On October 30, 2001, Red Samm submitted a Request for Equitable Adjustment ("REA") to the government seeking $2,729,242 for its additional incurred costs and a contract performance extension of 335 days as a result of an alleged differing site conditions. PPFUF ¶ 82. The government's Contracting Officer denied this claim on November 26, 2003, stating:

> [T]he dredge material encountered by the contractor was as indicated in the contract documents and is not a differing site condition. The Government maintains that the contractor's difficulties and inefficiencies were solely the result of the equipment the contractor chose to use.
>
> ...
>
> The soil description in the exploration logs are in accordance with ASTM Specification 2488-93. Per the standard, the words *with cobbles or with cobbles and boulders* are to be used if a field sample contains any cobbles and boulders. There is no provision for using the term *and cobbles* in lieu of *with cobbles*. The standard also included the option to provide an approximate percentage range for the material by using terms trace, few, little, some or mostly. In the case of two test pits the soil was describes as gravel w/ few cobbles. According to ASTM standard, this would equate to 5 to 10 percent cobbles by weight.

Pl. App. 284-88 (emphasis in original).

In April 2001, pursuant to the Assignment of Claims Act, Red Samm assigned all of its contract rights to Reliance Insurance Company ("Reliance"), a surety bonding business and Travelers subsidiary, that had issued performance and payment bonds on Red Samm's behalf for the contract. Pl. Am. Compl. ¶ 1.1; Pl. Am. Compl. Ex. 1; 31 USC § 3727; 41 U.S.C. § 15.

On March 29, 2004, following the Contracting Officer's decision, Travelers filed suit in this Court asserting four claims: (1) differing site condition; (2) misrepresentation; (3) failure to disclose superior knowledge; and, (4) improper application of the liquidated damages clause. *See* Pl. Am. Compl. On March 27, 2006, defendant filed for summary judgment on all claims pursuant to Rule 56(b) of the Rules of the United States Court of Federal Claims ("RCFC"). Plaintiff filed a cross-motion for summary judgment and its response to defendant's motion on May 5, 2006. The Court heard oral argument on the motions on October 11, 2006.

---

[10] The $218,460 the Corps withheld is mathematically equivalent to a 132-day delay. While the contract was completed 306 days late, the Corps apparently decided only to withhold 132-days' worth of liquidated damages. DPFUF ¶ 33.

## II. JURISDICTION AND STANDARD OF REVIEW

### A. Jurisdiction

The Contract Disputes Act ("CDA"), 41 U.S.C. § 609(a), operating in tandem with the Tucker Act, 28 U.S.C. § 1491(a)(2) confers jurisdiction to this Court in this action. *Texas Health Choice, L.C. v. Office of Pers. Mgmt.*, 400 F.3d 895, 899 (Fed. Cir. 2005) (*citing Quality Tooling Inc. v. United States*, 47 F.3d 1569, 1572-73 (Fed. Cir. 1995)). "The Tucker Act, in conjunction with the CDA, purports to make the Court of Federal Claims the exclusive trial court for hearing disputes over government contracts that fall under the CDA." *Id*. *See* 28 U.S.C. § 1491(a)(2) ("The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with a contractor arising under section 10(a)(1) of the Contracts Disputes Act of 1978 [41 U.S.C. § 609(a)(1)] . . . ." 28 U.S.C. § 1491(a)(2).

### B. Summary Judgment Standards

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c)*; Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Summary judgment is not a disfavored shortcut, but rather is an integral part of the Court's rules designed to secure a just, speedy and inexpensive determination of the facts. *Spirit Leveling Contractors v. United States*, 19 Cl. Ct. 84 (1989) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)). "Only disputes over facts that might affect the outcome of the case under governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. The nonmoving party is required to point to "'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (*quoting* Fed. R. Civ. P 56(e)). In considering summary judgment, the Court will not weigh the evidence or make credibility determinations. *Anderson*, 477 U.S. at 249. "All reasonable inferences and presumptions are resolved in favor of the non-moving party." *Id.* at 255. The Court will resolve all doubt over factual issues in favor of the non-moving party. *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). When faced with cross-motions for summary judgment each motion will be evaluated on its own merits. *California v. United States*, 271 F.3d 1377, 1380 (Fed. Cir. 2001).

Contract interpretation is a question of law that is particularly well suited for summary judgment. *Gov. Sys. Advisors, Inc. v. United States*, 847 F.2d 811, 812 n.1 (Fed. Cir. 1988) (*citing P.J. Maffei Bldg. Wrecking v. United States*, 732 F.2d 913, 916 (Fed. Cir. 1984)). However, interpretation of language, conduct and parties' intent, *i.e.*, the question of what meaning should be given by a court to the words of the contract, may sometimes involve questions of material fact and not present a pure question of law. *Beta Systems, Inc. v. United States*, 838 F.2d 1179, 1183 (Fed. Cir. 1988). Should a genuine issue of material fact be presented, summary judgment would be inappropriate. Only disputes over facts that might significantly affect the outcome of the case under the governing law preclude an entry of summary judgment. *Anderson*, 477 U.S. at 248. Here, no factual disputes are material to interpreting the contract. Summary judgment is appropriate.

## III. DISCUSSION

### A. The Parties' Contentions

Plaintiff asserts four claims in this matter: differing site conditions, misrepresentation, non-disclosure of superior knowledge, and unpaid contract balance.

*1. Type I Differing Site Condition*

Type I differing site conditions consist of "subsurface or latent physical conditions at the site which differ materially from those indicated in the contract." FAR § 52.236-2(a)(1) (1994). In order to recover on a Type I differing site condition claim, a contractor must prove that: the conditions indicated in the contract differ materially from those actually encountered during performance; the conditions encountered were reasonably unforeseeable based on all the information available to the contractor at the time of bidding; the contractor reasonably relied upon its interpretation of the contract and contract-related documents; and the contractor was damaged as a result of the material variation between expected and encountered conditions. *Comtrol, Inc. v. United States*, 294 F.3d 1357, 1362 (Fed. Cir. 2002) (*citing H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1345 (Fed. Cir. 1998)).

Plaintiff states that the contract indicated "loose soils, comprised of sands and gravels with few cobbles, which were suitable for hydraulic dredging." Pl. Mot. Summ. J. Plaintiff alleges that Red Samm reasonably relied on the contract indications, encountered subsurface conditions materially different than the contract indications, and incurred additional costs as a result of the differing conditions. *Id*. Because Red Samm relied upon the contract's indications in making its determination to employ a hydraulic dredge, plaintiff believes the increased costs that resulted from this determination are the responsibility of defendant under the contract's differing site condition clause. Pl. Am. Compl.

In its summary judgment motion, defendant raises four grounds for dismissing plaintiff's differing site condition claim: (1) absence of an affirmative representation of the site conditions; (2) absence of reliance on the contract's indications; (3) failure to review contract documents, specifically the Golder Report, that would have placed Red Samm on notice of the actual site conditions; and, (4) the term "few" in the test pit logs is patently ambiguous and should be construed against plaintiff because Red Samm never inquired about the ambiguity. *See* Def. Mot. Summ. J.

*2. Misrepresentation*

Plaintiff claims the government misrepresented the nature of the subsurface materials found in samples excavated from test pits 1-5. Pl. Am. Compl. ¶ 7.2. Had the test pit logs more accurately described the contents of the test pits, plaintiff believes Red Samm would have been alerted to the significant concentration of cobbles at the dredge sit and never would have attempted hydraulic dredging. Pl. Reply in Support of Mot. Summ. J. Plaintiff alleges that as a result of the government's misrepresentations, Red Samm "incurred additional costs and damages for which the government is liable to the plaintiff in the amount of $2,729,242.09. Pl. Am. Compl. ¶ 7.2. Further,

plaintiff asserts that the Corps failed to disclose to bidders that the Corps had employed the ASTM standards in compiling the test pit data and that the Corps failed to properly implement the ASTM procedures. *Id.*

Defendant, in its motion for summary judgment on plaintiff's misrepresentation claim, reasserts that it did not affirmatively represent what the site conditions would be and that even if it did, Red Samm did not rely on the Corps' representations. Def. Mot. Summ. J. 12-13. Defendant also states that despite the Contracting Officer's decision, the Corps did not employ the ASTM and therefore it could not have failed to disclose its use or follow it incorrectly. *Id.*

*3. Superior Knowledge*

Plaintiff's superior knowledge claim is essentially a reiteration of its misrepresentation claim. Plaintiff alleges the government had a duty to disclose its intent "to employ the practices and procedures of ASTM D2488 in preparing exploration logs for test pits 1-5." Am. Compl. ¶ 8.2. Plaintiff believes the Corps failure to disclose its use and understanding of the ASTM definition of "few" resulted in the Corps possessing knowledge that Red Samm did not have. Pl. Resp. 24-25. Plaintiff also reasserts that "[i]nstead of conveying the 'significant' extent of the cobbles he intended, the actual language employed by the Corps' geotechnical engineer communicated the precise opposite—'few,' if any, cobbles in the subsurface conditions." *Id.* at 24.

In its motion to dismiss plaintiff's superior knowledge claim, defendant states that it did not withhold vital information from plaintiff and that any information plaintiff did not have it could have obtained. Def. Mot. Summ. J. 17. Defendant reiterates that the test pit logs were not misleading because they were not intended to reflect subsurface conditions throughout the site. *Id.* at 13. Defendant also notes that plaintiff's arguments are inconsistent. Defendant observes that as a part of its differing site condition claim, plaintiff argues that defendant did not follow the ASTM, while later, as part of its superior knowledge claim, plaintiff alleges that defendant's failure to disclose or properly use the ASTM constituted a withholding of superior knowledge. *Id.* at 15. Ultimately, plaintiff's inconsistency is irrelevant. Because the Corp did not employ ASTM procedures, it could misuse them or fail to disclose its use. *Id.* at 13.

*4. Unpaid Contract Balance*

Plaintiff claims defendant improperly withheld $218,460 from Red Samm upon the completion of the project. Pl. Compl. 8. Defendant states that it withheld the money from Red Samm as liquidated damages for failure to timely complete the project by the contract completion deadline of November 8, 2000. Def. Mot. Summ. J. 18. Defendant further states that it was actually entitled to withhold $506,430 according to the liquidated damages clause, and instead, generously overpaid almost $300,000 despite the plain language of the liquidated damages clause of the contract. *Id.* Defendant believes plaintiff has no basis for its underpayment claim.

**B. Contract Interpretation**

*1. Principles of Contract Interpretation*: *the Williston v. Corbin Feud*

Both parties, but particularly the plaintiff, rely on extrinsic evidence to resolve the interpretation issues arising in this case. References to extrinsic evidence pervade their moving papers and supporting briefs. At oral argument, the Court questioned the parties as to the validity of the use of such extrinsic evidence and under what circumstances such evidence may be considered by a court. *See* Hr'g Tr. 25. No satisfactory answer was provided. Consequently, as an initial matter, it is appropriate to review a very short history of the law of contract interpretation to determine, among other things, when it is proper to consider extrinsic evidence. This allows the Court to better understand the context of the Federal Circuit's law on contract interpretation, as well as to how it treats extrinsic evidence of trade usage and custom, the parole evidence rule, and exactly when and under what circumstances terms in an agreement may be considered ambiguous.

A good starting point is to note that all agree that both statutory and contract interpretation are searches for meaning. While statutory interpretation is often characterized as the ascertainment of the "intent of the legislature,"[11] any attempt to find meaning outside the actual words of a statute is perilous at best. Determining "corporate" intent—the subjective intent of a collective body—is a statistical impracticality.[12] Consequently, the goal of statutory interpretation, as Justice Holmes noted, is "not [to] inquire what the legislature meant; we ask only what the statute means." Oliver Wendell Holmes, *The Theory of Statutory Interpretation*, 12 Harv. L. Rev. 417, 418-9 (1899).

Contract interpretation is also a search for meaning. Historical contract jurisprudence would ascertain meaning from that which was intended by the contracting parties. This "subjective" intent or "meeting of the minds" theory has an ancient lineage, dating to perhaps as early as sixteenth century English law. *See* E. Allan Farnsworth, *'Meaning' in the Law of Contracts*, 76 Yale L.J. 939, 942-46 (1967) (hereinafter "Farnsworth") (tracing the doctrine to a 1551 unresolved case in England's Exchequer Chamber, *Reniger v. Forgossa*, 75 Eng. Rep. 1 (Ex.1551)). Under the original iteration of the subjective theory, no contractual obligation existed unless both parties had the same contractual intent, a "meeting of the minds," which generally could be shown to be or not to be

[11] *See, e.g.*, *D.C. Nat'l Bank v. D.C.*, 348 F.2d 808, 810 (D.C. Cir. 1965) ("[S]ince the judicial function is to ascertain the legislative intention the Court may properly exercise that function with recourse to the legislative history, and may depart from the literal meaning of the words when at variance with the intention of the legislature as revealed by legislative history."). This approach was later criticized by a panel of the D.C. Circuit as "undemocratic" and contrary to constitutional theory. *See United States v. McGoff*, 831 F.2d 1071, 1080 n.19 (D.C. Cir. 1987).

[12] *See, e.g.,* Max Radin, *Statutory Interpretation*, 43 Harv. L. Rev. 863, 870 (1930) ("[T]he intention of a legislature is undiscoverable in any real sense . . . . [T]he chances that several hundred men each will have exactly the same . . . situation . . . [is] infinitesimally small."). Thus, Chief Justice Marshall observed that when interpreting statutes, "it has been truly stated to be the duty of the court to effect the intention of the legislature; but this intention is to be searched for in the words the legislature has employed to convey it." *Schooner Paulina's Cargo v. United States*, 11 U.S. (7 Cranch) 52, 60 (1812).

through the use of extrinsic evidence.[13] *Id.* at 942-43; *See* 1 Walter H.E. Jaeger, *Williston on Contracts* § 22, p.48 (3d ed. 1957); Samuel Williston, *Freedom of Contract*, 6 Cornell L. Q. 365, 368 (1921). True to its historical roots, the Restatement (Second) of Contracts (hereinafter "Restatement (Second)" or "Res. 2d Con.") defines "interpretation" as the "ascertainment of meaning" that corresponds to the meaning intended by the contracting parties, either mutually or separately.[14] Res. 2d Con. §§ 200-01.

But, the hegemony of the subjective theory of contracts was, by the nineteenth century, challenged by a bevy of legal reformers, both from the bench and the bar, who posited a contrary "objective" theory of contract interpretation**.** Thus, to Justice Holmes:

> You cannot prove a mere private convention between the two parties to give language a different meaning from its common one. It would offer too great risks if evidence were admissible to show that when they said 500 feet they agreed it should mean 100 inches or that Bunker Hill Monument should signify the Old South Church. As an artificial construction cannot be given to plain words by express agreement, the same rule is applied when there is a mutual mistake not apparent on the face of the instrument.

*Goode v. Riley*, 153 Mass. 585, 586 (1891) (citations ommitted). Learned Hand even went so far to opine that "A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent." *Hotchkiss v. Nat'l City Bank*, 200 F. 287, 293 (S. D. N. Y. 1911).[15]

The Hand dictum—that a meeting of the minds is unnecessary for a court to uphold a

---

[13] A renowned example being *Raffles v. Wichelhaus*, 2 Hurl. & C. 906, 159 Eng. Rep. 375 (Ex. 1864), better known to generations of law students as the case of the ship *Peerless*.

[14] Both the U.S. Supreme Court and the Federal Circuit recognize the Restatement as reflecting the traditional jurisprudence of contract law and thus as generally controlling in federal contracts. *See Mobil Oil Exploration & Producing Se., Inc. v. United States*, 530 U.S. 604, 608 (2000) ("The Restatement of Contracts reflects many of the principles of contract law that are applicable to [federal contracts]."); *see, e.g.*, *Centex Corp. v. United States*, 395 F.2d 1283, 1304 (Fed. Cir. 2005) (noting that the precepts of contract law contained in the Restatement "applies to the government just as it does to private parties."). Nonetheless, as will be explained below, and perhaps the source of the parties' trepidation in revealing to the Court their respective views on the use of extrinsic evidence, the Restatement's position is not always the law.

[15] Judge Hand further observed that "If however, it were proved by twenty bishops that either party, when he used the words, intended something else than the ususal meaning which the law imposes upon them, he would still be held, unless there were some mutual mistake, or something of that sort." *Hotchkiss*, 200 F. 2d at 293.

contract—was criticized as unfair and contrary to moral precepts.[16] The harshness of the rule was somewhat ameliorated by Professor Williston, who penned a "reasonable expectation" or "belief" standard that was later adopted in the First Restatement.[17] But, even this "modified objective theory" of contacts was widely criticized.

Most notably, in more recent times, Professor Corbin criticized this approach and any exclusion of extrinsic evidence used to prove intent, noting the dangers of "excluding all extrinsic evidence on the ground that the express words are so 'plain and clear' that their meaning as used by the parties must be determined solely by what is within the four corners of the instrument."[18] Corbin's concerns harken back to the old subjective theory and the need to effectuate the parties' intent, as well as a belief that under an objective criteria, courts will inevitably rewrite contracts.[19] The Corbin approach is followed in the Restatement (Second), as well as by most jurisdictions in the United States, including most United States Circuit Courts of Appeal.[20] It appears that the law has come full circle.

---

[16] Farnsworth at 946 n.38 & 39, citing 1 J. Austin, *Jurisprudence* 456 n.89 (4th ed. 1873); F. Pollack, *Principles of Contract Law and Equity* 309 (3d. Am. ed 1906).

[17] *Id.* at 946. This new standard of reasonable expectation provided that "words or other manifestations of intentions forming an agreement . . . are given the meaning which the party making the manifestations should reasonably expect that the other party would give to them . . . ." The Restatement (First) of Contracts § 233 (1932).

[18] Arthur Linton Corbin, *Corbin on Contracts* § 542A (1960).

[19] *Id* at §§ 535, 542. Professor Corbin observed that in such cases:

> [T]he court often says that a "court can not make a contract for the parties;" but when it holds the parties bound in accordance with a meaning that seems "plain and clear" to the court and excludes convincing evidence that the parties gave the words a different meaning; it is doing exactly what it declares that it can not do: the court is making a contract for the parties that they did not themselves make.

*Id*.

[20] *See* 11 Richard A. Lord, *Williston on Contracts* § 30:5 (4th ed. 1999):

> Under the prevailing, more expansive view of what the court may consider, the court does not simply determine whether, from its perspective, the contractual language is clear; rather, the court hears the proffer of the parties and determines if there are objective indicia that from the parties' linguistic reference point, the contract's terms are susceptible of different meanings. The Court must consider the words of the agreement, including writings made a part of the contract by annexation or reference, the alternative meanings suggested by counsel, and any extrinsic evidence offered in support of those meanings.

Thus, while the Restatement (Second) asserts that interpretation is the search for the parties' intent, intent is evidenced by words and conduct as shown by extrinsic evidence. Res. 2d Con. § 201. Under the Restatement (Second), language will not be interpreted in its "generally prevailing meaning" if a "different intention is manifested," including evidence of trade usage or custom. *Id*. The 'objective of interpretation in the general law of contracts is to carry out the understanding of the parties rather than to impose obligations on them contrary to their understanding."[21] Even where a contract is completely integrated, parole evidence may be considered to establish the contract is indeed integrated, or to determine ambiguity of meaning.[22] Needless to say, the Restatement's approach to contract interpretation is not limited to a statutory "plain meaning" approach. Nevertheless, this is *not* the law of the Federal Circuit.

*b. The Federal Circuit's Approach – Williston Redux*

Although in the Federal Circuit the "Restatement of Contracts is recognized as an appropriate source of authority in contract cases," *Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297, 1308 n.9 (Fed. Cir. 2004) (*citing Mobil Oil Exploration v. United States*, 530 U.S. 604, 608 (2000)),[23] by-in-large the Federal Circuit follows the competing Williston approach, mandating that in general, trial courts should not admit extrinsic evidence to determine the meaning of contractual terms and provisions. *E.g., Coast Fed. Bank v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (*en banc*) (holding that when "the provisions of the Agreement are phrased in clear and unambiguous language, they must be given their plain and ordinary meaning, and we may not resort to extrinsic evidence to interpret them."); *Hills Materials Co. v. Rice*, 982 F.2d 514, 516 (Fed. Cir. 1992) (stating, "[w]herever possible words of a contract should be given their ordinary and common meaning.").[24]

---

[21] *Id* § 201 cmt. c.

[22] *Id.* at § 214.

[23] *See generally* Frederick W. Claybrook, Jr., *It's Patent That "Plain Meaning" Dictionary Definitions Shouldn't Dictate: What Phillips Portends for Contract Interpretation*, 16 Fed. Cir. B.J. 91, 102 n.75 (*citing* nearly 150 cases where the Federal Circuit cited the Restatement for contract law issues).

[24] The Federal Circuit has been criticized for not following the majority of jurisdictions. *See* W. Stanfield Johnson, *Interpreting Government Contracts: Plain Meaning Precludes Extrinsic Evidence and Controls at the Federal Circuit*, 34 Pub. Cont. L. J. 635 (2004-5) ("Interpreting Government Contracts"). The author points out that the Federal Circuit's predecessor, the Court of Claims, for the most part took the opposite approach. *Id*. at 640. Thus, in *Gholson, Byars & Holmes Constr. Co. v. United States*, 351 F.2d 987 (Ct. Cl. 1965), in reversing the ASBCA for excluding extrinsic evidence of custom and trade meaning, the court noted that:

> [T]he principle is now established in this court (and almost every other court) that in order that the intention of the parties may prevail, the language of the contract is to be given effect according to its trade meaning notwithstanding that in its ordinary meaning it is unambiguous. That is to say that trade usage and custom may show that

The Circuit's rule therefore is reminiscent of the plain meaning doctrine of statutory construction: "Where the language is plain and admits of no more than one meaning, the duty of interpretation does not arise and the rules which are to aid doubtful meanings needs no discussion." *Caminetti v. United States,* 242 U.S. 470, 485 (1917) *(citing Hamilton v. Rathbone*, 175 U.S. 414, 421 (1899)). *See Best Power Tech. Sales Corp. v. Austin*, 984 F.2d 1172, 1177 (Fed. Cir. 1993); *Teleflex, Inc. v. Ficosa N. Am. Corp.,* 299 F.3d 1313, 1325 (Fed. Cir. 2002) (noting that because the legal presumption is that Congress intends that words have ordinary meaning, undefined terms in a statute are deemed to have their ordinarily understood meaning).

To be sure, the Federal Circuit has generally incorporated the rules of traditional statutory construction into its contract jurisprudence. For instance, it is a well-established the rule of statutory construction that it is only through context that language establishes a common and shared meaning. *See Pennington v. Coxe*, 6 U.S. (2 Cranch) 33, 52-53 (1804) (Marshall, C.J.) ("That a law is the best expositor of itself, that every part of an act is to be taken into view, for discovering the mind of the legislature; and the details of one part may contain regulations restricting the extent of general expressions used in another part of the same act . . . ."). *See also Transcon. & W. Air v. Civil Aeronautics Bd.*, 336 U.S. 601, 605-06 (1949). Thus, to avoid wooden literalism, a statute and especially its component parts should be read in context. *See Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 583 (2004). ("[S]tatutory language must be read in context since a phrase gathers meaning from the words around it.") (*citing Jones v. United States*, 527 U.S. 373, 389 (1999))). This is also the Circuit's rule in contract interpretation. *See, e.g., Jowett Inc. v. United* States, 234 F.3d 1365, 1368 (Fed. Cir. 2000) ("'[W]e must interpret the contract in a manner that gives meaning to all of its provisions and makes sense,'" (*quoting McAbee Constr., Inc. v. United States,* 97 F.3d 1431, 1435 (Fed. Cir. 1996))); *Rice v. United States*, 428 F.2d 1311, 1314 ( Ct. Cl. 1970) (noting that in judging the import of words in then contract, the context and intention [of the parties to the contract] are paramount).

Furthermore, because the meaning of words is very often imprecise, and no inherent meaning exists outside of context,[25] interpretive tools such as dictionaries are frequently used by courts to

---

> language which appears on its face to be perfectly clear and unambiguous has, in fact, a meaning different from its ordinary meaning.

*Id*. at 999. Compare this outcome to the holding in the more recent *R. B. Wright Constr. Co. v. United States*, 919 F.2d 1569, 1572 (Fed. Cir. 1990) ("Neither a contractor's belief nor contrary customary practice, however, can make an unambiguous contract provision ambiguous, or justify a departure from its terms."). *See also Hunt Constr. Group v. United States*, 281 F.3d 1369, 1373 (Fed. Cir. 2002) (rejecting argument that the existence of contrary trade practice "can render a contract ambiguous that is otherwise clear on its face," because in such a circumstance trade practice is "irrelevant.").

[25] Thus, to Justice Frankfurter:

> [U]nlike mathematical symbols, the phrasing of a document, especially a complicated

determine the meaning of a document's phrase or provision. In a statutory context the presumption is that Congress intends words to have ordinary meaning. *See Teleflex, Inc.*, 299 F.3d at 1325; *Best Power Tech. Sales Corp.*, 984 F.2d at 1177. Consequently, use of dictionaries as interpretive aids (*e.g*., "lexicography") are not considered "extrinsic" aids the use of which violates the plain meaning doctrine. *See United States v. Alvarez-Sanchez*, 511 U.S. 350, 357-58 (1994). *See also Vanguard Prods. Corp. v. Parker Hannifin Corp.,* 234 F.3d 1370, 1372 (Fed. Cir. 2000) (A dictionary is not prohibited extrinsic evidence, and is an available resource of claim construction.); *Int'l Bus. Mach. Corp., v. United States*, 201 F.3d 1367, 1372 (Fed. Cir. 2000) (*quoting Best Power Tech. Sales Corp.*, 984 F.2d at 1177 (It is a basic principle of statutory interpretation . . . that undefined terms in a statute are deemed to have their ordinarily understood meaning. For that meaning, we look to the dictionary. (citations omitted)).[26]

The Federal Circuit's lexicographic rule applies as well to contract interpretation. *See Teg-Paradigm Envtl, Inc. v. United States*, 465 F.3d 1329, 1340 (Fed. Cir. 2006) (accepting use of dictionary in interpreting contractual terms, but rejecting Appellant's particular application of dictionary definition of the word "surface" in the case); *See also Stewart v. United States*, 316 U.S. 354, 362 & n.6 (1942); *See also Norfolk S. Ry. v. James N. Kirby, Pty. Ltd.*, 543 U.S. 14, 31-32 (2004). And significantly, the Federal Circuit has extended the "lexicographic" approach to consideration of extrinsic evidence-evidence of trade practice and custom. *See Hunt Constr.*, 281 F.3d at 1373 ("[E]vidence of trade practice may be useful in interpreting a contract term having an accepted industry meaning different from its ordinary meaning-even where the contract otherwise appears unambiguous-because the 'parties to a contract . . . can be their own lexicographers and . . . trade practice may serve that lexicographic function in some cases,'" (*quoting Jowett*, 234 F.3d at 1368)). *See also Teg-Paradigm.*, 465 F.3d at 1339 ("As we did in *Coast Fed. Bank,* we turn to extrinsic evidence, specifically, the course of dealing of the parties, to confirm that our interpretation of the

---

> enactment, seldom attains more than approximate precision. If individual words are inexact symbols, with shifting variables, their configuration can hardly achieve invariant meaning or assured definiteness. Apart from the ambiguity inherent in its symbols, a statute suffers from dubieties. It is not an equation or a formula representing a clearly marked process, nor is it an expression of an individual thought to which is imparted the definiteness a single authorship can give. A statute is an instrument of government partaking of its practical purposes but also of its infirmities and limitations, of its awkward and groping efforts.

Felix Frankfurter, *Some Reflections on the Readings of Statutes*, 47 COLUM. L. REV. 527, 528 (1947) (quoted in N. Singer*,* 2A Sutherland's Statutory Construction § 45.01 (West 6th ed. 2000)). In other words, the "meaning of a word is its use in the language." L. Wittgenstein, Philosophical Investigations, 20e (G. Anscombe trans. 1953).

[26] The Federal Circuit has recognized that "dictionaries, encyclopedias and treatises are particularly useful resources to assist the court in determining" the meaning of highly technical or scientific terms. *Texas Digital Sys*., *Inc. v. Telegenix, Inc*., 308 F.3d 1193, 1202 (Fed. Cir. 2002); *Rocknel Fastener, Inc. v. United States*, 267 F.3d 1354, 1356-57 (Fed. Cir. 2001) (*quoting C.J. Tower & Sons v. United States*, 673 F.2d 1268, 1271 (C.C.P.A. 1982)).

plain and ordinary meaning was, in fact, the parties' understanding." (*citing Coast Fed. Bank*, 323 F.3d at 1040)).

Consequently, the court allows parties to proffer extrinsic evidence of trade practice and custom to determine meaning. Nevertheless, it is crucial to note that in the Federal Circuit trade practice and custom "may *not* be used . . . 'to create an ambiguity where a contract was not reasonably susceptible of differing interpretations at the time of contracting.'" *Teg-Paradigm*, 465 F.3d at 1338 (*quoting Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.*, 169 F.3d 747, 752 (Fed. Cir. 1999) (emphasis added)).[27] This is contrary to the majority Restatement (Second) approach, which allows extrinsic evidence of the parties' intent regardless of the common or plain meaning of contractual terms. *See* Res. 2d Con. § 201(1). *See also* Res. 2d Con. § 220 ("Usage" may not only give contrary meaning to "an agreement," but may also "supplement or qualify it").

The Federal Circuit's strict approach to the consideration of extrinsic evidence has been extended to the parole evidence rule. The Restatement (Second) clearly allows the consideration of extrinsic evidence of the parties' intent to contravene that a contract is integrated, even in the face of an unambiguous written integration clause.[28] But in *Rumsfeld v. Freedom N.Y., Inc.*, 329 F.3d 1320 (Fed. Cir. 2003), *reh'g denied*, 346 F. 3d 1359 (Fed. Cir. 2003), the Federal Circuit announced a more restrictive view of the parole evidence rule. When a contract is integrated, "'barring certain exceptions (*e.g.*, fraud), a party to a written contract cannot supplement or interpret that agreement with oral or parol statements that conflict with, supplant, or controvert the language of the written agreement itself.'" *Id.* at 1327 (*quoting Schism v. United States*, 316 F.3d 1259, 1278 (Fed. Cir.

---

[27] This is not unlike the Federal Circuit's approach in the statutory construction arena, where the court recognizes that statutory words and phrases may have a specialized or highly technical meaning contrary to accepted ordinary usage, but places the burden on the proponent of specialized meaning to rebut the ordinary meaning of words and phrases. *Compare Texas Digital Sys., Inc.*, 308 F.3d at 1203-04 *and Renishaw PLC v. Marposs Societa' per Azioni,* 158 F.3d 1243, 1250 (Fed. Cir. 1998) (noting that in statutory context, burden is on the advocate of specialized meaning), *with Jowett*, 234 F.3d at 1368 (in a contract setting "'a court should accept evidence of trade practice only where a party makes a showing that it relied reasonably on a competing interpretation of the words when it entered into the contract,'" (*quoting Metric Constructors*, 169 F.3d 747, 752 (Fed. Cir. 1999)).

[28] *See* Res. 2d Con. § 209(3) ("Where the parties reduce an agreement to a writing which in view of its completeness and specificity reasonably appears to be a complete agreement, it is taken to be an integrated agreement unless it is established by other evidence that the writing did not constitute a final expression."). *See also Id.* § 209 cmt. b (*"*Form of integrated agreement . . . . Written contracts, signed by both parties, may include an explicit declaration that there are no other agreements between the parties, but such a declaration may not be conclusive."); *Id.* § 210 cmt. b ("*Proof of complete integration.* That a writing was or was not adopted as a completely integrated agreement may be proved by any relevant evidence. A document in the form of a written contract, signed by both parties and apparently complete on its face, may be decisive of the issue in the absence of credible contrary evidence. But a writing cannot of itself prove its own completeness, and wide latitude must be allowed for inquiry into circumstances bearing on the intention of the parties.").

2002) (en banc)).[29] The court's take on the parole evidence rule, however "does not bar the use of extrinsic evidence to interpret the terms of a contract when the plain and ordinary meaning is not clear from the contract itself." *Teg-Paradigm*, 465 F.3d at 1339.

Akin to the statutory plain meaning doctrine,[30] only where there is an ambiguity, where words are reasonably susceptible to two or at least a finite few meanings, may courts resort to extrinsic evidence to interpret a contract. *E.g., Barron Bancshares Inc. v. United States*, 366 F.3d 1360, 1375 (Fed. Cir. 2004); *A-Transp. Nw. Co. v. United States*, 36 F.3d 1576, 1584 (Fed. Cir. 1994). Like the distinction of a "facial" statutory ambiguity, where statutory ambiguity results only when the statue is "applied,"[31] in contract law, the Federal Circuit divides ambiguity into two categories: patent and latent. *See P.R. Burke Corp. v. United States*, 277 F.3d 1346 (Fed. Cir. 2002). There is, however, no clear demarcation of what constitutes a patent ambiguity, and what makes for a latent ambiguity. *Fry Commc'ns., Inc. v. United States*, 22 Cl. Ct. 497, 509 (1991).

Generally, "[a] patent ambiguity in a contract is one that is, on its face, glaring and obvious. This has been described as encompassing 'an obvious omission, inconsistency, or discrepancy in significance,' or an 'obvious error in drafting, a gross discrepancy, or an inadvertent but glaring gap.'" *Tecom, Inc. v. United States*, 66 Fed. Cl. 736, 748 (2005) (internal citations omitted); *see Fort Vancouver Plywood Co. v. United States*, 860 F.2d 409, 414 (Fed. Cir. 1988). A court must decide on an *ad hoc* basis by "looking to what a reasonable man would find to be patent and glaring." *Max Drill Inc. v. United States*, 427 F.2d 1233, 1244 (1970) (*citing L. Rosenman Corp. v. United States*, 390 F.2d 711, 713 (Ct. Cl. 1968)); *see also Fort Vancouver Plywood*, 860 F.2d at 414 (stating, "[w]hen determining whether contract language is patently ambiguous, the language must be place on a spectrum of ambiguity." (*citing Newsom v. United States*, 676 F.2d 647, 650 (Ct. Cl. 1982))).

Relatedly, a patent ambiguity exists where there is a facial inconsistency between provisions or terms within the contract. *See P.R. Burke*, 277 F.3d at 1355 (holding that a patent ambiguity is one that is on the face of the contract); *Metcalf Constr. Co., Inc. v. United States*, 53 Fed. Cl. 617, 630 (2002) (noting "'a contract is subject to a patent ambiguity if it contains facially inconsistent

---

[29] The fourth edition of Williston, however, recognizes the Restatement (Second) view as the majority one: "In many more jurisdictions, however, the presence of an integration clause or merger clause is merely presumptive evidence of a parties' intention as to integration." 11 Richard A. Lord, Williston on Contracts § 33:21 (4th ed. 1999). Indeed, this was noted by the *Freedom NY, Inc.* court. *See Freedom NY, Inc.*, 329 F.3d at 1329 n.3.

[30] *See, e.g., Caminetti*, 242 U.S. at 485 ("Where the language is plain and admits of no more than one meaning the duty of interpretation does not arise and the rules which are to aid doubtful meanings needs no discussion."). *See generally* N. Singer, *2A Sutherland's Statutory Construction* Chs. 47-48 (West 6th ed. 2000).

[31] *See Chevron U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842-43 (holding that when a statute is clear on its face the court must give effect to "unambiguously expressed intent of congress." But, if the statute is ambiguous the court must decide if the enforcing agency's interpretation is permissible.").

provisions that would place the reasonable contractor on notice and prompt the reasonable contractor to rectify the inconsistency by inquiring of the appropriate parties.'" (*quoting Nielson-Dillingham Builders, J.V. v. United States*, 43 Fed. Cl. 5, 11 (1999))); *Input/Output Tech., Inc. v. United States*, 44 Fed. Cl. 65, 72 (holding "[t]he law teaches that a contract is subject to a patent ambiguity if it contains facially inconsistent provisions that would place a reasonable contractor on notice and prompt the contractor to rectify the inconsistency by inquiring of the appropriate parties." (*citing Nielson-Dillingham*, 43 Fed. Cl. at 11)).

Unlike a patent ambiguity, which should be, to the reasonable contractor, apparent on the face of the contract, "[a] latent ambiguity generally becomes evident, when, 'considered in light of objective circumstances, two conflicting interpretations appear reasonable.'" *Input/Output*, 44 Fed. Cl. at 72 n.10 (*quoting Cray Research, Inc. v. United States*, 41 Fed. Cl. 427, 438 (1998)). A latent ambiguity is an ambiguity that arises only once the contract is applied. *C.f. Cherry v. Auburn Gear, Inc.*, 441 F.3d 476, 484 (7th Cir. 2006); *see also* Black's Law Dictionary (7th ed. 2002) (defining latent ambiguity as "an ambiguity that does not readily appear in the language of a document, but instead arise from a collateral matter when the document's terms are applied or executed.").

The key distinction, however, between patent and latent ambiguity is in the way the law treats them and the corresponding effect on the contracting parties' rights and obligations. At common law, ambiguities are generally interpreted against the drafter (under the rule of *Contra Proferentem*).[32] *P.R. Burke.*, 277 F.3d at 1355; *Interstate Gen. Gov't Contractors v. Stone*, 980 F.2d 1433, 1435 (Fed. Cir. 1992). In the context of government contracts, contractors are required to inquire about patent ambiguities before making bids. *P.R. Burke*, 277 F.3d at 1355; *Ryco Constr., Inc. v. United States*, 55 Fed. Cl. 184, 191 (2002). The purpose of requiring pre-bid inquiry is to "prevent[] contractors from taking advantage of ambiguities in government contracts by adopting narrow interpretations in preparing its bids and then, after the award, seeking equitable adjustments to perform additional work the government actually wanted." *Triax Pac*., *Inc. v. West*, 130 F.3d 1469, 1475 (Fed. Cir. 1997). The Federal Circuit, however, "has not given the [patent ambiguity] doctrine broad application. Because the doctrine has the effect of relieving the government from consequences of its own poorly drafted contracts, the doctrine has been applied only to contract ambiguities that are judged so 'patent and glaring' that it is unreasonable for a contractor not to discover and inquire about them." *Triax Pac*., 130 F.3d at 1475.

A court's finding of a latent ambiguity, however, does not automatically mean a favorable result for the plaintiff. The court will only adopt the contractor's interpretation of a latent ambiguity if its interpretation is reasonable. *P.R. Burke*, 277 F.3d at 1355; *Newsome*, 676 F.2d 647, 649-50. Only upon a finding of reasonableness can the court apply the rule of *Contra Proferentem*. *P.R. Burke*, 277 F.3d at 1355; *see also Tecom*, 66 Fed. Cl. at 748.

---

[32] Latin for "against the offeror," *Contra Proferentem* is the contract interpretation doctrine that requires ambiguities to be "construed unfavorably to the drafter." Black's Law Dictionary 328 (7th ed. 1999).

**C. Analysis of the Instant Contract—Plain Meaning, Ambiguity and the Admissibility of Extrinsic Evidence**

With the Federal Circuit history detailed and the legal foundation of contract interpretation laid, the Court now turns to the instant contract. As previously noted, in order to succeed on a Type I differing site condition claim, plaintiff must prove: the conditions indicated in the contract differ materially from those actually encountered during performance; the conditions encountered were reasonably unforeseeable based on all the information available to the contractor at the time of bidding; the contractor reasonably relied upon its interpretation of the contract and the contract related documents; and the contractor was damaged as a result of the material variation between expected and encountered conditions. *Comtrol, Inc.*, 294 F.3d at 1362 (*citing H.B. Mac*, 153 F.3d at 1345).

*1. Contract Representations*

Unlike traditional contract interpretation, in a differing site condition claim, a contractor is permitted to make inferences from a contract's implications. *P.J. Maffei Bldg.*, 732 F.2d 913. Interpretation of contract indications requires the Court to "place itself into the shoes of a 'reasonable and prudent' contractor." *Id*. at 916. The implications in the contract need only be sufficient "to impress or lull a reasonable bidder." *Stock & Grove, Inc. v. United States*, 493 F.2d 629, 645 (Ct. Cl. 1974). Plaintiff's differing site conditions claim turns primarily on determination of the contract's representations. What indications a contract made is a question of law and therefore in the province of the Court. *P.J. Maffei Bldg.*, 732 F.2d at 916; *Foster Constr. C.A. & Williams Bros. Co. v. United States*, 435 F.2d 873, 881 (Ct. Cl. 1970). When a contract's language is unambiguous, it must be given its "plain and ordinary" meaning. *Coast Fed. Bank*, 323 F.3d at 1038 . As fully detailed below, this court believes the plain and unambiguous language of the contract conveys that only "few" or "incidental" cobbles and boulders were expected at the dredge site.

When determining the plain meaning of a contract, a court must first determine what documents are actually part of that contract. The documents in question here are documents attached to the contract as Appendix A. Documents will be considered part of a contract *only* when the *intention* to do so is clearly manifested. *Freedom NY Inc.*, 346 F.3d at 1361 (*citing* Restatement (Second) § 132 cmt. c, illus. 4 ("[T]he fastening [of two sheets by A] is a sufficient adoption of A's signature with reference to both sheets to charge A, but only if the evidence of the fastening is clear and convincing.")). To determine intent here, the Court looks to Section 02222, subsection 1.2, of the contract, entitled "Character of Materials:"

> Exploration Logs for the area to be dredged and excavated are enclosed in Appendix A. Incidental sunken logs, boulders, rock, snags and other miscellaneous debris from harbor and fishing operations should be expected. Geophysical data for this area can be obtained from the Corps of Engineers, Geotechnical Branch - Soils and Geology Section, Alaska District.

*Id.* That the parties intended to incorporate the test pit data into the contract is clear from this section. The title – "Character of Materials" – can only reasonably be construed to mean the

condition of the site to be found upon testing or excavating. The first sentence of the subsection, which incorporates the test pit logs, notes that the logs are "for the area to be dredged." The next sentence tells the bidder what should be "expected" to be found: "incidental sunken logs, boulders, rock [and] snags."

Whether the word "*incidental*"[33] modifies only "sunken logs" or whether it also describes the quantity of "boulders, rock [and] snags" is crucial to the determination of contractual inclusion. Since enumeration of a list of terms should be construed as an enumeration of a single specie (here, examples of barriers to dredging), the initial modifier "*incidental*" should apply to all enumerated terms.[34]

The second clause of the second sentence provides further support for a broad reach of the term "*incidental*." The clause tells the reader that "*other* miscellaneous debris from harbor and fishing operations should be expected." "*Other*" acts as a conjunction between the types of "*debris*" found in the second clause of the sentence and the "sunken logs, boulders, rock [and] snags" referenced in the first. Why two clauses? The impediments found in the first are different than the "*debris*" described in the second clause. The latter is man-made refuse, commercial by-product; the former is naturally-occurring. For clarity's sake, the different impediments were properly placed in separate clauses. Not to do so would have been poor drafting. Nevertheless, what is important is that both categories are impediments to dredging. Also significant about this clause linkage is that parallelism requires that any "*debris*" likely to be found was intended by the contracting parties to be only "*incidental*"in nature and not a significant barrier to the dredging. Accordingly, to avoid a strained interpretation, all parts of the sentence here should be read as a unified whole. The rocks, snags, logs and commercially-created debris were to all be interpreted as types of impediments to dredging, and were also all expected to be "*incidental*," and a minor barrier to dredging.

A plain meaning reading of the "Character of Materials" section of the contract demonstrates that the test pit logs appended to the contract are implicitly representative of the dredging area,[35] and

---

[33] Plainly, if the word "incidental" acts as a modifier to the entire sentence, it is of great significance because the import of the "Character of Materials" section would signal that the parties do not expect any serious physical impediment to the dredging. Merriam-Webster's Unabridged Dictionary's primary definition for "incidental" is something "subordinate, nonessential, or attendant in position or significance. . . : occurring merely by chance or without intention or calculation . . . a minor concomitant." Merriam-Webster: The Unabridged Dictionary, available at http://unabridged.merriam-webster.com.

[34] In a statutory interpretation context, the canon of construction, "*ejusdem generis*," creates a presumption that the enumeration or qualification of an enumeration of terms in a sentence or provision should be construed as being of the same classification or category. *See generally N. Singer,* 2A *Sutherland's Statutory Construction* §§ 47:01-38 (West 6th ed. 2000).

[35] Defendant appears to admit the validity of the Court's conclusion: "The purpose of the test pit explorations was to explore for bedrock and evaluate subsurface conditions in regard to dredging." DRPPFUF ¶ 38. Furthermore, the use of exploratory tests and their recorded logs has been well-

demonstrate only "incidental" impediments to dredging. Accordingly, the unambiguous meaning of this section demonstrates the parties' intent that the test logs be a part of the contract. *See, e.g.*, *Coast Fed. Bank*, 323 F.3d at1038 (holding that clear, unambiguous provisions of a contract must be given their plain and ordinary meaning); *Hills Materials Co.*, 982 F.2d at 516 (mandating that, "[w]herever possible, words of a contract should be given their ordinary and common meaning.").

In government contracts, however, one should not expect a perfect consistency, whether of Emerson's foolish kind or not.[36] This contract is no exception. The "Site Investigation and Conditions Affecting the Work" clause, an incorporated FAR provision,[37] stands seemingly contrary to the plain meaning of the above-analyzed section. Pl. App. 21. Specifically, the provision provides:

> (a) The Contractor acknowledges that it has taken steps reasonably necessary to ascertain the nature and location of the work, and that it has investigated and satisfied as to the general and local conditions which can affect the work or its costs . . . . The Contractor also acknowledges that it has satisfied itself as to the character, quality and quantity of surface and subsurface materials or obstacles to be encountered insofar as this information is reasonably ascertainable from an inspection of the site, *including all exploratory work done by the Government, as well as from the drawings and specifications made a part of this contract*.
>
> (b) *The Government assumes no responsibility for any conclusion or interpretation made by the Contractor based on any information made available by the Government*. Nor does the Government assume responsibility for any understanding reached or representations made concerning conditions which can affect the work by any of its officers or agents before the execution of this contract, unless that understanding or representation is expressly stated in this contract.

FAR § 52.236-3 (emphasis added). This provision holds contractors responsible for knowing all the information the government provides, including test pit data. It could, if broadly construed, absolve the government from responsibility for *any* incorrectly-supplied information regardless of the verity of the contractor's "conclusion or interpretation." Such a broad interpretation places all risk on a contractor. The unfortunate contractor would find himself between the Scylla of having to rely on the government's information if it seemed reasonable after expending funds to analyze it, and the Charybdis of bearing all the detrimental consequences if the government-supplied information turned out to be erroneous. *See United States v. Atlantic Dredging Co.*, 253 U.S. 1 (1920) (noting a bidder

---

established. *See Foster*, 435 F.2d at 888 (observing that test pit logs and soil boring logs are recognized as the most reliable and most specific indicator of subsurface conditions).

[36] "A foolish consistency is the hobgoblin of little minds, adored by little statesmen and philosophers and divines." Ralph Waldo Emerson, *Self-Reliance*, as quoted in COLE'S QUOTABLES, http://www.quotationspage.com/quote/26443.html.

[37] FAR § 52.236-3.

is entitled to rely on the accuracy of information contained in the solicitation; it need not conduct its on explorations or surveys); *see also Shank-Artukovich v. United* States, 13 Cl. Ct. 346, 354 (1987) *aff'd* 848 F.2d 1245 (Fed. Cir. 1988) ("While it is true that a contractor has a duty to consider all of the specifications, he has no duty to conduct his own investigation, and is not bound to know that which only an expert could derive from the contract."); *Foster*, 435 F.2d at 887. In this Court's opinion, such a wooden, literal interpretation here would go a long way to rendering dredging and other "site" types of federal contracts illusory. *See Torncello v. United States*, 681 F.2d 756 (Ct. Cl. 1982) ("We note as one of the most elementary propositions of contract law that a party may not reserve to itself a method of unlimited exculpation without rendering its promises illusory and the contract void.").

The broad, literal interpretation would also have the impermissible effect of elevating the language of one provision above another. Here, specifically, a broad reading of the site investigation and condition provision of incorporated FAR § 52.236.3 would in essence vitiate Section 02222, the contractual provision describing the conditions at the site. This is because a differing site condition claim requires "an erroneous indication [of the conditions of the site] in the contract," *Foster*, 435 F.2d at 881, and if the government is permitted to disavow through exculpatory language any responsibility for its representations, a showing of a differing site condition becomes impossible and therefore superfluous. *Foster*, 435 F.2d at 886-87 ("[I]t is erroneous as a matter of law, for [charging plaintiff with knowledge undiscoverable on a visual inspection of the site] improperly enhances the duty of a site investigation at the expense of the changed conditions clause and its underlying policies.").

The Federal Circuit notes another policy that conflicts with a restrictive, narrow interpretation of the site data investigation provision—the reduction in the cost of federal construction contracts to the taxpayers:

> Bidders are thereby given information on which they may rely in making their bids, and are at the same time promised an equitable adjustment under the changed conditions clause, if subsurface conditions turn out to be materially different than those indicated in the logs. The two elements work together; the presence of the changed conditions clause works to reassure bidder that they may confidently rely on the logs and need not include a contingency element in their bids. Reliance is affirmatively desired by the Government, for if bidders feel they cannot rely, they will revert to the practice of increasing their bids.

*Foster*, 435 F.2d at 887. *See generally* John Cibinic, Jr. & Ralph C. Nash, ADMINISTRATION OF GOVERNMENT CONTRACTS (4th ed.) 516-23 ("The Court of Claims has held that the site data investigation requirement should not be viewed so expansively as to frustrate the policy of the clause, which is to relieve the contractor of the necessity of allowing for contingencies in bid computation."). Thus, in order to effectuate the underlying policy of a differing site condition clause as laid out in *Foster*, the Court will not interpret the exculpatory language of the Site Investigation Clause excessively broadly. *C.f. Fehlhaber Corp. v. United States*, 151 F.Supp. 817, 819 (Ct. Cl. 1957) *cert denied*, 355 U.S. 877 (1957); *Morrison-Knudsen Co., Inc. v. United States*, 345 F.2d 535 (Ct. Cl. 1965); *Woodcrest Constr. Co., Inc. v. United States*, 408 F.2d 406, 410 (Ct. Cl. 1969), *cert denied*, 398 U.S. 958 (1970).

It should be noted that if the government truly intended to disavow the representations made in Appendix A, it could have done so more explicitly, as it did in *P.J. Maffei Bldg.*, 732 F.2d 913. There, the government solicited a bid for a demolition and removal. *Id.* at 914. As part of the contract, the winning bidder would keep the salvage value of the construction materials removed, thus the bids were to reflect this value. *Id.* Language in the contract from the government directed the bidders to drawings that were intended to help the bidders estimate the amount of steel the bidders could expect to recover. *Id.* However, within that language, the government also included the following: "Some drawings of some of the existing conditions are available . . . These drawings are for i*nformation* only and will *not* be part of the contract documents. The *quantity, quality, completeness, accuracy*, and *availability* of these drawings are *not* guaranteed." *Id.* at 914-15 (emphasis added). In the Corps' contract with Red Samm, the language directing the bidders to Appendix A, contains none of the caveats and clear indications that were present in *P.J. Maffei Bldg.* All clauses of the contract must be read together and given purpose and meaning. A boiler plate exculpatory clause cannot be interpreted so broadly as to render other portions of the contract insignificant. As such, the Court finds that the test pit data was specifically and clearly intended to be incorporated into the contract and the exculpatory language of the Site Investigation clause does not relieve defendant from the responsibility of the indications therein.

Having determined that the test pit data is part of the contract, the Court now seeks to ascertain its meaning. To do this, "a court must consider the contract as a whole and interpret it to effectuate its spirit and purpose, giving reasonable meaning to all parts in context and without contradiction." *L.W. Matteson, Inc. v. United States*, 61 Fed. Cl. 296, 307 (2004) (*citing Hunt Constr*., 281 F.3d at 1372). A reading of the test pit logs confirms the Court's interpretation of the "Character of Materials" section as representing that any cobbles or other impediments found at the site would in fact be "incidental." PPFUF ¶ 55.

For instance, the exploration log for Test Pit 1, dug to ten feet deep, indicated only "*Silty Sand*" for the first foot, and, significantly, "Gravel w/ *few* Cobbles & Boulders" for the remaining nine feet, and "*Easy* Digging" and "Sidewalls Caving - Refusal" at the ten foot level. DPFUF ¶ 5 (emphasis added). But, the exploration log for Test Pit 2, dug to nine and a half feet deep indicated "Gravel w/ Cobbles & Boulders" *throughout*. DPFUF ¶6. It did, however, also indicate that it would be "*Easy* Digging" at the nine and a half foot level. *Id.* The exploration log for Test Pit 3, dug to five feet deep, indicated only "Gravel and Cobbles" *for the first foot*, and "Weathered Bedrock" for the remaining four feet, with some "Difficulty of Digging - Refusal" at five feet. DPFUF ¶ 7. The exploration log for Test Pit 4, dug to nine feet deep, indicated"Gravel & Cobbles" *merely for the first foot*, with "Gravel" making-up the remaining eight feet, and "Angular to Subangular," "Easy Drilling" and "Sidewalls Caving - Refusal" being found at the nine foot level. DPFUF ¶ 8. Likewise, the exploration log for Test Pit 5, dug to eight feet deep, indicated only "Silty Sand" for the first foot and "Gravel w/ *few* Cobbles" for the remaining seven feet, with"Easy Digging" and "Sidewalls Caving - Refusal" at eight feet. DPFUF ¶ 9 (emphasis added).

The net result of these tests logs clearly signals that an excavator could expect to find no significant or onerous amount of cobbles at the dredging site. The fact that the test logs were coupled with the "Character of Materials" section of the contract, which contains language describing the dredging area as containing merely "incidental" impediments to dredging, strengthens this conclusion.

Nonetheless, the government attempts to salvage its interpretation of the contract's representations by using a two-pronged attack: (1) proffering a "vagueness" argument by honing-in on the word "few" in the test logs, and (2) alternatively arguing that the Golder Report was sufficient to notify plaintiff to the presence of the cobbles throughout the site. It is fair to characterize these contentions as a specie of prestidigitation; sleight-of-hand arguments cleverly designed to veil the plain meaning of a word in a way that adroitly makes common sense vanish into the proverbial thin air. Defendant, however, fails to see the forest through the trees. Reading the contract as a "harmonious, integrated whole," and interpreting the terms "few" and "some" in their "larger, contractual context, rather than in isolation," the meaning of the contract is, to the contrary, quite clear. *P.R. Burke Corp. v. United States*, 47 Fed. Cl. 340, 346 (2000) *aff'd* 277 F.3d 1346 (Fed. Cir. 2002).

Defendant first focuses on the word "few," arguing: "[c]ommon sense tells us that the word 'few' describing the abundance of cobbles in a test pit is obviously indeterminate." Def. Mot. Summ. J. 11. Indeed, the government claims that a qualitative term such as "few" is *always* vague.[38] *See* Hr'g Tr. 94-99. Not so. In general, the term "few," has a common and well-understood meaning. "Few" is defined as "amounting to or made up of a small number . . . . [A]n indefinitely small number." Webster's II New Riverside University Dictionary (1984). Its synonyms include "imperceptible, inconsequential, inconsiderable, infrequent . . . ." Roget's New Millennium Thesaurus (1st ed.) (available at http://thesaurus.reference.com/browse/few). The definition of "few" is consistent with "incidental," thus confirming what the contract's body already states. Read in context, the plain meaning of "few" and "incidental" in the contract is clear—they indicate that any impediments to dredging would be inconsequential. *See Jowett,* 234 F.3d at 1368.

Alternatively, the defendant, while maintaining the contract did not make any assertions as to the quantity of cobbles in the dredging area, argues that the Golder Report should have notified plaintiff to the presence of cobbles throughout the site. The Golder Report, the result of the seismic survey procured to determine the location of bedrock, was available to bidders upon request. DPFUF ¶ 17. Without getting into a long-winded discussion as to its inclusion in the contract, The Golder

---

[38] As proof of this proposition, defendant's counsel gives us the U.S. Marines' recruitment pitch of "the few, the proud" as an example of the word "few's" inherent vagueness. Def. Mot. Summ. J. 11. This is no proof. The word "few" in the context of the recruitment motto connotes that only a small percentage of the American population is qualified to serve as a Marine. "Few" is not vague at all since the dictionary definition of "vague" as "less than many"demonstrates a reasonable contractual certainty. To adopt the government's view that qualitative terms and their inevitable modifiers are by definition impermissibly indeterminate, would de facto proscribe the use of qualitative terms in contracts because only some degree of quantitative precision would pass muster under their philosophy. But, this has never been the law of contracts. *See generally* Joseph M. Perillo & John D. Calamari, *Calamari and Perillo on Contracts* (5th ed. 2004) § 11.37 ("The Satisfaction Cases"–citing cases throughout history upholding under the common law contracts premised on artistic taste, personal judgment, and other qualitative criteria), § 11.38 ("Good Faith & Fair Dealing"–citing cases finding an implied good faith covenant in requirements contracts and in the qualitative "satisfaction cases").

Report, like the test pit logs in Appendix A, was very much a part of the contract.[39] However, despite defendant's assertions to the contrary, the Golder Report does not support the position that plaintiff should have been aware of the cobbles and boulders it would face. In a section entitled "Geotechnical Interpretation and Expected Material Types," the Golder Report reads:

> This [seismic] signature is typical of course grained sediments deposited in a high energy environment. This interpretation is *consistent with the test pit data* from the southwest end of the site, which shows mostly gravel with some cobbles and boulders in the upper 10 ft. The seismic signature for these upper sediments is uniform and was observed in the seismic records *across the site*, suggesting that course-grained sediments, consisting of mostly sand and gravel with some cobbles and boulders exist throughout the site.

Def. App. 54 (emphasis added). Defendant argues that the word "some" should have alerted Red Samm to the presence of many cobbles throughout the site. DPFUF ¶ 19. And, when a solicitation refers to the existence of additional documents in the custody of the government describing site conditions, the contractor is charged with knowledge of the information in those documents. *Randa/Madison Joint Venture III v. Dahlberg*, 239 F.3d 1264, 1270-72 (Fed. Cir. 2001). However, as with its misguided attempt to focus on the word "few," defendant should not take the word "some" out of context. The Golder Report offers only that "the course grained sediments [data] . . . is *consistent with the test pit data . . . across the site.*" Therefore a plain meaning interpretation of the Golder Report, read with the rest of the contract, supports the determination that there were only a "few" cobbles at the dredge site. The finite distinction defendant wants Red Samm to have to undertake is inconsistent with the plain meaning of the contract. Even if Red Samm had read the Golder Report, as it acknowledges that it did not do, it would *not* have been put on notice of the "many" cobbles at the site.

To be sure, when interpreting a contract, the language of the contract must be given "the meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances." *Metric Constructors, Inc.*, 169 F.3d at 752. And it is worth repeating that in deriving this meaning, we began with the contract's language. *Coast Fed. Bank*, 323 F.3d at1038. Here, the plain and ordinary meaning of the contract language states that few or incidental cobbles or boulders were expected for the dredge area. This court does not believe the meaning of the contract is ambiguous. Our inquiry as to the contract representations could end here. However, as the Federal Circuit did in *Teg-Paradigm*, the Court turn to extrinsic evidence merely to confirm that our interpretation of the plain and ordinary meaning was, in fact, the parties' understanding. *See Teg-Paradigm*, 465 F.3d at 1339. This is done to valuate defendant's ambiguity argument, which ultimately, is unpersuasive.

---

[39] The Golder Report was referenced in the contract by the same section incorporating the test pits logs. The Court's reasoning for finding the test pits incorporated into the contract applies equally to the Golder Report. The unambiguous meaning of this section demonstrates the parties' intent to include the Golder Report as part of the contract. *See Coast Fed. Bank*, 323 F.3d at 1038.

Defendant claims ambiguity existed in the contract, once again zeroing-in on the meaning of the word "few."[40] Under the doctrine of *contra proferentem*, courts construe ambiguities against the parties who draft them. *Interstate Gen. Gov't. Contractors, Inc.*, 980 F.2d at 1435. However, in the area of government contracts, when an ambiguity is patent, the contractor has an affirmative duty to inquire as to the correct meaning of the patently ambiguous term prior to submitting its bid. *Id*. at 1436. Holding the term "few" as patently ambiguous would relieve the government from the effects of its own poorly drafted term, which the Federal Circuit disfavors. *Triax Pacific*, 130 F.3d at 1475. A court will only apply the patent ambiguity doctrine when the ambiguity is clear on the face of the contract.

In trying to define the word "few" in the contract, both parties resorted to the use of extrinsic evidence. Plaintiff offered expert testimony to support the reasonableness of its interpretation, while defendant turned to an industry standard, the ASTM. As stated, neither party addressed how extrinsic evidence should be properly evaluated. The Court now evaluates the extrinsic evidence offered properly—to confirm the parties' understanding of the plain and ordinary meaning of the contract. *See Coast Fed. Bank*, 323 F.3d at 1040.

When interpreting the contract, Red Samm initially turned to the dictionary to determine the meaning of "few." David Heeter, Red Samm's project estimator, stated, "I believed the term 'few' had a reasonably well understood, ordinary meaning of 'small, little, not many, of small number.'") Pl. App. 302. Subsequently, Red Samm made an as-applied interpretation of "few" to mean less-than-one-percent. Pl. App. 170 -71 (Heeter Depo.) (stating, "[T]hat was an interpretation of the definition of 'few,' based on the volume of the test pit. We anticipated that—the depth that the test pit went and the volume it created, which yielded what we said was less than 1 percent of the materials was cobbles.").

Plaintiff's expert, Roger Brown, supports Red Samm's interpretation. Brown stated, "in our opinion a reasonable interpretation of the test pit data indicating 'few' cobbles in TPs 1 and 5 would be considerably less than 5 percent and more on the order of 1 percent or less." Pl. App. 320.

Defendant presented extrinsic evidence as well. However, contrary to the mandates of the Federal Circuit, defendant attempted to use the mere existence of an industry standard to show ambiguity. *Hunt Constr*., 281 F.3d 1369. The introduction of a trade standard arose from the Contracting Officer's decision. In her decision, she stated that Wilson employed the ASTM, and thus the term "few" should be given a meaning in accordance with the ASTM standard, which is 5-10%. Pl. App. 284-88. In its papers submitted to this Court, defendant did not state whether Wilson actually employed the ASTM. The government did, however, argue that Mr. Wilson *believed* he was

---

[40] Tellingly, the government did not raise its ambiguity argument until it filed its motion for summary judgment. *See* Pl. App. 296. The protracted delay between the onset of the dispute and the raising of the patent ambiguity argument is evidence that the ambiguity is not patent. *See Record Steel & Constr., Inc. v. United States*, 62 Fed. Cl. 508, 517 (2004) (noting "[i]t appears from the record that the government did not explicitly raise its competing interpretation of the contract until the briefing of the pending dispositive motions. Previously, its actions in implementing the contract left uncertain the government's position on contractual interpretation.").

using the ASTM. Def. Resp. 12. Defense's extrinsic evidence does not support their understanding at the time of contract— rather, it attempts to create an ambiguity where one does not exist.

The Federal Circuit has specifically rejected the introduction of extrinsic evidence to create ambiguity. *Hunt Constr.*, 281 F.3d 1369. In *Hunt*, the plaintiff argued local trade practices established that public authorities routinely appoint contractors as their agent in order to secure tax exemptions. *Id.* at 1373. Relying on the local trade practice, Hunt did not include sales taxes as part of its bid even though the contract contained a provision "plainly instruct[ing] bidders that '[t]he contract price includes all applicable Federal, State, and local taxes and duties.'" *Id.* at 1372 (internal citations omitted). Hunt, citing the Federal Circuit's opinion in *Metric Constructors*, 169 F.3d 747, for the doctrine that "existence of a trade practice can render a contract ambiguous that is otherwise clear on its face," claimed that local trade practice created an ambiguity. *Id.* at 1372-73. The Federal Circuit rejected Hunt's argument stating:

> "Consideration of trade practice may be a useful interpretation aid where 'there is [a] term in the contract that has an accepted industry meaning different from its ordinary meaning' . . . . But Hunt does not claim that there is such a term of art included . . . here. Trade practice is therefore irrelevant in this case, and the contract's unambiguous terms govern."

*Id.* at 1373 (*quoting* Jowett, 234 F.3d at 1369).

Plaintiff argues that if the ASTM standard were employed, the Corps had an obligation to notify the bidders and to use it correctly. However, defendant does not actually argue that it employed the ASTM standard. Rather, defendant uses the mere existence of an industry standard to inject the appearance of ambiguity where there is none. There is limited support for finding the term "few" was used in accordance with the ASTM. Other than the notation "SM" (a symbol from the ASTM) in two of the test pits, *see* Def. App. 6-10, there were no indications that the test pit descriptions followed the ASTM standard. PPFUF ¶ 52(a). Further, the use of the ASTM standards to describe the site soil characteristics was not disclosed to Red Samm until the Contracting Officer issued her opinion. Pl. App. 296. Additionally, although Wilson used some of the terminology from the ASTM, he did not "precisely" follow all of the standards procedures. PPFUF ¶ 52. The ASTM standard cannot introduce an ambiguity into an otherwise unambiguous term. Accordingly, the Court finds the ASTM irrelevant for the purpose of interpreting the contract.[41]

Other extrinsic evidence supports the conclusion that the parties intended "few" to have its plain and ordinary meaning. The Corps' Detailed Project Report, not included in the contract documents, indicates the Corps interpreted the dredge area to consist of "easily dredgable material."

---

[41] Even by declining to find the term "few" was used in accordance with the ASTM, Red Samm can still support its misrepresentation or superior knowledge claims. The Court only concludes that it is inappropriate to interpret the term "few" in accordance with the ASTM. The Court, at this juncture, is not addressing plaintiff's allegations that the government's failure to disclose its possible use of the ASTM and the government's failure to correctly apply the standard constitute misrepresentation or failure to disclose superior knowledge. *See* Pl. Am. Compl. ¶¶ 7.5, 8.2.

PPFUF ¶ 41. Further, the Corps' own cost estimate described the material to be dredged as sand and also stated that dredging would most likely be performed through the use of a hydraulic system. *Id.* Alan Jefferies, the hydraulic design engineer for Corps, "interpreted the results of the Corps' geotechnical investigations at the project site to indicate 'that the material to be dredged is sand and gravel.'" PPFUF ¶ 43. The Corps' belief that the material to be dredged was suitable for hydraulic dredging is consistent with the term "few" meaning "not many" or 'incidental," as the Corps knew that the presence of "many" cobbles would prohibit the use of hydraulic dredging. DRPPFUF ¶ 37. The term "few" does not constitute "'an obvious omission, inconsistency, or discrepancy in significance,' or 'an obvious error in drafting, a gross discrepancy, or an inadvertent but glaring gap.'" *Tecom*, 66 Fed. Cl. at 748 (citations omitted). The extrinsic evidence in the instant situation reveals that the term "few" was intended to have its plain and ordinary meaning.

In addition to the term "few," the parties also diverged on the meaning of the terms in the Golder Report. Defendant claims that plaintiff's expert admitted that the Golder Report would have "raised a flag" as to the abundance of cobbles at the dredge site. DPFUF ¶ 19. However, defendant's assertion is premised on a confusion that occurred during Mr. Brown's (plaintiff's expert) deposition. *See* Def. App. 32-33. Defendant's counsel and Brown never reached a clear understanding about which report Brown was being questioned. Brown answered questions about the Wilson Report while defendant's counsel asked questions about the Golder Report. *See* Pl. App. 321. The fault for this confusion rests with defendant's counsel. Brown quoted language in his consulting report that is found in the Wilson Report. *Compare* Pl. App. 274 *and* Def. App. 54 ("The gravel soils containing cobbles and boulders should not present major problems provided the equipment used to dredge these materials is commensurate with those conditions.") Defendant's counsel then seized upon the word "some," which is found in both reports, to argue that if Red Samm had read the Golder Report, it would have been on notice. There is no logical basis for this argument. Pl. App. 321. Other than the mis-communication during Brown's deposition, no extrinsic evidence supports defendant's argument that the word "some" in the Golder Report should have placed plaintiff on notice of the cobbles at the dredge site.

After reviewing the potentially ambiguous terms of the contract with the help of extrinsic evidence, the Court is assured that its plain meaning interpretation of the contract is correct. To summarize, with regard to the contract indications, the Court finds: (1) a plain reading of the contract shows the Corps intended to express the conditions at the site; (2) the language of contract describes the presence of cobbles as "few" or "incidental;" (3) the exculpatory language of the Site Investigations clause does not relieve the government from responsibility for its contractual indications; and (4) an evaluation of extrinsic evidence confirms that the parties' understanding of the contract is consistent with the plain reading of the contract.

*2. Reasonableness of Plaintiff's Interpretation and Reliance*

Having thoroughly evaluated the contract and its representations, the court now turns to the second and third elements of plaintiff's differing site conditions claim—the reasonableness of the contractor in interpreting the contract and utilizing that information to make its bid. The *sine qua non* for prevailing upon a Type I differing site condition claim is reasonableness: The unexpected conditions must have been "*reasonably* unforeseeable based on all the information available to the contractor at the time of the bidding," and, the contractor must have "*reasonably* relied upon its

interpretation of the contract and contract-related documents;" *Comtrol Inc.*, 294 F.3d at1362 (emphasis added) (*citing H.B. Mac*, 153 F.3d at 1345). Since the reasonableness of plaintiff's contract interpretation and reliance are interrelated, the two elements are addressed together.

While "a contractor need not demonstrate that its interpretation of the contract is the *only* reasonable one, it does bear the burden of showing that its conclusion is at least a reasonable reading." *P.J. Maffei Bldg.*, 732 F.2d at 917 (emphasis in original); *see also Renda Marine, Inc. v. United States*, 66 Fed. Cl. 639, 652 (2005). A "contractor must show that it reasonably relied on the contract and contract related documents" and that the conditions were "reasonably unforeseeable based on all the information available to the contractor at the time of the bidding." *A.S. McGaughan Co. v. United States*, 24 Cl. Ct. 659, 665 (1991) (*quoting Stuyvesant Dredging Co. v. United States*, 834 F.2d 1576, 1581 (Fed. Cir. 1987)), *aff'd*, 980 F.2d 744 (Fed. Cir. 1992); *see also Comtrol Inc.*, 294 F.3d at 1362 (*citing H.B. Mac*, 153 F.3d at 1342).

Plaintiff demonstrated that it reasonably interpreted the contract indications. As previously noted in the *Contract Indications* section of this opinion, the plain language of the contract clearly implied cobble concentrations would be incidental. Red Samm did not misconstrue the contract representations in determining that it could therefore utilize hydraulic dredging. Defendant's challenge of the reasonableness of Red Samm's contract interpretations rested on the actual contract indications themselves. Having already decided that the contract indications were clear and unambiguous, the Court confirms Red Samm's contract interpretation was reasonable.

The parties disagree about whether the requirement of "reasonable reliance" must be pre-bid, or if course of performance reliance is sufficient. *Compare* Gov. Mot. Summ. J. 7-8 *with* Pl.'s Resp. 14-15. The Federal Circuit, in *Fruin-Colnon Corp. v. United States*, 912 F.2d 1426, 1430 (Fed. Cir. 1990) (*quoting Lear Siegler Mgmt. Servs. Corp. v. United States*, 867 F.2d 600, 603 (Fed. Cir. 1989)), held "that 'where a contractor seeks to recover based on his interpretation of an ambiguous contract, he must show he relied on this interpretation in submitting his bid.'" In *Sergent Mech. Sys., Inc. v. United States*, 34 Fed. Cl. 505, 522 n.24 (1995), a footnote stated that *Fruin-Colnon* required pre-bid reliance in situations only where a contract was ambiguous, and not in a Type I differing site condition claim. The Court disagrees with the finding in *Sergent*. As the Court noted earlier "the purpose of the changed conditions clause is thus to take at least some of the gamble on subsurface conditions out of bidding." *Foster*, 435 F.2d at 887. Thus, if a party does not show pre-bid reliance and only course of performance reliance, the purpose of the differing site condition clause would not be served. *C.f. A.S. McGaughan Co.*, 24 Cl. Ct. at 665 (*quoting Stuyvesant Dredging Co.*, 834 F.2d at 1581).

Regardless of whether or not course of performance reliance is sufficient, the Court finds that Red Samm did in fact rely on the contract's indications pre-bid. A subcontractor's reliance will be imputed to the prime contractor. *Foreschle Sons, Inc. v. United States*, 891 F.2d 270, 272 (Fed. Cir. 1989). Red Samm's bid incorporated a subcontractor's reliance on the contract's indications. In a declaration, Mr. Brannon, President of American, stated that "I reviewed the contract documents published by the US Army Corps of Engineers for the King Cove Harbor Improvements Project located in King Cove, Alaska. That review included the test pit logs and soil boring logs contained in Section 02222 of the specifications for the project. I then prepared an estimate for American to perform the dredging work on the project . . . ." Pl. App. 369.

The government argues that there is at least a genuine issue of material fact with regard to Red Samm's pre-bid reliance. Def. Resp. 17. To support its assertion, the government points to a statement by Mr. Heeter, Red Samm's project estimator, in which he stated that the nature of the material in the subsurface was "not a concern." Def. App. 69. In its papers, the government attempts to place Heeter's statements in the context of stating that the subsurface conditions were not a concern because its subcontractor was planning to use clamshell dredging. Def. Mot. Summ. J. 7. The Court however, recognizes the actual context in which Heeter made this statement. DPFUF ¶ 23. Heeter stated that the subsurface conditions were not a concern to him because he relied upon a subcontractor with respect to the subsurface conditions. *Id*. The government's twisting of Heeter's words does not raise a material issue of fact. It is a deceptive mis-characterization of facts. As noted above, a subcontractor's reliance is imputed to the prime contractor. Thus, if an issue is not a concern to the prime contractor because of its reliance upon a subcontractor, the prime is not barred from a raising a Type I differing site condition because of a lack of reasonable reliance; the subcontractor's reliance is sufficient.

Defendant also argues a lack of reliance by claiming that Red Samm performed its own tests and it was those tests, not the Corps' tests, upon which Red Samm relied. Def. Resp. 8-9. To support its argument, defendant states that in January 2000, Red Samm only sent its own data to DeGroot, the company from which Red Samm purchased its hydraulic dredger. DPFUF ¶ 26. However, no verifiable facts support defendant's assertion. What is certain is that Red Samm notified the Corps that it intended to use hydraulic dredging in October 1999, three months before it contacted DeGroot. Pl. App. 304. Therefore, the only evidence the government has to support its argument that Red Samm relied upon its own tests rather than the Corps' test is the fact that Red Samm performed the tests. That Red Samm performed additional tests beyond what the Corps provided, actually leads more to the conclusion that their reliance was reasonable. Since Red Samm's own tests confirmed the government's information and did not raise any red flags, its reliance on the contract indications was reasonable.

The instant case is similar to *Stuyvesant* but factual differences lead to an opposite result. *Stuyvesant*, 834 F.2d at 1576. Plaintiff in *Stuyvesant* was required to perform maintenance dredging and was to be paid "based upon the amount of material dredged." *Id*. at 1578. As in the instant case, the contract in *Stuyvesant* contained a provision entitled "Character of Materials." *Id.* However, in *Stuyvesant*, that section included the proviso: "Bidders are expected to examine the site of the work and the records of previous dredging, which are available . . . and after investigation decide for themselves the character of the materials." *Id.* at 1579. In a subsequent section, the contract in *Stuyvesant* also stated:

> The following table details the results of a nuclear density survey conducted in the project area on 4 April 1979. the [sic] in-place density readings presented represent the average value of the density readings taken within the range indicated. The averaged values should not be interpreted as indicating the maximum or minimum density of material which may be encountered.

*Id.* The *Stuyvesant* plaintiff did not visit the site to take its own readings of the dredge material's density and did not review the records of previous dredges. *Id.* The material density at the site ultimately proved to be more dense than the plaintiff expected. *Id*. The plaintiff asserted that it was

entitled to a differing site condition adjustment because the contract indicated the density of the materials to be dredged would have been easier to dredge than the density of the materials actually encountered. *Id.* at 1580. The court, quoting the trial court's rejection of the plaintiff's claim, stated, "'the six average density readings were identified to be guides only[,]' and did not 'reach the level of estimates and [were] clearly not facts upon which plaintiff could rely.'" *Id.* at 1581.

In the instant case, unlike *Stuyvesant*, the contract did not include any qualifying language. The contract section entitled "Character of Materials" did not include a provision requiring the contractor to "decide for themselves the character of the materials" to be encountered. Additionally, the contract did not include a warning like the one in *Stuyvesant*, which stated that the test pits "should not be interpreted as indicating the [type] of material which may be encountered." Rather, the contract here indicated the type of materials to be encountered and, as plaintiff's un-rebutted testimony explained, Red Samm reasonably relied upon these indications in preparing its bid. While Red Samm did conduct an investigation that revealed at least some cobbles and other stones, DPFUF ¶ 24, the government has recognized that "observations of cobbles on the surface of the tidal zone are not a reliable indicator of the extent of cobbles below the surface." PPFUF ¶ 56. Because a site investigation would not reveal the conditions of the subsurface, Red Samm was reasonable in relying upon the governments test pit and borehole data when preparing its bid. PPFUF ¶ 62.

Holding defendant responsible for the indications of the contract is consistent with the purpose of the differing site conditions clause included in the contract. By choosing to include a description of the subsurface site conditions without qualifying the indications as unreliable, the Corps assumed the risk of the conditions being different than those indicated. If the Corps is permitted to include unqualified indications of the subsurface conditions, and still not be held responsible if the conditions turn out to be different than those indications, the differing site condition clause would serve no purpose. This is especially true when a plaintiff provides un-rebutted expert testimony as to the reasonableness of its reliance on the contract documents.

To summarize, the Court believes Red Samm's contract interpretation and reliance were reasonable. As noted in the *Contract Indications* section, the plain language of the contract indicated that only incidental cobbles would exist at the dredge location. The Court finds nothing unreasonable about Red Samm interpreting that to mean they could utilize a hydraulic dredging system. Red Samm's reliance on the contract documents was reasonable as well. Given the facts that Red Samm's own site evaluations did not contradict the indications, and that the government itself relied on the contract indications, Red Samm's reliance was reasonable.

*3. Actual Encountered Site Conditions*.

The fourth element of a differing site condition claim is the requirement that the subsurface conditions actually encountered must differ materially from those depicted in the contract. *H.B. Mac*, 153 F.3d at 1345. Having already determined that the subsurface conditions are clearly indicated in the contract, the determination to be made here is whether the encountered conditions actually differed materially. To show that an encountered condition differed materially, the contractor must demonstrate the impact of the anticipated condition and the actual condition encountered. (*See* J. Cibinic, Jr. & R. Nash, Jr., ADMINISTRATION OF GOVERNMENT CONTRACTS 496-97 (2d ed. 2d prtg. 1986)). The encountered conditions must exist at the time of the contract.

*See John McShain Inc. v. United States*, 375 F.2d 829 (Ct. Cl. 1967); *see also Arundel Corp. v. United States*, 96 Ct. Cl. 77 (1942).

The contract indicated that there were only a "few" cobbles and boulders within the dredge area. The Court must determine whether there were more than a "few" cobbles and boulders. Neither party contends the site conditions changed during the course of the contract. However, the parties disagree as to the actual percentage of cobbles existing within the dredge area. PPFUF ¶ 93. Red Samm found cobble percentages ranging from 6.5% to 34.3%, while defendant found a range from 2.3% to 8.9%. *Id*. The Court does not need to resolve the discrepancy because under either party's findings, the conditions were materially different than the contract indications. In the instant situation, a material difference would exist if the percentage of existing cobbles is greater than the minimum percentage that would force a contractor to choose to not employ hydraulic dredging. Red Samm would not have attempted hydraulic dredging if it knew the cobble percentages were greater than five percent. Hr'g Tr. 98. No determination of the exact percentage of cobbles is necessary, because both the government and Red Samm's estimations of average cobble percentages is above the five percent cut-off point. PPFUF ¶ 93. Further, a description of "few" in the dredging context could not reasonably include conditions consisting of greater than five percent cobbles and boulders. Given the fact that the actual encountered cobble percentages were significantly greater than the plain language indication of the contract, the Court finds that the actual conditions encountered differed materially from those indicated in the contract documents.

*4. Extra Costs Attributable to the Differing Conditions*

Finally, in order to prevail on a differing site condition claim, plaintiff must show that excess costs were specifically attributable to the differing condition. *Comtrol Inc.*, 294 F.3d at 1362. Plaintiff's expert calculated the added costs deriving from the differing site condition as $2,459,228. PPFUF ¶ 82. The parties agree that the abundance of cobbles located at the site was the cause of Red Samm's delay. PPFUF ¶¶ 83-84. Despite this, the government offers an expert report as evidence that it believed a combination of hydraulic and clamshell dredging was appropriate. Pl. App. 290. The report, written after the work had been concluded, conflicts with the Corps' pre-bid understanding, which expressed a belief that the site was conducive for hydraulic dredging. PPFUF ¶¶ 41-42. The Court does not find the expert report sufficient to create an issue of material fact. Certainly, Red Samm's belief that it could employ hydraulic dredging was reasonable given the Corps' pre-bid assertions. And, with both parties agreeing that the encountered cobbles caused the delay, the only question to be determined is the actual cost difference.

Because the parties agree to the actual cause of the delay, the Court believes the extra costs were specifically attributable to the materially-differing conditions. However, calculation of the extra costs attributable to the differing conditions is an issue of material fact that cannot be decided by summary judgment. The government's expert stated: "Red Samm was inexperienced at dredging operations, as evidenced by their configurations and lack of industry standard record keeping. Their decision to use a hydraulic suction dredge in a non-industry standard configuration, and without experience necessary to effectively operate it, was a poor business decision." Def. Supp. App. 7. Plaintiff's expert disagreed with that assessment, and concluded that Red Samm operated the dredge in an appropriate and effective manner and the cause of the delay was exclusively the result of excess cobbles. Pl. App. 352-55. Unquestionably, the presence of more than a few cobbles and boulders

created delays and added costs. However, the extent of the damages caused by the greater-than-represented-cobbles as compared to the possible inexperience and poor decision making on the part of the Red Samm, can only be resolved by a further development of the facts and a weighing of the credibility of the witnesses. *See Fru-Con Constr. v. United States*, 43 Fed. Cl. 306, 318 (1999) (stating "defendant may avoid liability on [a Type I differing site condition] claim if it can demonstrate by a preponderance of the evidence that plaintiff performed inefficiently or unreasonably) (*citing* J. Cibinic, Jr. & R. Nash, Jr., ADMINISTRATION OF GOVERNMENT CONTRACTS 482-82 (2d ed. 2d prtg. 1986). Although the Court finds that plaintiff has met its burden of proof with regard to liability for its differing site condition claim, the Court has insufficient evidence to make a determination for appropriate damages. Such further determination must be made outside of summary judgment.

**C. Misrepresentation and Superior Knowledge**

Because the Court finds in favor of the plaintiff on its differing site condition claim, it need not address either its misrepresentation or superior knowledge claims. *See Dawco Constr., Inc. v. United States*, 18 Cl. Ct. 682, 696 (1991) *rev'd other grounds*, 930 F.2d 872 (Fed. Cir. 1991).

**D. Liquidated Damages and Other Damages**

Plaintiff also requests $218,460 for the unpaid balance of the contract that defendant withheld as Liquidated Damages. Pl. Am. Compl. ¶ 9.2 As with the calculation of the extra costs actually attributable to the differing site condition, the determination of the amount owed on the contract is a determination of fact inappropriate for summary judgment. As such, the Court will not calculate liquidated damages, instead deferring to a later hearing on this issue.

## IV. CONCLUSION

With regard to the differing site condition claim, the Court believes plaintiff has made a sufficient showing of each of the necessary elements. The contract makes clear representations regarding the site conditions, Red Samm's understanding and application of those indications were reasonable, the actual encountered site conditions differed materially from the representations, and any extra costs were attributable to the materially-differing conditions. For these reasons, defendant's motion for summary judgment, is **DENIED**, and plaintiff's cross-motion for summary judgment is **GRANTED** with respect to liability. Plaintiff's cross-motion for Equitable Adjustment is **DENIED**. The parties shall confer and discuss the possibility of settlement with respect to the appropriate calculation of damages, equitable adjustment and application of the liquidated damages clause in light of the Court's opinion. The parties shall file a Joint Status Report by **April 19, 2007**, updating the Court as to the parties' progress.

**IT IS SO ORDERED.**

s/ Lawrence J. Block

**Lawrence J. Block**
**Judge**